**Albert N. Kennedy**, OSB No. 82142
    Direct Dial:  (503) 802-2013
    Facsimile:    (503) 972-3713
    E-Mail:      al@tonkon.com
**Timothy J. Conway**, OSB No. 85175
    Direct Dial:  (503) 802-2027
    Facsimile:    (503) 972-3727
    E-Mail:      tim@tonkon.com
**Michael W. Fletcher**, OSB No. 01044
    Direct Dial:  (503) 802-2169
    Facsimile:    (503) 972-3869
    E-Mail:      michaelf@tonkon.com
**TONKON TORP** LLP
1600 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR  97204

Attorneys for Tort Claimants Committee

CLERK US BANKRUPTCY COURT
DISTRICT OF OREGON

'04  NOV 12  P 1 :14

LODGED_____REC'D___
PAID_____DOCKETED_____

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| ROMAN CATHOLIC ARCHBISHOP | ) | Case No. 04-37154-elp11 |
| OF PORTLAND IN OREGON, AND | ) | |
| SUCCESSORS, A CORPORATION | ) | |
| SOLE, dba the ARCHDIOCESE OF | ) | |
| PORTLAND IN OREGON, | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| TORT CLAIMANTS COMMITTEE, | ) | Adv. Proc. No. 04-03292-elp |
| | ) | |
| Plaintiff, | ) | **TORT CLAIMANT COMMITTEE'S** |
| | ) | **MEMORANDUM IN SUPPORT OF** |
| v. | ) | **MOTION FOR PARTIAL** |
| | ) | **SUMMARY JUDGMENT** |
| ROMAN CATHOLIC ARCHBISHOP | ) | |
| OF PORTLAND IN OREGON, AND | ) | |
| SUCCESSORS, A CORPORATION | ) | |
| SOLE, dba the ARCHDIOCESE OF | ) | |
| PORTLAND IN OREGON, | ) | |
| | ) | |
| Defendant. | ) | |

# **TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................1

II.   OVERVIEW OF THE FIRST AMENDMENT ...........................................................2

    A.    THE RELIGION CLAUSES ..........................................................................2

    B.    CASES INVOLVING JUDICIAL INQUIRY INTO RELIGIOUS
        INSTITUTIONS ..........................................................................................3

III.  THE COURT HAS SUBJECT MATTER JURISDICTION.  INDEED, THE
    RELIGION CLAUSES REQUIRE THE COURT TO DECIDE THESE
    PROPERTY OWNERSHIP ISSUES ............................................................................4

    A.    THE COURT HAS SUBJECT MATTER JURISDICTION..............................4

        1.    THE ECCLESIASTICAL ABSTENTION CASES ARE
             IRRELEVANT BECAUSE THE DISPUTE IS BETWEEN A
             RELIGIOUS INSTITUTION AND THIRD-PARTY
             CREDITORS ....................................................................................5

        2.    THERE IS NO DISPUTE OVER RELIGIOUS DOCTRINE...............6

        3.    EVEN THE ECCLESIASTICAL ABSTENTION CASES
             PROVIDE THAT COURTS MAY APPLY NEUTRAL
             PRINCIPLES OF LAW TO DECIDE INTRACHURCH
             DISPUTES THAT DO NOT HINGE ON RELIGIOUS
             DOCTRINE OR PRACTICE ................................................................7

    B.    ALLOWING DEBTOR TO UNILATERALLY DETERMINE WHAT
        CONSTITUTES ITS BANKRUPTCY ESTATE WOULD VIOLATE
        THE ESTABLISHMENT CLAUSE ..................................................................8

    C.    THE *LEMON V. KURTZMAN* STANDARD IS MET ...................................10

IV.   DEBTOR'S FIFTH AFFIRMATIVE DEFENSE IS WITHOUT MERIT TO
    THE EXTENT IT INVOKES THE FREE EXERCISE CLAUSE OF THE
    FIRST AMENDMENT AND THE RELIGIOUS FREEDOM
    RESTORATION ACT .............................................................................................11

    A.    THE FREE EXERCISE CLAUSE DOES NOT PRECLUDE
        APPLICATION OF NEUTRAL PRINCIPLES OF LAW TO THE
        REAL PROPERTY ISSUE............................................................................12

    B.    RFRA HAS NO BEARING ON THIS CASE..................................................14

V.    THE OREGON CONSTITUTION AND O.R.S. § 65.042 HAVE NO
    BEARING ON THIS CASE........................................................................................16

i

A.    DEBTOR'S STATE CONSTITUTIONAL ARGUMENTS FAIL FOR THE SAME REASONS ITS FIRST AMENDMENT ARGUMENTS ARE WITHOUT MERIT ...............................................................................17

B.    O.R.S. § 65.042 IS ALSO IRRELEVANT TO THE DISPOSITION OF THIS CASE ...............................................................................18

VI.   DEBTOR—AND NOT ITS PARISHES AND SCHOOLS—OWNS THE DISPUTED REAL PROPERTY ...............................................................................19

A.    TITLE TO THE DISPUTED REAL PROPERTY IS IN THE NAME OF THE DEBTOR...............................................................................20

B.    DEBTOR'S PARISHES AND SCHOOLS ARE PART OF, NOT SEPARATE FROM, DEBTOR ...............................................................................20

      1.    DEBTOR IS A UNITARY ENTITY THAT INCLUDES ITS PARISHES AND SCHOOLS...............................................................................21

      2.    OREGON COURTS HAVE CONSISTENTLY—AND REPEATEDLY—FOUND THAT THE PARISHES AND SCHOOLS ARE PART OF DEBTOR...............................................................................23

      3.    COURTS THROUGHOUT THE COUNTRY HAVE FOUND THAT UNINCORPORATED PARISHES AND SCHOOLS ARE PART OF A ROMAN CATHOLIC DIOCESE ...............................24

      4.    DEBTOR SHOULD BE JUDICIALLY ESTOPPED FROM CLAIMING THAT ITS PARISHES OR SCHOOLS ARE SEPARATE ENTITIES...............................................................................25

            a.    *Archdiocese of Portland v. Thorne* (1979) ...............................26

            b.    *Archdiocese of Portland & Diocese of Baker v. Employment Div. (Mattson)* (1991) ...............................27

            c.    *Central Catholic Educ. Ass'n v. Archdiocese of Portland* (1996)...............................................................................28

C.    DEBTOR CANNOT HOLD PROPERTY IN TRUST FOR ITSELF.............30

VII.  CONCLUSION...............................................................................30

ii

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1

## TABLE OF AUTHORITIES

2

Cases

3

*Akoury v. Roman Catholic Archbishop of Boston*
4     No. 04-3803-B (Mass. Sup. Ct. Sept. 14, 2004) .................................................. 25

5 *Albers v. Church of the Nazarene*
    698 F.2d 852 (7th Cir. 1983) ......................................................................... 23
6

*Allen v. Hendrick*
7     206 P. 733 (Or. 1922) .................................................................................. 30

8 *Ambassador College v. Geotzke*
    675 F.2d 662 (5th Cir. 1982) ......................................................................... 13
9

*Archdiocese of Portland & Diocese of Baker v. Employment Div.*
10     Nos. 86-T-0818-111 (Or. Employment Div. Oct. 16, 1990) ........................................ 27, 28

11 *Archdiocese of Portland in Oregon v. Raymond Thorne, Ass't Dir. for*
    *Employment*
12     No. 78-T-62 (Or. Employment Div. Jan. 22, 1979) ................................................ 26, 27

13 *Archdiocese v. County of Washington*
    458 P.2d 682 (Or. 1969) .............................................................................. 24
14

*Bell v. Presbyterian Church (U.S.A.)*
15     126 F.3d 328 (4th Cir. 1997) ......................................................................... 6

16 *Blackhawk v. Pennsylvania*
    381 F.3d 202 (3d Cir. 2004) .......................................................................... 12
17

*Board of Educ. of Kiryas Joel Village School Dist. v. Grumet*
18     512 U.S. 687 (1994) ................................................................................... 9

19 *Bryce v. Episcopal Church in the Diocese of Colorado*
    289 F.3d 648 (10th Cir. 2002) ....................................................................... 6, 8
20

*Burns & Russell Co. of Baltimore v. Oldcastle, Inc.*
21     166 F. Supp. 2d 432 (D. Md. 2001) ................................................................... 23

22 *Cantwell v. Connecticut*
    310 U.S. 296 (1940) ................................................................................... 3
23

*Central Catholic Educ. Ass'n v. Archdiocese of Portland*
24     916 P.2d 303 (Or. 1996) .............................................................................. 23, 28, 29

25 *Central Catholic Educ. Ass'n v. Archdiocese of Portland*
    No. PR-1-93 (Or. Employment Rel. Bd. Sept. 14, 1993), *aff'd* 891 P.2d 1318
26     (Or. App. 1995) ...................................................................................... 29

i

*Church of the Lukumi Babalu Aye v. City of Hialeah*
  508 U.S. 520 (1993) ............................................................................................ 3, 12

*City of Boerne v. Flores*
  521 U.S. 507 (1997) ....................................................................................... 3, 12, 14

*Dickerson v. United States*
  530 U.S. 428 (2000) ............................................................................................... 14

*Dolquist v. Heartland Presbytery*
  2004 WL 624962 (D. Kan. Mar. 9, 2004) ........................................................... 13

*Eberle v. Benedictine Sisters of Mt. Angel and Archdiocese of Portland in Oregon*
  385 P.2d 765 (Or. 1963) ....................................................................................... 24

*EEOC v. Electro-Term, Inc.*
  167 F.R.D. 344 (D. Mass. 1996) ........................................................................... 13

*EEOC v. Roman Catholic Diocese of Raleigh, N.C.*
  213 F.3d 795 (4th Cir. 2000) .................................................................................. 6

*EEOC v. St. Francis Xavier Parochial School*
  77 F. Supp. 2d 71 (D.D.C. 1999) .................................................................... 23, 25

*Employment Div. v. Archdiocese of Portland*
  600 P.2d 926 (Or. App. 1979) ......................................................................... 24, 27

*Employment Div. v. Smith*
  494 U.S. 872 (1990) ................................................................................. 3, 4, 12, 13

*Eugene Sand & Gravel v. City of Eugene*
  558 P.2d 338 (Or. 1976) ................................................................................... 17, 18

