L. Martin Nussbaum
Eric V. Hall
ROTHGERBER JOHNSON & LYONS LLP
90 South Cascade, Suite 1100
Colorado Springs, CO 80903
Telephone: 719-386-3000
Facsimile: 719-386-3070
E-Mail:    mnussbaum@rothgerber.com
           ehall@rothgerber.com
and

Howard M. Levine, OSB No. 80073
Thomas W. Stilley, OSB No. 88316
William N. Stiles, OSB No. 65123
SUSSMAN SHANK LLP
1000 SW Broadway, Suite 1400
Portland, OR 97205-3089
Telephone: (503) 227-1111
Facsimile: (503) 248-0130
E-Mail:    howard@sussmanshank.com
           tom@sussmanshank.com
           bills@sussmanshank.com

Attorneys for Debtor and Debtor-In-Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF OREGON

| | |
|---|---|
| In re | ) |
| | ) |
| ROMAN CATHOLIC ARCHBISHOP OF | ) Case No. 04-37154-elp11 |
| PORTLAND IN OREGON, and | ) |
| successors, a corporation sole, dba the | ) |
| ARCHDIOCESE OF PORTLAND IN | ) |
| OREGON, | ) |
| Debtor. | ) |
| | ) |
| ———————————————————— | ) Adv. Proc. No. 04-03292-elp |
| | ) |
| TORT CLAIMANTS COMMITTEE, | ) DEBTOR'S BRIEF IN RESPONSE TO |
| | ) TORT CLAIMANTS COMMITTEE'S |
| Plaintiff, | ) RESTATED SECOND MOTION FOR |
| v. | ) PARTIAL SUMMARY JUDGMENT |
| | ) AND SUPPORTING ITS CROSS |
| ROMAN CATHOLIC ARCHBISHOP OF | ) MOTION FOR PARTIAL SUMMARY |
| PORTLAND IN OREGON, and | ) JUDGMENT |
| successors, a corporation sole, dba the | ) |
| ARCHDIOCESE OF PORTLAND IN | ) |
| OREGON, ET AL. | ) |
| | ) |
| Defendants. | ) |
| ———————————————————— | |

TABLE OF CONTENTS

I.     STRUCTURE OF RESPONSE ...................................................................1
II.    SUMMARY OF ARGUMENT ....................................................................2
       A.     Introduction ................................................................................2
       B.     Oregon Corporation Law and the First Amendment Ensure That
              Religious Corporations Define Their Own Doctrine and Governance.3
       C.     The Debtor's Cross Motion ........................................................5
III.   THE COURT HAS SUBJECT MATTER JURISDICTION SUBJECT TO
       POTENTIAL CONSTITUTIONAL LIMITATIONS .................................6
IV.    OREGON RELIGIOUS CORPORATION LAW IMPORTS ECCLESIASTICAL
       LAW INTO CORPORATE GOVERNANCE .............................................7
       A.     Oregon's Original Corporation Sole Statute Requires the Importation
              of Religious Law Into the Governance of Ecclesiastical Corporations
              Sole ..............................................................................................7
       B.     Oregon's Modern Religious Corporation Law Also Requires that
              Church Law Govern Church Corporations .................................8
       C.     The Office of an Archbishop That Constitutes a Corporation Sole
              Cannot be Separated From Archbishop's Obligation to Conduct
              Archdiocesan Affairs in Accordance With Canon Law ........................9
V.     THE DEBTOR'S ARTICLES OF INCORPORATION IMPORT CANON LAW
       INTO THE CORPORATION'S GOVERNANCE LAW ...........................13
       A.     Under the 1983 Code of Canon Law, the Parishes and the
              Archdiocese Are Distinct Entities.........................................................15
       B.     Under Canon Law, and in Fact, the Parishes Conduct Their Temporal
              Affairs Distinct from the Archdiocese and as Ecclesial Entities .......17
VII.   THE PARISHES HAVE SUFFICIENT IDENTITY OR CIVIL STATUS TO BE
       BENEFICIARIES OF A TRUST....................................................................18
       A.     The Parishes Are Not Operating Divisions of the Debtor ..................18
       B.     The Parishes Can and Have Been Sued..........................................20
       C.     The Parishes Do Not Need to Be Civil Statutory Corporations in
              Order to Have Rights in Property ...........................................20
       D.     If Civil Status Is Required for Parishes to Be Beneficiaries of a Trust,
              the Court May Recognize Them as "Religious Organizations" Under
              the Oregon Charitable Trust and Corporation Act ...........................22
VIII.  FIRST AMENDMENT FOUNDATION ...............................................23
       A.     There Are Many Doctrinal Groupings Arising from First Amendment
              Religion Clause Cases.   The Doctrine of Church Autonomy Is Most
              Applicable to the Issues Here ...............................................23
       B.     Watson v. Jones: The Rule of Deference ...........................................25
       C.     Jones v. Wolf:  "Neutral Principles" Methodology.............................27
IX.    THE AUTHORITY OF CHURCHES TO DEFINE THEIR OWN POLITY IS NOT
       LIMITED BY A CLAIMANT'S THIRD PARTY STATUS OR BY INTRA-CHURCH
       CONTEXT.............................................................................................30
       A.     The Church Autonomy Doctrine Applies in Many Circumstances

Other Than Intra-Church Disputes ..................................................31

B.    Courts Have Applied the Church Autonomy Doctrine in Numerous "Third Party" Cases ....................................................32

C.    *Watson's* Protection of Church Doctrine and Polity Comes Not From a Plaintiff's Consent But from the Constitution .....................34

D.    The Spokane Order has Troubling Implications............................36

X.    THE TORT CLAIMANTS COMMITTEE HAS DISTORTED FIRST AMENDMENT DOCTRINE ................................................................................37

A.    The First Amendment Protects Actions and Beliefs........................38

B.    Federal Courts Have Unanimously Rejected the Argument That the 1990 Decision in *Employment Division v. Smith* Diminished Church Autonomy Jurisprudence..................................................39

C.    Ecclesiastical Abstention Law--Better Described as Church Autonomy Law--Restrains Courts from Hearing Cases Touching upon Ecclesiastical Subject Matters .................................................40

D.    The Doctrine of Church Autonomy Is Not Limited to Intra-Church Disputes Determining Religious Doctrine..............................40

E.    *General Council* Does Not Create a "Third Party" Exception to the Doctrine of Church Autonomy ...................................................42

F.    First Amendment Protection Does Not Require a Dispute Between the Parishes and the Archdiocese............................................43

G.    Permitting a Church to Define Its Own Polity Does Not Violate the Establishment Clause..............................................................43

H.    The TCC's Invocation of *Lemon v. Kurtzman* Is Misplaced..............45

I.    *Jones v. Wolf* Does Not Mandate Express Trust Language in Deeds ................................................................................45

J.    The Religious Freedom Restoration Act Prevents the Court from Applying the Bankruptcy Code to Remake the Polity of Catholic Institutions...............................................................45

K.    Section 65.042 of the Oregon Non-Profit Corporation Act Follows the *Watson* Rule of Deference.................................................48

XI.    THE DEBTOR IS NOT JUDICIALLY ESTOPPEDFROM ARGUING THAT PARISHES ARE SEPARATE ENTITIES WITH THEIR OWN PROPERTY ADMINISTERED BY THEIR  RESPECTIVE PASTORS ....................................49

A.    The Court's Jurisdiction May Not  Be Expanded by Estoppel ..........49

B.    The Requisites for Judicial Estoppel Are Not Present......................50

C.    The TCC's Cases Do Not Support Its Argument for Judicial Estoppel ................................................................................51

XII.    CONCLUSION...............................................................................54

1

# TABLE OF AUTHORITIES

**Cases**

Burgess v. Rock Creek Baptist Church, 734 F.Supp. 30, 32 (D. D.C. 1990) ............... 40

Fredenburg v. Contra Costa County Department of Health Services, 172 F.3d 1176,
    1178-1179 (9th Cir. 1999) .......................................................... 50

11 U.S.C. § 548(a)(2)) .................................................................. 47

433 U.S. at 604 ......................................................................... 27

443 U.S. at 604 ......................................................................... 28

Albers v. Church of the Nazarene, 698 F.2d 852, 857 (7th Cir. 1983) .................. 18

Albers, 698 F.2d at 857 ................................................................. 19

American Fire and Cas. Co., 341 U.S. 6, 17-18 (1951) ................................... 50

Archdiocese of Portland & Diocese of Baker v. Employment Div. Nos. 86-T-081
    and 86-T-111, aff'd ................................................................ 51

Archdiocese of Portland in Oregon v. Employ. Div., 814 P.2d 566 (Or. Ct. App. 1991),
    rev. den., 822 P.2d 1194 (Or. 1991), cert. den., 506 U.S. 815 (1992) ............ 51

Archdiocese of Portland v. County of Washington, 458 P.2d 682 (Or. 1969) ............ 51

Arver v. U.S., 245 U.S. 366, 290 (1918) ................................................ 44

Baker, 15 P.2d at 613-614 .............................................................. 52

Bd. of Educ. of Kiryas Joel v. Grumet, 512 U.S. 687 (1994) ........................... 44

Brown v. Webb, 120 P. 387, 389 (Or. 1912) ............................................. 20

Bryce v. Episcopal Church in the Diocese of Colo, 289 F.3d 648 (10th Cir. 2002)..33, 35

Bryce, 289 F.3d at 656 (10th Cir. 2002) ................................................ 39

Bryce, 289 F.3d at 658 ................................................................. 36

Cantwell v. Connecticut, 310 U.S. 296 (1940) .......................................... 38

Carnes v. Smith, 222 S.E.2d 322 (Ga. 1976) ........................................28, 45

Carnes, 222 S.E. 2d at 324 ............................................................. 28

Catholic Bishop of Chicago, 440 U.S. 490 (1979) ....................................... 41

Catholic Bishop of Chicago, 440 U.S. at 502 ........................................... 33

Catholic University, 83 F.3d 455, 461-63 (D.C. Cir. 1996) ............................. 39

Catholic University, 83 F.3d at 461 ................................................... 40

Central Catholic Edu. Ass'n v. Archdiocese of Portland, 916 P.3d 303 (Or. 1996) ...... 51

Christians I, 82 F.3d at 1418-19 ....................................................... 47

Christians I, 82 F.3d at 1419 .......................................................... 47

Christians I, 82 F.3d at 142 ........................................................... 48

Christians v. Crystal Evangelical Free Church, 141 F.3d 854, 856 (8th Cir. 1998)....... 47

Christians v. Crystal Evangelical Free Church, 141 F.3d 854, 859 (8th Cir. 1998)....... 46

Church of the Lukumi Babalu Aye v. City of Hialeah, 508 U.S. 520, 543 (1993) .......... 23

Cimijotti v. Paulsen, 230 F.Supp. 39, 41 (N.D. Iowa, 1964) ............................ 32

City of Boerne v. Flores, 521 U.S. 507 (1997) ......................................46, 47

Combs v. Central Texas Annual Conf. of the United Methodist Church,
    173 F.3d 343, 347-51 (5th Cir. 1999) ............................................. 39

Combs, 173 F.3d at 348 (5th Cir. 1999) ................................................ 40

Committee of Tort Litigants v. Catholic Bishop of Spokane, 2005 WL 2108895,
    (Bankr. E.D.Wash. 2005) ........................................................... 10

iii

Committee of Tort Litigants v. Catholic Bishop of Spokane, at *11.................................50
Committee of Tort Litigants v. Catholic Diocese of Spokane at *13.................................36
Committee of Tort Litigants v. Catholic Diocese of Spokane at *13-14 .........................34
Committee of Tort Litigants v. Catholic Diocese of Spokane at *15..............................37
Committee of Tort Litigants v. Catholic Diocese of Spokane, at *13-16 ........................32
Committee of Tort Litigants v. Catholic Diocese of Spokane, at 27, 29 ..........................30
Corp. of the Presiding Bishop v. Amos, 483 U.S. 327, 334 (1987) ...............................44
Crowder v. Southern Baptist Convention, 637 F.Supp. 478, 480 (N.D. Ga. 1986) ........40
Cutter v. Wilkinson, 125 S.Ct. 2113 (2005)....................................................................44
Dickerson v. United States, 530 U.S. 428 (2000)) ...........................................................46
E.E.O.C. v. Catholic University of America, 83 F.3d 455, 466 (D.C. Cir. 1996).............39
Eberle v. Benedictine Sisters of Mt. Angel, 385 P.2d 765 (Or. 1963) ............................51
EEOC v. Roman Catholic Diocese of Raleigh, 213 F.3d 795, 800 n.1 (4th Cir. 2000) ..39
EEOC v. Southwestern Baptist Theological Sem, 651 F.2d 277, 284 (5th Cir. 1981) ...33
Ehrens v. The Lutheran Church-Missouri Synod, 269 F.Supp.2d 328 (S.D.N.Y. 2003) 32
Employment Div. v. Archdiocese of Portland, 600 P.2d 926 (Or. App. 1979) aka
    Archdiocese of Portland in Oregon v. Raymond Thorne, Ass't Dir. for Employment,
    No. 78-T-62 .............................................................................................................51
Employment Div. v. Smith, 494 U.S. 872 (1990) ............................................................39
Employment Div., Dept. of Human Resources of Oregon v. Smith, 494 U.S. 872,
    884 (1990) ...........................................................................................................23, 24
Employment Div., Dept. of Human Resources of Oregon v. Smith, 494 U.S.
    872 (1990) ...............................................................................................................23
Equal Employment Opportunity Commission v. St. Francis Xavier Parochial School,
    77 F Supp 2d 71 (D DC 1999) ................................................................................19
F.E.I. Publications, Ltd. v Catholic Bishop of Chicago, 754 F2d 216 (7th Cir. 1985) ......19
Gellington v. Christian Methodist Episcopal Church, Inc., 203 F.3d 1299, 1301-04
    (11th Cir. 2000)........................................................................................................39
General Council on Fin. & Admin. of the United Methodist Church v. California
    Super. Ct. 439 U.S. 1355 (1978)..............................................................................42
General Council, 439 U.S. at 1369 ..................................................................................42
Gonzalez v. Roman Catholic Archbishop of Manila, 280 U.S. 1 (1929).........................31
Guam v. Guerrero, 290 F.3d 1210, 1211, 1218-21 (9th Cir. 2002)................................46
Hamilton v. State Farm Fire & Casualty Co., 270 F.3d 778, 785 (9th Cir. 2001) ...........51
Hiles v. Episcopal Diocese of Massachusetts, 773 N.E.2d 929 (Mass. 2002)...............32
Houston v. Mile High Adventist Academy, 846 F.Supp. 1449 (D. Colo. 1994) ..............40
Hutchinson v. Thomas, 789 F.2d 392, 395-96 (6th Cir. 1986)........................................32
Hutchison v. Thomas, 789 F.2d 392, 396 (6th Cir. 1986) ...............................................39
In Gonzalez, 280 U.S. 1 (1929) .......................................................................................33
In re Coastal Plains, 179 F.3d 197, 208 (5th Cir. 1999))................................................51
Insurance Corp. of Ireland, Ltd. v. Compaigtnie des Bauixitees de Guinee,
    456 U.S. 694, 702 (1982) ........................................................................................50
Johnson v. Oregon, 141 F.3d 1361, 1370 (9th Cir. 1998) ..............................................51
Jones v. Wolf, 243 S.E.2d 860 (Ga. 1978) .....................................................................27
Jones v. Wolf, 443 U.S. 595 (1979) .................................................................................27

Jones v. Wolf, 443 U.S. at 602-03 ................................................................28

Jones v. Wolf, 443 U.S. at 602-05, 609 n.8 ...............................................43

Jones v. Wolf, 443 U.S. at 606 ....................................................................45

Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in North
   America, 344 U.S. 94, 116 (1952) .............................................................12

Kedroff v. St. Nicholas Cathedral, 344 U.S. 94 (1952) ..............................39

Kedroff, 344 U.S. 93 (1952) ..........................................................................12

Kedroff, 344 U.S. 94 (1952) ..........................................................................31

Kedroff, 344 U.S. at 116 ..........................................................................34, 35

Kedroff, 344 U.S. at 122 ................................................................................24

Klagsbrun v. Va'Ad Harabonim of Greater Monsey, 53 F.Supp.2d 732
   (D.N.J. 1999) ..............................................................................................41

Kreshik, 363 U.S. at 190 ..........................................................................24, 35

La Voz Radio de la Communidad v. FCC, 223 F.3d 313 (6th Cir. 2000) ......46

Lemon v. Kurtzman, 403 U.S. 602 (1971) ...................................................45

Lewis v. Seventh-day Adventists Lake Region Conference, 978 F.2d 940,
   942-43 (6th Cir. 1992 .................................................................................41

Lewis v. Seventh-day Adventists Lake Region Conference, 978 F.2d 940, 942-43
   (6th Cir. 1992) ............................................................................................41

Mabus v. St. James Episcopal Church, 884 So.2d 747, 764 (Miss. 2004) ..........32

Mabus, 884 So.2d at (Miss. 2004) ..............................................................32

Magic Valley Evangelical Free Church v. Fitzgerald, 220 B.R. 386, 391
   (D. Idaho 1998) ..........................................................................................47

Magic Valley Evangelical Free Church, 220 B.R. at 391 ...........................47

Magic Valley Evangelical Free Church, 220 B.R. at 392 ...........................48

Magic Valley Evangelical Free Church, 220 B.R. at 392. ..........................48

Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar, 179 F.3d 1244
   (9th Cir. 1999) ............................................................................................44

Mannix v. Purcell, 19 N.E. 572, 582 (Ohio 1888)........................................29

Maryland and Virginia Eldership of the Churches of God v. Church of God at
   Sharpsburg, Inc., 396 U.S. 367 (1970) ....................................................28

McClure v. The Salvation Army, 460 F.2d 553 (5th Cir. 1972) ...................32

McClure, 460 F.2d 553 (5th Cir. 1972) ........................................................41

Miller v. Reed, 176 F.3d 1202 (9th Cir.1999)...............................................24

Miller v. Reed, 176 F.3d 1202, 1207-1208 (9th Cir. 1999)..........................24

Mockaitis v. Harcleroad, 104 F.3d 1522, 1530 (9th Cir. 1997)...................46

Municipality of Ponce v. Roman Catholic Apostolic Church in Porto Rico,
   210 U.S. 737, 744 (1908) ..........................................................................22

New Hampshire v. Maine 532 U.S. 742, 743 (2001) ...................................50

New Hampshire v. Maine, supra at 743........................................................51

NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 502 (1979) ................11

Northside Bible Church v. Goodson, 387 F.2d 534 (5th Cir. 1967)..............12

O'Connor v. Diocese of Honolulu, 885 P.2d 261 (Hawaii 1994) .................32

O'Connor v. Diocese of Honolulu, 889 P.2d 261 (Hawaii 1994) .................32

Order of St. Benedict of New Jersey v. Steinhauser, 234 U.S. 640 (1914)...................45