*Everson v. Bd. of Educ.*
  330 U.S. 1 (1947) .................................................................................................... 8

*F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago*
  754 F.2d 216 (7th Cir. 1985) ................................................................................ 24

*Fernhoff v. Tahoe Regional Planning Agency*
  803 F.2d 979 (9th Cir. 1986) ................................................................................ 22

*Gen. Council on Fin. and Admin. of the United Methodist Church v. Superior
  Court of California*
  439 U.S. 1355 (1978) .................................................................................... 4, 6, 11

*Guam v. Guerrero*
  290 F.3d 1210 (9th Cir. 2002) ......................................................................... 14, 15

*Hamilton v. State Farm Fire & Cas. Co.*
  270 F.3d 778 (9th Cir. 2001) ................................................................................ 29

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

*Helfand v. Gerson*
105 F.3d 530 (9th Cir. 1997) ........................................................................ 25

*Ho v. Presbyterian Church of Laurelhurst*
840 P.2d 1340 (Or. App. 1992) ..................................................................... 13

*In re Belcher*
287 B.R. 839 (Bankr. N.D. Ga. 2001) ........................................................... 13

*In re Canter*
299 F.3d 1150 (9th Cir. 2002) ...................................................................... 15

*In re Cardelucci*
285 F.3d 1231 (9th Cir. 2002) ...................................................................... 16

*In re Carmel of St. Joseph of Santa Ynez*
237 B.R. 155 (9th Cir. B.A.P. 1999) ............................................................. 13

*In re Contemporary Mission, Inc.*
44 B.R. 940 (Bankr. D. Conn. 1984) ............................................................. 14

*In re Sugar Indust. Antitrust Litig.*
579 F.2d 13 (3d Cir. 1978) ........................................................................... 22

*In re The Bible Speaks*
69 B.R. 643 (Bankr. D. Mass. 1987) ............................................................. 14

*Jones v. Wolf*
443 U.S. 595 (1979) ............................................................................... passim

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in No. Am.*
344 U.S. 94 (1952) ......................................................................................... 4

*La Voz Radio de la Communidad v. FCC*
223 F.3d 313 (6th Cir. 2000) ........................................................................ 14

*Lang v. Oregon Idaho Annual Conference of United Methodist Church*
21 P.3d 1116 (Or. App. 2001) ....................................................................... 13

*Larkin v. Grendel's Den, Inc.*
459 U.S. 116 (1982) ....................................................................................... 9

*Lemon v. Kurtzman*
403 U.S. 602 (1971) .................................................................................. 3, 10

*Locke v. Davey*
540 U.S. 712, 124 S. Ct. 1307 (2004) ........................................................... 12

*Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*
179 F.3d 1244 (9th Cir. 1999) ......................................................... 7, 8, 10, 23

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

*Malicki v. Doe*
  814 So. 2d 347 (Fla. 2002) ........................................................................... 6, 8

*McKelvey v. Pierce*
  800 A.2d 840 (N.J. 2002) ............................................................................... 6

*Meltebeke v. Bureau of Labor and Industries*
  852 P.2d 859 (Or. App. 1993) ...................................................................... 18

*Morse v. Paulson*
  186 P.2d 394 (Or. 1974) .............................................................................. 30

*New Hampshire v. Maine*
  532 U.S. 742 (2001) ..................................................................................... 26

*NLRB v. Bildisco & Bildisco*
  465 U.S. 513 (1984) ..................................................................................... 15

*Powell v. Bunn*
  59 P.3d 559 (Or. App. 2002) ........................................................................ 17

*Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem. Presbyterian*
  *Church*
  393 U.S. 440 (1969) .................................................................................. 3, 4, 5

*Rayburn v. Gen. Conf. of Seventh-Day Adventists*
  772 F.2d 1164 (4th Cir. 1985) ..................................................................... 6, 8

*Reynolds v. United States*
  98 U.S. 145 (1878) ................................................................................. 3, 4, 12

*Roman Catholic Archbishop of Diocese of Oregon v. Baker*
  15 P.2d 391 (Or. 1932) ................................................................................ 24

*San Jose Christian College v. City of Morgan Hill*
  360 F.3d 1024 (9th Cir. 2004) ..................................................................... 15

*School District of Abington Township, Pa. v. Schempp*
  374 U.S. 203 (1963) ....................................................................................... 3

*Serbian E. Orthodox Diocese for U.S. of Am. & Canada v. Milivojevich*
  426 U.S. 696 (1976) ............................................................................... passim

*Smith v. Employment Div.*
  721 P.2d 445 (Or. 1986) ............................................................................... 18

*Smith v. O'Connell*
  986 F. Supp. 73 (D.R.I. 1997) ........................................................................ 8

*Smith v. Raleigh Dist. of N.C. Conf. of United Methodist Church*
  63 F. Supp. 2d 694 (E.D.N.C. 1999) ........................................................... 6, 8

iv

*Trustees of the Presbytery of Willamette v. Hammer*
  385 P.2d 1013 (Or. 1963) ........................................................................ 13

*United States v. ITT Blackburn Co.*
  824 F.2d 628 (8th Cir. 1987) .................................................................. 22

*United States v. Lee*
  455 U.S. 252 (1982)................................................................................ 4

*Wagner v. Professional Engineers in California Govt.*
  354 F.3d 1036 (9th Cir. 2004) ................................................................ 25

*Watson v. Jones*
  80 U.S. 679 (1871)................................................................................. 5

*Western Beef, Inc. v. Compton Inv. Co.*
  611 F.2d 587 (5th Cir. 1980) .................................................................. 22

Statutes

42 U.S.C. § 2000bb ....................................................................... 14, 15, 16

O.R.S. § 65.042 .................................................................................... 18

O.R.S. § 65.067 ................................................................................ 13, 21

Religious Liberty and Charitable Donation Protection Act of 1998
  Pub. L. No. 105-183, 112 Stat. 517 ....................................................... 13

Other Authorities

*Restatement (Second) of Trusts* § 99(5) .................................................. 30

The Federalist No. 42 (James Madison) .................................................... 16

Constitutional Provisions

Or. Const. , art. 1, § 2.......................................................................... 17

Or. Const. , art. 1, § 3.......................................................................... 17

Or. Const. , art. 1, § 5.......................................................................... 17

U.S. Const. art. 1, § 8, cl. 4 .................................................................. 15

v

1 | **I.    INTRODUCTION**

2 |       The Roman Catholic Archbishop of Portland in Oregon, and Successors, a

3 | Corporation Sole, dba the Archdiocese of Portland in Oregon ("Debtor") voluntarily initiated

4 | this Chapter 11 case and thereby stayed numerous tort cases alleging very serious illegal

5 | misconduct. Debtor freely embraces the protections afforded to all debtors under the

6 | Bankruptcy Code—secular and religious alike. It seeks a bar date and discharge of an untold

7 | number of future claims by the victims of priest abuse.

8 |       At the same time, Debtor takes a decidedly more circumscribed view of its

9 | obligations toward its creditors. Cloaking itself in the First Amendment, Debtor asserts in its

10 | Third Affirmative Defense that the Court lacks subject matter jurisdiction to determine the

11 | assets of the bankruptcy estate and must simply accept its decision that the Disputed Real

12 | Property,[1] which comprises the vast majority of its real property, is held in trust for its

13 | parishes and schools.[2] Debtor's Fifth Affirmative Defense broadly invokes "religious

14 | freedom" and suggests that Oregon law and other nonbankruptcy law—perhaps the Religious

15 | Freedom Restoration Act, 42 U.S.C. § 2000bb *et. seq.* ("RFRA")—precludes the Court from

16 | identifying and marshaling the assets of this estate. Debtor's Sixth Affirmative Defense

17 | claims that it holds all of the Disputed Real Property at issue in this proceeding "for others."

18 | Answer ¶ 20.

19 |       Debtor's novel argument is flawed. To begin with, Debtor's affirmative

20 | defenses turn the First Amendment on its head. Instead of **preventing** the Court from

21 | adjudicating this dispute, the First Amendment actually **requires** the Court to determine

22 |

---

23 | [1] The "Disputed Real Property" is the real property identified in subsections I and II of
24 | Exhibit 14b of Debtor's Statement of Financial Affairs, as amended.

[2] Debtor's Third Affirmative Defense asserts Lack of Subject Matter Jurisdiction and is
25 | apparently based on the First Amendment arguments it has begun to articulate in earlier
filings with the Court. *See* Answer ¶ 17; Debtor's Mem. of 8/3/04 Regarding Currently
26 | Identified Major Issues at 5 (hereafter "Debtor's Mem. of 8/3/04").

**Page 1 of 30 -**   TORT CLAIMANT COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION
FOR PARTIAL SUMMARY JUDGMENT

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    ownership of the Disputed Real Property by applying the Bankruptcy Code and neutral state

2    law governing trusts and real property.  Debtor's religious character is of no relevance

3    whatsoever to determining ownership of the Disputed Real Property.  In fact, for the Court to

4    deny its jurisdiction—and thereby allow Debtor unilaterally to determine the extent of its

5    bankruptcy estate—would be to give it an unconstitutional preference based solely on its

6    status as a religious institution.  Second, RFRA has no bearing on this action because Debtor

7    cannot satisfy its basic elements and because the uses to which it apparently seeks to put the

8    statute would violate the First Amendment.  Third, Oregon constitutional and nonprofit

9    corporation law are irrelevant here.  Finally, Debtor's contention that its parishes and schools

10   have some interest in the Disputed Real Property is without merit.  The parishes and schools

11   have no separate existence under civil law and, therefore, can have no legal or beneficial

12   interest in the Disputed Real Property.

13           The Committee is accordingly entitled to the dismissal of Debtor's Third, Fifth

14   and Sixth Affirmative Defenses.  The Court has jurisdiction to determine the ownership of

15   the Disputed Real Property through the application of ordinary principles of bankruptcy,

16   property and trust law, which point to only one conclusion:  the Disputed Real Property

17   belongs to Debtor and is part of its bankruptcy estate.

18   **II.      OVERVIEW OF THE FIRST AMENDMENT**

19           The First Amendment states, in relevant part, that "Congress shall make no

20   law respecting an establishment of religion, or prohibiting the free exercise thereof."