1   Parish of the Advent v. Episcopal Diocese of Massachusetts, 688 N.E.2d 923
2       (Mass. 1997)............................................................................32
    Parkview Hospital v. St. Vincent Medical Center, 211 B.R. 619 (Bankr. Ct.,
3       N.D. Ohio 1997)........................................................................22
4   Prediction-making in the Supreme Court, 32 UCLA L. Rev. at 1020 n.1. ......42
    Prediction-making in the Supreme Court: The Granting of Stays by
4       Individual Justices, 32 UCLA L. Rev. 1020, 1047 (June 1985)............42
5   Presb. Church v. Mary Elizabeth Blue Hull, 393 U.S. 440 (1969).............39
6   Reynolds v. United States, 98 U.S. 145 (1878) ...............................38
    RFRA. 42 U.S.C. § 2000bb-1(b)............................................47
7   Richardson v. United States, 943 F.2d 1107, 1113 (9th Cir. 1991) ..........50
    Ritter v. Smith, 726 F.2d 1505, 1512 n.17 (11th Cir.) .......................42
8   Roman Catholic Archbishop of Diocese of Oregon v. Baker, 15 P.2d 391
9       (Or. 1932).............................................................................51
    Schieffer v. Catholic Archdiocese of Omaha, 244 Neb. 715, 508 N.W.2d 907,
10      911 (Neb. 1993)......................................................................32
11  See Christians v. Chrystal Evangelical Free Church, 82 F.3d 1407, 1417-19
        (8th Cir. 1996).......................................................................47
12  Serbian E. Orthodox v. Milivojevich, 426 U.S. 696 (1976).................39
    Serbian Eastern Orthodox Diocese for the United States of America and Canada
13      Diocese v. Milivojevich, 426 U.S. 696 (1976).............................24
    Serbian, 426 U.S. 696 (1976)...............................................42
14  Serbian, 426 U.S. at 709 .................................................24, 35
    Serbian, 426 U.S. at 713-14 (1976)........................................28
15  Shaliehsabou v. Hebrew Home of Greater Washington, Inc., 363 F.3d 299,
16      306 n.7 (4th Cir. 2004)..........................................................39
    Sherbert v. Verner, 374 U.S. 398 (1963) ...................................23
17  Smith, 494 U.S. 872 (1990) ...............................................38
    Smith, 494 U.S. at 877, 887................................................39
18  Smith, 494 U.S. at 881-82................................................24
    Spokane Opinion at *13-16....................................................31
19  State v. Portland General Electric Co., 95 P. 722 (Or. 1908)...............5
    Teadt v. Lutheran Church, Missouri Synod, 603 N.W.2d 816, 822
20      (Mich. Ct. App. 1999) ............................................................32
    The Lustre of Our Country:  The American Experience of Religious Freedom
21      69-70 (1998) ........................................................................43
    The Powers of the Supreme Court Justice Acting in an Individual Capacity,
22      112 U. Pa. L. Rev. 981, 988 (1964) .......................................42
    Thomas v. Review Bd. of Indiana Employment Security Div., 450 U.S. 707,
23      715 (1981) ...........................................................................33
24  Tilton v. Marshall, 925 S.W.2d 672 (Tex. 1996)............................32
    Tritchler v. County of Lake, 358 F.3d 1150, 1154 (9th Cir. 2004) ...........50
25  Turner v. The Church of Jesus Christ Latter-day Saints, 18 S.W. 3d 877
26      (Tex. App. — Dallas 2000, no writ)........................................32
    United States v. Baird-Neece Packing Corp., 151 F.3d 1139, 1147 (9th Cir. 1998) ......51

United States v. Ballard, 322 U.S. 78 (1944) ........................................................... 32, 41

United States v. Ballard, 322 U.S. 78 (1944). ................................................................ 39

United States v. Ruiz, 73 F.3d 949, 953 (9th Cir.1996) ................................................... 50

Walz v. Tax Comm'n of City of New York, 397 U.S. 664, 676 (1970) ........................... 34

Watson v. Jones, 80 U.S. (13 Wall.) 679 (1871) ........................................................ 5, 25

Watson, 80 U.S. at 727 ............................................................................................. 35, 41

Watson, 80 U.S. at 733 .................................................................................................... 49

Watson, 80 U.S. at 734 .................................................................................................... 31

Williams v. Episcopal Diocese of Massachusetts, 766 N.E.2d 820, 824
    (Mass. 2002) .............................................................................................................. 40

Wyler Summit Partnership v. Turner Broadcasting System, 235 F.3d 1184, 1190
    (9th Cir. 2000) ............................................................................................................ 50

Yaggie v. Indiana-Kentucky Synod Lutheran Church, 860 F.Supp. 1194 (W.D. Ky.
    1994), aff'd, 64 F.3d 664 (6th Cir. 1995) ................................................................. 41

**Statutes**

(Citing RCW § 24.12.010) ................................................................................................ 9

11 U.S.C. § 541 ................................................................................................................. 2

1872 Oregon Church Property Act ................................................................................... 8

1872 Oregon Corporation Sole Statute ........................................................................... 8

1872 Oregon Religious Corporation Statutes ................................................................. 11

O.R.S. § 128.620(2)(a) .................................................................................................... 19

O.R.S. § 128.620(2)(b) .................................................................................................... 19

O.R.S. § 128.620(3) ........................................................................................................ 19

O.R.S. § 128.620(4) .................................................................................................... 20, 21

O.R.S. § 128.640(2)(a) .................................................................................................... 20

O.R.S. § 128.640(2)(a) and (4) ....................................................................................... 19

O.R.S. § 128.640(2)(a). ................................................................................................... 20

O.R.S. § 28.040 ............................................................................................................... 19

O.R.S. § 28.130 ............................................................................................................... 19

O.R.S. § 64.042 ............................................................................................................... 47

O.R.S. § 65.042 .................................................................................................. 8, 10, 11, 46

O.R.S. § 65.067 ................................................................................................................. 8

O.R.S. § 65.357(2)(d) ................................................................................................... 8, 13

O.R.S. § 65.377(2)(c) ................................................................................................... 8, 10

O.R.S. § 65.377(2)(c) ...................................................................................................... 13

O.R.S. § 657.072(1) ......................................................................................................... 51

O.R.S. §§ 65.067, 65.042, 65.357(2)(d), and 65.377(2)(c) .......................................... 20

O.R.S. §§ 65.067, 65.357(2)(d), 65.377(2)(c), 65.042 ................................................. 10

O.R.S. §§ 65.357(2)(d) ................................................................................................... 10

Or. Gen'l Laws at 127 ............................................................................................... 6, 7, 20

Or. Gen'l Laws at 127 § 9 ............................................................................................... 10

Or. Gen'l Laws at 127 § 9; Or. Gen'l Laws at 135-36 ................................................... 10

Or. Gen'l Laws at 135. ..................................................................................................... 8

Or. Gen'l Laws at 135-36 ................................................................................................ 20

vii

1    Or. Gen'l Laws at 135-36 §§ 2 and 4 ...................................................7
     Or. Gen'l Laws, ch. IV (1864)...........................................................6
2    Or. Gen'l. Laws at 127 § 9 ...............................................................8
3    RCW § 24.12.010 ..........................................................................10
     RCW §§ 24.12.010, 24.12.020, 24.12.030, 24.12.040 ......................10
4    Washington Corporation Sole Statute (Wash. Rev. Code § 24.12.010) ................9

**Other Authorities**
5    3 W. S. Holdsworth, a History of English Law 474-82 (1923). ...............14
6    Black's Law Dictionary 366 (8th ed. 1999)........................................6
     CIC c. 113-116, 1279.1.................................................................15
7    CIC c. 373.....................................................................................15
     CIC c. 391.1.................................................................................16
8    CIC cc 113-116, 373, 515.3, 532, 1256-1257.1, 1267.1,1267.3, 1279.1, 1282,
9        1284.2.3..................................................................................18
     CIC, c. 116...................................................................................15
10   CIC, c. 515.3................................................................................15
     CIC, cc. 1257.1, 1282, and 1284..2.3 ...........................................16
11   CIC, cc. 369, 373, 515.1...............................................................14
     CIC, cc. 393, 515.3; 532, 1279.1...................................................16
12   Code of Canon Law:  Latin-English Edition xxix (1998)..................14, 15
13   Code of Canon Law:  Latin-English Edition xxx (1998)........................15
     Corpus Iuris Canonici ......................................................................1
14   John Paul II, "Apostolic Constitution: Sacrae Disciplinae Leges............14, 15
     Paul II, "Apostolic Constitution: Sacrae Disciplinae Leges...................15
15   Restatement (Second) of Trusts § 348 cmt. f (1959)..........................20
     Restatement (Second) of Trusts § 391 (1959)...................................19
16   The Code of Canon Law (1983) ......................................1, 14, 15
17   U.S. Const. Amend. I.....................................................................22

**Rules**
18   Fed. R. Civ. P. 12(b)(1).....................................................................6
19   Fed. R. Civ. P. 12(h)(3)....................................................................6

20

21

22

23

24

25

26

1    The Roman Catholic Archbishop of Portland in Oregon, and successors, a

2    corporation sole ("Debtor"), through Rothgerber Johnson & Lyons LLP and Sussman

3    Shank LLP, submits this Brief in Opposition to the Tort Claimants Committee's ("TCC")

4    Restated Second Motion for Partial Summary Judgment ("Restated Motion") and in

5    Support of its Cross Motion for Partial Summary Judgment.

## I.
## STRUCTURE OF RESPONSE

6

7    This brief will first address the TCC's request in the Restated Motion to dismiss

8    the Debtor's Third Affirmative Defense regarding subject matter jurisdiction.  It will then

9    describe Oregon corporation law applicable to religious corporations and the statutory

10   right of such corporations, for more than 130 years, to define their governance in

11   accordance with their beliefs.  Next, it examines the Debtor's articles of incorporation

12   and the seven instances in which those articles import Canon Law[1] to define the

13   Debtor's governance.

14   The brief then turns to the First Amendment principles on which the Oregon

15   religious corporation statutes are based.  Those principles provide that the Court

16   cannot, as the TCC requests, rearrange church polity[2] by asking the Court to ignore the

17   separateness of the parishes and combine them with the Debtor.  Oregon corporation

18   law, the First Amendment, and the Debtor's articles of incorporation make clear that the

19   Court must consider church law – here Canon Law – in resolving the issues in this case.

20   The latter sections of this brief respond to the TCC's attempt to have the Court

21   ignore First Amendment protections.  Nonetheless, based on these First Amendment

22   protections, the Court should deny the TCC's request to dismiss the Debtor's Fifth

23

---

24   1 When capitalized, "Canon Law" or "CIC" shall mean The Code of Canon Law (1983). CIC is an abbreviation for *Corpus Iuris Canonici*, the Latin title for The Code of Canon Law.

25   2 "Polity" refers to the ways in which an institution organizes and governs itself, the creations of entities within or related to the institution, the allocation of rights and authority within the institution and its

26   affiliated entities, and the law governing the institution.

**Page 1 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT

Rothgerber Johnson & Lyons LLP
90 S. Cascade # 1100, Colorado Springs, CO 80903
(719) 386-3000

1    Affirmative Defense regarding religious freedom and deny the TCC's request that the

2    Court find that the Parishes[3] are mere operating divisions of the Debtor.   Finally, the

3    Debtor will explain why judicial estoppel does not prevent the Debtor from claiming that

4    parishes are separate entities.

5            The TCC's Restated Motion is limited in its reach and does not ask the Court to

6    make any determination of the rights of any party to any property.  The Debtor's Cross

7    Motion seeks a ruling that the Debtor governs its affairs in accordance with Canon Law,

8    and that under Canon Law, in conjunction with civil law, the Parishes and the Debtor are

9    distinct entities.  The Debtor will present evidence and argument related to interests in

10   particular property when the Debtor responds to the TCC's Third Motion for Partial

11   Summary Judgment.

12                                      II.
                            SUMMARY OF ARGUMENT
13
        **A.     Introduction.**  The Debtor, a corporation sole, is the incorporation of the
14
     office of the Archbishop, who has certain powers, authority, and limitations.  The
15
     question the Court will eventually have to decide in this adversary proceeding is
16
     whether the property of the Parishes is, under 11 U.S.C. § 541, property of the Debtor's
17
     estate.  The answer to the ultimate question will come largely from Oregon corporation
18
     law, the Debtor's articles of incorporation, the First Amendment, Canon Law, Oregon
19
     trust law, and other evidence.
20
            The TCC contends that it is unreasonable for a church to invoke this Court's
21

22   _____
             3 "Parish" herein refers to each Catholic parish, along with its school, mission, or missions, if any,
23   which is located within the territory of the Archdiocese.  "Parishes" comports with the first subclass which
     the TCC identified in its First Amended Complaint of July 26, 2005.  When the TCC requested that the
24   Court declare that "Debtor's parishes and schools have no legal existence separate from or independent
     of Debtor . . .," TCC's Restated Motion at ¶ 4, the TCC did not define "parishes and schools."  As this
25   request was not contained within the TCC's Memorandum in Support of Second Motion for Partial
     Summary Judgment filed on May 5, 2005 ("TCC Brief"), the Archdiocese assumes here that "Debtor's
26   parishes and schools" means "Parishes" and does not include Central Catholic High School, Marist High
     School, or Regis High School.  The TCC makes no argument directed at these three high schools.

**Page 2 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

1  jurisdiction and then expect church law to play a role in determining the outcome.  The

2  Debtor wants to be clear:  **Canon Law, the universal law of the Church, matters in**

3  **this bankruptcy case.  It matters, not because the Debtor says it matters, but**

4  **because civil law says it matters.  It matters because Oregon corporation and**

5  **trust law, First Amendment doctrine, and the Debtor's publicly filed articles of**

6  **incorporation say it matters.**

7       This does not mean that the Court cannot decide the ultimate issues in this

8  adversary proceeding as to who owns property, what property is held in trust and for

9  whom, and what restrictions may attach to the property.  What it does mean, however,

10  is that the Court cannot ignore Canon Law, violate the First Amendment, and change

11  the fundamental structure of a church in so doing.

12       Parishes are not an abstraction.  They are not in bankruptcy.  They are not mere

13  assets available for enlarging the Debtor's estate.  As Archbishop Vlazny states:

> Under Catholic Church polity and Canon Law, the parish is a form of
> ecclesial entity distinct from a diocese or archdiocese. There are 124
> Parishes within the territory of the Archdiocese of Portland in Oregon.
> Forty of these parishes operate and support schools as part of their
> ministries.  Each parish is a community of faith whose members worship
> together and do works of mercy.  Parishioners gather for Eucharist on
> Sundays.  They observe the Church calendar.  They study Scripture and
> hear it proclaimed and preached.  They help others through schools, food
> banks, emergency assistance, family support, visiting the elderly and the
> sick, assisting the disabled, advocating for peace and justice, ministering
> to those in prison, and other activities.  These parishioners form friends of
> the heart in their parishes.  Through the sacraments, they celebrate and
> solemnize the hinge moments of their lives--baptizing those new to faith;
> marrying those in love, and burying their beloved in death.

Vlazny Decla. at ¶ 7.

**B.    Oregon Corporation Law and the First Amendment Ensure That
Religious Corporations Define Their Own Doctrine and Governance.**  Through its

legislation for religious corporations beginning in 1872 and continuing through the

present, the Oregon legislature has, on at least six occasions, enacted provisions

guaranteeing that religious corporations will be organized and governed in accordance

**Page 3 of 54 -** DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

Rothgerber Johnson & Lyons LLP
90 S. Cascade # 1100, Colorado Springs, CO 80903
(719) 386-3000

1    with religious law.  These statutes incorporate church law into the governance of church

2    corporations.  They permit officers and directors of religious corporations, in the

3    exercise of their fiduciary obligation, to rely upon information from religious authorities.

4             It is axiomatic that courts should provide statutory construction that does not

5    violate the Constitution if any other possible construction remains available.  First

6    Amendment doctrine, therefore, provides a guide for the interpretation of Oregon

7    corporation law.  It also provides an additional source of substantive civil law for

8    resolving a dispute over church property.  They acknowledge that, should the State's

9    corporation law conflict with church law, church law trumps--just as required by the First

10   Amendment.

11            Relying upon two 1874 Oregon religious corporation statutes, the then current

12   Archbishop formed a statutory corporation sole to conduct the temporal affairs of the

13   Archdiocese.  An corporation sole is the civil recognition of an ecclesiastical office--

14   here, "the bishop and his successors" as having the rights and powers of a corporation.[4]

15            In the Catholic Church, a priest becomes bishop by means of an ordination ritual

16   which requires the new bishop to solemnly vow that he will, in perpetuity, conduct his

17   ministry and administration as bishop in accordance with Canon Law.  The Canon Law

18   of the Catholic Church is the oldest legal system in the world. Cafardi Decl ¶ 9.

19            It is not surprising then that the 1874 articles of incorporation of the Debtor state

20   five times that the Debtor operates under the canons, rules and usages of the Catholic

21   Church.  The 1939 and 1940 supplements to those articles repeat similar concepts.

22   Oregon corporation law very clearly provides that the powers of a corporation cannot

23   _____

24   [4] While there are differences between a diocese and an archdiocese and their respective bishop
     and archbishop, those differences have little significance with regard to the diocese's or archdiocese's
25   relationship to parishes or the bishop's or archbishop's reserved powers regarding parish property.
     Cafardi Decla. at ¶ 22.  Statements in Canon Law, referred to in this brief regarding a bishop apply
26   equally to an archbishop and regarding a diocese apply equally to an archdiocese.  Canon Law also
     refers to a diocese or an archdiocese as a "particular church."  Id. ; see, e.g., CIC, cc. 369, 373, 515.1.

**Page 4 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

1    exceed those granted under a corporation's articles.  Accordingly, acts by the Debtor,

2    that are beyond the corporation's powers are *ultra vires.*[5]

3         There are many distinct doctrinal groupings within First Amendment

4    jurisprudence, the one most applicable here is the Doctrine of Church Autonomy.  This

5    principle derived from <u>Watson v. Jones</u>, 80 U.S. (13 Wall.) 679 (1871).  <u>Watson</u> holds

6    that the First Amendment serves as a structural restraint on governmental power over

7    core church functions and thereby acts as a bulwark separating church and state.  Chief

8    among these protected church functions is, as the TCC admits, the ability of a church to

9    organize itself and define its own governance consistent with its own religious beliefs.

10   Because the Church Autonomy Doctrine functions as a constitutionally-mandated

11   structural restraint upon governmental power and not as a contract between a church

12   and its members, the First Amendment guarantees that churches have the authority to

13   define their own polity regardless whether those challenging such church authority are

14   present or past church leaders, present or past church members, the unchurched, or

15   the government itself.

16        **C.    <u>The Debtor's Cross Motion.</u>**  The Debtor believes it is entitled to

17   summary judgment on several critical issues in this case.  It has therefore filed a cross

18   motion for summary judgment.  In its Cross Motion, the Debtor asks the Court to enter

19   summary judgment finding:

20        1.    The Debtor is, under Oregon corporation law, a corporation sole.  A

21   corporation sole is the incorporation of an office – here, the office of the Archbishop of

22   the Archdiocese of Portland in Oregon.

23        2.    A Catholic bishop solemnly vows during his ordination to conduct his

24   entire ministry and administration as a bishop in accordance with Catholic and Canon

25

26   _____

     5 See <u>State v. Portland General Electric Co.</u>, 95 P. 722 (Or. 1908)  (a corporation does not have
     power beyond those provided for in the corporation's articles).  See also O.R.S. 60.077(2).

**Page 5 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

1    Law.

2         3.     Oregon law requires the Debtor to function and govern its affairs in

3    accordance with the constitution, canons, rules, regulations, disciplines, doctrine, and

4    practice of the Roman Catholic Church.

5         4.     The Debtor's Articles of Incorporation require the Debtor to function and

6    govern its affairs in accordance with the doctrine, canons, rules, and usages of the

7    Roman Catholic Church.

8         5.     The First Amendment guarantees that religious institutions have the power

9    to decide for themselves, free from state interference, matters of church government,

10   faith, and doctrine – including the definition and creation of ecclesial entities like

11   Catholic parishes and the empowering of church officials to pastor and administer such

12   parishes and their property.  Catholic institutions define their governance through Canon

13   Law.

14        6.     The Court must consider Canon Law in determining whether the Parishes

15   are entities separate from the Debtor.

16        7.     The Parishes and the Debtor are separate entities.

17

18                                            III.
     **THE COURT HAS SUBJECT MATTER JURISDICTION SUBJECT TO POTENTIAL**
19                          **CONSTITUTIONAL LIMITATIONS**

20        The TCC contends that the Court has subject matter jurisdiction to decide

21   whether the property of the Parishes is part of the Debtor's estate.  The Debtor agrees.