21   U.S. Const. amend. I.   The Religion Clauses are typically referred to as the Establishment

22   Clause and the Free Exercise Clause.

23           **A.      THE RELIGION CLAUSES**

24           The Establishment Clause polices the boundary between church and state by

25   preventing the government from passing laws that "aid one religion, aid all religions, or

26   prefer one religion over another."  *School District of Abington Township, Pa. v. Schempp,*

**Page 2 of 30 -**   TORT CLAIMANT COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION
                   FOR PARTIAL SUMMARY JUDGMENT

374 U.S. 203, 216 (1963), *quoting Everson v. Bd. of Educ.*, 330 U.S. 1, 15 (1947). The Supreme Court has articulated a three-part test to determine whether a law complies with the Establishment Clause: "First, the [law] must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government[al] entanglement with religion." *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971) (internal citations omitted).

The Free Exercise Clause guarantees "first and foremost, the right to believe and profess whatever religious doctrine one desires." *Employment Div. v. Smith*, 494 U.S. 872, 877 (1990). The Supreme Court has long held that the Free Exercise Clause "embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." *Cantwell v. Connecticut*, 310 U.S. 296, 303-04 (1940); *Reynolds v. United States,* 98 U.S. 145, 166-67 (1878). Accordingly, generally applicable neutral laws are constitutional even if they incidentally burden the exercise of religion. *Smith*, 494 U.S. at 878; *see also City of Boerne v. Flores*, 521 U.S. 507, 535 (1997); *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531 (1993). The courts have no discretion; the rule of law applies to religious conduct.

### B. CASES INVOLVING JUDICIAL INQUIRY INTO RELIGIOUS INSTITUTIONS

The Supreme Court has held that the Religion Clauses forbid a court from exercising jurisdiction when an intrachurch dispute cannot be resolved without the court deciding a matter of "discipline, faith, internal organization, or ecclesiastical rule, custom or law." *Serbian E. Orthodox Diocese for U.S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 713 (1976). *See also Jones v. Wolf*, 443 U.S. 595, 604 (1979); *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem. Presbyterian Church*, 393 U.S. 440, 449 (1969); *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in No. Am.*, 344 U.S. 94,

**Page 3 of 30 -** TORT CLAIMANT COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1 | 120-21 (1952).

2 |       This principle implicates both the Free Exercise and Establishment Clauses.

3 | The "ecclesiastical abstention"[3] cases "are premised on a perceived danger that in resolving

4 | intrachurch disputes the state will become entangled in essentially religious controversies or

5 | intervene on behalf of groups espousing particular doctrinal beliefs." *Gen. Council on Fin.*

6 | *and Admin. of the United Methodist Church v. Superior Court of California*, 439 U.S. 1355,

7 | 1373 (1978); *see also Mary Elizabeth Blue Hull*, 393 U.S. at 449. They also uphold the basic

8 | First Amendment principle that religious institutions must have "power to decide for

9 | themselves, free from state interference, matters of church government as well as those of

10 | faith and doctrine." *Kedroff*, 344 U.S. at 116. *See also Serbian E. Orthodox Diocese*, 426

11 | U.S. at 724-25; *United States v. Lee*, 455 U.S. 252, 257 (1982).

12 |       Importantly, the ecclesiastical abstention cases do not stand for independence

13 | or autonomy from civil law. Instead, they state simply that government may not determine

14 | religious belief. *Smith*, 494 U.S. at 877; *Reynolds*, 98 U.S. at 166.

15 | **III.**    **THE COURT HAS SUBJECT MATTER JURISDICTION. INDEED, THE**
16 |         **RELIGION CLAUSES REQUIRE THE COURT TO DECIDE THESE**
        **PROPERTY OWNERSHIP ISSUES**

17 |       Nothing in this inquiry requires the Court to investigate or rule on religious

18 | beliefs. Rather, traditional principles of bankruptcy, real property and trust law control. If

19 | the Court declines to apply these neutral civil laws, it will have violated the Establishment

20 | Clause by granting Debtor an unprecedented privilege based solely on its status as a religious

21 | institution: the power to decide the extent of its bankruptcy estate.

22 |      **A.**     **THE COURT HAS SUBJECT MATTER JURISDICTION**

23 |       Debtor's status as a religious institution does not limit the Court's subject

24 |

---

25 | [3] "Ecclesiastical abstention" refers to the fundamental holding in these cases that courts must
abstain from exercising jurisdiction to resolve intrachurch disputes over the interpretation of
26 | religious doctrine or ecclesiastical law.

**Page 4 of 30 -**   TORT CLAIMANT COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION
           FOR PARTIAL SUMMARY JUDGMENT

1    matter jurisdiction.  The First Amendment prevents a court from deciding a case involving a

2    religious institution only when two criteria are met:  (1) the matter involves an intrachurch

3    dispute **and** (2) the outcome rests **solely** on a determination of religious doctrine or

4    ecclesiastical law.  Here the dispute is between a religious institution and third parties, and

5    there is no dispute over religious doctrine or ecclesiastical law.  Moreover, even the

6    "ecclesiastical abstention" cases provide that a court may decide an intrachurch dispute by

7    applying neutral principles of law.

8          **1.    THE ECCLESIASTICAL ABSTENTION CASES ARE
9                  IRRELEVANT BECAUSE THE DISPUTE IS BETWEEN A
                   RELIGIOUS INSTITUTION AND THIRD-PARTY
10                 CREDITORS**

11          The ecclesiastical abstention cases are irrelevant here because this adversary

12    proceeding is a dispute between Debtor and its creditors, and not between factions within a

13    church.[4]  As Justice Rehnquist explained almost 30 years ago, the ecclesiastical abstention

14    cases have no bearing in conflicts between religious institutions and third parties.  In *Gen.*

15    *Council on Fin. and Admin. of the United Methodist Church v. Superior Court*, the petitioner

16    was a defendant in a class action suit involving claims for breach of contract, fraud and

17    violations of state securities law.  Invoking the ecclesiastical abstention cases that Debtor

18    likely relies on here, the petitioner requested an interlocutory stay of the state court

19    proceedings while it sought a writ of certiorari from the Supreme Court.  Justice Rehnquist

20    denied the petition and explained that:

21               [t]here are constitutional limitations on the extent to which a
                 civil court may inquire into and determine matters of
22               ecclesiastical cognizance and polity in adjudicating intrachurch

23    _____

24    [4] In each of the Supreme Court's ecclesiastical abstention cases, the Court addressed a
      conflict between two factions of a church.  *See Jones*, 443 U.S. at 597; *Serbian E. Orthodox*
      *Diocese*, 426 U.S. at 696; *Mary Elizabeth Blue Hull*, 393 U.S. at 441; *Watson v. Jones*, 80
25    U.S. 679, 681 (1871).  We are aware of no reported case in which a United States court held
      that it did not have subject matter jurisdiction to adjudicate a dispute between a religious
26    organization and a third party solely because of the religious character of one of the parties.

**Page 5 of 30 -**    TORT CLAIMANT COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION
                      FOR PARTIAL SUMMARY JUDGMENT

1    disputes. See *Serbian Eastern Orthodox Diocese v.*
2    *Milivojevich.* But this Court never has suggested that those
     constraints similarly apply outside the context of such
3    intraorganization disputes. Thus, *Serbian Orthodox Diocese*
     and the other cases cited by applicant are not on point. Those
     cases are premised on a perceived danger that in resolving
4    intrachurch disputes the State will become entangled in
     essentially religious controversies or intervene on behalf of
5    groups espousing particular doctrinal beliefs. . . . **Such**
     **considerations are not applicable to purely secular disputes**
6    **between third parties and a particular defendant, albeit a**
     **religious affiliated organization . . . .**
7

8    *Gen. Council*, 439 U.S. at 1372-73 (emphasis added).

9         Justice Rehnquist's discussion of third-party harm focused on fraud and the

10   other causes of action in the case before him. Both state and federal courts have

11   subsequently confirmed that his reasoning applies with equal force to other disputes between

12   religious organizations and third parties. *See Bryce v. Episcopal Church in the Diocese of*

13   *Colorado*, 289 F.3d 648, 657 (10th Cir. 2002) (quoting *Bell*); *EEOC v. Roman Catholic*

14   *Diocese of Raleigh, N.C.*, 213 F.3d 795, 801 (4th Cir. 2000); *Bell v. Presbyterian Church*

15   *(U.S.A.)*, 126 F.3d 328, 331 (4th Cir. 1997) (quoting *Gen. Council*); *Rayburn v. Gen. Conf. of*

16   *Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985) ("[C]hurches are not—and

17   should not be—above the law. Like any other person or organization, they may be held

18   liable for their torts and upon their valid contracts."); *Smith v. Raleigh Dist. of N.C. Conf. of*

19   *United Methodist Church*, 63 F. Supp. 2d 694, 713 (E.D.N.C. 1999) (quoting *Gen. Council*);

20   *Malicki v. Doe*, 814 So. 2d 347, 351 n.2 & 357 (Fla. 2002) (quoting *Bell* and citing dozens of

21   federal and state sexual abuse cases); *McKelvey v. Pierce*, 800 A.2d 840, 851 (N.J. 2002)

22   (quoting *Rayburn and Bell*).

23         **2.    THERE IS NO DISPUTE OVER RELIGIOUS DOCTRINE**

24         The ecclesiastical abstention cases are also inapplicable here because there is

25   no doctrinal dispute.

26         There is no doctrinal conflict between Debtor and its parishes because they

**Page 6 of 30 -**  TORT CLAIMANT COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION
                    FOR PARTIAL SUMMARY JUDGMENT

1  apparently intend to advance the same interpretation of canon law.  Moreover, the Committee

2  expresses no view on the relationship between an archdiocese and parish under the internal

3  doctrine of the Roman Catholic Church.[5]

4        **3.      EVEN THE ECCLESIASTICAL ABSTENTION CASES**
                        **PROVIDE THAT COURTS MAY APPLY NEUTRAL**

5                          **PRINCIPLES OF LAW TO DECIDE INTRACHURCH**
                        **DISPUTES THAT DO NOT HINGE ON RELIGIOUS**

6                          **DOCTRINE OR PRACTICE**

7          The Court would have jurisdiction to determine the real property issue even if

8  the dispute were between two religious entities.  As the Supreme Court stressed in *Jones v.*

9  *Wolf*, the First Amendment does not require "the States to adopt a rule of compulsory

10  deference to religious authority in resolving church property disputes . . . where no issue of

11  doctrinal controversy is involved."  443 U.S. at 605.  Instead, the courts are "constitutionally

12  entitled to adopt neutral principles of law as a means of adjudicating a church property

13  dispute."  *Id.* at 604.  Such principles include "objective, well-established concepts of trust

14  and property law familiar to lawyers and judges," including the language of deeds, the terms

15  of church charters and the state statutes governing the holding of church property.  *Id.* at 603.