     The Debtor did not initiate this bankruptcy proceeding to contend that the Court lacks
22
     jurisdiction to decide key issues in this case. The TCC, however, requests that the Court
23
     dismiss the Debtor's Third Affirmative Defense regarding the limits of the Court's subject
24
     matter jurisdiction.[6]  That's the rub.  All that the Debtor's Third Affirmative Defense
25
     ─────────────────────────────
          6 *See* TCC's Brief in Support of Its Second Motion for Partial Summary Judgment ("TCC Brief") at
26   4-9.

     **Page 6 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
     COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
     JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
     JUDGMENT

Rothgerber Johnson & Lyons LLP
90 S. Cascade # 1100, Colorado Springs, CO 80903
(719) 386-3000

1    essentially provides is notice that, given the religious character of the Debtor and the

2    requirements of the First Amendment, there are certain ecclesiastical subject matters

3    over which no civil court has jurisdiction.

4         In one sense, an affirmative defense regarding subject matter jurisdiction is

5    unnecessary because it can be challenged any time by the parties or raised by the court

6    itself.  *Cf.*  Fed. R. Civ. P. 12(b)(1) (requiring pleading of affirmative defense of lack of

7    subject matter jurisdiction) and Fed. R. Civ. P. 12(h)(3) (indicating that subject matter

8    jurisdiction is never waived and can be raised, even *sua sponte* by the court, at any

9    time).

10        The Court here has sufficient jurisdiction, notwithstanding First Amendment

11   limitations, to resolve the property dispute.  The purpose of the Debtor's Third

12   Affirmative Defense is transparency.  It plead this affirmative defense--a contingent

13   challenge to the scope of subject matter jurisdiction that may never need to be argued--

14   to remind all that churches are different from traditional civil entities because the First

15   Amendment limits governmental power in certain ways regarding religious institutions

16   that do not apply to secular institutions.

17                                              **IV.**
     **OREGON RELIGIOUS CORPORATION LAW IMPORTS ECCLESIASTICAL**
18                        **LAW INTO CORPORATE GOVERNANCE**

19        **A.    Oregon's Original Corporation Sole Statute Requires the Importation**

20   **of Religious Law Into the Governance of Ecclesiastical Corporations Sole.**

21   Oregon enacted its first non-profit corporation act in 1864.  Or. Gen'l Laws, ch. IV (1864)

22   (attached to Stilley Decla. at Ex. 2).  Even so, the Archbishop did not form a corporation

23   until after the 1872 enactment of two Oregon statutes which better accommodated

24   Catholic Church polity.  The first was a statutory recognition of an ecclesiastical

25   corporation sole.  Or. Gen'l Laws at 127 (attached to Stilley Decla. at Ex. 3).   An

26   ecclesiastical corporation sole is the recognition by civil authorities of a church office as

**Page 7 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

1    having certain legal capacities and advantages.  Black's Law Dictionary 366 (8th ed.

2    1999); *see* additional discussion, *infra*, at Section V.

3        The corporation sole is an acceptable match to Catholic Church polity because it

4    accommodates the role of the Archbishop as chief legislator, executive, and

5    administrator.  Cafardi Decla. at ¶¶ 21, 41-42.    More importantly, it protects the

6    Archbishop's role as canonical steward of the Archdiocese (Id. at ¶ 42) because the

7    1872 Oregon corporation sole statute requires the incorporation of Canon Law into

8    corporate governance.  Or. Gen'l Laws at 127.  It states:

9        [A]ny person being the bishop, overseer, or presiding elder of any church,
         or religious denomination of this State, may, **in conformity with the**
10       **constitutions, canons, rules, regulations, and discipline of such**
         **church or denomination,** become a corporation sole for religious and
11       educational purposes.

12   Or. Gen'l Laws at 127 § 9 (attached to Stilley Decla. at Ex. 3) (emphasis added).

13       The second Oregon statute for churches similarly imported religious law to define

14   the governance of church property-holding corporations.  Entitled the "Oregon Act for

15   the Formation of Ecclesiastical Corporations for the Holding of Church Property" the

16   statute permitted church leaders

17       who shall have been duly chosen, elected, or appointed, **in accordance**
         **with the usages and regulations of such church,** and authorized to act
18       for the church and who (in whom) shall be vested, at the time, the legal
         title of the church property ...

19
20   to become a religious corporation in order to acquire, encumber, convey, and otherwise

21   manage property for the benefit of the church Or. Gen'l Laws at 135-36 §§ 2 and 4

22   (attached to Stilley  Decla. at Ex. 4) (emphasis added).

     B.    **Oregon's Modern Religious Corporation Law Also Requires that**
23   **Church Law Govern Church Corporations.**  As discussed *infra* at Section V, the First
24
     Amendment bars government from interfering with a denomination's definition of its own
25
     governance and polity.  Modern Oregon religious corporation law, like its 1872
26

**Page 8 of 54 -** DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

1    predecessors, complies with this mandate.  The modern Oregon corporation sole

2    statute states:

3        Any individual may, **in conformity with the constitution, canons, rules,**
         **regulations and disciplines or any church or religious denomination,**
4        form a corporation hereunder to be a corporation sole.

5    O.R.S. § 65.067 (emphasis added).  In addition, O.R.S. § 65.357(2)(d) and O.R.S.

6    § 65.377(2)(c) permit officers and directors of religious corporations to rely upon

7    information from religious authorities, and O.R.S. § 65.042 codifies constitutional

8    doctrine barring government from remaking church polity:

9        **If religious doctrine or practice governing the affairs of a religious**
         **corporation is inconsistent with the provisions of this chapter on the**
10       **same subject, the religious doctrine or practice shall control** to the
         extent required by the Constitution of the United States or the constitution
11       of this state or both.

12       Thus, the Oregon legislature has made clear that religious corporations may, as

13   the Debtor has done, follow its religious authorities in its structure, governance, and

14   operations.

15       C.    **The Office of an Archbishop That Constitutes a Corporation Sole**

16   **Cannot be Separated From Archbishop's Obligation to Conduct Archdiocesan**

17   **Affairs in Accordance With Canon Law.**  The Archbishop formed the Debtor

18   corporation sole under both the 1872 Oregon Corporation Sole Statute and the 1872

19   Oregon Church Property Act.  Stilley Decla. at Ex. 1, 3, and 4; Conway Decla. Ex. 1 at

20   1-6.  The former requires that the person who holds the church office that is to become

21   the corporation sole must "be . . .the bishop . . . of any church, or religious denomination

22   in" Oregon.  Or. Gen'l. Laws at 127 § 9.  The latter requires that the church office holder

23   must have been "chosen, elected, or appointed, in accordance with the usages and

24   regulations of such church . . ."  Or. Gen'l Laws at 135.

25       As will be more fully explained below, Canon Law and a bishop's vows, therefore,

26   require that a bishop respect that parishes are separate and distinct juridic persons from

**Page 9 of 54 -** DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

Rothgerber Johnson & Lyons LLP
90 S. Cascade # 1100, Colorado Springs, CO 80903
(719) 386-3000

1   the diocese, each with its own property, rights, and obligations.  If this Court were to

2   refuse to recognize Parish separateness from the Debtor and treat them as a single

3   entity, as the TCC requests, it would be altering Church polity in violation of Oregon law

4   and the First Amendment.  This would necessarily and impermissibly entangle the Court

5   in the polity of a church.

6        In Committee of Tort Litigants v. Catholic Bishop of Spokane, 2005 WL 2108895,

7   (Bankr. E.D.Wash. 2005) (the "Spokane Opinion") the Spokane Court offered an

8   extraordinarily constrained interpretation of that portion of the Washington Corporation

9   Sole Statute (RCW § 24.12.010) which states:

10          Any person, being the bishop . . . of any church or religious denomination,
            may, in conformity with the constitution, canons, rules, regulations or
11          discipline of such denomination, become a corporation sole in the manner
            as described in this chapter as nearly as may be . . .
12
13  Id at *17 (citing RCW § 24.12.010).  It held that the "common sense" interpretation of

    this provision is that, when a Catholic bishop decides to "become" a corporation sole,
14
    Canon Law applies only to determine whether he is a canonically valid bishop.  It
15
    reasoned that Canon Law is thereafter irrelevant in the operation of a diocesan
16
    corporation.  Id.
17
         A more logical interpretation would be to find that the words "may, in conformity
18
    with the constitution, canons, rules, regulations or discipline of such denomination,
19
    become a corporation sole..." mean the corporation itself had to be formed in a manner
20
    that would thereafter allow it to operate in accordance with such constitution, canons,
21
    rules, and disciplines of its denominations.  It is illogical that a corporation which must
22
    be formed in accordance with a church's constitution, canons, rules, and disciplines,
23
    could later ignore them once it is formed.  Operation under church law necessarily
24
    follows formation under church law.
25

26

**Page 10 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

1    The Spokane Court did not consider that when a Catholic bishop enters office, he

2    vows  to conduct his entire ministry and administration as a bishop in accordance with

3    Canon Law.  When he was ordained a bishop, Archbishop Vlazny, for example,

4    . . . in the presence of hundreds of the laity and clergy, many visiting
     bishops, and ecumenical guests [vowed] from the beginning to the end of
5    my ministry and administration as bishop, of whatever diocese I served, to
     conduct the ministries and affairs of the diocese in accordance with
6    Scripture, the magisterial teaching and doctrine of the Catholic Church,
     and the Canon Law of the Catholic Church.  It is, accordingly, by virtue of
7    my role and office as Bishop or Archbishop and the promises required of
     me to hold such an office that I must conform my ministry, work, and
8    administration as Archbishop of the Archdiocese of Portland in Oregon in
     accordance with Scripture, Catholic doctrine and practice, and Canon
9    Law.

10    Vlazny Decla. at ¶¶ 2-4.  Even without such vows, Canon Law itself obligates bishops

11    and others who administer their churches to do so in accordance with Canon Law.

12    Cafardi Decla. at ¶ 10 and its Ex. A, CIC, c. 1282.

13    The rules of statutory interpretation require *true* common sense and more.  They

14    require a reading of one statutory provision consistently with others.  Most important,

15    they require a construction that would not "violate the Constitution if any other possible

16    construction remains available.  NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 502

17    (1979).  The latter is especially important when the independence of a religious

18    institution is at stake because "[t]he values enshrined in the First Amendment plainly

19    rank high 'in the scale of our national politics.'"  Id.

20    The relevant Oregon corporation statutes differ substantially from those in

21    Washington.[7]  While there is some similarity between Or. Gen'l Laws at 127 § 9, O.R.S.

22    § 65.042; and RCW § 24.12.010, Washington has no provisions similar to O.R.S. §§

23    65.357(2)(d) or O.R.S. § 65.377(2)(c) which permit officers and directors of religious

24    corporations to rely upon information from religious authorities and thereby conduct

25    _____

26    7 *Compare* RCW §§ 24.12.010, 24.12.020, 24.12.030, 24.12.040 *with* Or. Gen'l Laws at 127 § 9;
     Or. Gen'l Laws at 135-36; O.R.S. §§ 65.067, 65.357(2)(d), 65.377(2)(c), 65.042.

Rothgerber Johnson & Lyons LLP
90 S. Cascade # 1100, Colorado Springs, CO 80903
(719) 386-3000

1    corporate affairs in accordance with religious information, including canon law.

2    Washington also has no provision similar to O.R.S. § 65.042 which requires, in

3    accordance with First Amendment principles, that church defined governance trump

4    state defined governance.

5         In sum, the common sense interpretation of the 1872 Oregon Religious

6    Corporation Statutes and the modern Oregon corporation sole statute, each of which

7    treats an ecclesiastical office as a corporation, is to recognize that the objectives and

8    powers of the ecclesiastical office of a Catholic Bishop are defined by Canon Law and

9    church doctrine.  The common sense reading of those statutes  recognizes that when a

10   bishop is placed into office, he must conduct his ministry in accordance with Canon

11   Law, which in turn requires that he administer the corporation through which the diocese

12   conducts its temporal affairs consistent with Canon Law.

13        Oregon corporation law, like <u>Kedroff</u>'s description of <u>Watson</u>, "radiates a spirit of

14   freedom for religious organizations, an independence from secular control or

15   manipulation, in short, power to decide for themselves, free from state interference,

16   matters of church government."  *See* <u>Kedroff v. St. Nicholas Cathedral of the Russian</u>

17   <u>Orthodox Church in North America</u>, 344 U.S. 94, 116 (1952).  They also align with the

18   First Amendment law that voids legislation seeking to modify the polity of a

19   denomination.  <u>Northside Bible Church v. Goodson</u>, 387 F.2d 534 (5th Cir. 1967)

20   (striking down the Dumas Act by which the Alabama legislature sought to modify

21   Protestant denominational polity); <u>Kedroff</u>, 344 U.S. 93 (1952) (striking down the New

22   York legislature's attempt to modify the polity of the Russian Orthodox Church).

23        In sum, the Oregon religious corporation law recognizes that religious

24   corporations must be permitted to conduct their affairs in accordance with their own

25   church law.  This conclusion is  strengthened by the seven instances in which the

26

**Page 12 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

1    Debtor imported Canon Law into its articles of incorporation, as discussed in the next

2    section.

3                                    **V.**
     **THE DEBTOR'S ARTICLES OF INCORPORATION**
4    **IMPORT CANON LAW INTO THE CORPORATION'S GOVERNANCE LAW**

5            On September 17, 1874, Archbishop Blanchet filed articles of incorporation for

6    the Debtor.  The original handwritten articles, with changes only to the corporate name,

7    remain operative to this day.  Stilley Decla. at Ex. 1; Conway Decla., Ex. 1 at 1-6.

8    These articles of incorporation are highly instructive.

9            First, the articles refer to both 1872 statutes, each of which incorporates canon

10   law into corporate governance.

11           Second, the articles themselves refer to Canon Law five times, stating:

12       •      That the incorporator Archbishop Blanchet, was "duly appointed . . .
                in conformity with the Constitution, **canons, rules, usages and**
13              **regulations** of said Church . . .;"

14       •      That Archbishop Blanchet, "together with [his] successors in office
                [who have been] duly appointed, **authorized and empowered** as
15              such, **according to the canons, usages and regulations of the**
                **[Roman Catholic] Church**" will serve as the corporation sole;
16
         •      That "the object and purposes of this corporation is to provide for
17              and maintain the worship of Almighty God, and the preaching of the
                gospel of our Lord Jesus Christ, **according to the doctrine,**
18              **canons, rules and usages of the Roman Catholic Church**," to
                advance education, charity, piety, and learning; and "for acquiring,
19              holding and disposing of church property for the benefit of the
                Roman Catholic Church for works of charity and for public worship;"
20
         •      That the Archbishop and his successors "will hold said office or
21              position, in said Diocese, **under the canons, rules and usages of**
                **the Roman Catholic Church . . .;" and
22
         •      That the Archbishop's "successor[s] shall and will be chosen or
23              appointed, **under and in accordance with the canons, rules and**
                **regulations of said church . . . ."**
24
     Id. (emphasis added).
25
             Third, the supplementary articles incorporate Canon Law two more times.  In
26
     1939, the Debtor filed supplementary articles of incorporation with the Oregon Secretary

**Page 13 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

1    of State which reiterated that the incumbent Archbishop was "duly appointed, authorized

2    and empowered . . . **according to the canons, usages and regulations of the**

3    **Roman Catholic Church**."  Conway Decla., Ex. 1 at 7-11 (emphasis added).   The

4    following year, the Debtor filed additional supplementary articles of incorporation which,

5    twice more, imported Canon Law, stating:

6    　　　[T]the Archbishop, and his successor or successors, will hold said office or
    　　　position in said Archdiocese **under the canons, rules and usages of the**
7    　　　**Roman Catholic Church** until death, resignation or deposition, and
    　　　whenever said office or position shall become vacant . . ., his successor
8    　　　shall and will be chosen or appointed under and **in accordance with the**
    　　　**canons, rules and regulations of said Church** . . .
9
10   Id. at 12-18 (emphasis added).

11   　　　The foregoing portions of the articles and supplemental articles evidence the

12   intention that the Debtor would be formed and operated not only in accordance with civil

13   law, but also in accordance with Canon Law.  Requiring a religious corporation to be

14   formed under Canon Law while not permitting it to operate under Canon Law makes no

15   sense.  The Oregon statutes reinforce this principle by permitting directors of religious

16   corporations to rely on "information, opinions, reports or statements. . . prepared or

17   presented by . . . . religious authorities . . . the director believes justify [his] reliance and

18   confidence . . ."  O.R.S. § 65.357(2)(d).  See Id. at O.R.S. § 65.377(2)(c).  Under this

19   statute, the sole director, the Archbishop, is permitted to rely upon such information,

20   including Canon Law, in "discharging his duties as a director."  Id.

21   //

22   //

23   //

24   //

25   //

26   //

**Page 14 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

Rothgerber Johnson & Lyons LLP
90 S. Cascade # 1100, Colorado Springs, CO 80903
(719) 386-3000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**VI.**
**THE PARISHES AND THE DEBTOR ARE**
**DISTINCT ECCLESIASTICAL ENTITIES**

A.    **Under the 1983 Code of Canon Law, the Parishes and the**

**Archdiocese Are Distinct Entities.**  The Catholic Church organizes itself through

decrees from ecumenical councils, papal encyclicals, a universal catechism, a common

liturgy, universal law, and Scripture.  The Church's universal law is its Canon Law.  The

Canon Law of the Catholic Church is the oldest legal system in the world.  Cafardi

Decla. at ¶ 9.  Indeed, the English and American notion of the corporation is itself

derived from Canon Law which first recognized an entity or an office[8] as a *persona ficta*

or juridic person.[9]

From the Council of Trent (1545-1563) until 1917, certain decrees and collections

of Church law from the first through sixteenth centuries comprised the *Corpus Iuris*

*Canonici*, the "body of canon law."  Id.  The first codification of Canon Law occurred in

1917.  Id.  The second codification occurred in 1983 to "incorporat[e] the theology of the

Second Vatican Council," resulting in The Code of Canon Law (1983).  Id. at ¶ 9.

Canon Law is inextricably intertwined with Catholic faith and doctrine.  Its first source is

"the books of the Old and New Testament . . ."  *See* John Paul II, "Apostolic

Constitution:  *Sacrae Disciplinae Leges*," as reprinted in Code of Canon Law:  Latin-

English Edition xxix (1998).  Cafardi Decla. at ¶¶ 13-14.

Canon Law makes clear distinctions between parishes and dioceses.  Each

parish and each diocese is a separate *persona ficta* known as a public[10] juridic person.

_____

[8] Offices as, for example, the king and his successor, the bishop and his successors, the abbot and his successors, and the pastor and his successor.

[9] 3 W. S. Holdsworth, a History of English Law 474-82 (1923).

[10] Canon Law's use of "public" here is different from that of civil law.  Under Canon Law a juridic person is said to be "public" when it is created by an ecclesial authority.  CIC, c. 116.

**Page 15 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

1    Each owns its respective "temporal goods" or property.  Each has its own administrator-

2    -a pastor for the parish and a bishop for the diocese.

3        The canonical principles relevant here are:

4    1.    The Code of Canon Law (1983) is the universal law for the Catholic
          Church and is in force for all dioceses and parishes in the United States.
5          Cafardi Decla. at ¶ 10; Vlazny Decla. at ¶ 9.

6    2.    The first source of Canon Law is "the books of the Old and New
          Testament from which is derived the whole juridical legislative tradition of
7          the Church . . ."  See Cafardi Decla. at ¶ 13 quoting from its Ex. B, John
          Paul II, "Apostolic Constitution:  Sacrae Disciplinae Leges," as reprinted in
8          Code of Canon Law:  Latin-English Edition xxix (1998); Vlazny Decla. at ¶
          9.
9

10   3.    The Code of Canon Law (1983) is the Catholic "Church's principal
          legislative document [and is] founded on the juridical legislative heritage of
          revelation and tradition."  See Cafardi Decla. at ¶ 14 quoting from its Ex.
11         B, John Paul II, "Apostolic Constitution:  Sacrae Disciplinae Leges," as
          reprinted in Code of Canon Law:  Latin-English Edition xxx (1998); Vlazny
12         Decla. at ¶ 9.