16  In dictum, the Court went on to explain how religious entities could avoid internal property

17  disputes in the first place—by following settled law.  *Id.* at 606.

18          Five years ago, the Ninth Circuit applied neutral principles to resolve a

19  religious dispute.  In *Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*, 179 F.3d

20  1244 (9th Cir. 1999), a Sufi religious order and its leader sued a breakaway organization and

21  its founders, who challenged the legitimacy of the leader's succession.  The district court

22  dismissed the case after concluding that it turned on doctrinal issues.  Although the Ninth

23  Circuit agreed that the district court could not declare whether the leader's succession was

24  _____

25  [5] The existence of a doctrinal dispute is a necessary but hardly sufficient condition for the
applicability of the ecclesiastical abstention doctrine.  A court can exercise jurisdiction even

26  in cases involving an intrachurch dispute so long as it can be resolved by the application of
neutral principles of civil law.  *See infra* at III.A.3.

**Page 7 of 30 -**   TORT CLAIMANT COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION
                 FOR PARTIAL SUMMARY JUDGMENT

1   legitimate, it held that the lower court could decide the plaintiffs' trademark, Lanham Act,

2   unfair competition, and tortious conversion of property claims by applying ordinary

3   principles of federal and state law. *Id.* at 1249-50.

4          Just as in *Maktab*, the Court here can apply "secular principles of property,

5   trust and corporate law . . .", *id.* at 1249, to determine the ownership of the Disputed Real

6   Property. It is not as though Debtor has organized its affairs without the benefit of the law.

7   It has formed a corporation sole and bought and sold property under existing law. The First

8   Amendment provides no excuse for now proceeding as though those actions never took

9   place, as if Debtor is somehow above the laws it has repeatedly relied upon in ordering its

10  affairs.

11         **B.    ALLOWING DEBTOR TO UNILATERALLY DETERMINE WHAT
               CONSTITUTES ITS BANKRUPTCY ESTATE WOULD VIOLATE
12             THE ESTABLISHMENT CLAUSE**

13         The Court must treat Debtor as it would any other party in bankruptcy by

14  applying secular principles of law to determine the ownership of the Disputed Real Property.

15  Not only do the ecclesiastical abstention cases authorize this approach, *see supra* at II.A.3,

16  but the alternative that Debtor has proposed would violate the Establishment Clause.

17         The Establishment Clause prevents the government from passing or enforcing

18  laws that "aid one religion, aid all religions, or prefer one religion over another." *Everson,*

19  330 U.S. at 15. Many courts have accordingly concluded that religious institutions are

20  subject to the tort law claims of third parties because exempting them from liability solely on

21  the basis of their religious status would place them in a privileged position. *Bryce*, 289 F.3d

22  at 657; *Rayburn*, 772 F.2d at 1171; *Smith v. Raleigh Dist.*, 63 F. Supp. 2d at 716 n.18; *Smith*

23  *v. O'Connell*, 986 F. Supp. 73, 80 (D.R.I. 1997); *Malicki*, 814 So. 2d at 351.

24         Here, allowing Debtor to unilaterally decide whether its bankruptcy estate

25  includes the Disputed Real Property would similarly violate the Establishment Clause by

26  * * *

**Page 8 of 30 -**   TORT CLAIMANT COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION
                FOR PARTIAL SUMMARY JUDGMENT

1   granting a privilege to an institution based solely on its religious status.[6] If a religious

2   institution can invoke the protections of the Bankruptcy Code and then compel the

3   bankruptcy court to defer to its unilateral decision on the extent of the estate, it will have

4   gained an advantage in its relations with creditors that goes far beyond any accommodation

5   of religion recognized under the First Amendment.

6          The Establishment Clause plainly forbids a court from giving what Justice

7   Rehnquist has termed "blind deference" to the dictates of a religious organization. As he

8   noted in his dissenting opinion[7] in *Serbian E. Orthodox Diocese*:

> To make available the coercive powers of civil courts to
> rubber-stamp ecclesiastical decisions of hierarchical religious
> associations, when such deference is not accorded similar acts
> of secular voluntary associations, would, in avoiding the free
> exercise problems petitioners envision, itself create far more
> serious problems under the Establishment Clause.

13   426 U.S. at 734.

14          Finally, Debtor can hardly complain that the Court's enforcement of neutral

15   principles will frustrate any Church doctrine concerning the relationship between an

16   archdiocese and its parishes. The application of neutral principles of law to a church

17   property dispute does not interfere with the free exercise of religion because it does not

---

[6] Allowing Debtor to define the extent of its bankruptcy estate would not only grant a privilege to religion; it would also usurp a core function of the Court. The Supreme Court has never addressed whether such deference to the unilateral determinations of a religious litigant is unconstitutional. However, it has held in the context of school administration and liquor store licensure that the Establishment Clause forbids delegation of the government's discretionary authority "to a group defined by its character as a religious community, in a legal and historical context that gives no assurance that governmental power has been or will be exercised neutrally." *Board of Educ. of Kiryas Joel Village School Dist. v. Grumet*, 512 U.S. 687, 696 (1994); *see also Larkin v. Grendel's Den, Inc.*, 459 U.S. 116 (1982).

[7] Three years after Justice Rehnquist authored his dissent in *Serbian E. Orthodox Diocese*, the Supreme Court adopted his analysis and held in *Jones v. Wolf* that courts may apply neutral principles of law to decide intrachurch property ownership disputes without violating the Religion Clauses. 433 U.S. at 604. The *Jones* Court also went one step further, by explaining how churches can make their property ownership intentions clear by following the prevailing law. *Id.* at 606.

**Page 9 of 30 -**   TORT CLAIMANT COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION
FOR PARTIAL SUMMARY JUDGMENT

1   foreordain the outcome of the case for or against the church.  A church—like any other actor

2   engaging in economic activity—has an obligation to ensure that its deeds and other legal

3   instruments conform with the requirements of the law.  As the Supreme Court stated in *Jones*

4   *v. Wolf*:

> At any time before the dispute erupts, the parties can ensure, if
> they so desire, that the faction loyal to the hierarchical church
> will retain the church property . . . [by] modify[ing] the deeds
> or the corporate charter [or by modifying] the constitution of
> the general church . . . to recite an express trust . . . . The
> burden involved in taking such steps will be minimal.  And the
> civil courts will be bound to give effect to the result indicated
> by the parties, provided it is embodied in some legally
> cognizable form.

10   443 U.S. at 606.

11          The Ninth Circuit relied on this principle in *Maktab*.  Noting that the religious

12   order had "adopted certain state and federal legal structures" by incorporating itself and

13   registering trademarks, the Court concluded that "it is incumbent upon the civil court now to

14   apply to those structures the secular law that governs them."  179 F.3d at 1250.

15          Here, if Debtor had wished to establish that it holds the Disputed Real

16   Property as trustee for the parishes, it could have taken the legal steps required to do so—by

17   incorporating the parishes and declaring legally cognizable trusts.  But Debtor instead titled

18   the Disputed Real Property in its own name and declined every opportunity to embody the

19   purported requirements of canon law in instruments that a civil court could enforce.  It is now

20   the Court's duty to exercise subject matter jurisdiction in this case and resolve the dispute by

21   enforcing the forms of property ownership that Debtor has, in fact, adopted.

22          **C.     THE *LEMON V. KURTZMAN* STANDARD IS MET**

23          The laws at issue here satisfy the standard articulated in *Lemon v. Kurtzman*,

24   403 U.S. at 612-13, and their enforcement will not violate the Establishment Clause.

25          First, the purposes of bankruptcy law and Oregon real property law are

26   incontrovertibly secular.

**Page 10 of 30 -**  TORT CLAIMANT COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION
FOR PARTIAL SUMMARY JUDGMENT

1    Second, applying bankruptcy and real property laws to determine the Disputed

2    Real Property's ownership will neither advance nor inhibit religion.  Holding religious

3    entities to the same bankruptcy or real property standards as any secular party merely puts

4    religious entities on an equal footing with all other debtors and real property owners.  While

5    Debtor may argue that finding the Disputed Real Property to be part of its bankruptcy estate

6    will inhibit its religious mission, the counter argument is equally true:  Failing to apply

7    generally applicable, neutral principles of bankruptcy and Oregon real property law to

8    religious debtors and property owners allows them a special benefit that materially advances

9    religion.

10    Third, the Court will not excessively entangle itself with a religious entity by

11    applying generally applicable, neutral principles of law to determine the Disputed Real

12    Property's ownership.  This case does not turn on, or even involve, ecclesiastical doctrine or

13    religious belief.  There is no danger that in resolving this dispute, the Court will, as Justice

14    Rehnquist warned, "become entangled in essentially religious controversies or intervene on

15    behalf of groups espousing particular doctrinal beliefs."  *Gen. Council*, 439 U.S. at 1372-73.

16    Whatever Debtor's beliefs may be, only its conduct is relevant to the legal questions posed in

17    this case.

18    **IV.    DEBTOR'S FIFTH AFFIRMATIVE DEFENSE IS WITHOUT MERIT TO
         THE EXTENT IT INVOKES THE FREE EXERCISE CLAUSE OF THE**
19    **FIRST AMENDMENT AND THE RELIGIOUS FREEDOM RESTORATION
         ACT**
20

21    Debtor's Fifth Affirmative Defense asserts that adjudication of the

22    Committee's complaint "could potentially entangle the Court in the interpretation of religious

23    law in violation of the First Amendment . . . and other applicable nonbankruptcy law."