13   4.    Canon Law recognizes certain non-natural persons it calls juridic persons.
          Juridic persons can be public or private.  Public juridic persons are those
14         which have been constituted by the competent ecclesiastical authority and
          carry out in the name of the Catholic Church its proper function.  CIC, c.
15         116; Cafardi Decla. at ¶¶ 24 and 25 and its Ex. A, CIC c. 113-116, 1279.1;
          Vlazny Decla. at ¶ 9.
16

17   5.    Under Canon Law, ecclesiastical property (sometimes called temporal
          goods) always belongs to a single public juridic person.  Cafardi Decla. at
18         ¶ 24 at its Ex. A, CIC cc. 113-116; Vlazny Decla. at ¶ 9.

19   6.    Under Canon Law, a public juridic person owns its own property.[11]  Cafardi
          Decla. at ¶¶ 24-26, 29-31, 33, 35 and its Ex. A, CIC cc 113-116, 373,
          515.3, 532, 1256-1257.1, 1267.1,1267.3, 1279.1, 1282, 1284.2.3; Vlazny
20         Decla. at ¶ 9.

21   7.    Under Canon Law, a parish is a public juridic person. CIC, c. 515.3;
          Cafardi Decla. at ¶29 and its Ex. A, CIC cc. 515.3, 532, 1279.1; Vlazny
22         Decla. at ¶ 9.

23   8.    Under Canon Law, an archdiocese is a public juridic person. Cafardi
          Decla. at ¶ 26 and its Ex. A, CIC c. 373; Vlazny Decla. at ¶ 9.
24

25

26
    _____
    [11] A "public juridic person" under Canon Law most closely resembles a corporation under civil law.

**Page 16 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

Rothgerber Johnson & Lyons LLP
90 S. Cascade # 1100, Colorado Springs, CO 80903
(719) 386-3000

9.    As public juridic persons under Canon Law, parishes and archdioceses own their respective property.  Cafardi Decla. at ¶ 24, 31; Vlazny Decla. at ¶ 9.

10.   Under Canon Law, the administration of property of a public juridic person is given to the one who immediately governs the public juridic person. Accordingly, the pastor of a parish is the exclusive administrator of parish property, and the archbishop of an archdiocese is the exclusive administrator of archdiocesan  property. Cafardi Decla. at ¶ 25-26, 29 and its Ex. A at CIC, cc. 393, 515.3; 532, 1279.1; Vlazny Decla. at ¶ 9.

11.   Canon Law requires those who administer ecclesial property to do so in accordance with the norms of Canon Law. Cafardi Decla. at ¶ 30 and its Ex. A,  CIC, cc. 1257.1, 1282, and 1284..2.3; Vlazny Decla. at ¶ 9.

12.   The church is hierarchical.  The legislative, executive, and judicial powers of an Archdiocese are entrusted to its Archbishop.   Accordingly, an Archbishop's decisions are decisions by the highest Archdiocesan legislator, judicatory, and executive.  Cafardi Decla. at ¶ 20, 21 and its Ex. A, CIC c. 391.1.

**B.    Under Canon Law, and in Fact, the Parishes Conduct Their Temporal Affairs Distinct from the Archdiocese and as Ecclesial Entities.**  The Parishes conduct their temporal affairs, distinct from the Archdiocese, with their own pastor-administrators. Vlazny Decl ¶ 8 *See generally* Vuylsteke Decla.  The Parishes, for example, receive contributions and bequests, open checking accounts, hire employees, administer payroll, enter into contracts, do their own long-range financial planning and budgeting, purchase property (including, but not limited to furniture, fixtures, telecommunications equipment, computers, etc.), pay taxes, and maintain financial records.  *See generally* Vuylsteke Decla

The Canons cited above and others, are the religious authorities that the Archbishop – the sole director of the Debtor – relies on in his administration of the Debtor, as Oregon law allows.  The Canons are fundamental to the way the Debtor governs itself.  The Archbishop's reliance on these Canons is expressly permitted by Oregon law and contemplated by the articles of incorporation.  This Court cannot disregard them.

Rothgerber Johnson & Lyons LLP
90 S. Cascade # 1100, Colorado Springs, CO 80903
(719) 386-3000

1

2
### VII.
**THE PARISHES HAVE SUFFICIENT IDENTITY OR CIVIL STATUS**
3
**TO BE BENEFICIARIES OF A TRUST**
4
The TCC requests that the Court declare that the Parishes "have no legal
5
existence separate from or independent of" the Debtor.  TCC Brief at 22-24.  This
6
argument ignores Canon Law and the Church's practices which define and respect that
7
each Parish, being part of the universal Catholic Church, is a distinct public juridic
8
person with its own property and its own administrator.  *See* text, *supra*, at Section VI.
9
The TCC's argument is conclusory and is constructed on the unsubstantiated assertion
10
that the Parishes, mostly being *statutorily* unincorporated, are mere divisions of the
11
Debtor.  Id. at 24.

12
**A.**    <u>**The Parishes Are Not Operating Divisions of the Debtor.**</u>  The TCC
13
contends that the Parishes are merely "operating divisions" of the Debtor.  This seeks to
14
impose a business paradigm on the parishes which is inconsistent with their existence
15
as separate juridic persons under Canon Law, and contrary to the way in which they in
16
fact are organized and carry on their day-to-day affairs.

17
As Dean Cafardi states, "There is seldom a perfect fit between the ecclesiastical
18
entities known as public juridic persons and the civil entities by which they sometimes
19
conduct their temporal affairs.  In order to honor canonical principle, church leaders
20
must try to comport the governance and activities of such civil entities as closely as
21
possible to the Code of Canon Law."  Cafardi Declar, ¶ 41.  For a court to attempt to
22
impose upon the Parishes an operative civil structure not of its own making and
23
inconsistent with Canon Law and longstanding religious practice would violate basic
24
First Amendment principles.

25
The  TCC cites a number of cases stating, conclusorily, that an "unincorporated
26
division cannot be sued . . ."  TCC Brief at 24.  Most notably though, the TCC, citing
<u>Albers v. Church of the Nazarene</u>, 698 F.2d 852, 857 (7th Cir. 1983), admits that the

**Page 18 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

1    definition of an operating division is that it is a portion of a corporation that does not own

2    its own assets.  TCC Brief at 24.  <u>Albers</u> explains:  **"An unincorporated division has**

3    **no separate assets; all its assets are owned by the organization of which it is a**

4    **part."**  <u>Albers</u>, 698 F.2d at 857 (emphasis added).

5              This, of course, is one of the primary reasons why the Parishes are not divisions

6    of the Debtor.  Parishes are public juridic persons with their own separate assets.

7    Cafardi Decla. at ¶¶ 24-26, 29-31, 33, 35 and its Ex. A, CIC cc 113-116, 373, 515.3,

8    532, 1256-1257.1, 1267.1,1267.3, 1279.1, 1282, 1284.2.3; Vlazny Decla. at ¶  9;

9    Vuylsteke Decla. at ¶ ___ (explaining that parishes purchase property in the name of

10   the parish).

11             <u>F.E.I. Publications, Ltd. v Catholic Bishop of Chicago</u>, 754 F.2d 216 (7th Cir.

12   1985) is not helpful to the TCC's argument.  In that case, the trial court, relying on

13   Illinois law, and without any apparent consideration of Canon Law, exonerated parishes

14   of that diocese from liability for a tortuous interference claim.  The underlying Illinois

15   statutes were almost certainly different than those in Oregon.  Moreover, because that

16   Court did not consider the impact of Canon Law in its analysis, its ruling has no

17   probative effect.

18             <u>Equal Employment Opportunity Commission v. St. Francis Xavier Parochial</u>

19   <u>School</u>, 77 F Supp 2d 71 (D DC 1999) is likewise not helpful to the TCC.  In that case,

20   the Court did not have to decide whether the parishes were separate or unincorporated

21   divisions of a corporation—it was not the issue.  The issue was whether the parishes

22   could still be a party to litigation under Fed. R. Civ. P. 17.  Here again, the Court did not

23   give any apparent consideration to Canon Law, nor discuss the underlying state law and

24   its impact on the decision.  The facts, issues and underlying law presently before this

25   Court are vastly different.

26             Parishes actually hold themselves out as separate entities. They have visible

**Page 19 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

Rothgerber Johnson & Lyons LLP
90 S. Cascade # 1100, Colorado Springs, CO 80903
(719) 386-3000

1    signs stating their own names, not for example, "St. Mary's Church, a division of the

2    Archdiocese of Portland".  Parishes have their own letterhead, check stock, and other

3    indicia of unique identity.  Vuylsteke Decla. at ¶ 19.

4         **B.    The Parishes Can and Have Been Sued.**  The TCC requests, without

5    legal authority or argument, that the Court find that the Parishes lack "capacity to sue or

6    be sued."  TCC Restated Motion at ¶ 4.  History belies the truth of this statement.  In

7    one year alone, immediately prior to the Debtor's bankruptcy filing,  tort claimants,

8    including members of the TCC, named parishes as defendants in more than 25

9    lawsuits.  Stilley Declaration, ¶ 7.

10        Further, each parish has the capacity to be sued, for example, as *cestui que trust*

11   (beneficiary of a trust), O.R.S. § 28.040; as a "person" with an interest in a trust

12   ("person" defined as including a "society"); id., O.R.S. § 28.130; as an unincorporated

13   "religious society," Brown v. Webb, 120 P. 387, 389 (Or. 1912); as a "person who has a

14   special interest in the enforcement of a charitable trust," Restatement (Second) of

15   Trusts § 391 (1959); as a member of a class, id. at § 391 cmt. e; or as a "religious

16   organization" under Oregon Charitable Trust and Corporation Act, O.R.S.

17   § 128.640(2)(a).

18        **C.    The Parishes Do Not Need to Be Civil Statutory Corporations in**

19   **Order to Have Rights in Property.**  The TCC suggests that the only way the Parishes

20   can have an interest in property is if they are civil statutory corporations. Otherwise,

21   they argue, the Parish assets are property of the estate. This ignores the possibility that

22   Parishes can be beneficiaries of a trust.  The question of whether Parishes can be

23   beneficiaries of a trust is not yet before the Court.  However that question does not turn

24   on whether the parishes are incorporated, but on **whether a parish has sufficient**

25   **identity to be the beneficiary of a trust**.

26

**Page 20 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

1      Under the Oregon Charitable Trust and Corporation Act, a charitable trustee may

2  hold property in trust either for a "legal entity," O.R.S. § 128.620(2)(a), or "for a

3  particular charitable corporate purpose." Id. at O.R.S. § 128.620(2)(b). Regardless of

4  its civil legal structure, a parish and the activities that occur at parishes, can easily

5  constitute "a particular charitable purpose" because the Act itself defines "charitable

6  purpose" as including "for the benefit of religion." Id. at O.R.S. § 128.620(3).

7  Accordingly, the second manner by which a charitable trustee may hold property also

8  does not require the beneficiary to have any particular legal structure.

9      The Oregon legislature's indifference to the civil legal status of a charitable trust

10  beneficiary is also evident from the fact that the legislature imposes no "legal entity"

11  requirement, even for a trustee, when the trust has a religious purpose. The Act states

12  that when a trustee "holds property for religious purposes," it may be "[a]ny religious

13  corporation sole," or " any religious corporation **or organization**." Id. at O.R.S.

14  § 128.640(2)(a) (emphasis added). The Oregon legislature broadly defines a "religious

15  organization" as **"any organized church or group organized for the purpose of**

16  **divine worship, religious teaching, or other direct ancillary purposes."** Id. at

17  O.R.S. § 128.620(4) (emphasis added). See Cafardi Decl. ¶ 20 A "religious

18  organization" is a legal entity, with sufficient identity to function as a trustee under

19  Oregon trust law, even when it is organized exclusively under its own religious tenets

20  and not under any statutory law.[12]

21      Similarly, assets may be transferred subject to restrictions that limit the use and

22  disposition of the asset transferred. The Restatement of Trust (Second) states:

23  ------------------------------

24    [12] Like the Oregon religious corporation laws (at Or. Gen'l Laws at 127; Or. Gen'l Laws at 135-36; see also O.R.S. §§ 65.067, 65.042, 65.357(2)(d), and 65.377(2)(c) ), the Oregon Charitable Trust and

25  Corporation Act accommodates religious organizations by permitting them to organize themselves. It does this by exempting religious corporations sole, religious corporations, and religious organizations

26  from the duties of other charitable trustees to register their trusts, to file their organizing documents, to file other reports with the Attorney General, and to pay fees to the Attorney General. O.R.S. § 128.640(2)(a).

**Page 21 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

Rothgerber Johnson & Lyons LLP
90 S. Cascade # 1100, Colorado Springs, CO 80903
(719) 386-3000

1
2
3
4
5
6

> Property may be devoted to charitable purposes not only by transferring it
> to individual trustees to hold it for such purposes, but also by transferring it
> to a charitable corporation. It may be provided that the corporation shall
> take property for any of the purposes for which the corporation is
> organized.   It may be provided that the corporation shall take the property
> for only one of its purposes. It may be provided that the corporation shall
> hold the property forever and devote the income only to the
> accomplishment of the purposes of the corporation or for one of its
> purposes. Thus, where a gift of property is made to an incorporated
> educational institution, it may be given with a direction to invest the
> principal and use the income in paying the salary of a professor of
> mathematics.

7
8
9
10
11
12
13

Restatement (Second) of Trusts § 348 cmt. f (1959); *see also* Municipality of Ponce v. Roman Catholic Apostolic Church in Porto Rico, 210 U.S. 737, 744 (1908) ("a dedication to a public or charitable use may exist, even where there is no specific corporate entity to take as a grantee"); Parkview Hospital v. St. Vincent Medical Center, 211 B.R. 619 (Bankr. Ct., N.D. Ohio 1997) (removing from a hospital debtor's estate a fund derived from both restricted and unrestricted gifts which the hospital designated for furthering osteopathic medicine and not to any separate legal entity).

14
15
16

**D.    If Civil Status Is Required for Parishes to Be Beneficiaries of a Trust, the Court May Recognize Them as "Religious Organizations" Under the Oregon Charitable Trust and Corporation Act.**

17
18
19
20
21

As explained, *supra*, at Section VII, D, there can be no doubt that the Parishes are "religious organizations" under the Oregon Charitable Trust and Corporation Act, because they easily satisfy the test of being an "organized church or group organized for the purposes of divine worship, religious teaching, or other direct ancillary purposes." O.R.S. § 128.620(4); Cafardi Decla. at ¶ 28; *see generally* Vuylsteke Declaration.

22
23
24
25
26

As the Debtor has established above, Oregon law has deliberately and specifically recognized that the First Amendment requires that religious corporations be allowed to govern their affairs in accordance with their own religious teachings.  This includes specific statutory references to "religious doctrine or practice" and the "constitution, canons, rules, regulations and disciplines of any church or religious

**Page 22 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT

1    denomination" in defining the rights of a religious corporation under Oregon law.

2    Oregon's recognition of these concepts are completely consistent with the principles of

3    the First Amendment and the Church Autonomy Doctrine, more fully discussed below,

4    which prohibits Courts and the government from intruding on matters or faith, discipline,

5    and doctrine.

6

## VIII.
## FIRST AMENDMENT FOUNDATION

7

8    **A.    There Are Many Doctrinal Groupings Arising from First Amendment**

9    **Religion Clause Cases.  The Doctrine of Church Autonomy Is Most Applicable to**

10    **the Issues Here.**  The First Amendment states that "Congress shall make no law

11    respecting an establishment of religion or prohibiting the free exercise thereof."  U.S.

12    Const. Amend. I.  Although worded as a limitation of Congressional power, the First

13    Amendment Religion Clauses either limit or structurally restrain government from

14    burdening the free exercise of religion, from interfering with the institutional autonomy of

15    churches, and from creating a religious establishment regardless whether the state

16    action comes from the legislative, judicial, or executive branch of government.[13]

17    Appendix A shows the many doctrinal groupings within Religion Clause jurisprudence

18    including its three principal branches:  Free Exercise jurisprudence, Establishment

19    Clause jurisprudence, and Church Autonomy[14] jurisprudence.[15]

20    ───────────────

21    [13] *See, e.g.,* Kedroff, 344 U.S. 93 (1952) (restraining legislative branch); Kreshik v. Saint Nicholas Cathedral, 363 U.S. 190  (1960) (restraining judicial branch); United States v. Ballard, 322 U.S. 78 (1944) (restraining executive branch).

22    [14] Professor Douglas Laycock is the first to identify the jurisprudence here as the Doctrine of

23    "Church Autonomy."  Douglas Laycock, Towards a General Theory of the Religion Clauses:  The Case of Church Labor Relations and the Right to Church Autonomy, 81 Colum. L. Rev. 1373 (1981).  The

24    Supreme Court  subsequently adopted the term.  Corporation of the Presiding Bishop v. Amos, 483 U.S. 327, 341-46 (1987) (Brennan, J., concurring, joined by Marshall, J.).

25    [15]Results similar to those requested in the Archdiocese's Cross Motion are mandated by two

26    other religious liberty doctrines:  the First Amendment Free Exercise doctrine involving individualized assessments, Church of the Lukumi Babalu Aye v. City of Hialeah, 508 U.S. 520, 543 (1993), Employment Div., Dept. of Human Resources of Oregon v. Smith, 494 U.S. 872, 884 (1990), Sherbert v.

**Page 23 of 54 -** DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

Rothgerber Johnson & Lyons LLP
90 S. Cascade # 1100, Colorado Springs, CO 80903
(719) 386-3000

1    The Church Autonomy Doctrine most directly applies to disputes that would, as

2    the TCC has requested here, have the Court change the structure and polity of the

3    Church by effectively merging the Parishes into the Archdiocese.  *See generally*

4    Serbian Eastern Orthodox Diocese for the United States of America and Canada

5    Diocese v. Milivojevich, 426 U.S. 696 (1976).

6         The Supreme Court has repeatedly made clear that the governance and polity of

7    a church includes the church's authority to determine the administration, use, and

8    ownership of church property by ecclesial entities.  In its Kreshik decision, for example,

9    the Supreme Court stated:

10        [In Kedroff,] we held that **the right conferred under canon law** upon the
          Archbishop of the North American Archdiocese of the Russian Orthodox
11        Greek Catholic church, as the appointee of the Patriarch of Moscow, **to
          the use and occupancy of the St. Nicholas Cathedral** in New York City,
12        owned by respondent corporation, **was "strictly a matter of
          ecclesiastical government,"** and as such could not constitutionally be
13        impaired by state statute.

14    Kreshik, 363 U.S. at 190 (emphasis added).  Justice Frankfurter, concurring in Kedroff,

15    similarly found:

16        [W]hen courts are called upon to adjudicate disputes which, though
          generated by conflicts of faith, may fairly be isolated as **controversies
17        over property** and therefore within judicial competence, **the authority of
          courts is in strict subordination to the ecclesiastical law** of a particular
18        church prior to schism.

19    Kedroff, 344 U.S. at 122; *see also* Serbian, 426 U.S. at 709 ("Resolution of the religious

20    disputes at issue here affect the control of church property in addition to the structure

21    and administration of the American-Canadian diocese.").

22

23    _____

24    Verner, 374 U.S. 398 (1963); and the First Amendment Free Exercise hybrid rights doctrine, Smith, 494
      U.S. at 881-82, Miller v. Reed, 176 F.3d 1202, 1207-1208 (9th Cir. 1999).  The Archdiocese is not
      presently invoking or briefing these theories because they may prove unnecessary.  The Religious
25    Freedom Restoration Act ("RFRA") also requires the same result.  In its present Cross Motion, the
      Archdiocese invokes RFRA solely to explain that the Court should deny the TCC's Restated Motion to
26    Dismiss that portion of the Debtor's religious liberty affirmative defense based upon RFRA.