24    Answer ¶ 19.  Debtor has not yet defined the scope of its First Amendment defense or

25    identified the "other applicable nonbankruptcy law" it plans to invoke in this action.  In other

26    contexts, however, Debtor has asserted that RFRA requires the Court to defer to its internal

**Page 11 of 30** -  TORT CLAIMANT COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION
         FOR PARTIAL SUMMARY JUDGMENT

**Tonkon Torp**LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1  ecclesiastical rules in deciding the real property issue and that something it terms the

2  "constitutional privilege of freedom of religion" shields it from answering creditors'

3  questions about its structure and finances.[8]  Debtor's Fifth Affirmative Defense is without

4  merit to the extent it embraces these claims, and the Committee is entitled to summary

5  judgment.

6       **A.**     **THE FREE EXERCISE CLAUSE DOES NOT PRECLUDE
   APPLICATION OF NEUTRAL PRINCIPLES OF LAW TO THE REAL
7  PROPERTY ISSUE**

8       The Free Exercise Clause of the First Amendment does not constrain the

9  Court's power to decide the real property issue by applying ordinary principles of civil law.

10  As the Supreme Court held in *Smith*, and repeatedly confirmed in subsequent decisions, it is

11  black letter law that a neutral law of general applicability binds all persons and institutions,

12  even if it incidentally burdens a particular religious practice.  *Smith*, 494 U.S. at 878-82; *see*

13  *also Locke v. Davey*, 540 U.S. 712, 124 S. Ct. 1307, 1312-13 (2004); *Lukumi*, 508 U.S. at

14  531; *City of Boerne*, 521 U.S. at 515; *Reynolds*, 98 U.S. at 166.  A law is "neutral" if it does

15  not target religiously motivated conduct on its face and is not based on animus or hostility

16  toward a religious entity or religion in general.  *Lukumi*, 508 U.S. at 532-33.  *See also Locke*,

17  124 S. Ct. at 1312; *Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004).  It is

18  "generally applicable" unless it "burdens a category of religiously motivated conduct but

19  exempts or does not reach a substantial category of conduct that is not religiously motivated

20  and that undermines the purposes of the law to at least the same degree as the covered

21  conduct that is religiously motivated." *Id.*

22       In the course of deciding the real property issue, the Court will apply the

23  Bankruptcy Code as well as Oregon real property and trust law.  As noted above, these laws

24  * * *

25

---

26  [8] *See* Debtor's Mem. of 8/3/04, at 5.

**Page 12 of 30 -** TORT CLAIMANT COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION
FOR PARTIAL SUMMARY JUDGMENT

are generally applicable and neutral within the meaning of *Smith*.[9]  *See In re Belcher*, 287

B.R. 839, 848 (Bankr. N.D. Ga. 2001) ("Bankruptcy law is facially neutral and applies to all

applicants for the benefits involved.").  The First Amendment not only permits but requires

the Court to enforce these generally applicable and neutral laws. *Smith*, 494 U.S. at 885.

Under *Smith*, moreover, the courts may not craft accommodations to neutral

and generally applicable laws.  Accommodation is the job of the legislature. *Id.* at 890.

Here, Congress and the Oregon legislature have already spoken by giving special

accommodation to religious persons and institutions. *See* Religious Liberty and Charitable

Donation Protection Act of 1998, Pub. L. No. 105-183, 112 Stat. 517 (amending several

sections of Bankruptcy Code to exclude certain religious contributions from consideration by

the bankruptcy courts for various purposes); O.R.S. § 65.067 (authorizing creation of a

religious "corporation sole" that lacks a board of directors and is "managed by a single

director who shall be the individual constituting the corporation").

Finally, the Free Exercise Clause will not limit whatever discovery may be

necessary in this case.  Contrary to Debtor's fanciful suggestion, there is no "constitutional

privilege of the freedom of religion" that shields a religious institution from discovery

concerning its organizational structure and finances in the course of litigation with a private

third party. *See Ambassador College v. Geotzke*, 675 F.2d 662, 662-65 (5th Cir. 1982);

*Dolquist v. Heartland Presbytery*, 2004 WL 624962, at *2 (D. Kan. Mar. 9, 2004); *EEOC v.*

*Electro-Term, Inc.*, 167 F.R.D. 344, 346-47 (D. Mass. 1996); *In re The Bible Speaks*, 69 B.R.

---

[9] Although the scale of this case is unique, it is hardly the first time that a religious institution
has filed for or been placed into bankruptcy. In resolving disputes with third parties that
have arisen in such cases, the courts have enforced the Code and generally applicable
principles of trust and property law. *See, e.g., In re Carmel of St. Joseph of Santa Ynez*, 237
B.R. 155 (9th Cir. B.A.P. 1999). Moreover, Oregon courts routinely apply basic principles
of trust and property law in disputes between religious institutions and third parties. *Trustees
of the Presbytery of Willamette v. Hammer*, 385 P.2d 1013 (Or. 1963) (real property and trust
dispute); *Lang v. Oregon Idaho Annual Conference of United Methodist Church*, 21 P.3d
1116 (Or. App. 2001) (land sale dispute); *Ho v. Presbyterian Church of Laurelhurst*, 840
P.2d 1340 (Or. App. 1992) (same).

**Page 13 of 30 -**   TORT CLAIMANT COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION
FOR PARTIAL SUMMARY JUDGMENT

643, 644-48 (Bankr. D. Mass. 1987); *In re Contemporary Mission, Inc.*, 44 B.R. 940, 942-43
(Bankr. D. Conn. 1984).

### B.    RFRA HAS NO BEARING ON THIS CASE

In defiance of *Smith* and in violation of the separation of powers, Congress
enacted RFRA in 1993 to impose strict scrutiny analysis on neutral, generally applicable laws
that incidentally burden religion. *See* 42 U.S.C. § 2000bb(a) (legislative findings); *City of
Boerne*, 521 U.S. at 513-515, 536 (summarizing RFRA's legislative history and concluding
that "RFRA contradicts vital principles necessary to maintain separation of powers").  The
Supreme Court decided in *City of Boerne* that RFRA exceeded Congress' enforcement
powers under Section Five of the Fourteenth Amendment, and declared it unconstitutional as
applied to state and local government. *Id.* at 536.  The Ninth Circuit has held that RFRA is
constitutional as applied to the federal government. *Guam v. Guerrero*, 290 F.3d 1210, 1221
(9th Cir. 2002).  However, other courts have voiced doubts on this issue, particularly in light
of the Supreme Court's decision in *Dickerson v. United States*, 530 U.S. 428, 437 (2000),
which reaffirmed that the separation of powers forbids Congress from statutorily superseding
the Supreme Court's constitutional decisions.[10] *La Voz Radio de la Communidad v. FCC*,
223 F.3d 313, 319 (6th Cir. 2000) (doubting constitutionality of RFRA and citing cases).

Debtor asserts that RFRA requires the Court to set aside neutral principles of
law and defer to its unilateral decision on the extent of its own bankruptcy estate.  Even if
RFRA is generally constitutional as applied to the federal government, Debtor's argument
runs roughshod over RFRA's basic statutory elements and would result in an as-applied
violation of the Establishment Clause.

A party invoking RFRA must first demonstrate that governmental action
substantially burdens its exercise of religion.  The government must then show that

---

[10] The Committee preserves without further argument the issue whether RFRA is
constitutional as applied to the federal government.

**Page 14 of 30** - TORT CLAIMANT COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION
FOR PARTIAL SUMMARY JUDGMENT

1  imposition of the burden is the least restrictive means of furthering a compelling

2  governmental interest. § 2000bb-1(a)-(b). The Ninth Circuit stated in *Guerrero* that state

3  action substantially burdens free exercise if it "put[s] substantial pressure on an adherent to

4  modify his behavior and to violate his beliefs," and it cautioned that a "substantial" burden

5  must be more than an inconvenience. 290 F.3d at 1222, *quoting Thomas v. Review Bd. of*

6  *Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981). More recently, the Ninth Circuit has

7  held there is no substantial burden on free exercise under the analogous Religious Land Use

8  and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc *et seq.*, unless governmental

9  action imposes a "significantly great restriction or onus" that "render[s] religious exercise

10  effectively impracticable." *San Jose Christian College v. City of Morgan Hill*, 360 F.3d

11  1024, 1034-35 (9th Cir. 2004).

12        The only state action in this case will be the Court's routine enforcement of

13  the Bankruptcy Code and Oregon law in resolving the real property issue. Debtor cannot

14  colorably maintain that the Court's application of these neutral principles would pressure it to

15  alter its religious practices or abandon its beliefs, much less prevent it from exercising those

16  beliefs. Indeed, Debtor has sought Chapter 11 protection so that it can continue to promote

17  its religious purposes after settling the sexual abuse cases Debtor believes financially threaten

18  its existence. Debtor's Mem. of 8/3/04, at 2; *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 527

19  (1984) (noting that debtor rehabilitation is a primary aim of Chapter 11).

20        Even if Debtor could show a substantial burden on free exercise, the

21  government has a compelling interest in the Court's routine administration of Debtor's case.

22  Uniformity and predictability are necessary in the bankruptcy context. From the

23  Constitution's authorization of "uniform Laws on the subject of Bankruptcies" to the more

24  recent standards governing the withdrawal of district court referrals under 28 U.S.C.

25  § 157(d), the bankruptcy system has required the consistent and predictable treatment of

26  debtors. U.S. Const. art. 1, § 8, cl. 4; *In re Canter*, 299 F.3d 1150, 1154 (9th Cir. 2002)

**Page 15 of 30 -** TORT CLAIMANT COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION
FOR PARTIAL SUMMARY JUDGMENT

1    (noting that "uniformity of bankruptcy administration" is a factor in determining whether

2    there is cause for district court to withdraw referral of case to bankruptcy court); *In re*

3    *Cardelucci*, 285 F.3d 1231, 1236 (9th Cir. 2002) (noting, in rejecting rational-basis

4    challenge, that "application of the federal interest rate to all claims is rationally related to the

5    legitimate interests in efficiency, fairness, predictability, and uniformity within the

6    bankruptcy system"); The Federalist No. 42 (James Madison) ("The power of establishing

7    uniform laws of bankruptcy is so intimately connected with the regulation of commerce . . .

8    that the expediency of it seems not likely to be drawn into question."). The least restrictive

9    means of advancing the uniform administration of the bankruptcy system—indeed, the only

10   means of advancing this interest—is for the Court to treat Debtor as it would any other

11   institution.