**Page 24 of 54 -** DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

Rothgerber Johnson & Lyons LLP
90 S. Cascade # 1100, Colorado Springs, CO 80903
(719) 386-3000

1    **B.**     *Watson v. Jones:* **The Rule of Deference.** The fountainhead of Church

2    Autonomy law is <u>Watson v. Jones</u>, 80 U.S. (13 Wall.) 679 (1871).  <u>Watson</u> involved a

3    post-Civil War, church property dispute between the pro- and anti-slavery factions of a

4    Presbyterian congregation.  <u>Watson</u> reversed the Kentucky Court of Appeals which had

5    "overrule[d] the decision of the highest judicatory of [the Presbyterian C]hurch . . . and,

6    substitute[d] its own judgment for that of the ecclesiastical court." <u>Id.</u> at 734.  <u>Watson</u>

7    held that disputes involving hierarchical churches must be decided, not by testing which

8    faction had departed from the traditional doctrine, but by a rule of deference.

9
     [W]henever the questions of discipline, or of faith, or ecclesiastical rule,
     custom or law have been decided by the highest of these church
10   judicatories to which the matter has been carried, the legal tribunals must
     accept such decisions as final and as binding on them, in their application
11   to the case before them.

12   <u>Id.</u> at 727.

13
     <u>Watson</u> recognized the "right to organize voluntary religious associations . . . and
14
     to create tribunals for decision of controverted issues of faith . . ." <u>Id.</u> at 728.  It
15
     recognized that this independence for religious institutions was protected by "the
16
     structure of our government." <u>Id.</u> at 730.  <u>Watson</u> also recognized that disputes like the
17
18   one at bar risked entangling the judicial branch in ecclesiastical matters. <u>Id.</u> at 733.  It

19   reasoned:

20
     [I]t is easy to see that if the civil courts are to inquire into all these matters,
21   the whole subject of doctrinal theology, the usages and customs, the
     written laws, and fundamental organization of every religious
22   denomination may, and must be examined into with minuteness and care,
     for they would become, in almost every case, the *criteria* by which the
23   validity of the ecclesiastical decree would be determined in civil court.

24   <u>Id.</u> at 733 (emphasis in original).  This risk of entanglement was, for the <u>Watson</u> court,

25   compounded by the fact that  civil courts are "incompetent judges of matters of faith,

26   discipline, and doctrine." <u>Id.</u> at 732.

**Page 25 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

1

2   Each of these [religious institutions] has a body of constitutional and
    ecclesiastical law of its own, to be found in their written organic laws, their
3   books of discipline, in their collections of precedents, in their usage and
    customs, which as to each constitute a system of ecclesiastical law and
4   religious faith that tasks the ablest minds to become familiar with. It is not
    to be supposed that the judges of the civil courts can be as competent in
5   the ecclesiastical law and religious faith of all these bodies as the ablest
    men in each are in reference to their own.

6   Id. at 729.

7   The court also reasoned that there was a certain fairness to the rule of deference which

8   requires the courts to defer to the church authority because most property disputes

9   involve individuals who previously had attached to the church and thereby "implied[ly]

10  consent[ed] to [its] government." Id. at 729.

11      The Watson Court was quite aware that it had pronounced a rule structurally

12  restraining the power of government and, therefore, a doctrine limiting subject matter

13  jurisdiction. "[N]o jurisdiction has been conferred on the [civil] tribunal to try the

14  particular case before it." Id. at 733; see also id. (noting that the Watson rule was based

15  upon "[t]he structure of our government").

16      Watson rejected Lord Eldon's Rule, adopted in England for intra-church disputes,

17  whereby a civil court would determine which party followed traditional doctrine. This

18  methodology may have been appropriate in England, with its established church, but

19  not in the United States where religious "bodies [had] the right of construing their own

20  church laws." Id. at 728, 733.   Just as Watson precludes a court from imposing "right"

21  doctrine on a church, it also prohibits this Court from imposing a "right" polity on a

22  Catholic diocese. Thus, the Church Autonomy Doctrine functions as a structural

23  restraint on governmental power.[16]

24      _____

    [16] Some commentators identify this rule as primarily an Establishment Clause value. Carl H.
25  Esbeck, The Establishment Clause as a Structural Restraint on Governmental Power, 84 Iowa L. Rev. 1
    (1998). The Supreme Court attributes its refusal to resolve the merits of disputes involving ecclesiastical
26  subject matters to the sovereign's lack of power, or, more generally, to the separation of church and state,
    and, hence, to the civil magistrate's lack of subject matter jurisdiction. See Watson, 80 U.S. at 727-30
    (1871); Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440,

**Page 26 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

Rothgerber Johnson & Lyons LLP
90 S. Cascade # 1100, Colorado Springs, CO 80903
(719) 386-3000

1    **C.**    ***Jones v. Wolf*: "Neutral Principles" Methodology.** Jones v. Wolf

2    identified "Neutral Principles" as a permissible alternative to the deference approach.  It

3    is available for church property disputes providing the Court does not become entangled

4    in matters of religious doctrine, polity, or practice.  In Jones v. Wolf, 443 U.S. 595

5    (1979), a congregation of the Presbyterian Church of the United States ("PCUS") had

6    voted to leave the PCUS denomination and join the Presbyterian Church in America

7    ("PCA").  The secessionist congregation sought to take its property with it.  The PCUS

8    objected, and civil litigation commenced between the local majority faction aligned with

9    the PCA and the local minority faction aligned with the PCUS.

10    When the minority faction's suit reached the Georgia Supreme Court, it "applied

11    neutral principles" and focused on the legal title of the property.  It affirmed the trial court

12    by reasoning that, because legal title to the property vested in the local church, the

13    congregation could migrate to the PCA with its property in tow.  Jones v. Wolf, 243

14    S.E.2d 860 (Ga. 1978).  While the U.S. Supreme Court, on a 5-4 vote, permitted (but

15    did not require) the neutral principles approach, 433 U.S. at 604, the court did not itself,

16    however, use neutral principles to decide the case.  Instead, it found that the Georgia

17    Supreme Court's application of neutral principles had entangled it in a core church

18    function.  Id. at 606-09.  The Supreme Court, therefore, vacated and remanded the

19    case.  Id. at 610.

20    The case recognized that the usual method for resolving disputes that touch

21    upon matters of faith, polity, canon law, morals, or ecclesiastical relationships was the

22    rule of deference.  This rule was first pronounced in Watson and, most recently, in

23    _____

24    445-49 (1969) ("[It is] wholly inconsistent with the American concept of the relationship between church
and state to permit civil courts to determine ecclesiastical questions"); Serbian, 426 U.S. at 713-14 (courts

25    have no authority to decide ecclesiastical issues).  In Kedroff, 344 U.S. at 116, the court ties its holding to
the "separation of church and state," which bespeaks of the Establishment Clause.  Id. at 110.  To lack

26    power or jurisdiction is to speak of a structural restraint on the sovereign, thus preventing the court to
adjudicate the merits of the dispute, and that sort of restraint is best explained by attributing the Church
Autonomy Doctrine to the Establishment Clause.

**Page 27 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

Rothgerber Johnson & Lyons LLP
90 S. Cascade # 1100, Colorado Springs, CO 80903
(719) 386-3000

1    <u>Serbian</u>, 426 U.S. at 713-14 (1976).   <u>Jones v. Wolf</u> allowed that a state was permitted

2    "to adopt neutral principles of law as a means of adjudicating a church property

3    dispute." 443 U.S. at 604.   Under the neutral principles methodology, a court would

4    examine a variety of evidence including:

5           . . . the language of deeds, the terms of the local church charters, the state
            statutes governing the holding of church property, and the provision in the
6           constitution of the general church concerning the ownership and control of
            church property.
7
     <u>Id.</u> at 603.
8
          The Court's recognized the following as relevant evidence:  deeds, <u>id.</u> at 597;
9
     mortgages and other evidence of borrowing, <u>id.</u>; a variety of ecclesiastical documents
10
     including church corporate charters and constitutions, <u>id.</u> at 602, 604; materials
11
     indicating denominational affiliation, <u>id.</u> at 597-98; papers regarding congregational
12
     voting and membership requirements, <u>id.</u> at 598; evidence of denominational polity, <u>id.</u>;
13
     and evidence regarding the investigation and findings of the regional Presbytery, <u>id.</u>  In
14
     its discussion of other cases employing the neutral principles methodology, <u>Jones v.</u>
15
     <u>Wolf</u> recognized that other evidence of ecclesiastical law is also relevant, including
16
     Books of Church Order and Discipline analogous to the Catholic <u>Code of Canon Law</u>.
17
     <u>Id.</u> at 600.  <u>Jones v. Wolf</u> also cited <u>*Maryland and Virginia Eldership of the Churches of*</u>
18
     <u>*God v. Church of God at Sharpsburg, Inc.*</u>, 396 U.S. 367 (1970) in which the Court
19
     resolved a property dispute by, *inter alia*, reviewing denominational governing
20
     documents.  <u>Jones v. Wolf</u>, 443 U.S. at 602-03.
21
          <u>Jones v. Wolf</u> cited another Georgia Supreme Court decision, <u>Carnes v. Smith</u>,
22
     222 S.E.2d 322 (Ga. 1976), as a better example of the neutral principles approach.  <u>Id.</u>
23
     at 600.  <u>Carnes</u> involved a secessionist Methodist congregation which sought to take its
24
     real property with it as it left the United Methodist Church.  <u>Carnes</u>, 222 S.E. 2d at 324.
25
     The local church had an established practice of participating in United Methodist Church
26
     denominational polity by contributing to the parent denomination and sending delegates

**Page 28 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

Rothgerber Johnson & Lyons LLP
90 S. Cascade # 1100, Colorado Springs, CO 80903
(719) 386-3000

1    to its meetings. Id. Even though the deed conveying the property to the local church

2    conveyed it to the "trustees" of the local church and "their Successors in office as such

3    forever in fee simple," and even though the deed contained no language even

4    suggesting a beneficial interest in the denomination, the Georgia Supreme Court,

5    applying neutral principles, held that the Methodist Book of Discipline controlled. Id. at

6    324-35.

7         According to the court, the Book of Discipline made it "clear that church property

8    is held by local trustees for the benefit of the general Church." Id. Carnes vindicates

9    the principle that, under the First Amendment, churches and denominations retain the

10   power to define their own polity, even when the deeds by which they take property

11   contain no evidence of church polity.  It also stands for the proposition that a transferor

12   may not, through the language in the deed conveying property to the church, modify

13   that church's polity.  A church's polity is defined instead by its own canon law.

14        Jones v. Wolf's primary concern was to utilize the methodology which had the

15   least risk of entangling civil courts in ecclesiastical subject matters.  It noted that, when

16   the governance of the church itself was at issue, as was the situation involving its

17   secessionist Presbyterian congregation, the neutral principles approach would be least

18   entangling.  Id. at 605 (when "the locus of control would be ambiguous, and [a] careful

19   examination of the constitutions of the general and local church . . . [would] be

20   necessary," neutral principles methodology minimizes entanglement).

21        Jones v. Wolf permits States to adopt neutral principles methodology to reach

22   results consistent with the common understanding of the religious congregants prior to

23   the dispute. Id. At 603.  It does not permit that methodology to override the internal law

24   of the religious body. Id. at 604 (citing Serbian, supra).[17]

---

25   
26        17 While the Debtor was the first Catholic diocesan corporation in American history to file a
     petition for bankruptcy, there was an earlier insolvency involving the Archbishop of Cincinnati and his
     filing of an assignment for the benefit of creditors.  That case raised many issues nearly identical to those
     now before this Court.  In Mannix v. Purcell, 19 N.E. 572, 582 (Ohio 1888), the Archbishop's creditors

**Page 29 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

1    It noted that Georgia corporation law was problematic under the neutral

2    principles methodology because it "requires that 'church property be held according to

3    the terms of the church government,' and provides that a local church affiliated with a

4    hierarchical religious association 'is part of the whole body of the general church and is

5    subject to its laws and regulations.'" Id. at 608.  The Court then explained how canon

6    law informs the content of the relevant deed.

7          All this may suggest that **the identity** of the "Vineville Presbyterian
         Church" **named in the deeds must be determined according to the**
8          **Book of Church Order**, which sets out the laws and regulations of
         churches affiliated with the PCUS.  Such a determination, however, would
9          require a civil court to pass on questions of religious doctrine, and to usurp
         the function of the commission appointed by the Presbytery, which already
10         has determined that the petitioners represent the "true congregation" of
         the Vineville church.  Therefore, **if the Georgia law provides that the**
11         **identity of the Vineville church is to be determined according to the**
         **"laws and regulations" of the PCUS, then the First Amendment**
12         **requires that the Georgia Courts give deference to the presbyterial**
         **commission's determination of that church's identity.**

13   Id. at 609 (emphasis added).

14
                                      IX.
15         THE AUTHORITY OF CHURCHES TO DEFINE THEIR OWN POLITY
               IS NOT LIMITED BY A CLAIMANT'S THIRD PARTY STATUS
16                        OR BY INTRA-CHURCH CONTEXT.

17         The Spokane Bankruptcy Court recently declined to apply First Amendment

18   Church Autonomy law to assist in determining whether the parish property was part of

19   the Diocese of Spokane's bankruptcy estate.  <u>Committee of Tort Litigants v. Catholic</u>

20   <u>Diocese of Spokane</u>, at 27, 29.  The Spokane Court <u>assumed</u> without deciding that the

21   parishes were separate legal entities for the purpose of that decision.  As a result, that

22   ───────────────────────────────────────────────
     sought parish property to pay his debts arguing that the title documents named him as "owner."  The Ohio
23   Supreme Court recognized, first, that "[n]o higher or better right or title to any of this property passed to
     the assignees than the assignor held" and that the debtor's "creditors acquired no new rights or remedies
24   in or against it by force of the assignment."  Id. at 584.  The court then considered evidence of "15
     centuries into the laws and canons of the church" and found "proof . . . overwhelming that [the bishop]
25   was not invested with an absolute title to it as his own."  Id.  The court held:  **"The legal title to all this**
     **property is in the bishop, while the equitable or beneficial interest is in the several congregations .**
     **. ."**  Id. at 590 (emphasis added).  The court's methodology was precisely the same neutral principles
26   analysis later endorsed in  Jones v. Wolf, including a close consideration of the deeds and the Canon
     Law which informed the meaning of the deeds.

     **Page 30 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
     COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
     JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
     JUDGMENT

1    decision has little if any bearing on what the Court is being asked to decide here – are

2    the parishes separate from the Debtor?    Some discussion of the Spokane decision,

3    however, is instructive in disposing of the misguided belief that the Church Autonomy

4    Doctrine is limited to only cases involving intra-church disputes.

5        The Spokane Court reasoned that the Church Autonomy cases are limited to

6    intra-church property disputes and that the Church Autonomy Doctrine's structural

7    limitations on governmental power do not apply when tort claims are brought by

8    "unrelated third parties" [18] or "creditors."  Spokane Opinion at *13-16.  The Spokane

9    Court refused to apply the Church Autonomy Doctrine by over-emphasizing one among

10   many rationales in <u>Watson</u>.  It focused on a single sentence in <u>Watson</u> which noted that

11   those who unite themselves to a church impliedly consent to its government.  <u>Id</u>. at *13-

12   14.  As explained below, consent is not the determinative rationale in <u>Watson</u>.  *See* text,

13   *infra*, at Section IX, C and X, E.  The Spokane Court's logic and reading of First

14   Amendment precedent is incorrect and has troubling implications.

15       A.    <u>**The Church Autonomy Doctrine Applies in Many Circumstances**</u>

16   <u>**Other Than Intra-Church Disputes**</u>.  The Spokane Court incorrectly stated that the

17   Church Autonomy Doctrine is limited to "intra-church disputes, that is to say, disputes as

18   to ownership of property between different factions of a religious organization."  <u>Id</u>. at

19   *14.  Not so.  <u>Watson</u>'s holding, as the Supreme Court itself intended, has had "far-

20   reaching consequences,".  <u>Watson</u>, 80 U.S. at 734.

21       It has caused courts to defer to ecclesiastical authorities in a great variety of

22   circumstances including:  (1) church property disputes, <u>Kedroff</u>, 344 U.S. 94 (1952); (2)

23   disputes involving the interplay of Canon Law and trust law, <u>Gonzalez v. Roman</u>

24   <u>Catholic Archbishop of Manila</u>, 280 U.S. 1 (1929); (3) clergy malpractice cases, <u>Mabus</u>

25   _____

26   [18] The TCC invokes different reasoning in its argument for a "third party" exception to the Church
     Autonomy Doctrine.  Its argument is rebutted, *infra*, at Section IX, C and X, E.

**Page 31 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

1  v. St. James Episcopal Church, 884 So.2d 747, 764 (Miss. 2004) (collecting cases

2  rejecting clergy malpractice); (4) church-minister disputes, McClure v. The Salvation

3  Army, 460 F.2d 553 (5th Cir. 1972); (5) church-parishioner disputes, O'Connor v.

4  Diocese of Honolulu, 889 P.2d 261 (Hawaii 1994); (6) claims arising from church

5  communications, United States v. Ballard, 322 U.S. 78 (1944); and (7) negligent

6  supervision of ministers, Ehrens v. The Lutheran Church-Missouri Synod, 269

7  F.Supp.2d 328 (S.D.N.Y. 2003), see Appendix A.

8  **B.    Courts Have Applied the Church Autonomy Doctrine in Numerous**

9  **"Third Party" Cases.**  Both the Spokane Court ruled and the TCC contends that the

10  Church Autonomy Doctrine does not apply when "third parties" initiate litigation against

11  a religious entity.  Committee of Tort Litigants v. Catholic Diocese of Spokane, at *13-

12  16; TCC Brief at 7-8.  While the TCC never defines "third party," it and the Spokane

13  Court, conclusorily state that "tort claimants" and "creditors" are "third parties."  One

14  problem with this assertion is that it ignores the cases where the Church Autonomy

15  Doctrine barred the plaintiffs whose relationship was similar to the tort claimants here,

16  from resolving their claims in civil court.  These cases include clergy malpractice

17  cases,[19] minister-parishioner cases,[20] minister-church cases,[21] and church

18  communications cases.[22]

---

[19] See, e.g., Schieffer v. Catholic Archdiocese of Omaha, 244 Neb. 715, 508 N.W.2d 907, 911 (Neb. 1993) (stating no courts recognize clergy malpractice); Teadt v. Lutheran Church, Missouri Synod, 603 N.W.2d 816, 822 (Mich. Ct. App. 1999) (citing courts rejecting clergy malpractice claims); Mabus, 884 So.2d at (Miss. 2004) (collecting cases rejecting clergy malpractice).

[20] See, e.g., O'Connor v. Diocese of Honolulu, 885 P.2d 261 (Hawaii 1994); Parish of the Advent v. Episcopal Diocese of Massachusetts, 688 N.E.2d 923 (Mass. 1997); Turner v. The Church of Jesus Christ Latter-day Saints, 18 S.W. 3d 877 (Tex. App. — Dallas 2000, no writ).

[21] See, e.g., Hiles v. Episcopal Diocese of Massachusetts, 773 N.E.2d 929 (Mass. 2002) (defamation claim barred); Hutchison v. Thomas, 789 F.2d 392, 395-96 (6th Cir. 1986) (defamation and intentional infliction of emotional distress claims barred).