12          Most important of all, Debtor's construction of RFRA falls afoul of both the

13   Establishment Clause and the express provisions of the statute. If the Court allows Debtor to

14   define the extent of the bankruptcy estate, it will violate the Establishment Clause by

15   improperly promoting religion. *Supra* at II.B. Debtor cannot achieve through RFRA what

16   the First Amendment forbids, and RFRA itself disclaims such a result. The final provision of

17   RFRA states that "[n]othing in this chapter shall be construed to affect, interpret, or in any

18   way address that portion of the First Amendment prohibiting laws respecting the

19   establishment of religion. . . ." § 2000bb-4. In sum, the Court's inquiry under RFRA ends

20   when it finds, as it must, that the Religion Clauses require it to apply neutral principles of law

21   to the real property issue.

22   **V.    THE OREGON CONSTITUTION AND O.R.S. § 65.042 HAVE NO BEARING**

23   **       ON THIS CASE**

24          Debtor's Fifth Affirmative Defense asserts that adjudication of the

25   Committee's complaint could entangle the Court in the interpretation of religious law in

26   violation of O.R.S. § 65.042 and the Oregon Constitution's equivalent of the First

**Page 16 of 30** - TORT CLAIMANT COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION
FOR PARTIAL SUMMARY JUDGMENT

1    Amendment. Answer ¶ 19. Debtor's defenses assume that the Bankruptcy Code does not

2    preempt these state law provisions and that they compel a different analysis of the religion

3    issues addressed above. However, the Oregon Constitution and § 65.042 do not extend any

4    greater protection to Debtor—or impose any more constraints upon government—than the

5    First Amendment and RFRA. Thus, if the Court concludes that Debtor's First Amendment

6    and RFRA defenses are without merit, it can also dismiss the state law defenses without even

7    taking up the preemption issue.

8         **A.**      **DEBTOR'S STATE CONSTITUTIONAL ARGUMENTS FAIL FOR THE SAME REASONS ITS FIRST AMENDMENT ARGUMENTS ARE**

9                   **WITHOUT MERIT**

10         The Oregon Constitution addresses religion issues in three clauses that are

11    relevant here. Article 1, Section 2 provides that "[a]ll men shall be secure in the Natural

12    right, to worship Almighty God according to the dictates of their own consciences."

13    Article 1, Section 3 provides that "[n]o law shall in any case whatever control the free

14    exercise, and enjoyment of religeous [*sic*] opinions, or interfere with the rights of

15    conscience." Article 1, Section 5 provides that "[n]o money shall be drawn from the

16    Treasury for the benefit of any religeous [*sic*] or theological institution, nor shall any money

17    be appropriated for the payment of any religeous [*sic*] services in either house of the

18    Legislative Assembly." Sections 2 and 3 broadly track the Free Exercise Clause of the First

19    Amendment. Although the state constitution lacks an express establishment clause, the

20    Oregon Supreme Court has held that the above-quoted provisions collectively require

21    governmental neutrality toward religion. *Eugene Sand & Gravel v. City of Eugene*, 558 P.2d

22    338, 342 (Or. 1976); *see also Powell v. Bunn*, 59 P.3d 559, 575 (Or. App. 2002).

23         In the past two decades, Oregon courts have used the same analytical

24    frameworks that apply under the First Amendment and RFRA to resolve religion issues

25    arising under the state constitution. As to free exercise, the courts apply *Smith*-like principles

26    in some contexts and RFRA-like strict scrutiny in others. *Compare Smith v. Employment*

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1 | *Div.*, 721 P.2d 445, 448-49 (Or. 1986) (upholding denial of benefits "through the operation of

2 | a statute that is neutral both on its face and as applied"), *with Meltebeke v. Bureau of Labor*

3 | *and Industries*, 852 P.2d 859, 864-65 (Or. App. 1993) (holding that agency rule governing

4 | "religious discrimination" by employer was unconstitutional as applied because state could

5 | not show that an incidental burden on religion was "essential to accomplish an overriding

6 | governmental interest"). As to establishment issues, the Oregon Supreme Court has adopted

7 | the tripartite *Lemon v. Kurtzman* standard. *Eugene Sand & Gravel*, 558 P.2d at 342.

8 | In view of these symmetries, the Court need not predict how an Oregon court

9 | would analyze Debtor's affirmative defenses under the state constitution. Whatever standard

10 | the court applied would mirror *Smith, Lemon* or RFRA, and as the Committee has shown

11 | above, Debtor's defenses fail under all three federal analogues.

12 |
13 | **B.     O.R.S. § 65.042 IS ALSO IRRELEVANT TO THE DISPOSITION OF THIS CASE**

14 | O.R.S. § 65.042 is a provision of the Oregon Nonprofit Corporations Act (the

15 | "Act"). It states that:

16 |
17 | [i]f religious doctrine or practice governing the affairs of a religious corporation is inconsistent with the provisions of this chapter on the same subject, the religious doctrine or practice shall control to the extent required by the Constitution of the
18 | United States or the Constitution of this state, or both.

19 | No Oregon court has ever construed or applied § 65.042 in a published

20 | opinion. However, it is difficult to discern the statute's relevance because this adversary

21 | proceeding does not allege that Debtor has violated the Act. In any event, § 65.042 merely

22 | confirms that the Act does not displace the requirements of the state and federal

23 | constitutions, and for all the reasons provided above, neither the First Amendment nor its

24 | Oregon equivalents ultimately have any bearing on the Court's decision here.

25 | * * *

26 | * * *

**Page 18 of 30 -**  TORT CLAIMANT COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION
FOR PARTIAL SUMMARY JUDGMENT

## VI.   DEBTOR—AND NOT ITS PARISHES AND SCHOOLS—OWNS THE DISPUTED REAL PROPERTY

Debtor concedes, as it must, that it alone holds fee title to the Disputed Real Property. [11] Notwithstanding this admission, Debtor claims in its bankruptcy schedules that the Disputed Real Property is not part of the estate because it is held for the benefit of Debtor's parishes and schools. In this adversary proceeding, Debtor's Sixth Affirmative Defense similarly asserts that it "holds the Disputed Real Property for others," presumably its parishes and schools. Answer ¶ 20.

Debtor's position is factually unsupportable, and it conflicts with the basic principles of Oregon property and trust law that the Court must apply here. Debtor's representatives have acknowledged in these proceedings that Debtor governs the parishes and schools. In addition, Debtor has repeatedly admitted in other legal proceedings that the parishes and schools are part of its corporation sole, and it has derived significant advantages from the courts' recognition of its unitary corporate structure.

Because the uncontroverted record shows that Debtor's parishes and schools have no independent existence, they **cannot** have legal or beneficial interests in the Disputed Real Property. The Committee is therefore entitled to the dismissal of Debtor's Sixth Affirmative Defense and a declaration that the Disputed Properties are property of the bankruptcy estate, free of any interests of any school or parish. Moreover, in view of Debtor's frequent representations that the parishes and schools have no independent existence, the Court should judicially estop Debtor from now taking a contrary position.

* * *

* * *

---

[11] This motion for summary judgment only concerns the real property identified as being held for the benefit of Debtor's parishes and schools. Plaintiff is not seeking summary judgment at this time with respect to interests in personal property or interests in real estate claimed for entities other than Debtor's parishes and schools.

**Page 19 of 30** - TORT CLAIMANT COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

**A.    TITLE TO THE DISPUTED REAL PROPERTY IS IN THE NAME OF THE DEBTOR**

Schedule A lists 15 properties owned by Debtor.  In Exhibit 14b to its Statement of Financial Affairs, as amended, Debtor lists over 600 properties it claims to hold for "others."  Of these, Debtor claims to hold over 500 properties for its various churches and 11 for three different high schools.

The title records for the Disputed Real Property provide no support for Debtor's assertion that it holds these properties for the benefit of its parishes and schools. What the records do show is that Debtor holds fee title to each parcel, and the deeds to all of these properties are duly and properly recorded in the counties where the properties are located.  None of the deeds name anyone other than Debtor as record title holder.  No interest of any parish or school is identified on any deed to the Disputed Real Property.  Tort Claimants Committee's Concise Statement of Material Facts (hereafter "Concise Statement") ¶ 5.

The status of the legal title to the Disputed Real Property is clear.  Neither the parishes nor the schools have any recorded interest in the property.  Instead, Debtor owns the Disputed Real Property without any interest of any parish or school.

**B.    DEBTOR'S PARISHES AND SCHOOLS ARE PART OF, NOT SEPARATE FROM, DEBTOR**

This is not the first time that Debtor has litigated the nature of its relationship to its parishes and schools.  In numerous prior cases, Debtor has asserted that its parishes and schools are part of its corporation sole.  It has uniformly and consistently prevailed on that point and won important concessions from government in the spheres of taxation and employment.

Now that Debtor is faced with the bankruptcy consequences of its unitary corporate structure, it wants to take a different tack.  However, the uncontroverted record

**Page 20 of 30 -** TORT CLAIMANT COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1   shows that the parishes and schools are part of Debtor and that they have no independent

2   existence. The Court—like every other court that has previously addressed the question—

3   must find that Debtor, its schools, and parishes are one.

### 1.    DEBTOR IS A UNITARY ENTITY THAT INCLUDES ITS PARISHES AND SCHOOLS

6          Debtor is the governing body of the Roman Catholic Church for western

7   Oregon. Its head is Archbishop John Vlazny, and it has organized itself as a corporation sole

8   pursuant to O.R.S. § 65.067.[12] Archbishop Vlazny is Debtor's only corporate director. He is

9   responsible for Debtor's governance and has final say in all decisions. Concise Statement,

10   ¶¶ 10, 11.

11          Debtor has divided its territory into approximately 124 local parishes through

12   which it administers pastoral activities and operates schools. Debtor also directly operates

13   three secondary schools.[13] None of the local parishes or schools are separately incorporated.

14   Concise Statement ¶ 6. Archbishop Vlazny oversees the pastoral and administrative

15   activities of all parishes, and he is solely responsible for the placement, transfer and

16   supervision of priests. Concise Statement ¶¶ 12, 13. Archbishop Vlazny appoints a Director

---

18   [12] O.R.S. § 65.067(1) provides as follows:

> Any individual may, in conformity with the constitution, canons, rules, regulations and disciplines of any church or religious denomination, form a corporation hereunder to be a corporation sole. Such corporation shall be a form of religious corporation and will differ from other such corporations organized hereunder only in that it shall have no board of directors, need not have officers and shall be managed by a single director who shall be the individual constituting the corporation and its incorporator or the successor of the incorporator.