[22] See, e.g., Cimijotti v. Paulsen, 230 F.Supp. 39, 41 (N.D. Iowa, 1964) (First Amendment bars defamation claim arising from ecclesiastical tribunal testimony); Tilton v. Marshall, 925 S.W.2d 672 (Tex. 1996) (fraudulent preaching claims barred by First Amendment); Bryce v. Episcopal Church in the

**Page 32 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT

1    The United States Supreme Court itself has, in many circumstances, applied

2  Church Autonomy principles, in so-called "third party" situations.  In <u>Gonzalez</u>, 280 U.S.

3  1 (1929), for example, a "creditor" sued a Catholic Archdiocese arguing, in part, that

4  "even though he [was] not entitled to be appointed chaplain, he [was] entitled to recover

5  the surplus net income" of an endowed chaplaincy while it had no chaplain.  <u>Id</u>. at 18.

6  The "creditor" made this argument after he had failed in his effort to become the

7  chaplain (that is to say, after he had failed to become a related-party church minister).

8  The case nowhere mentions the creditor's relationship to the Catholic Church, if any.  It

9  only mentions his relationship with the testatrix who endowed the chaplaincy.  The

10  United States Supreme Court rejected the claim by invoking First Amendment Church

11  Autonomy principles and the 1917 Code of Canon Law (1917).  <u>Id</u>.  Furthermore, if the

12  term "third party" is a means for identifying those litigants unrelated to a church, none

13  could be more unrelated than the government itself.[23]  Nonetheless, cases initiated by

14  the government which involve ecclesiastical subjects are also routinely barred because

15  of First Amendment Church Autonomy concerns.

16    The Supreme Court has applied Church Autonomy principles in cases initiated by

17  "third party" government agencies.  <i>See</i>, e.g., <u>Catholic Bishop of Chicago</u>, 440 U.S. at

18  502 (First Amendment precludes NLRB from evaluating charges of unfair labor

19  practices made by Catholic school teachers when their church employers defended

20  their actions as "mandated by their religious creeds"); <u>Thomas v. Review Bd. of Indiana</u>

21  <u>Employment Security Div.</u>, 450 U.S. 707, 715 (1981) (noting that the First Amendment

22  precluded the court from determining an intra-denominational dispute regarding whether

23  a Jehovah's Witness conscientious objection to working in a foundry fabricating turrets

24  _____

   <u>Diocese of Colorado</u>, 289 F.3d 648 (10th Cir. 2002) (Church Autonomy Doctrine bars claims arising from
25  parish meetings related to youth minister).

26    [23] <i>See</i> e.g., <u>EEOC v. Southwestern Baptist Theological Seminary</u>, 651 F.2d 277, 284 (5th Cir.
   1981) (EEOC cannot force seminary to disclose demographic information about its faculty).

**Page 33 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

1    for military tanks was consistent with denominational doctrine); Walz v. Tax Comm'n of

2    City of New York, 397 U.S. 664, 676 (1970) (noting the First Amendment commended

3    tax exemptions for religious entities because such exemptions "restrict[] the fiscal

4    relationship between church and state, and tends to complement and reinforce the

5    desired separation insulating each from the other").

6          **C . *Watson*'s Protection of Church Doctrine and Polity Comes Not From**

7    **a Plaintiff's Consent But From the Constitution.**  The Spokane Court's conclusion

8    that Watson depends upon a plaintiff's consent to church polity, Committee of Tort

9    Litigants v. Catholic Diocese of Spokane at *13-14, is incorrect and assumes that the

10    Watson rule comes not from the Constitution but from contract law.  The Spokane Court

11    ignored the dominant rationales supporting Watson's Church Autonomy Doctrine

12    including:  a religious society's authority to determine its own governance, the structural

13    restraint limiting governmental power over ecclesiastical matters, the inherent risks of

14    governmental entanglement in adjudicating disputes involving ecclesiastical  matters,

15    the limits of judicial competence over ecclesiastical matters, and the differences

16    between English and American models of church-state relations.

17         These rationales relating to the institutional independence of churches, already

18    dominant in Watson, became even more important when the Supreme Court later held

19    that Watson had pronounced a constitutional doctrine.  Kedroff, 344 U.S. at 116

20    (Watson's doctrine protecting church autonomy "must now be said to have federal

21    constitutional protection as part of the free exercise of religion against state

22    interference").

23          [Watson] . . . radiates . . . a spirit of freedom for religious organizations, an
                independence from secular control or manipulation, in short, power to
24          decide for themselves, free from state interference, matters of church
                government as well as those of faith and doctrine.

25    Id.

26

**Page 34 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

1    The Church Autonomy Doctrine does not depend on a claimant's relationship

2 with a church but on the character of the government's intrusion into the church.  The

3 Supreme Court has identified **subject matters off limit to government**, such as:

4 "questions of discipline, or of faith, or ecclesiastical rule, custom, or law;" "matters of

5 church government;" and "control of church property."  <u>Kedroff</u>, 344 U.S. at 116;

6 <u>Watson</u>, 80 U.S. at 727; <u>Kreshik</u>, 363 U.S. at 190; <u>Serbian</u>, 426 U.S. at 709.

7 Accordingly, the Church Autonomy Doctrine is not a limitation on the classes of

8 individuals permitted to sue a church.  It is a structural limitation on governmental power

9 that applies when the litigation involves ecclesiastical subject matters.[24]

10    The Spokane Court's over-emphasis of the sentence in <u>Watson</u> regarding an

11 individual's consent to church governance effectively converts <u>Watson</u>'s constitutional

12 doctrine into one of contract.  The Spokane Court effectively holds that, absent a

13 meeting of the minds between the plaintiff and the church being sued regarding that

14 church's polity, there is no limitation on the plaintiff's ability to litigate claims that, if

15 successful, would change the church's internal structure. This conclusion opens the

16 door for those with claims involving ecclesiastical subject matters to avoid constitutional

17 doctrine by merely disaffiliating with a church before filing suit.  This would place the

18 application of the constitutional principles separating church and state in the hands of

19 each plaintiff.  It would result in a church having a different structure depending upon

20 each Plaintiff's relationship with the church it is suing and would violate basic First

21 Amendment doctrine.

22    Curiously, the TCC invokes <u>Bryce v. Episcopal Church in the Diocese of</u>

23 <u>Colorado</u>, 289 F.3d 648 (10th Cir. 2002) in support of its third party argument.  TCC

24 Brief at 8.  <u>Bryce</u> holds the opposite of what the TCC contends and is, in fact, a good

25

26    [24] *See* Section VIII, *supra*.

**Page 35 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

1  example of why there is no "third party" or "non-member" exception to the Church

2  Autonomy Doctrine.  When Ms. Bryce, a terminated youth minister, sued the church on

3  a variety of theories, she argued that the First Amendment did not bar her lawsuit

4  because, given that "she was neither an ordained minister nor a member of the

5  Episcopal Church," id. at 651, she was a third party.  Ms. Bryce also amended her

6  complaint to add her partner, Rev. Sarah Smith, to the lawsuit precisely to contend that

7  even if the Doctrine of Church Autonomy barred her claims, it could not bar her partner's

8  claims because the partner was a "third party" with no relationship whatsoever to the

9  church defendants.

10  The Tenth Circuit squarely rejected this proposed "third party" or "non-member"

11  exception to the Church Autonomy Doctrine, reasoning:

12  Plaintiff Smith [Bryce's partner] contends that, unlike Bryce, she had no
relationship with St. Aidan's and must be considered a third party who is
13  not subject to internal church disciplinary procedures.  This argument
misses the mark.  The church autonomy doctrine is rooted in protection of
14  the First Amendment rights of the church to discuss church doctrine and
policy freely.  The applicability of the doctrine does not focus upon the
15  relationship between the church and Rev. Smith.  It focuses instead on the
right of the church to engage freely in ecclesiastical discussions with
16  members and nonmembers.

17  Bryce, 289 F.3d at 658.

18      D.    **The Spokane Order has Troubling Implications.**  The Spokane Court's

19  observes that, in the Supreme Court's intra-church property disputes, "the controversy

20  has not been between the religious organization and an unrelated third party but has

21  been between the religious organizations and certain **members or prior members**."

22  Committee of Tort Litigants v. Catholic Diocese of Spokane at *13 (emphasis added).

23  This statement has troubling implications.  If consent based on membership were the

24  only touchstone for a church autonomy analysis, then tort claimants/creditors who were

25  members of the Church would have very different rights to collect a claim than

26  nonmembers.

**Page 36 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

Rothgerber Johnson & Lyons LLP
90 S. Cascade # 1100, Colorado Springs, CO 80903
(719) 386-3000

1    In essence, the Spokane Court reasoned that, because the tort claimants were

2    "unrelated third parties," it could disregard Canon Law and the First Amendment.  One

3    implication of this decision is that a party's relationship with the Church determines the

4    applicability of the First Amendment.  This leads to the result that tort claimants who

5    never joined the Catholic Church and never consented to its polity could seek to

6    disregard the parishes existence and collect their claims against the diocese from

7    parishes' assets while Catholic claimants would be limited to only the diocese's assets

8    as recognized by Canon Law.[25]

9    Another troubling implication arises from the Spokane Court artificially

10    constricting Church Autonomy law to "intra-church property disputes" and noting that

11    there as no dispute between the Spokane diocese and the parishes.  Committee of Tort

12    Litigants v. Catholic Diocese of Spokane at *15.  In essence,  the Spokane Court held

13    that it could rearrange Catholic Church polity and Canon Law when the parishes and

14    the diocese were in agreement regarding Church polity but not when there was a

15    dispute.

16

17                                   **X.**
**THE TORT CLAIMANTS COMMITTEE HAS DISTORTED**
**FIRST AMENDMENT DOCTRINE.**

18

19    As explained *supra*, the First Amendment prevents the Court from rearranging

20    the structure of the Catholic Church and from ignoring that the Parishes are separate

21    ecclesial entities with their own administrators and property.  It also provides two

22    alternative methods for the Court to resolve this church property dispute--both of which

23    give account to the critical role of church law in defining church polity.  The TCC has

24    offered nine arguments to constrict the First Amendment.  It has offered similar

25    arguments to direct the Court away from the Religious Freedom Restoration Act and

26    _____

25 Most of the tort claimants here are not strangers to the Catholic Church.  Most were Catholics at the
time of the alleged tortious incidents.  *See generally* Hoffmann Declaration.

**Page 37 of 54 -** DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

1    one provision of Oregon religious corporation law.  In making these arguments, the TCC

2    has repeatedly misconstrued important precedent to present an erroneous and self-

3    serving interpretation of the law.  Each of the TCC's arguments are addressed in this

4    section.

5        **A.    The First Amendment Protects Actions and Beliefs.**  The TCC invokes

6    *dicta* from Cantwell v. Connecticut, 310 U.S. 296 (1940) to suggest that, although the

7    First Amendment "absolutely" protects religious belief, it generally subjects religious

8    conduct to governmental regulation.[26]  TCC Brief at 3.  The TCC makes this argument

9    to suggest that the Catholic Church's *action* in defining its structure and polity--including

10   the distinctiveness of its parishes--warrants no First Amendment protection.  This

11   argument is incorrect.  First, the plain language of the First Amendment protects "the

12   free *exercise* of religion."  "Exercise" means action.

13       Second, when quoting Cantwell, the TCC omitted that portion of the quotation

14   which stated that the Free Exercise Clause limits governmental choices in regulating

15   religious actions.  The omitted text states:  "In every case the power to regulate must be

16   so exercised as not, in attaining a permissible end, unduly to infringe the protected

17   freedom."  Id. at 303-04.

18       Third, Cantwell's actual holding protected the religious *actions* of three Jehovah's

19   Witnesses who were door-to-door proselytizing and sharing anti-Catholic information in

20   violation of state criminal statutes which prohibited solicitation without a license and

21   disturbing the peace.  *See* id. at 300.  The true holding in Cantwell was that the First

22   Amendment precluded the government from regulating the religious actions of these

23   three Jehovah's Witnesses--even when their actions constituted a crime.

24   _____

25   [26] The TCC also cites Reynolds v. United States, 98 U.S. 145 (1878) for this proposition.  TCC
     Brief at 3.  Reynolds is not a church autonomy case as it involves the prosecution of an individual for
     bigamy.  It is a pure Free Exercise case.  Such matters are now governed by Smith, 494 U.S. 872 (1990).
26   Moreover, the belief-action dichotomy was not dispositive in Reynolds.

**Page 38 of 54 -** DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

Rothgerber Johnson & Lyons LLP
90 S. Cascade # 1100, Colorado Springs, CO 80903
(719) 386-3000

1    Finally, Cantwell is off point because it is an individual Free Exercise rights case

2    and not a church autonomy case.  *See* Appendix A.

3        **B.    Federal Courts Have Unanimously Rejected the Argument That the**

4    **1990 Decision in *Employment Division v. Smith* Diminished Church Autonomy**

5    **Jurisprudence.**  As part of its contention that the First Amendment provides almost no

6    protection for religious exercise, and in support of its request that the Court dismiss the

7    Fifth Affirmative Defense relating to religious freedom, the TCC contends that

8    Employment Div. v. Smith, 494 U.S. 872 (1990) permits government to burden the free

9    exercise of religion if it does so by "generally applicable neutral laws."  TCC Brief at 3.

10   This argument has several errors.

11       First, the TCC omits that Smith itself expressly re-affirmed the vitality of the

12   Church Autonomy law.[27]  Every Circuit Court of Appeals considering whether Smith

13   diminished Church Autonomy law has determined that it is has not.[28]  No court has held

14   otherwise. Second, the TCC confuses and conflates Smith's approach for applying Free

15   Exercise law to "neutral and generally applicable" laws in individual rights cases with

16   Jones v. Wolf's "neutral principles" methodology for applying Church Autonomy theory

17   in church property disputes.[29]  *See* TCC Brief at 4 and 14-15.  The only thing the two

18       [27] Smith, 494 U.S. at 877, 887, reaffirming four seminal Church Autonomy cases: Presb. Church
19   v. Mary Elizabeth Blue Hull, 393 U.S. 440 (1969), Kedroff v. St. Nicholas Cathedral, 344 U.S. 94 (1952),
     Serbian E. Orthodox v. Milivojevich, 426 U.S. 696 (1976), and United States v. Ballard, 322 U.S. 78
20   (1944).  Hull, Kedroff, and Serbian are church property disputes.

21       [28] Catholic University, 83 F.3d 455, 461-63 (D.C. Cir. 1996); Combs v. Central Texas Annual
     Conf. of the United Methodist Church, 173 F.3d 343, 347-51 (5th Cir. 1999); EEOC v. Roman Catholic
22   Diocese of Raleigh, 213 F.3d 795, 800 n.1 (4th Cir. 2000); Gellington v. Christian Methodist Episcopal
     Church, Inc., 203 F.3d 1299, 1301-04 (11th Cir. 2000); Bryce, 289 F.3d at 656 (10th Cir. 2002) ("The
23   Supreme Court's decision in [Smith] does not undermine the principles of the church autonomy
     doctrine."); Shaliehsabou v. Hebrew Home of Greater Washington, Inc., 363 F.3d 299, 306 n.7 (4th Cir.
24   2004).

25       [29] *See e.g.*, E.E.O.C. v. Catholic University of America, 83 F.3d 455, 466 (D.C. Cir. 1996) ("Jones,
     however, dealt with a dispute over church property, and the 'neutral principles' to which the Supreme
     Court referred were those embodied in trust and property law"); Hutchison v. Thomas, 789 F.2d 392, 396
26   (6th Cir. 1986) (Jones "expressly noted, however, that the 'neutral principles' exception to the usual rule
     of deference applies only to cases involving disputes over church property"); Crowder v. Southern Baptist

**Page 39 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

1  tests have in common is the use of the word "neutral." .Conflating the two tests, the

2  .TCC never explains that <u>Smith</u> involved a generally applicable law which burdened an

3  individual's free exercise and not a church's autonomy.

> 4  . . . *Smith* did not address the Free Exercise Clause's protection to a
> church against government encroachment into the church's internal
> 5  management. *Catholic University*, 83 F.3d at 461.  Rather, *Smith* only
> addressed the strand of Free Exercise Clause protection afforded an
> 6  individual to practice his faith. . . . **Smith . . . did not mean that a
> church, as opposed to an individual, is never entitled to relief from a
> 7  neutral law of general applicability**.

8  <u>Combs</u>, 173 F.3d at 348 (5th Cir. 1999) (emphasis added).

9      **C.**    <u>**Ecclesiastical Abstention Law--Better Described as Church**</u>

10  <u>**Autonomy Law--Restrains Courts from Hearing Cases Touching upon**</u>

11  <u>**Ecclesiastical Subject Matters**</u>**.**  The TCC denominates Church Autonomy

12  jurisprudence as "ecclesiastical abstention" law and argues--as if churches were the

13  constitutional equivalents of tire dealerships--that this body of law does "not stand for

14  [church] independence or autonomy from civil law."  TCC Brief at 3-4.  While some

15  courts have referred to the Church Autonomy cases as "abstention" cases, the term is

16  inaccurate when used to imply that the civil courts have a choice whether to defer to

17  ecclesiastical authority when the civil litigation touches upon ecclesiastical subject

18  matters.  *See* text, *supra*, at  Section VIII.

19      **D.**    <u>**The Doctrine of Church Autonomy Is Not Limited to Intra-Church**</u>

20  <u>**Disputes Determining Religious Doctrine**</u>**.**  The TCC asserts that Church Autonomy

21  law applies "only when . . . (1) the matter involves an intra church dispute, and (2) the

22  outcome rests **solely** on a determination of religious doctrine or ecclesiastical law."

23  <u>Convention</u>, 637 F.Supp. 478, 480 (N.D. Ga. 1986) (although property disputes may be considered for
24  "neutral principles" analysis, claim to require church hierarchy to be operated in certain manner was not
cognizable); <u>Burgess v. Rock Creek Baptist Church</u>, 734 F.Supp. 30, 32 (D. D.C. 1990) (neutral principles
25  "approach applies only to church property disputes"); <u>Houston v. Mile High Adventist Academy</u>, 846
F.Supp. 1449 (D. Colo. 1994) ("doubtful" that "neutral principles" doctrine can be applied to a dispute not
involving property); <u>Williams v. Episcopal Diocese of Massachusetts</u>, 766 N.E.2d 820, 824 (Mass. 2002)
26  (no "same law" exception to Church Autonomy Doctrine).

**Page 40 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

Rothgerber Johnson & Lyons LLP
90 S. Cascade # 1100, Colorado Springs, CO 80903
(719) 386-3000

1     TCC Brief at 5 (emphasis in original). The TCC cites no legal authority for this incorrect

2     proposition. *See* text, *supra*, at Sections IX, A.

3         The Church Autonomy cases are not limited, as the TCC suggests to merely

4     "stat[ing] that government may not determine religious belief." TCC Brief at 4. When

5     the litigation involves core ecclesiastical subject matters--as, for example, when church

6     polity or church-minister relationships are at issue--these cases deprive the court of

7     jurisdiction over disputes involving many different laws, including civil rights laws,

8     McClure, 460 F.2d 553 (5th Cir. 1972); contract laws, Lewis v. Seventh-day Adventists

9     Lake Region Conference, 978 F.2d 940, 942-43 (6th Cir. 1992); labor regulations,

10     Catholic Bishop of Chicago, 440 U.S. 490 (1979); tort laws, Klagsbrun v. Va'Ad

11     Harabonim of Greater Monsey, 53 F.Supp.2d 732 (D.N.J. 1999), and criminal statutes,

12     United States v. Ballard, 322 U.S. 78 (1944).

13         While the First Amendment would not permit a civil court to adjudicate a dispute

14     in which the court is required to decide between two competing religious doctrines, few

15     of the cases in which courts have lacked jurisdiction involve such a clear constitutional

16     violation. In most instances in which civil courts decline jurisdiction because of the

17     Church Autonomy Doctrine, they do so because adjudication would likely cause the

18     Court to become entangled with ecclesiastical subject matters that are purely religious.

19         The standard for impermissible governmental entanglement with an

20     ecclesiastical subject matter is far less than the TCC's proposed standard "that the

21     outcome rest solely on a determination of religious doctrine or ecclesiastical law."