[13] Debtor's schedules identify three unincorporated schools for which it claims to hold real property: Central Catholic High School, Marist High School, and Regis High School. There are other Catholic secondary schools within the Archdiocese's boundaries, but they are separately incorporated and ownership of their property is not at issue.

**Page 21 of 30** - TORT CLAIMANT COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1   Financial Services for the Archdiocese, and he has signing authority on all of Debtor's

2   accounts, including parish checking accounts. Concise Statement ¶ 15.

3          Parishes are responsible for the day-to-day operation of schools. However,

4   Debtor and the Diocese of Baker have stipulated in other legal proceedings[14] that they

5   "operate elementary and secondary schools through **their** local parishes and religious

6   orders," that the schools "are a part of the Archdiocese and Diocese respectfully [*sic*]," and

7   that they "have no separate legal existence apart from that of [Debtor and Diocese of Baker]."

8   Concise Statement ¶ 22 (emphasis added). Archbishop Levada, who was Archbishop

9   Vlazny's predecessor, has testified that parishes are entities "within" Debtor, and, if a parish

10  has a school, "the school is under the principal; the principal is hired and fired by the pastor;

11  the pastor is appointed by me." Concise Statement ¶ 14.

12          Finally, Archbishop Vlazny can establish as well as suppress parishes, and he

13  has exercised his powers of suppression in this Archdiocese and elsewhere. As Bishop of the

14  Diocese of Winona, Minnesota, he suppressed parishes "a couple of times." Concise

15  Statement ¶ 17. Since his appointment in Oregon, the Archbishop has consolidated four

16  Portland parishes into one, and he has also suppressed a parish in Drain. Concise Statement

17  ¶ 16.

18          In civil law, a corporation may have many divisions, but those divisions have

19  no legally recognized identity. *See United States v. ITT Blackburn Co.*, 824 F.2d 628, 631

20  (8th Cir. 1987) ("[A]n unincorporated division cannot be sued or indicted, as it is not a legal

21  entity."); *Western Beef, Inc. v. Compton Inv. Co.*, 611 F.2d 587, 590 (5th Cir. 1980)

22  (explaining that an unincorporated division is "not a separate legal entity wholly apart from

23  its owner"); *In re Sugar Indust. Antitrust Litig.*, 579 F.2d 13, 18 (3d Cir. 1978).

24

25  [14] These stipulations of fact are non-hearsay under Fed. R. Evid. 801(d)(2), and the Court
    may consider them in ruling on this motion for summary judgment. *Fernhoff v. Tahoe*
26  *Regional Planning Agency*, 803 F.2d 979, 985 (9th Cir. 1986).

**Page 22 of 30** - TORT CLAIMANT COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION
FOR PARTIAL SUMMARY JUDGMENT

1  Unincorporated divisions have no separate assets; instead, all assets are owned by the

2  corporation or organization. *Albers v. Church of the Nazarene*, 698 F.2d 852, 857 (7th Cir.

3  1983); *see also Burns & Russell Co. of Baltimore v. Oldcastle, Inc.*, 166 F. Supp. 2d 432, 440

4  (D. Md. 2001); *EEOC v. St. Francis Xavier Parochial School*, 77 F. Supp. 2d 71, 76 (D.D.C.

5  1999).

6  The Ninth Circuit held in *Maktab* that when religious institutions adopt certain

7  legal structures, "it is incumbent upon the civil court . . . to apply to those structures the

8  secular law that governs them." 179 F.3d at 1250.  On the record before the Court, the

9  applicable law points to only one conclusion: Debtor owns the Disputed Real Property, and

10  it is part of Debtor's estate.  Debtor's parishes and schools have no legally recognized

11  identity.  Instead, they are merely unincorporated divisions of Debtor that cannot have a

12  separate interest in the Disputed Real Property.  If Debtor had wanted its parishes and

13  schools to be separate legal entities with legally cognizable property interests, it could have

14  incorporated them and titled the Disputed Real Property accordingly.  Indeed, there are

15  parishes elsewhere and even Catholic schools within the Archdiocese that are separately

16  incorporated.  Having failed to create its parishes and schools as distinct legal entities, Debtor

17  cannot now claim the bankruptcy advantages of separate incorporation.

18  **2.    OREGON COURTS HAVE CONSISTENTLY—AND
        REPEATEDLY—FOUND THAT THE PARISHES AND**
19  **SCHOOLS ARE PART OF DEBTOR**

20  Debtor has often litigated claims concerning parishes and schools.  In each

21  instance, the Oregon courts have resolved the case on the basis that Debtor, and not the

22  parish or school, is the owner of the property.  These cases demonstrate that, throughout its

23  history, Debtor has consistently claimed that its parishes and schools are subordinate parts of

24  its corporation sole with no legal identity of their own.  *See, e.g., Central Catholic Educ.*

25  *Ass'n v. Archdiocese of Portland*, 916 P.2d 303 (Or. 1996) (Central Catholic High School is

26  "owned and operated by Debtor"); *Archdiocese v. County of Washington*, 458 P.2d 682 (Or.

**Page 23 of 30 -**  TORT CLAIMANT COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION
FOR PARTIAL SUMMARY JUDGMENT

1    1969) (Debtor sought permit to build "its" proposed church and school); *Eberle v.*

2    *Benedictine Sisters of Mt. Angel and Archdiocese of Portland in Oregon*, 385 P.2d 765 (Or.

3    1963) (claim against Debtor as the "owner" of the St. Paul's School in Marion County);

4    *Roman Catholic Archbishop of Diocese of Oregon v. Baker,* 15 P.2d 391 (Or. 1932) (Debtor

5    acquired real property, erected a church and subsequently maintained it); *Employment Div. v.*

6    *Archdiocese of Portland*, 600 P.2d 926 (Or. App. 1979) (all of Debtor's primary and

7    secondary schools are subject to the direct control of Debtor and therefore exempt from

8    unemployment compensation taxes).

9        **3.    COURTS THROUGHOUT THE COUNTRY HAVE FOUND
            THAT UNINCORPORATED PARISHES AND SCHOOLS ARE
10          PART OF A ROMAN CATHOLIC DIOCESE**

11           Courts throughout the country have consistently concluded that

12    unincorporated Roman Catholic parishes and schools have no separate legal existence and

13    are instead part of their diocese or archdiocese.

14           The Seventh Circuit recognized that parishes have no separate existence in

15    *F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago*, 754 F.2d 216 (7th Cir. 1985).

16    F.E.L. sued the Catholic Bishop for tortious interference with F.E.L.'s business relationship

17    with certain parishes.  The Seventh Circuit dismissed this claim, holding that tortious

18    interference was legally impossible because the Catholic Bishop and its parishes are the same

19    entity.  *Id.* at 220.  The court further stated that:

20               As a "corporation sole," the Catholic Bishop owns all the real
                 and personal property in the Chicago Archdiocese.  The
21               parishes themselves have no individual capacity to sue or be
                 sued.  In short, the parishes within the Archdiocese are not
22               legal entities separate and independent from the Catholic
                 Bishop, but are subsumed under the Catholic Bishop.

23

24    *Id.* at 221.

25           In *EEOC v. St. Francis Xavier Parochial School*, the Equal Employment

26    Opportunity Commission ("EEOC") sued the school and church of St. Francis Xavier Parish

**Page 24 of 30 -** TORT CLAIMANT COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION
FOR PARTIAL SUMMARY JUDGMENT

1  within the Archdiocese of Washington.  The court concluded that, as unincorporated

2  divisions of the Archdiocese, the parish school and church lacked the legal capacity to sue or

3  be sued.  77 F. Supp. 2d at 74-80.  It reasoned that:

4          An incorporated religious organization constitutes a single
        legal entity, and that unincorporated divisions of that
5          organization lack any independently recognized legal status.
        Because the Archdiocese of Washington is incorporated as a
6          corporation sole and holds title to all Archdiocese assets, its
        unincorporated divisions also lack any independently
7          recognized status.

8  *Id.* at 79.

9          Most recently, members of St. Albert the Great Parish in the Archdiocese of

10  Boston sought to enjoin the Archbishop from selling parish assets and taking parish funds.

11  *Akoury v. Roman Catholic Archbishop of Boston*, No. 04-3803-B, mem. op. at 2 (Mass. Sup.

12  Ct. Sept. 14, 2004) (Affidavit of Albert N. Kennedy, Ex. 15).  The court denied the motion

13  after finding that the parish was merely an unincorporated subdivision of the Archdiocese

14  and that the parish priest held the assets as agent for the Archdiocese.  *Id.* at 5.

15          **4.    DEBTOR SHOULD BE JUDICIALLY ESTOPPED FROM
                CLAIMING THAT ITS PARISHES OR SCHOOLS ARE
16                SEPARATE ENTITIES**

17          Judicial estoppel is an equitable doctrine that precludes a party from

18  advantageously taking a position in one court proceeding and then taking an inconsistent

19  position in a later case.  *Wagner v. Professional Engineers in California Govt.*, 354 F.3d

20  1036, 1044 (9th Cir. 2004).  The doctrine is "intended to protect the integrity of the judicial

21  process by preventing a litigant from playing fast and loose with the courts."  *Id.* (internal

22  quotation omitted).  It applies whether the position "is an expression of intention, a statement

23  of fact, or a legal assertion."  *Helfand v. Gerson*, 105 F.3d 530, 535 (9th Cir. 1997).  The

24  United States Supreme Court has devised the following non-exhaustive list of factors that

25  courts may consider in determining whether to apply judicial estoppel:

26  * * *

**Page 25 of 30 -** TORT CLAIMANT COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION
FOR PARTIAL SUMMARY JUDGMENT

1     First, a party's later position must be "clearly inconsistent" with
      its earlier position. . . . Second, courts regularly inquire
2     whether the party has succeeded in persuading a court to accept
      that party's earlier position, so that judicial acceptance of an
3     inconsistent position in a later proceeding would create "the
      perception that either the first or second court was misled."
4     . . . . A third consideration is whether the party seeking to
      assert an inconsistent position would derive an unfair
5     advantage or impose an unfair detriment on the opposing party
      if not estopped.
6

7   *New Hampshire v. Maine*, 532 U.S. 742, 743 (2001).