22     Watson itself required a rule of deference when the dispute involved a hierarchical

23     church and "questions of [church] discipline, or of faith, or ecclesiastical rule, custom or

24     law." Watson, 80 U.S. at 727. *See* Yaggie v. Indiana-Kentucky Synod Lutheran

25     Church, 860 F.Supp. 1194 (W.D. Ky. 1994), aff'd, 64 F.3d 664 (6th Cir. 1995)

26     (defamation claim barred by First Amendment subject matter jurisdiction grounds; "[i]t

Rothgerber Johnson & Lyons LLP
90 S. Cascade # 1100, Colorado Springs, CO 80903
(719) 386-3000

1  makes no difference that the ecclesiastical dispute fails to touch on church or religious

2  doctrine.").

3      E.    *General Council* **Does Not Create a "Third Party" Exception to the**

4  **Doctrine of Church Autonomy.**   The TCC, invoking General Council on Fin. & Admin.

5  of the United Methodist Church v. California Super. Ct. 439 U.S. 1355 (1978), takes a

6  different route from that of the Spokane Court to contend that the tort claimants are free

7  of First Amendment strictures because of their "third party" status.  TCC Brief at 7-8.

8        The TCC's invocation of General Council does not save a "third party" exception.

9  The TCC presents General Council as if it were an opinion of the United States

10  Supreme Court authored by Justice Rehnquist.  It is not.  It is an "in chambers" opinion

11  of Justice Rehnquist sitting as a Circuit Justice.  "In chambers" opinions are not

12  opinions of the Supreme Court, and they have no precedential value outside the case in

13  which they are made.[30]

14        Furthermore, the TCC quotes only *dicta* from this opinion.  The issue before

15  Justice Rehnquist was whether to stay a California state court's determination that it had

16  *in personam* jurisdiction over a national denomination or just a division thereof.  General

17  Council, 439 U.S. at 1369.  Finally, Justice Rehnquist was one of two dissenters in the

18  landmark Church Autonomy decision, Serbian, 426 U.S. 696 (1976), decided two years

19  earlier.  He, acting unilaterally as a Circuit Justice, wrote *dicta* into General Council, still

20  fighting the battle he had lost in Serbian.[31]

---

21  [30] *See* Lois J. Scali, Comment, Prediction-making in the Supreme Court: The Granting of Stays
22  by Individual Justices, 32 UCLA L. Rev. 1020, 1047 (June 1985); Ritter v. Smith, 726 F.2d 1505, 1512
   n.17 (11th Cir.) ("[A] decision to grant or deny a stay is not one on the merits of the claims presented.").
23  "In-chambers opinions respond to applications to Justices in their individual capacity, directed to their
   chambers by the Clerk of the Supreme Court." Scali, Prediction-making in the Supreme Court, 32 UCLA
   L. Rev. at 1020 n.1.  *See generally* Note, The Powers of the Supreme Court Justice Acting in an
24  Individual Capacity, 112 U. Pa. L. Rev. 981, 988 (1964) ("Opinions of the individual justices are not
   decisions of the Court . . .").
25
26  [31] The TCC does not like Serbian and argues that Jones v. Wolf transformed Justice Rehnquist's
   Serbian dissent into controlling law.  TCC Brief at 12 n.10.  This is not so.  Serbian is good authority, cited
   by hundreds of courts.  Jones v. Wolf itself relies upon it and cites it six times with no hint of criticism.

**Page 42 of 54 -** DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

1    As the Debtor has explained earlier, the primary problem with the TCC's

2    proposed "third party" exception is that the First Amendment Church Autonomy Doctrine

3    does not depend upon the status of the claimant but upon the character of the

4    governmental intrusion into a church.  *See* text, *supra*, at Section VIII, B.

5    **F.    First Amendment Protection Does Not Require a Dispute Between**

6    **the Parishes and the Archdiocese.**  The TCC contends, without citation to any legal

7    authority, that because there is no dispute between the Parishes and the Archdiocese

8    regarding Catholic doctrine and Canon Law, the Doctrine of Church Autonomy does not

9    apply.  TCC Brief at 9.  This argument is a variation of the arguments, considered

10   earlier, that the Church Autonomy Doctrine only applies in intra-church disputes and

11   does not apply in "third party" disputes.  It is still incorrect.  *See* text, *supra*, at Section

12   VIII, B.

13   **G.    Permitting a Church to Define Its Own Polity Does Not Violate the**

14   **Establishment Clause.**  The TCC asserts that allowing Debtor to unilaterally determine

15   what constitutes its bankruptcy estate would violate the Establishment Clause.  *See*

16   TCC Brief at 10-11.  The Debtor is not attempting to do so.  The TCC's theory that the

17   Establishment Clause prevents a denomination from determining its own polity

18   (including rules regarding property ownership among ecclesial entities within the

19   denomination) subverts the Church Autonomy Doctrine.  The TCC's argument on this

20   point treats the Church Autonomy Doctrine not as a structural limitation on

21   governmental power but as a governmental accommodation of religion similar to the

22   legislative grant of a religious exemption.[32]  The Church Autonomy Doctrine requires

23   government to defer to a denomination's self-defined governance.

24   *See* Jones v. Wolf, 443 U.S. at 602-05, 609 n.8.

25   [32] *See* John T, Noonan, Jr., The Lustre of Our Country:  The American Experience of Religious
     Freedom 69-70 (1998) (explaining James Madison's "decisive" move in replacing George Mason's
26   proposed language for the "fullest Toleration in the Exercise of Religion" with language guaranteeing the
     "full and free exercise" of religion in Virginia's 1776 Declaration of Rights).

**Page 43 of 54 -** DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

Rothgerber Johnson & Lyons LLP
90 S. Cascade # 1100, Colorado Springs, CO 80903
(719) 386-3000

1    Even if, *arguendo*, the Church Autonomy Doctrine functioned as an

2    accommodation of religion, the Establishment Clause permits religious

3    accommodation.[33]  Governmental accommodation of religion (which does not

4    discriminate between religious groups), like legislative exemption of religion, is not an

5    establishment of religion because leaving religion alone is never an establishment.[34]

6        The TCC's invocation of Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v.

7    Kianfar, 179 F.3d 1244 (9th Cir. 1999) does not support the proposition that

8    denominations may not "unilaterally" define their own polity.  *See* TCC Brief at 10.

9    Maktab involved a copyright dispute between a Muslim Sufi group and secessionists led

10   by Ali Kianfar and Hanid Kianfar.  The Ninth Circuit recognized that if the hierarchy of

11   the Sufi order were not controverted, it would likely adjudicate the dispute through the

12   Watson deference approach.  Id. at 1248 (The deference "approach is most easily

13   employed when there is no dispute between the parties concerning the hierarchical

14   nature of the church . . . .").  Because the Kianfars contested the legitimacy of the

15   group's Forty-First Teacher's successor, the Circuit Court, instead, utilized the neutral

16   principles methodology and determined that copyright ownership rested in the Sufi order

17   in whose name the copyrights were registered.  This conclusion was consistent with the

18   "tradition and practice of the Order."  Id. at 1246.

19       A significant aspect of Maktab's holding that is consistent with the Debtor's

20   argument is that the bare title of a copyright only determines ownership when such title

21   evidence is not contrary to a religious group's polity, canon law, corporate documents,

22   [33] Cutter v. Wilkinson, 125 S.Ct. 2113 (2005); Corp. of the Presiding Bishop v. Amos, 483 U.S.
23   327, 334 (1987) ("This Court has long recognized that the government may (and sometimes must)
     accommodate religious practice and that it may do so without violating the Establishment Clause."); Arver
24   v. U.S., 245 U.S. 366, 290 (1918) (rejecting argument that exempting clergy from the Selective Service
     Act constitutes an establishment).

25       [34] TCC's cite to Bd. of Educ. of Kiryas Joel v. Grumet, 512 U.S. 687 (1994) is misplaced because
     Kiryas Joel involved government favoring one religion over others by creating a special public school
26   district for one religious group, the Satmar Hasidic Jews.  TCC Brief at 11 n.9.

**Page 44 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

1  or state law.  *See* <u>Order of St. Benedict of New Jersey v. Steinhauser</u>, 234 U.S. 640

2  (1914) (even though copyrights were registered in name of deceased Benedictine

3  priest, they were, by application of the organizing law of a Benedictine monastery and

4  the sixth century Rule of St. Benedict, owned by the religious order).

5      H.    **The TCC's Invocation of *Lemon v. Kurtzman* Is Misplaced**.  The TCC

6  contends that "bankruptcy law and Oregon real property law" are constitutional under

7  <u>Lemon v. Kurtzman</u>, 403 U.S. 602 (1971).  TCC Brief at 13.  The Debtor is not

8  challenging the constitutionality of these laws.

9      I.    ***Jones v. Wolf* Does Not Mandate Express Trust Language in Deeds**.

10  The TCC, invoking *dicta* from <u>Jones v. Wolf</u>, argues that the Debtor and the Parishes

11  are "obligated" to include trust language in the deeds by which the Parishes acquired

12  their property.  *See* TCC Brief at 12.  There is no such requirement.  <u>Jones v. Wolf</u>

13  simply observes that the modification of language in those documents readily available

14  for public inspection--in warranty deeds and in articles of incorporation--might simplify

15  the determination of a trust relationship.  <u>Jones v. Wolf</u>, 443 U.S. at 606 (stating that the

16  parties may make such modifications "if they so desire" in the property records or in "the

17  constitution of the general church").

18      <u>Jones v. Wolf</u> made clear that deeds and other public documents need not

19  contain explicit trust language for a trust to exist.  It did this by endorsing <u>Carnes v.</u>

20  <u>Smith</u>, 222 S.E.2d 322 (Ga. 1976) which applied the canon law of the United Methodist

21  denomination to impose a trust even though trust language was absent from both the

22  deed and the articles of incorporation and was present only in the Methodist Book of

23  Discipline.

24      J.    **The Religious Freedom Restoration Act Prevents the Court from**

25  **Applying the Bankruptcy Code to Remake the Polity of Catholic Institutions**.  The

26  TCC asserts that "RFRA has no bearing on this case" because:  (1) it is

**Page 45 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

1  unconstitutional, even as applied to the federal government, (2) applying RFRA for the

2  Archdiocese's benefit violates the Establishment Clause, (3) finding that parish property

3  is part of the Debtor's estate, despite Canon Law to the contrary, does not "substantially

4  burden" burden religious exercise, and (4) such a finding  survives strict scrutiny, *i.e.*,

5  ignoring the Debtor's religious character when applying the Bankruptcy Code is the

6  least restrictive means of serving a compelling state interest.  TCC Brief at 14-16.  Each

7  of these arguments lacks merit.

8      The Ninth Circuit has already rejected the first two.  <u>Guam v. Guerrero</u>, 290 F.3d

9  1210, 1211, 1218-21 (9th Cir. 2002) (RFRA is constitutional as applied to the federal

10  government, even after <u>Dickerson v. United States</u>, 530 U.S. 428 (2000)); <u>Mockaitis v.</u>

11  <u>Harcleroad</u>,[35] 104 F.3d 1522, 1530 (9th Cir. 1997) (joining other courts of appeal

12  rejecting Establishment Clause challenge to RFRA).[36]

13      Moreover, in a thorough opinion arising in the bankruptcy context, the Eighth

14  Circuit rejected the identical arguments made here by the TCC.  <u>Christians v. Crystal</u>

15  <u>Evangelical Free Church</u>, 141 F.3d 854, 859 (8th Cir. 1998) ("<u>Christians II</u>").  After

16  analyzing the separation of powers argument, the Eighth Circuit concluded that "RFRA

17  is an appropriate means by Congress to modify the United States bankruptcy laws."  <u>Id.</u>

18  at 861.  Likewise, after a thorough examination of Establishment Clause precedent,

19  <u>Christians II</u> held: "RFRA fulfills each of the elements presented in the <u>Lemon</u> test,

20  and . . . Congress did not violate the Establishment Clause in enacting RFRA."  <u>Id.</u> at

21  863.

22      The TCC's remaining two RFRA arguments are equally unavailing.  First, it is

23  astounding that the TCC contends that there would be no "substantial burden on

24      [35] <u>Mockaitis</u> was overruled on other grounds by <u>City of Boerne v. Flores</u>, 521 U.S. 507 (1997).

25      [36] The TCC's citation to <u>La Voz Radio la Communidad v. FCC</u>, 223 F.3d 313 (6th Cir. 2000) is

26  misleading.  *See* TCC Brief at 14.  The Sixth Circuit panel in that case referred only in passing to RFRA's constitutionality, and did not purport to analyze the issue.  <u>Id.</u> at 319.

**Page 46 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

1    religious exercise" were this Court to combine the assets of 124 parishes into the

2    Debtor's estate, contrary to the very Canon Law governing both.  *See* TCC Brief at 14-

3    15.  For comparison, in tithing cases bankruptcy courts regularly find that recovering (or,

4    "avoiding" under 11 U.S.C. § 548(a)(2)) a debtor's tithes from the debtor's church--even

5    for modest sums--constitutes a "substantial burden" under RFRA.  *See* <u>Christians v.</u>

6    <u>Chrystal Evangelical Free Church</u>, 82 F.3d 1407, 1417-19 (8th Cir. 1996) ("<u>Christians</u>

7    <u>I</u>")[37] (recovering $13,450 in tithes constitutes a "substantial burden" under RFRA); <u>Magic</u>

8    <u>Valley Evangelical Free Church v. Fitzgerald</u>, 220 B.R. 386, 391 (D. Idaho 1998)

9    (recovering $5,204 is "substantial burden" under RFRA).  For the Eighth Circuit in

10   <u>Christians I</u>, it was "sufficient that the governmental action in question meaningfully

11   curtails, albeit retroactively, a religious practice of more than minimal significance in a

12   way that is not merely incidental." <u>Christians I</u>, 82 F.3d at 1418-19.

13        Finally, it cannot be said that the TCC's requested application of the Bankruptcy

14   Code is the least restrictive means of serving a compelling state interest, as required

15   under RFRA. 42 U.S.C. § 2000bb-1(b).  The TCC's request to maximize the size of the

16   Debtor's estate, by including parish property, is neither a compelling state interest nor

17   the least restrictive means of accomplishing such an interest.  Bankruptcy courts that

18   have reached RFRA's strict scrutiny analysis have acknowledged that compelling

19   governmental interests are "interests of the highest order," <u>Christians I</u>, 82 F.3d at 1419,

20   or "paramount interests," <u>Magic Valley Evangelical Free Church</u>, 220 B.R. at 391, such

21   as maintaining the tax system, preserving national security, ensuring public safety, or

22   providing public education. <u>Christians I</u>, 82 F.3d at 1419 (citing cases); <u>Magic Valley</u>

23   <u>Evangelical Free Church</u>, 220 B.R. at 391 (citing cases).  These courts conclude,

24   _____

25   [37] This earlier decision from the Eighth Circuit (<u>Christians I</u>) was summarily vacated and
     remanded in light of the Supreme Court's decision in <u>City of Boerne v. Flores</u>, 521 U.S. 507 (1997).  After
     reconsideration, the Eighth Circuit (in <u>Christians II</u>) reinstated it.  <u>Christians v. Crystal Evangelical Free</u>
26   <u>Church</u>, 141 F.3d 854, 856 (8th Cir. 1998).

**Page 47 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

Rothgerber Johnson & Lyons LLP
90 S. Cascade # 1100, Colorado Springs, CO 80903
(719) 386-3000

1   however, that "maximizing the recovery of creditors cannot be considered an interest of

2   the highest order." <u>Magic Valley Evangelical Free Church</u>, 220 B.R. at 392. The Eighth

3   Circuit has a similar clear-eyed explanation in the analogous tithing situation. <u>Christians</u>

4   <u>I</u>, 82 F.3d at 142 ("[W]e cannot see how the recognition of . . . a free exercise exception

5   to the avoidance of fraudulent transfers can undermine the integrity of the bankruptcy

6   system").

7         Even if this Court found, contrary to case law, that "maximizing the debtor's

8   estate" was a compelling governmental interest, refusing to recognize the free exercise

9   exceptions created by RFRA and the First Amendment would not be the least restrictive

10   means of furthering such an interest. It is simply not the case, as the TCC suggests,

11   *see* TCC Brief at 15-16, that "uniformity and predictability" in the bankruptcy system

12   requires a blind-eye to the religious character of the debtor. Rather, "the Bankruptcy

13   Code subordinates the interests of creditors to the interests of debtors and other public

14   policy interests in numerous circumstances." <u>Magic Valley Evangelical Free Church</u>,

15   220 B.R. at 392. Thus, rather than the flat rule proposed by the TCC, a less restrictive

16   means of achieving any governmental interest served by the bankruptcy system would

17   be to apply the Bankruptcy Code as it is currently written – which includes the free

18   exercise exceptions created by RFRA and the First Amendment.

19         In sum, this Court should not dismiss the Archdiocese's religious freedom

20   defense, as based on RFRA.

21       **K.**    **Section 65.042 of the Oregon Non-Profit Corporation Act Follows the**

22   ***Watson* Rule of Deference.** The TCC contends that O.R.S. § 65.042 is irrelevant and

23   the Court should dismiss the Archdiocese's fifth affirmative defense to the extent that it

24   relies upon O.R.S. § 65.042. TCC Brief at 19, 21. The TCC is wrong on both counts.

25   Section 65.042's significance in restating the <u>Watson</u> rule is discussed *supra* at

26   Section IV. It is part of the state law which the Court must apply in resolving this case.

**Page 48 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

1    Moreover, it is one of the several statements of Oregon law that enables the Debtor to

2    follow its Canon Law in its governance. That "[n]o Oregon Court has ever construed or

3    applied O.R.S. § 64.042 in a published opinion" is not a basis to disregard its text or

4    relevance.

5

**XI.**

**THE DEBTOR IS NOT JUDICIALLY ESTOPPED**
6    **FROM ARGUING THAT PARISHES ARE SEPARATE ENTITIES**
**WITH THEIR OWN PROPERTY ADMINISTERED BY THEIR**
7    **RESPECTIVE PASTORS**

8        The TCC relies on the doctrine of judicial estoppel and seeks to avoid the Court's

9    examination of the relevant evidence and law regarding the Parishes' status as separate

10   entities with their own property. TCC Brief at 27. The judicial estoppel doctrine is not

11   available both because the Court may not expand its jurisdiction by estoppel and

12   because the requirements for estoppel are not present.

13        A.    <u>The Court's Jurisdiction May Not Be Expanded by Estoppel</u>. The

14   First Amendment acts as a structural restraint upon judicial power and thereby limits the

15   court's subject matter jurisdiction. The <u>Watson</u> court pronounced a doctrine which

16   functions as a structural restraint on governmental power and, therefore, a rule limiting

17   subject matter jurisdiction. "[N]o jurisdiction has been conferred on the [civil] tribunal to

18   try the particular case before it." <u>Watson</u>, 80 U.S. at 733. "The structure of our

19   government has, for the preservation of civil liberty, rescued the temporal institutions

20   from religious interference [and] it has secured religious liberty from the invasion of the

21   civil authority." <u>Id</u>. at 730 (emphasis added). <u>Watson</u> reasoned:

22            It may be said here, also, that no jurisdiction has been conferred on the
            tribunal to try the particular case before it, or that, in its judgment, it
23          exceeds the powers conferred upon it, or that the laws of the church do
            not authorize the particular form of proceeding adopted; and, in a sense
24          often used in the courts, **all of those may be said to be questions of**
            **jurisdiction**.
25

    <u>Id.</u> at 733 (emphasis added).
26

Rothgerber Johnson & Lyons LLP
90 S. Cascade # 1100, Colorado Springs, CO 80903
(719) 386-3000

1    The TCC cannot invoke judicial estoppel to expand the powers of this Court.

2    "The jurisdiction of the federal courts is carefully guarded against expansion by judicial

3    interpretation or by prior action or consent of the parties." American Fire and Cas. Co.,

4    341 U.S. 6, 17-18 (1951).  "Subject matter jurisdiction cannot be conferred upon the

5    courts by the actions of the parties and principles of estoppel and waiver do not apply."