8            In prior legal proceedings, Debtor contended that parishes and schools are part

9   of its corporation sole.  Courts accepted these assertions and granted Debtor significant

10  benefits.  Now that it finds itself in bankruptcy, however, Debtor claims that the parishes and

11  schools are separate entities with interests in the Disputed Real Property.  The Court should

12  estop Debtor from repudiating the factual claims and legal assertions it has repeatedly, and

13  successfully, advanced in other courts.  A few examples will suffice to show how Debtor is

14  attempting to play "fast and loose" with the Court.

15           **a.       *Archdiocese of Portland v. Thorne* (1979)**

16           In *Archdiocese of Portland in Oregon v. Raymond Thorne, Ass't Dir. for*

17  *Employment*, No. 78-T-62 (Or. Employment Div. Jan. 22, 1979) (Concise Statement ¶ 19),

18  Debtor asserted that parochial schools under the immediate supervision of parish pastors

19  were part of itself.  Debtor's memorandum of law made the following statements:

20           [T]he parochial schools operated by the Catholic church are an
             integral part of the church.
21

22           [T]he Archdiocese, through its local pastor, is also responsible
             for the employment of all parish personnel, including lay
23           teachers in the parish school.

24           [I]t is clear that the Archdiocese intends its parochial schools to
             be an integral part of the church itself, and effect must be given
25           to such an intent.

26           Said schools must be considered an integral part of the Catholic
             Church . . . .

**Page 26 of 30 -** TORT CLAIMANT COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION
                   FOR PARTIAL SUMMARY JUDGMENT

1    The parochial schools, not being separately incorporated, are
     clearly not legal entities separate from the church itself.
2
     Plaintiff also meets the requirement of control, in that the
3    parochial schools of the Archdiocese are operated, supervised,
     controlled or principally supported by The Catholic Church
4    represented by the Archdiocese here in Western Oregon.
     These schools are not separately incorporated and the Catholic
5    Church has legal control over them.  For the same reason that
     the schools must be seen as an integral part of the church, . . .
6    their schools must likewise be seen as controlled by the church.

7    *Id.* at 5-6.

8          The Referee adopted Debtor's position.  In his ruling, he found that it was

9    "beyond question" and "amply demonstrated in both word and deed for decades" that "the

10   Catholic church considers its denominational schools to be but a portion of itself."  *Id.* at 7.

11   He concluded that "the parochial schools are so intertwined within plaintiff's corporate

12   structure as to be an inseparable part thereof."  *Id.* at 8.

13         On appeal by the Employment Division, Debtor further refined the positions it

14   had taken before the Referee.  In a brief submitted to the Oregon Court of Appeals, Debtor

15   urged the court to find that there is a "distinction between church operated institutions which

16   are separately incorporated and those which are not."  Concise Statement ¶ 20.  The latter, it

17   argued, should be exempt from unemployment taxation because they are merely "one

18   organization within the legal entity of the corporate structure of the Portland Archdiocese"

19   and "subordinates of the Catholic Church."  *Id.*  Debtor again prevailed, with the Court of

20   Appeals finding that the schools "are subject to the direct legal control of the Archdiocese

21   and its parishes . . . ."  *Employment Div. v. Archdiocese of Portland*, 600 P.2d at 928.

22              **b.    *Archdiocese of Portland & Diocese of Baker v. Employment
                        Div. (Mattson)* (1991)**
23

24         Years later, Debtor repeatedly claimed in *Archdiocese of Portland & Diocese*

25   *of Baker v. Employment Div.*, Nos. 86-T-081; 86-T-111 (Or. Employment Div. Oct. 16,

26   1990) (hereafter "*Mattson*") (Concise Statement ¶ 22)  that it owns and controls its parishes

**Page 27 of 30 -** TORT CLAIMANT COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION
                    FOR PARTIAL SUMMARY JUDGMENT

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    and schools.[15]  At the administrative level, Debtor and the Diocese of Baker stipulated that

2    they "operate elementary and secondary schools through their local parishes and religious

3    orders" and that these schools "are a part of the Archdiocese and Diocese . . . ." *Id.*

4           On appeal to the Oregon Supreme Court, Debtor and the Diocese of Baker

5    asserted that a majority of the former's employees, and close to a majority of the latter's

6    employees, work in their schools.  They further claimed that "[t]hese elementary and

7    secondary schools are operated primarily for religious purposes and have no separate legal

8    existence apart from that of the [a]pplicants."  Concise Statement ¶ 24.  In their petition to the

9    United States Supreme Court for a writ of certiorari, Debtor and its co-appellant again

10   represented that they "collectively operate 63 elementary and secondary schools through their

11   local parishes and religious orders" and that the schools "have no separate legal existence

12   apart from that of the [p]etitioners."  *Id.*

13
               **c.**     ***Central Catholic Educ. Ass'n v. Archdiocese of Portland***
14                    **(1996)**

15           Debtor most recently claimed that a high school was part of its corporation

16   sole in *Central Catholic Educ. Ass'n v. Archdiocese of Portland*, 916 P.2d 303 (Or. 1996)

17   (hereafter "*Central Catholic*").  A union had petitioned for certification as the exclusive

18   bargaining representative for certain high school employees.  Debtor asserted that the

19

---

20   [15] Debtor did not prevail in *Mattson*.  However, it would be appropriate for the Court to
        consider Debtor's assertions in this litigation because it succeeded in persuading the Referee
21   that parochial school workers are employees of the Archdiocese.

22       Ironically, Debtor was so persuasive on this point that it undercut its own Establishment
        Clause argument.  Debtor claimed that it should be exempt from the unemployment
23   compensation system because an excessive entanglement with religion would result when the
        Employment Division became involved in the cases of employees discharged for doctrinal
24   reasons.  However, the Referee noted that Debtor "has approximately 120 people leave its
        employment each year," but only five separations in the previous three years were the result
25   of doctrinal violations.  The Referee concluded that "[t]he applicants have not established
        that a real problem has occurred in this area."  Concise Statement ¶ 22; Kennedy Aff. Ex. 8,
26   at 6.

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1   employees worked for the Archdiocese.  Debtor also contended that it was not an employer

2   subject to the jurisdiction of the Employment Relations Board because, viewing the totality

3   of financial activities, it was instead subject to the exclusive jurisdiction of the National

4   Labor Relations Board ("NLRB").

5           In its Brief on the Merits to the Oregon Supreme Court, Debtor stated that

6   "[t]he Archbishop is responsible for all of the pastoral and administrative affairs of each of

7   the parishes, schools and agencies within his geographic jurisdiction."  Concise Statement

8   ¶ 25.  It further claimed that the "Archbishop alone has final authority within the

9   Archdiocese, subject only to the Pope's ultimate authority," and that his powers include

10  "ultimate authority" over the Archdiocese's schools.  *Id.*  In view of the Archbishop's control

11  over schools and teachers, Debtor contended that the union would "interpose a third party in

12  the relationship between the Archbishop and his teachers."  *Id.*

13          Debtor prevailed on its claims.  The Employment Relations Board, the Oregon

14  Court of Appeals and the Oregon Supreme Court found that Debtor owned and operated the

15  high school, and they agreed that all of Debtor's activities should be considered in

16  determining whether it satisfied the financial criteria for NLRB jurisdiction.  See *Central*

17  *Catholic*, No. PR-1-93, mem. op. at 2-3, 9-10 (Or. Employment Rel. Bd. Sept. 14, 1993)

18  (Concise Statement ¶ 26), *aff'd,* 891 P.2d 1318, 1321 (Or. App. 1995), 916 P.2d at 310.

19          The above-quoted statements show that Debtor has repeatedly persuaded other

20  courts that its corporation sole embraces unincorporated parishes and schools.  Debtor's

21  belated abandonment of this position threatens the integrity of both the judicial process and

22  the bankruptcy system, which "depends on full and honest disclosure by debtors of all their

23  assets."  *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 785 (9th Cir. 2001); *see also*

24  *Helfand*, 105 F.3d at 535.  Debtor's conduct satisfies the criteria for judicial estoppel, and the

25  Court should invoke the doctrine to prevent Debtor from claiming that its parishes and

26  schools are separate entities that can somehow claim an interest in the Disputed Real

**Page 29 of 30** -  TORT CLAIMANT COMMITTEE'S MEMORANDUM IN SUPPORT OF MOTION
FOR PARTIAL SUMMARY JUDGMENT

1 | Property.

2 |     **C.**    **DEBTOR CANNOT HOLD PROPERTY IN TRUST FOR ITSELF**

3 |     Finally, Debtor's Sixth Affirmative Defense rests on a legal impossibility: the

4 | notion that Debtor can hold property in trust for itself. As Oregon courts have long

5 | recognized, a trust exists when "legal title is held by one person, the trustee, while another,

6 | the cestui que trust, has the beneficial interest." *Allen v. Hendrick*, 206 P. 733, 740 (Or.

7 | 1922). There can be no trust where the sole beneficial interest and the legal title are in the

8 | same person. *Morse v. Paulson*, 186 P.2d 394, 396 (Or. 1974); *see also Restatement*

9 | *(Second) of Trusts* § 99(5) ("The sole beneficiary of a trust cannot be the sole trustee of the

10 | trust."); *id.* at § 115(5) (same); *id.* at § 410 (same). Here, Debtor cannot hold property "in

11 | trust" for its parishes and schools because they are all one and the same.

12 | **VII.**    **CONCLUSION**

13 |     For the foregoing reasons, Debtor's Third, Fifth and Sixth Affirmative

14 | Defenses should be dismissed. The Court should declare that Debtor's parishes and schools

15 | have no legal or beneficial interest in the Disputed Real Property.

16 |     DATED this 12th day of November, 2004.

17 |     TONKON TORP LLP

18 |

19 |     By _____

20 |         ALBERT N. KENNEDY, OSB No. 82142
        Attorneys for Tort Claimants Committee

21 |     MARCI A. HAMILTON, *Pro Hac Vice*
    36 Timber Knoll Drive

22 |     Washington Crossing, PA 18977
    Telephone: (215) 493-1973

23 |

24 |     Special Counsel for Tort Claimants Committee

25 | 032545\00001\595348 V015

26 |

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440