6    Richardson v. United States, 943 F.2d 1107, 1113 (9th Cir. 1991).  No statement of a

7    party, including prior inconsistent statements, can confer jurisdiction upon a court.  See

8    Insurance Corp. of Ireland, Ltd. v. Compaigtnie des Bauixitees de Guinee, 456 U.S.

9    694, 702 (1982) ("no action of the parties can confer subject matter jurisdiction upon a

10    federal court").

11    **B.    The Requisites for Judicial Estoppel Are Not Present.**  Judicial

12    estoppel generally is not available unless the party asserting the doctrine shows:

13    1.    Clearly Inconsistent Prior Position.  "[A] party's later position must be
       clearly inconsistent with its earlier position." New Hampshire v. Maine 532
14        U.S. 742, 743 (2001).  The parties' positions must be so completely
       inconsistent as to be "tantamount to a knowing misrepresentation to or
15        even fraud on the court," and thus must be so "manifestly inconsistent with
       a prior position as to amount to an affront to the court . . . ." Wyler Summit
16        Partnership v. Turner Broadcasting System, 235 F.3d 1184, 1190 (9th Cir.
       2000) (internal citations and  quotations omitted).  The Spokane Court
17        rejected a judicial estoppel argument on these grounds. Committee of
       Tort Litigants v. Catholic Bishop of Spokane, at *11.[38]

18    2.    Prior Success.  "[C]ourts regularly inquire whether the party has
19        succeeded in persuading a court to accept that party's earlier position, so
       that judicial acceptance of an inconsistent position in a later proceeding
20        would create the perception that either the first or the second court was

21
22    [38] The Ninth Circuit strictly applies the "clearly inconsistent prior position" test and   rejects judicial
       estoppel unless the prior position was effectively identical. Tritchler v. County of Lake, 358 F.3d 1150,
       1154 (9th Cir. 2004) (position that supervisor's harassing conduct toward other employee was unwelcome
23        in administrative proceedings against supervisor was not directly contrary to later position that supervisor
       did not harass employee for purposes of sexual harassment law); Fredenburg v. Contra Costa County
       Department of Health Services, 172 F.3d 1176, 1178-1179 (9th Cir. 1999) (position by employee that she
24        was incapable of doing her regular work was not directly inconsistent with position in disability
       discrimination claim that she was able to perform all the essential functions of her job); United States v.
25        Ruiz, 73 F.3d 949, 953 (9th Cir.1996) (position that stun grenades were weapons for purposes of
       weapons prosecution was not directly inconsistent with previous position that stun grenades were not
26        weapons, where two cases were unrelated and did not involve the same adverse party).

**Page 50 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

1    misled.  Absent success in a prior proceeding, a party's later inconsistent
     position introduces no 'risk of inconsistent court determinations.'" ·New
2    Hampshire v. Maine, *supra* at 743 (internal citations omitted).

3    3.    Unfair Advantage.  Courts ask "whether the party seeking to assert an
            inconsistent position would derive an unfair advantage or impose an unfair
4           detriment on the opposing party if not estopped." Id.

5    4.    Acquiescence by Party Asserting Estoppel.  Because the doctrine is
            applied equitably, courts also give weight to a fourth factor:  whether the
6           assertion of the contrary position is "to the prejudice of the party who has
            acquiesced in the position formerly taken . . ." Id. at 749.
7

8    5.    Bad Faith.  "Judicial estoppel applies when a party's position is
            tantamount to a knowing misrepresentation to or even fraud on the court.
9           If incompatible positions are based not on chicanery, but only on
            inadvertence or mistake, judicial estoppel does not apply."  Johnson v.
10          Oregon, 141 F.3d 1361, 1370 (9th Cir. 1998) (internal citations and
            quotations omitted); *see* United States v. Baird-Neece Packing Corp., 151
11          F.3d 1139, 1147 (9th Cir. 1998) (as party's position change was not bad
            faith, new position was not barred by judicial estoppel).[39]

12   **C.    The TCC's Cases Do Not Support Its Argument for Judicial Estoppel.**

13   The TCC identifies six cases which purportedly support its contention that the Debtor

14   took inconsistent positions that justify judicially estopping it from asserting the Parishes'

15   distinctiveness.  TCC Brief at 25, 27-31.  These cases are listed in the footnote.[40]

16         The average age of the TCC's six cases is 34 years old.  None of the cases

17   satisfies the "clearly inconsistent prior position" test.  *See* n. 38, *supra*.  The Debtor

18   does not take any of the following positions: (a) that a parish is not a public juridic

19   _____

20   [39] An example of such bad faith is when a debtor in bankruptcy omits from his schedule of assets
     a known cause of action and profits from his misrepresentation by "subsequently asserting such claims
21   for his own benefit in a separate proceeding."  Hamilton v. State Farm Fire & Casualty Co., 270 F.3d 778,
     785 (9th Cir. 2001) (quoting In re Coastal Plains, 179 F.3d 197, 208 (5th Cir. 1999)).

22   [40] The TCC's cases purportedly warranting judicial estoppel are:  Roman Catholic Archbishop of
     Diocese of Oregon v. Baker, 15 P.2d 391 (Or. 1932) ("**Baker**"); Eberle v. Benedictine Sisters of Mt. Angel,
23   385 P.2d 765 (Or. 1963) ("**Mt. Angel**"); Archdiocese of Portland v. County of Washington, 458 P.2d 682
     (Or. 1969) ("**Washington County**"); Employment Div. v. Archdiocese of Portland, 600 P.2d 926 (Or. App.
24   1979) aka Archdiocese of Portland in Oregon v. Raymond Thorne, Ass't Dir. for Employment, No. 78-T-62
     ("**Thorne**"); Archdiocese of Portland & Diocese of Baker v. Employment Div. Nos. 86-T-081 and 86-T-
25   111, *aff'd*, Archdiocese of Portland in Oregon v. Employ. Div., 814 P.2d 566 (Or. Ct. App. 1991), *rev.*
     *den.*, 822 P.2d 1194 (Or. 1991), *cert. den.*, 506 U.S. 815 (1992) ("**Mattson**"); Central Catholic Edu. Ass'n
26   v. Archdiocese of Portland, 916 P.3d 303 (Or. 1996) ("**Central Catholic**").

**Page 51 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

1    person, distinct from the Debtor; (b) that a Parish pastor does not administer his own

2    parish's temporal goods; (c) that the Debtor owns any Parish's real estate or financial

3    assets; or (d) that Debtor holds anything more than mere legal title to any Parish's real

4    estate with the beneficial interest of that property owned by a Parish.

5         The TCC nowhere contends that the Debtor made bad faith assertions in any of

6    the six cases.  The TCC does not contend that the Debtor is seeking unfair advantage

7    by explaining that it is governed by Canon Law.  How could it be unfair for the Debtor to

8    assert the importance of Canon Law when Oregon corporation law and its publicly filed

9    articles of incorporation have stated the same for over 130 years?  Finally, the TCC

10   nowhere contends that it or any of its constituents acquiesced in or relied upon the

11   position taken by the Archdiocese in any of the six cases.  **Therefore, the first, third,**

12   **fourth and fifth requirements identified above are not satisfied in any of the six**

13   **cases.**

14        Moreover, the six cases are inapposite.  Baker is a seventy-three year old case

15   in which the Debtor challenged the constitutionality of a zoning ordinance as applied to

16   school buildings.  Baker, 15 P.2d at 613-614.  It has nothing to do with whether

17   parishes or schools are separate from the Debtor.

18        Mount Angel is a premises liability case which held that, because the Benedictine

19   sisters operated a Catholic school, they were responsible for ensuring its safe condition.

20   The opinion identifies no position taken by the Debtor regarding the ownership of the

21   school.

22        Washington County is a case in which the Debtor unsuccessfully contended that

23   the County Review Board acted capriciously in denying a conditional use permit for

24   construction of a church and school.  It, therefore, satisfies none of the five requisites for

25   judicial estoppel.

26

**Page 52 of 54** - DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

Rothgerber Johnson & Lyons LLP
90 S. Cascade # 1100, Colorado Springs, CO 80903
(719) 386-3000

1      <u>Thorne</u> is an unemployment compensation dispute as to whether Catholic

2    schools within the Archdiocese qualified for the statutory exemption.[41]  The TCC

3    nowhere contends that it or its constituents were prejudiced because it or they

4    "acquiesced in the position formerly taken."  It does not contend that the Debtor took

5    any position in <u>Thorne</u> in bad faith.  The TCC identifies no positions taken by the Debtor

6    regarding the Parishes being separate entities under Canon Law, the Parishes owning

7    their own property, or the Parishes' property being unavailable to pay debts of the

8    Debtor.

9       Mostly, the TCC relies upon a few statements, quoted out of context, which

10   themselves fail to satisfy the "clearly inconsistent prior position" test.[42]  The TCC, for

11   example, quotes brief stating that the "schools [are] an integral part of the Catholic

12   Church" and that the schools "are not legal entities separate from the church itself."

13   TCC Brief at 28.  The phrase, "Catholic Church" or "church," while relevant to the

14   exemption at issue in <u>Thorne</u>, is not synonymous with the Debtor.  It refers to the

15   worldwide Catholic Church which is divided into approximately 2,000 diocesan public

16   juridic persons and many more parish public juridic persons, each of which owns and

17   administers its own property.  The TCC omits that the Archdiocese informed the

18   Employment Division that the Catholic Church was organized by its own, self-defined

19   polity ("the organizational structure of the Catholic Church springs from a tradition

20   separate from our common law [that] must be understood in its own setting").  This

21   "tradition separate from our common law," of course, refers to Canon Law.  Finally, the

22   TCC omits that the referee found that "plaintiff's schools were not to be considered a

23

---

24      [41] An employer is exempt from the unemployment compensation tax if "[e]mployment does not include services performed in the employ of:  (A) a church . . . association of churches [or] (B) [a]n organization which is operated primarily for religious purposes and which is operated supervised or

25   controlled or principally supported by a church . . ."  O.R.S. § 657.072(1).

26      [42] See n. 38 supra.

**Page 53 of 54 -** DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

1  part of plaintiff's corporate organization . . ." <u>Id</u>. at 7-8.  Thus, <u>Thorne</u> fails the first, third,

2  fourth, and fifth requisites for judicial estoppel.

3      <u>Mattson</u>, like <u>Washington County</u>, cannot support the TCC's theory of offensive

4  judicial estoppel because the Archdiocese did not prevail at any of the three levels of

5  this litigation when it argued that it was unconstitutional for the Employment Division to

6  attempt to collect unemployment taxes from it.

7      <u>Central Catholic</u> is a case assessing whether the Oregon Employment Relations

8  Board had jurisdiction over a petition for certification as the exclusive bargaining agent

9  of the teachers and support personnel at Central Catholic High School.  Central Catholic

10 High School is not a parish school.  Because its property is not at issue in this response

11 and cross-motion, any statements made regarding its relationship with Central

12 Catholic's teachers are irrelevant.

**XII.**
**CONCLUSION**

13

14      Based upon these arguments, evidence, and law, the Archdiocese respectfully

15 requests that the Court deny the TCC's Restated Second Motion for Partial Summary

16 Judgment.  It also requests that the Court grant the Archdiocese's Cross Motion for

17 Partial Summary Judgment.

18

19          Respectfully submitted

20          SUSSMAN SHANK LLP

21      By: _____
            Howard M. Levine, OSB #80073
22          Thomas W. Stilley, OSB #88316
            William N. Stiles, OSB #65123
23          Of Attorneys for Debtor

24      ROTHGERBER JOHNSON & LYONS LLP

25          L. Martin Nussbaum, CO Bar No. 15370
            Eric V. Hall, CO Bar No. 32028
26          Admitted Pro Hac Vice
            Of Attorneys for Debtor

**Page 54 of 54 -** DEBTOR'S BRIEF IN RESPONSE TO TORT CLAIMANTS
COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL SUMMARY
JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL SUMMARY
JUDGMENT

Rothgerber Johnson & Lyons LLP
90 S. Cascade # 1100, Colorado Springs, CO 80903
(719) 386-3000

# CONSTITUTIONAL DOCTRINES REGARDING RELIGIOUS FREEDOM
*Prepared by L. Martin Nussbaum, Esq. (2005)*



Exhibit A
Page 1 of 1

**I L L U S T R A T I O N   1**

1          <u>CERTIFICATE OF SERVICE</u>

2          I certify that on September 19, 2005, I served **by first class mail,** a full and

3    correct copy of the foregoing **DEBTOR'S BRIEF IN RESPONSE TO TORT**

4    **CLAIMANTS COMMITTEE'S RESTATED SECOND MOTION FOR PARTIAL**

5    **SUMMARY JUDGMENT AND SUPPORTING ITS CROSS MOTION FOR PARTIAL**

6    **SUMMARY JUDGMENT,** to the interested parties of record, addressed as follows:

7
                    **SEE ATTACHED LIST OF INTERESTED PARTIES**
8

9
          Dated:        September 19, 2005
10

11

12

13                         Thomas W. Stilley, OSB No. 88316
                           Howard M. Levine, OSB No. 80073
14                         Susan S. Ford, OSB No. 84220
                           William N. Stiles, OSB No. 65123
15

16

17

18

19

20

21

22

23

24

25

26


Page 1 - CERTIFICATE OF SERVICE

Pamela Griffith
U.S. Trustee's Office
620 SW Main Street, Rm. 213
Portland, OR  97205

Tort Claimants Committee
Albert N. Kennedy
Tonkon Torp LLP
Suite 1600, 888 SW 5th Ave.
Portland, OR 97204

Mr. Donn Christiansen
c/o Michael Morey P.C.
8 N. State Street, Suite 301
Lake Oswego, OR  97034

Catherine Travis
Lane Powell Spears Lubersky LLP
Suite 2100, 601 SW Second Ave
Portland, OR 97204-3158

Steven M. Hedberg
Douglas R. Pahl
Perkins Coie
1120 NW Couch Street, 10th Floor
Portland, OR  97209

Thomas W. Stilley
Sussman Shank LLP
1000 SW Broadway, Suite 1400
Portland, OR  97205

Holy Family Catholic Church
3732 SE Knapp
Portland, OR 97202

Cameo Garrett
4875 Harnden Road
Cashmere, WA  98815

Oregon Education Technology
Consortium
8995 SW Miley Rd., #101
Wilsonville, OR 97070

Thomas Sand
Jerry B. Hodson
Miller Nash LLP
Suite 3500, 111 SW 5th Ave.
Portland, OR 97204

Tom Dulcich
Margaret Hoffman
Schwabe Williamson & Wyatt PC
1211 SW 5th Ave.
Portland, OR 97204

Jeffrey Werstler
IRS1220 SW Third Avenue
MS-0240
Portland, OR  97204

Phoebe Joan O'Neill
1500 SW Fifth Avenue
Unit 703
Portland, OR  97201

ACE Property & Casualty Insurance Company
c/o Joseph A. Field
Field & Associates
610 SW Alder St, Suite 910
Portland, OR 97205

Michael S. Morey
8 N. State Street
Suite 301
Lake Oswego, OR  97034

Peter C. McKittrick
Farleigh Wada & Witt PC
Suite 600
121 SW Morrison St.
Portland, OR 97204

Linda Boyle
Time Warner Telecom, Inc.
10475 Park Meadows Drive, #400
Littleton, CO  80124

Jonathan E. Cohen
PMB 315
6663 SW Beaverton Hillsdale Highway
Portland, OR 97225-1403

Steven C. Berman
Stoll Stoll Berne Lokting & Shlachter
209 SW Oak Street, Suite 500
Portland, OR  97204

Robert J. Vanden Bos
Vanden Bos & Chapman
Suite 520
319 SW Washington St.
Portland, OR 97204

Jame A. Hayes Jr.
Cummins & White LLP
2424 SE Bristol Street, Suite 300
Newport Beach, CA  92660

General Insurance Company
John A. Bennett
Bullivant Houser Bailey, A Professional
Corporation
Suite 300, 888 SW 5th Ave.
Portland, OR 97204

Robert Millner
Kevin P. Kamraczewski
Sonnenschein, Nath & Rosenthal
8000 Sears Tower
Chicago, IL  60606

Paul E. DuFresne
5135 SW 85th Avenue
Portland, OR  97225

David A Foraker, Future Claimants
Representative
Greene & Markley, PC
Suite 600, 1515 SW 5th Ave.
Portland, OR 97201

L. Martin Nussbaum
Rothgerber Johnson & Lyons LLP
Wells Fargo Tower, Suite 1100
90 South Cascade Avenue
Colorado Springs, CO  80903

Kelly W.G. Clark
Attorney at Law
1706 NW Glisan, Suite 6
Portland, OR  97209

Neil T. Jorgenson
Attorney at Law
520 SW Sixth Avenue, Suite 820
Portland, OR  97204

Karl Mullen
Mullen Law Firm, P.C.
8225 SW Fairway Drive, Suite 100
Portland, OR  97225

Eric J. Neiman
Heather J. Van Meter
Williams Kastner & Gibbs, PLLC
888 SW Fifth Avenue, Suite 600
Portland, OR  97204

Margaret M. Anderson
Patrick M. Jones
Lord, Bissell & Brook LLP
115 South LaSalle Street
Chicago, IL  60603

Thomas W. Brown
Cosgrave Vergeer Kester LLP
805 SW Broadway, 8th Floor
Portland, OR 97205

Scott L. Jensen
Brownstein Rask et al.
1200 SW Main Building
Portland, OR  97205

Marilyn Podemski
2477 SW Arden Road
Portland, OR 97201

Richard C. Josephson
Stephen A. Redshaw
Stoel Rives LLP
Suite 2600, 900 SW 5th Ave.
Portland, OR 97204

David B. Levant
Stoel Rives, LLP
600 University Street, Suite 3600
Seattle, WA  98101

Gary Bisaccio
2125 SW 4th Avenue
Portland, OR  97201

Richard Anderson
Anderson & Monson
Park Plaza West, Suite 460
10700 SW Beaverton-Hillsdale Hwy.
Beaverton, OR  97005

Karen Belair
Law Department
Union Pacific Railroad
1400 Douglas Street, MC 1580
Omaha, NE  68179-1580

Dana Shelton, Recovery Specialist
Recovery Department
NOVA Information Systems, Inc.
7300 Chapman Highway
Knoxville, TN  37920

William Tharp
Fred C. Ruby
Department of Justice
1162 Court Street NE
Salem, OR  97301

Erin K. Olson
806 SW Broadway
Suite 800
Portland, OR  97205

David Slader
David Slader Trial Lawyers P.C.
806 SW Broadway, Suite 400
Portland, OR  97205

Brad T. Summers
Daniel R. Webert
Ball Janik LLP
Suite 1100, 101 SW Main St.
Portland, OR 97204

James B. Davidson
Daniel P. Larsen
Ater Wynne  LLP
Suite 1800, 222 SW Columbia St.
Portland, OR 97201

Timothy J. McNamara
Craig A. Ryan
OneBane Law Firm
PO Box 3507
Lafayette, LA  70502-3507

James M. Altieri, William T. Corbett Jr.
Robert K. Malone, Michael P. Pompeo
Drinker Biddle & Reath LLP
500 Campus Drive
Florham Park, NJ  07932-1047

Michael J. Farrell
Martin Bischoff, et al.
888 SW Fifth Avenue, Suite 900
Portland, OR  97204

Wilson C. Muhlheim
Muhlheim Boyd & Carroll
88 East Broadway
Eugene, OR  97401

Bradley S. Copeland
Loren S. Scott
Arnold Gallagher, et al.
PO Box 1758
Eugene, OR  97440-1758

Paulette Furness
Director of Business Affairs
Archdiocese of Portland in Oregon
2838 East Burnside
Portland, OR  97214