Howard M. Levine, OSB No. 80073
Thomas W. Stilley, OSB No. 88316
William N. Stiles, OSB No. 65123
SUSSMAN SHANK LLP
1000 SW Broadway, Suite 1400
Portland, OR 97205-3089
Telephone: (503) 227-1111
Facsimile: (503) 248-0130
E-Mail:        howard@sussmanshank.com
               tom@sussmanshank.com
               bills@sussmanshank.com
and

L. Martin Nussbaum, Admitted Pro Hac Vice
Eric V. Hall, Admitted Pro Hac Vice
ROTHGERBER JOHNSON & LYONS LLP
90 South Cascade, Suite 1100
Colorado Springs, CO 80903
Telephone: 719-386-3000
Facsimile: 719-386-3070
E-Mail:        mnussbaum@rothgerber.com
               ehall@rothgerber.com

Attorneys for Debtor and Debtor-In-Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF OREGON

| | |
|---|---|
| In re | ) |
| | ) |
| ROMAN CATHOLIC ARCHBISHOP OF PORTLAND IN OREGON, and successors, a corporation sole, dba the ARCHDIOCESE OF PORTLAND IN OREGON, | ) Case No. 04-37154-elp11 )<br>)<br>)<br>)<br>) |
| Debtor. | ) |
| ──────────────────────────── | ) |
| | ) Adv. Proc. No. 04-03292-elp |
| TORT CLAIMANTS COMMITTEE, | ) |
| | ) DEBTOR'S BRIEF IN RESPONSE TO |
| Plaintiff, | ) THE TORT CLAIMANTS |
| v. | ) COMMITTEE'S THIRD MOTION FOR |
| | ) PARTIAL SUMMARY JUDGMENT |
| ROMAN CATHOLIC ARCHBISHOP OF PORTLAND IN OREGON, and successors, a corporation sole, dba the ARCHDIOCESE OF PORTLAND IN OREGON, ET AL. | )<br>)<br>)<br>)<br>)<br>) |
| | ) |
| Defendants. | ) |
| ──────────────────────────── | ) |

**TABLE OF CONTENTS**

I.    INTRODUCTION                                                                      1

II.   SECTION 544(a)(3) DOES NOT PERMIT A HYPOTHETICAL BFP TO TAKE
      TITLE FREE AND CLEAR OF THE PARISHES', HIGH SCHOOL'S, AND
      TRUST BENEFICIARIES' INTERESTS                                                    1

      A.    A Hypothetical BFP Attempting to Purchase Parish or High School Property
            From the Debtor has Inquiry Notice of the Interests of the Parishes, the High
            Schools, and the Trust Beneficiaries                                        1

            1.    Oregon has not Abolished Inquiry Notice                               1

            2.    The Parishes and High Schools' Possession of the Property Provides
                  Constructive Notice                                                   4

            3.    The Debtor's Practices Provide Inquiry Notice                         5

            4.    The Fact That the Debtor is an Ecclesiastical Corporation Sole Provides
                  Inquiry Notice                                                        6

            5.    A Hypothetical BFP has a Duty to Inquire Into the Canon Law
                  Requirements for the Sale of Property                                 7

III.  THE PARISHES, SCHOOLS, PARISHIONERS, STUDENTS, AND OTHERS
      ARE BENEFICIARIES OF TRUSTS RECOGNIZED UNDER CIVIL LAW                            9

      A.    Forms of Trust                                                              9

            1.    Charitable Trusts                                                     9

            2.    Resulting Trusts                                                      9

            3.    Express Trusts                                                        10

      B.    The Rights of the Beneficiaries Under Certain Trusts are Superior to the Rights
            of a Trustee in Bankruptcy                                                  11

            1.    Resulting Trusts.                                                     11

            2.    Charitable Trusts                                                     11

            3.    Express Trusts                                                        12

C.     Section 544(a)(3) Should not be Read to Permit the Avoidance of a Beneficiary's Interest in Trust Property Where no Transfer by the Debtor Took Place    12

IV.   THE RELIGIOUS FREEDOM RESTORATION ACT PRECLUDES THE COURT FROM APPLYING § 544(a)(3)TO CHANGE THE POLITY OF THE ARCHDIOCESE AND THE PARISHES    12

A.     When a Federal Statute Burdens the Free Exercise of Religion, the Religious Freedom Restoration Act Exempts the Religious Person or Entity Unless the Statute Advances a Compelling Governmental Interest by the Least Restrictive Means    12

B.     RFRA Applies to the Bankruptcy Code    13

C.     The Application of § 544(a)(3) to Consolidate the Parishes and Their Property Into the Debtor's Estate Violates RFRA    14

     1.     Substantial Burden    14

     2.     Absence of Compelling Governmental Interest    15

     3.     Least Restrictive Means    16

V.   THE FIRST AMENDMENT DOCTRINE OF CHURCH AUTONOMY PRECLUDES THE COURT FROM APPLYING § 544(a)(3) TO MODIFY THE POLITY AND GOVERNANCE OF THE ARCHDIOCESE AND THE EXEMPLAR PARISHES.    16

VI.   CONCLUSION    20

# TABLE OF AUTHORITIES

## Cases

*Akins v. Vermast*, 150 Or. App. 236, 242, 945 P.2d 640 (Or. App. 1997) ............................. 3

*Allen v. Hendrick*, 104 Or. 202, 227 (1922) ...................................................................... 10

*Andrews v. Hochmuth*, 253 Or. 313, 316 (1969) ............................................................... 10

*Beck v. Aichele*, 258 Or. 245, 249, 482 P.2d 184 (1971) ..................................................... 3

*Belt v. Matson*, 120 Or. 313, 320-322 (1927) ..................................................................... 1

*Bohlman v. Coffin*, 4 Or. 313, 317 (1873) ........................................................................... 1

*Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648 (10th Cir. 2002) ....... 17

*Carnes v. Smith*, 222 S.E.2d 322 (Ga. 1976) .................................................................... 19

*Christians v. Evangelical Free Church (In re Young)*, 82 F.3d 1407 (8th Cir. 1996), *vacated and rem'd* 521 U.S. 1114 (1997), *reinstated* 141 F.3d 854 (8th Cir. 1998) ..................... 13

*Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 537 (1993) ....................... 15

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ................................................................... 13

*Employment Div. v. Smith*, 494 U.S. 872 (1990) ............................................................... 13

*Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1 (1929) ............................... 20

*Gorzeman v. Thompson,* 162 Or. App. 84, 93 (1999) .......................................................... 4

*Holbrook v. Hendricks' Estate*, 175 Or. 159, 169 (1944) .................................................... 10

*In re Bishop College*, 151 B.R. 394 (Bankr. N.D. Texas 1993) ........................................... 11

*In re Estate of Buesing*, 240 Or. 399, 406-407, 402 P.2d 98 (1965) ................................... 10

*In re Golden Triangle Capital, Inc.*, 171 B.R. 79, 82 (9th Cir. B.A.P. 1994) ........................ 11

*In re Mills Concepts Corp.,* 123 B.R. 938 (Bankr. D. Mass. 1991) ...................................... 12

*In re Palmer*, 1992 Bankr LEXIS 593 (Bankr. C.D. Cal. 1992) ........................................... 12

*In re Parkview Hospital*, 211 B.R. 619 (Bankr. N.D. Ohio 1997) ......................................... 11

*In re Sale Guaranty Corporation*, 220 B.R. 660 (9th Cir. B.A.P. 1998) ............................... 11

*In re Seaway Express Corp.,* 912 F.2d 1125 (9th Cir. 1990) .............................................. 12

*In re Tessier*, 190 B.R. 396 (Bankr. D. Mont. 1995) .......................................................... 15

*In re Torrez*, 827 F.2d 1299 (9th Cir. 1987) ...................................................................... 11

*Jones v. Wolf*, 443 U.S. 595, 609 (1979) .......................................................................... 18

*Jones v. Wolf*, 443 U.S. at 600 ......................................................................................... 19

*Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952) .............................................. 17

*Kedroff*, 344 U.S. at 116 .................................................................................................. 17

*Klamath Falls Assembly of God v. State Highway Commission*, 255 Or. 211, 465 P.2d 697 (1970) ........................................................................................................................... 8

*Kreshik v. St. Nicholas Cathedral*, 363 U.S. 190 (1960) .................................................... 17

*Kresik v. St. Nicholas Cathedral*, 363 U.S. 190 (1960) ...................................................... 18

*Mannix v. Purcell*, 19 N.E. 572, 584 (Ohio 1888) ............................................................. 20

*McClure v. Salvation Army*, 460 F.2d 553 (5th Cir. 1972) .................................................. 17

*McCormick on Evidence*, 615, § 254 (2d Ed. 1972) ............................................................. 3

*Northside Bible Church v. Goodson*, 387 F.2d 534 (5th Cir. 1967) ..................................... 18

*Order of St. Benedict of New Jersey v. Steinhauser*, 234 U.S. 640 (1914) .......................... 19

*Parker v. Newitt*, 18 Or. 274, 276 (1890) ......................................................................... 10

*Rogers v. Donovan*, 268 Or. 24, 26-27, 518 P.2d 1306 (1974) ............................................ 3

*Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709 (1976) .................... 17

*Sherbert v. Verner*, 374 U.S. 398 (1963) .......................................................................... 13

iii

*Sherbert*, 374 U.S. at 406................................................................................................... 15

*Stevens v. American Sav. Institution, Inc.*, 289 Or. 349, 356 (1980) .............................. 4

*United States v. Ballard*, 322 U.S. 78 (1944) .................................................................. 17

*Unterkircher v. Unterkircher,* 183 Or. 583, 591 (1948) ................................................. 10

*Watson v. Jones*................................................................................................................ 18

*Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1871) ............................................................ 17

*Watson v. Jones*, 80 U.S. 679, 727 (1871) ..................................................................... 17

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) ...................................................................... 13

*Young*, 82 F.3d. at 1420.................................................................................................... 16

**Statutes**

11 U.S.C. § 541(b) ............................................................................................................ 15

11 U.S.C. § 541(b)(1) ....................................................................................................... 11

11 U.S.C. § 541(c)(2) ................................................................................................. 11, 15

11 U.S.C. § 541(d) ..................................................................................................... 11, 15

11 U.S.C. § 544(a)(3) ......................................................................................................... 1

11 U.S.C. § 548................................................................................................................. 13

42 U.S.C. § 2000bb(b)(1) ................................................................................................ 13

42 U.S.C. § 2000bb-1 ...................................................................................................... 14

O.R.S 128.620(3) ............................................................................................................... 9

O.R.S. § 65.042 .................................................................................................................. 9

O.R.S. 128.620(2)(b) .......................................................................................................... 9

O.R.S. 128.630 ................................................................................................................... 9

O.R.S. 65.042 ......................................................................................................... 7, 9, 19

O.R.S. 65.067 ............................................................................................................... 7, 19

O.R.S. 65.357(2)(d) ...................................................................................................... 7, 19

O.R.S. 65.377(2)(c) ...................................................................................................... 7, 19

O.R.S. 87.920 ..................................................................................................................... 2

O.R.S. 93.643 ........................................................................................................... 2, 3, 4

O.R.S. 93.643(1) .......................................................................................................... 1, 3

O.R.S. Chapter 93.............................................................................................................. 1

Or. Gen'l Laws at 127 § 9 ............................................................................................ 7, 19

Or. Gen'l Laws at 135-36 §§ 2 and 4.............................................................................. 19

Religious Liberty and Charitable Donation Protection Act of 1988, Pub.L. No. 105-183, ..... 14

**Other Authorities**

1987 Oregon Laws Chapter 586 ......................................................................................... 3

Oregon Laws 1987 Chapter 586 .................................................................................... 1, 2

Oregon State Bar CLE publication titled "*Principles of Oregon Real Estate Law*" (OSB CLE 1995) provides in Chapter 8, § 8.6.............................................................................. 2

*Principles of Oregon Real Estate Law* (OSB CLE Supp 2003) at § 8.7............................ 4

**Treatises**

*Restatement (Second) of Trusts* § 351, cmt. b (1959) ...................................................... 9

*Restatement of Trusts,* 2d Ed....................................................................................... 11

iv

1   **I.      INTRODUCTION.**

2          The Roman Catholic Archbishop of Portland in Oregon, and successors, a corporation

3   sole ("Debtor"), submits this response in opposition to the TCC's Third Motion for Partial

4   Summary Judgment (the "Third Motion").  As more fully set forth below, the Tort Claimants

5   Committee's ("TCC") Third Motion should be denied.

6   **II.     SECTION 544(a)(3) DOES NOT PERMIT A HYPOTHETICAL BFP TO TAKE
7            TITLE FREE AND CLEAR OF THE PARISHES', HIGH SCHOOL'S, AND
            TRUST BENEFICIARIES' INTERESTS**

8          The TCC's Third Motion under 11 U.S.C. § 544(a)(3) fails unless the bankruptcy trustee,

9   as a hypothetical purchaser of the Test Parishes' and High School's property from the Debtor,

10  qualifies as a bona fide purchaser for value under Oregon law.  BFP status requires the purchaser

11  to have neither record notice nor inquiry notice.  If the purchaser has either record or inquiry

12  notice, then the purchaser is not a BFP.  Here, any such purchaser would have inquiry notice,

13  each of which defeats the TCC's § 544(a)(3) motion.

14         **A.      A Hypothetical BFP Attempting to Purchase Parish or High School Property
15  From the Debtor has Inquiry Notice of the Interests of the Parishes, the High Schools, and
16  the Trust Beneficiaries.**   Inquiry notice has been part of Oregon common law for more than

17  130 years. *Bohlman v. Coffin*, 4 Or. 313, 317 (1873).  Inquiry notice is (according to the way

18  TCC's witness Newkirk's  exhibits describe it), of " … [a]ny facts, rights, interests, or claims

19  which are not shown by the public records, but which could be ascertained by an inspection of

20  the land or by making inquiry of persons in possession thereof".  See *Belt v. Matson*, 120 Or.

21  313, 320-322 (1927).

22             **1.      Oregon has not Abolished Inquiry Notice .**  The TCC claims that

23  inquiry notice was abolished by the 1987 enactment of what is now O.R.S. 93.643(1).  The TCC

24  is wrong.  O.R.S. 93.643(1) was enacted as part of Oregon Laws 1987 Chapter 586.  That whole

25  chapter only discusses and deals with record notice; it does not mention inquiry notice.  In

26  addition, all of O.R.S. Chapter 93 only deals with recording.  The purpose of Oregon Laws 1987

**Page 1 of 20 -** DEBTOR'S BRIEF IN RESPONSE TO THE TORT CLAIMANTS
COMMITTEE'S THIRD MOTION FOR PARTIAL SUMMARY JUDGMENT

1   Chapter 586 is to clarify which real property records a buyer, title company, or lender would

2   have to check on record notice. Chisholm Decl. ¶ 7. It has nothing whatsoever to do with

3   inquiry notice.

4        The Oregon State Bar CLE publication titled "*Principles of Oregon Real Estate Law*"

5   (OSB CLE 1995) provides in Chapter 8, § 8.6 that:

6        O.R.S. 93.643 (along with O.R.S. 87.920) could be construed as abolishing
         inquiry notice. The drafters of O.R.S. 93.643 report no such intention.
7

8        **a.      Plaintiff's Own Evidence Recognizes Inquiry Notice**. Plaintiff

9   relies on the August 11, 2005, Affidavit of the chief underwriter at Chicago Title, Malcolm

10  Newkirk. His Affidavit includes copies of recent preliminary title reports on certain of the

11  parcels involved in plaintiff's Third Motion. Essentially all of those reports contain an exception

12  for: " … [a]ny facts, rights, interests, or claims which are not shown by the public records, but

13  which could be ascertained by an <u>inspection of the land</u> or by making <u>inquiry of persons in</u>

14  <u>possession thereof</u>". (Emphasis added). *See*, e.g. Newkirk Decl. Exs. 1, p. 2; 2 pp. 2, 8 p.. 2.;

15  Chisholm Decl. ¶ 8. It is that form of inquiry notice—inspection and inquiry--, that very

16  exceptions to the TCC's witness's own title reports, on which the Defendants rely.

17       Oregon title companies insert the inspection and possession exception for inquiry notice

18  in standard title policies. Chisholm Decl. ¶ 8. These exceptions would not be necessary if

19  inquiry notice, other than recording, had been abolished. Obviously, the title companies, that

20  insure title and have the economic risk of being wrong, think inquiry notice is still the law in

21  Oregon. All for good reason. Inquiry notice is still alive and well in Oregon. Chisholm Decl.

22  ¶ 9).

23       **b.      The Statute must be construed to avoid Unreasonable and**

24  **Absurd Results.** "It is a fundamental canon that

25       * * * [I]t is the duty of the court in construing a statute to ascertain the intention
         of the Legislature and to refuse to give literal application to language when to do
26       so would produce 'an <u>absurd or unreasonable result</u>,' but, rather, 'to construe the

1 act, if possible, so that it is a reasonable and workable law and not inconsistent
2 with the general policy of the Legislature * * *.

3 *Beck v. Aichele*, 258 Or. 245, 249, 482 P.2d 184 (1971) (quoting and citing cases, emphasis

4 added).  Plaintiff's interpretation of O.R.S. 93.643(1) violates that basic canon of statutory

5 construction and would bring absurd results.   The TCC's theory suggests that inquiry notice,

6 recognized and applied in Oregon for over 130 years, somehow vanished when the legislature in

7 1987 enacted a new statute governing recording.

8         **c.**      **Basic Rules of Statutory Construction Direct that Inquiry**

9 **Notice was not Abolished.**  *Rogers v. Donovan*, 268 Or. 24, 26-27, 518 P.2d 1306 (1974),

10 instructs, quoting from *McCormick on Evidence*, 615, § 254 (2d Ed. 1972):

11     [W]hen the common law imposes a restriction not mentioned in the statute, the
12     restriction has been said to govern, unless the circumstances show a legislative
    intention to abrogate it.
13

14 So, too, here.  Inquiry notice is a restriction at common law on what a person need do to be a

15 BFP.  Inquiry notice is not mentioned in 1987 Oregon Laws Chapter 586, and the circumstances

16 do not show a legislative intention to abrogate it.  Just the opposite.  Thus, the common law

17 doctrine of inquiry notice lives and survives.

18         **d.**      **The Oregon Courts continue to recognize Inquiry Notice.**  In

19 cases with facts arising subsequent to the time that O.R.S. 93.643(1) became law, Oregon courts

20 have continued to recognize that inquiry notice is still valid.   *Akins v. Vermast*, 150 Or. App.

21 236, 242, 945 P.2d 640 (Or. App. 1997).  In *Akins*, a case decided approximately 10 years after

22 O.R.S. 93.643 became law, and which is based on events that occurred in 1994, the Oregon

23 Court of Appeals held that inquiry notice is alive and well.  In that case, it found that a

24 lienholder, seeking to invoke BFP status in order to take title free of a subsequently recorded

25 interest, could not do so because it had a duty to inquire.  *Akins* is interesting because it provides

26 instruction on how even the most obscure fact (a buyer asking to retain $1,500 of the loan

**Page 3 of 20 -** DEBTOR'S BRIEF IN RESPONSE TO THE TORT CLAIMANTS
COMMITTEE'S THIRD MOTION FOR PARTIAL SUMMARY JUDGMENT

1    proceeds after stating he needed the entire $21,500 to purchase the property) was sufficient to put

2    the lender on notice of the buyer's fraud that would have been discovered on further inquiry.  *See*

3    *also, Gorzeman v. Thompson,* 162 Or. App. 84, 93 (1999).

4         The 2003 supplement to *Principles of Oregon Real Estate Law* (OSB CLE Supp 2003) at

5    § 8.7 comments:

6         The court did not discuss O.R.S. 93.643 in the *Akins* or *Gorzeman* opinion.  The
7    results suggest that O.R.S. 93.643 bears on the meaning of record notice but not
     on inquiry notice.

8         **e.**     **The TCC's Interpretation would Raise Constitutional Issues.**

9    If the TCC's interpretation were to prevail, a serious constitutional issue would arise on whether

10   the enactment of the 1987 statute violated rights of the parishes and high schools by taking away

11   the property rights they had under inquiry notice prior to enactment of the statue.  Also, such a

12   result would raise serious First Amendment and RFRA issues.  Statutes should be construed if

13   possible to avoid constitutional issues.  Holding that inquiry notice is still alive and well and not

14   abolished by the 1987 legislation would avoid  those issues at least relating to inquiry notice.

15        **2.**     **The Parishes and High Schools' Possession of the Property Provides**

16   **Inquiry Notice.**  Possession of real property by the prior owner, or someone other than the

17   record owner, has long been sufficient inquiry notice to a prospective purchaser.  *Stevens v.*

18   *American Sav. Institution, Inc.*, 289 Or. 349, 356 (1980).  The Exemplar Parishes and High

19   School properties consists of parish churches, parish halls, rectories, school buildings,

20   gymnasiums, and athletic fields and structures.  Each parish church and school has signs

21   denoting them as such (e.g., St. Brigitta Catholic Church, St. Elizabeth Ann Seton Catholic

22   Church, St. Philip Benizi Catholic Church, Holy Redeemer Catholic School, Regis Catholic High

23   School); Lewis Decl. filed in Support of TCC's Third Motion, Exs. 1 and 2; Bachman Decl.

24   Filed in Support of TCC's Third Motion, Exs. 1-8).  None of the churches or schools have signs

25   suggesting any relationship with the Debtor or the Archdiocese of Portland.

26        If a prospective purchaser were to inspect the parish property the inspection would reveal

**Page 4 of 20 -** DEBTOR'S BRIEF IN RESPONSE TO THE TORT CLAIMANTS
COMMITTEE'S THIRD MOTION FOR PARTIAL SUMMARY JUDGMENT

1 the property is occupied by the parish priest and the parishioners.  If that person were to inquire

2 of someone at the parish about buying the property, such prospective purchaser would be

3 directed to the pastor.  If the purchaser were to first approach the Debtor, the purchaser would be

4 referred to the pastor.  Wilson Decl. ¶ 7.  The Debtor would only become involved once the

5 decision had been made at the parish level to sell the property.  There is no possible way a person

6 could purchase the property directly from the Debtor without the pastor's involvement and

7 consent.  Wilson Decl., ¶ 7 .

8    **3.**  **The Debtor's Practices Provide Inquiry Notice.**  It would be impossible

9 for a BFP to purchase parish or high school property without the Debtor following canonically

10 mandated procedures.  Wilson Decl., ¶ 7.  The Debtor's established practices and procedures to

11 accomplish this have been in place for many years.  Wilson Decl. ¶ 9.  Although Canon Law

12 requires the Archbishop's permission, parish property cannot be sold without the consent of the

13 pastor, in consultation with the parish advisors.  If a prospective buyer were to contact the Debtor

14 about purchasing parish property, the buyer would be directed to the pastor.  Wilson Decl. ¶¶ 5

15 and 7.

16    The pastor, in consultation with the parish advisors determines if the parish wants to sell

17 the property, determines the sale price, selects a realtor if one is to be involved, and negotiates

18 the commission rate.  Purchase offers are presented to the pastor.  The pastor, in consultation

19 with the parish advisors, decides which offer to accept.  Wilson Decl. ¶ 5.

20    The Archdiocesan Property Office coordinates closing the transaction.  It provides any

21 requested corporate documents to the title company and reviews the closing documents prior to

22 submitting them to the Vicar General for signature.  The sales proceeds are paid to the Debtor, as

23 record title holder, and then disbursed to the parish according to the direction of its pastor.

24 Wilson Decl. ¶ 5.

25    Often people dealing with parishes in making bequests or other gifts of real property are

26 surprised to learn that the Debtor needs to be involved in the transaction.  Wilson Decl. ¶ 8.  It is

1  conceivable that a prospective buyer would have no knowledge of the Debtor's involvement, or

2  that the Debtor held record title, until that information is presented to the buyer on a sale

3  agreement or other transactional document.

4  　　Similar procedures would be followed for the sale of Catholic high school properties, the

5  only difference being that the principal and school advisory board would make the decisions

6  rather than the pastor and the parish advisors.  Wilson Decl. ¶ 9.

7  　　**4.**　　**The Fact That the Debtor is an Ecclesiastical Corporation Sole**

8  **Provides Inquiry Notice.**  The fact that the Debtor is an ecclesiastical corporation sole, named

9  "Roman Catholic Archbishop of Portland in Oregon, and successors, a corporation sole," in and

10  of itself , creates a duty of inquiry.  The following questions should become apparent to any

11  would-be purchaser of property titled in the name of such corporation:  What is a corporation

12  sole?  What powers does it possess?  Who is the Roman Catholic Archbishop of Portland in

13  Oregon?  What does legal title in the name of such a corporation mean?  What authority does

14  that corporation have to buy and sell local church property?  Does the corporation have a board

15  of directors?  If so, does it need the board's approval of the sale?  What do the corporation's

16  articles of incorporation say?  Is a corporate resolution required?  Who has authority to sign a

17  deed on behalf of the corporation?  Since the property appears to belong to the parish, do I need

18  to talk to the pastor or someone else at the local church about buying the property?  Do the

19  parishioners have any rights or interests?  Do they need to be consulted?

20  　　An ecclesiastical corporation sole, here being the incorporated office of a Catholic

21  Archbishop, is an oddity in and of itself.  Any hypothetical "reasonable prudent person"

22  attempting to purchase property from such a corporation would necessarily have a duty to inquire

23  and obtain answers to questions like those stated above before buying property from that

24  corporation.  The record title itself even raises questions which triggers a duty to inquire further.[1]

25  _____

1 *See Newkirk Decl.,* Ex. 21, pg 1: the vestee of one parcel is "Roman Catholic Archbishop of Portland in Oregon and successors, a corporation sole for the benefit of The Immaculate Conception Church"; Ex 1, pg 16-17: vestee is

26  "Archdiocese of Portland By St. Elizabeth Ann Seton"; Ex 5, pg 37: shows "HOLY REDEEMER" on a recorded plat; Ex. 7, pg. 51-52: a recorded document mentioning "the existing building at St. John Fisher School", and a

1    It is unreasonable for a buyer of property from an ecclesiastical corporation sole to look

2    only at the vesting deed to confirm that the corporation holds record title to the property.  The

3    buyer must look at its Articles to see whether there may be restrictions on its ability to convey

4    title.  The buyer cannot merely accept a deed signed by an authorized representative of such

5    corporation, when it is readily apparent that the property is being used as a parish church or

6    Catholic high school, and neither the Archbishop nor the corporation sole are in physical

7    possession of the property.  The parties in possession of and using the property on a day-to-day

8    basis are the  parish priests, the parishioners, students and others.  Any reasonable prudent person

9    would begin his or her investigation into purchasing the property at the parish or high school

10   itself, not at the county recording office.

11       **5.    A Hypothetical BFP has a Duty to Inquire Into the Canon Law**

12   **Requirements for the Sale of Property.**  The TCC admits that a prospective purchaser would

13   have to look at the Oregon statutes and the Debtor's Articles of Incorporation.  The TCC

14   wrongly suggests, however, that a prospective BFP would be entitled to reasonably conclude,

15   solely from reading the Oregon Non-Profit Corporation Act and the Debtor's Articles, that "the

16   Debtor has statutory and corporate authority to give clear title to its property, wherever located in

17   the Archdiocese."  The TCC ignores altogether those multiple portions of Oregon corporation

18   law *for religious* corporations that permit the Debtor to govern itself according to Canon Law.

19   *See* Debtor's Combined Brief at 7-12; Or. Gen'l Laws at 127 § 9 (requiring the ecclesiastical

20   official who is the corporation sole to act in conformity with church law); O.R.S. 65.067 (same);

21   O.R.S. 65.042 (establishing that church law trumps the Oregon Non-Profit Corporation Act when

22   the two are in conflict); and O.R.S. 65.357(2)(d) and O.R.S. 65.377(2)(c) (permitting a religious

23   corporation's officers and directors to rely upon information from religious authorities in

24   managing the corporation).

---

25   kindergarten and library addition there, and page 54 thereto describes the owner of the parcel as "Archdiocese of
     Portland in Oregon/St. John Fisher Church (Owner)"; Ex 8, pg 5, 12, and 13: contains recorded plats maps showing
26   the parcel as "Queen of Peace Catholic Church"; and Ex 22, pg 8, is  a recorded Memorandum of Agreement
     Affecting Real Property showing Regis High School as the Borrower under an Energy Services Agreement.

1    The TCC likewise ignores those provisions in the Debtor's articles and the supplements to

2  those articles that limit the Debtor corporation's purposes, powers, and operations to those

3  consistent with Catholic doctrine, Catholic usages, and Canon Law.  Debtor's Combined Brief at

4  13-14.  Just as Archbishop Vlazny vowed to conduct his episcopacy in accordance with Canon

5  Law when he first became a bishop, the Debtor's articles of incorporation require that the

6  Archbishop—who, along with his successors, *is the corporation sole*—be appointed into office,

7  be authorized and empowered to act, be limited in his goals and purposes, and hold and conduct

8  his office in accordance with Catholic doctrine, Catholic usages, and Canon Law.  Debtor's

9  Combined Brief at 13-14; Declaration of John Vlazny filed herein on Sept. 19, 2005 (hereinafter

10  Vlazny Decl.) at ¶¶ 2 and 4; Declaration of Thomas W. Stilley filed herein on Sept. 19, 2005

11  (hereinafter Stilley Decl.) at Ex. 1.

12    The Debtor does not dispute that Oregon law and its own Articles authorize it to convey

13  property to which it holds record title; however, Oregon law and those same Articles recognize

14  that the Debtor must comply with religious doctrine and practice in doing so.  This is enough to

15  put a prospective buyer on inquiry notice that it should inquire further into what Catholic

16  religious doctrine and practice, including Canon Law, requires.

17    In *Klamath Falls Assembly of God v. State Highway Commission*, 255 Or. 211, 465 P.2d

18  697 (1970) the Oregon Supreme Court held that a buyer of property adjacent to vacant land that

19  was expected to become a public highway took subject to the minutes of the State Highway

20  Commission from many years before where those minutes disclosed that there would be no

21  access to the highway from the property he was buying.  The court found notice of this

22  restriction existed because the deed to the State Highway Commission of the property next door

23  included the words "for highway purposes".  The court said those three words imposed on the

24  buyer the duty to inquire further, including looking at "official minutes" of the State Highway

25  Commission from 1944, which minutes would have notified the buyer that property he was

26

**Page 8 of 20 -** DEBTOR'S BRIEF IN RESPONSE TO THE TORT CLAIMANTS
COMMITTEE'S THIRD MOTION FOR PARTIAL SUMMARY JUDGMENT

1    purchasing would not have access to the highway.  As that buyer had a duty to inquire further by

2    looking as far as those minutes, a prospective buyer of parish or high school property would

3    certainly have the duty to further inquire as to what Catholic doctrine, Catholic usages, and

4    Canon Law requires.

5          The First Amendment to the United States Constitution, the resulting Church Autonomy

6    Doctrine, and O.R.S. 65.042 require that the Debtor be permitted to govern itself and administer

7    its affairs in accordance with Canon Law and its own religious practices.  See Debtor's

8    Combined Brief at pages 3-5, 8-9, and 23-30.  In doing so, the Debtor must comply with the

9    canons regarding the administration of church property.  The canons provide that the pastor, not

10    the Archbishop, is the administrator of parish property.  The parish pastor, in consultation with

11    his own parish advisors, makes the decision whether to sell parish property.  Cafardi Decl. ¶ 29.

12    If the value of such property exceeds $516,500, the transaction requires the consent of not only

13    the Archbishop, but also the Archdiocesan Finance Council, the College of Consultors, and those

14    concerned.  Cafardi Second Decl. ¶ 7.  The Debtor's established practices regarding the sale of

15    property bear this out.  *See* Section II.A.3 above.

16    **III.    THE PARISHES, SCHOOLS, PARISHIONERS, STUDENTS, AND OTHERS
17            ARE BENEFICIARIES OF TRUSTS RECOGNIZED UNDER CIVIL LAW**

18          **A.    Forms of Trust.**  Oregon law recognizes various forms of trusts.  A brief

19    summary of some of those that may be applicable here are:

20          **1.    Charitable Trusts.**  In Oregon a corporation sole "…which has accepted

21    property to be used for a particular charitable purpose…",  such as for a parish or school, has a

22    fiduciary duty to use that property for that particular charitable purpose.  O.R.S. 128.620(2)(b),

23    O.R.S. 128.630 and O.R.S. 128.620(1) and O.R.S 128.620(3).  No particular words, or even the

24    word "trust",  are necessary to create a charitable trust.  *Restatement (Second) of Trusts* § 351,

25    cmt. b (1959).  The evidence submitted by each of the defendants, referred to hereby, establishes

26    that parish and high school properties are held in charitable trusts.

          **2.    Resulting Trusts.**  Oregon enforces resulting trusts. *Parker v. Newitt,* 18

Or. 274, 276 (1890):

> The principle is well settled in equity that where one purchases an estate and pays for it and takes the title in the name of another, or where one purchases land with the money of another and takes the title to himself, there arises, by operation of law, a resulting trust in favor of him whose money paid for it."

*Accord*: *Unterkircher v. Unterkircher,* 183 Or. 583, 591 (1948); *In re Estate of Buesing*, 240 Or. 399, 406-407, 402 P.2d 98 (1965). The evidence submitted by the defendants, referred to hereby, shows that the parish and high school properties are also held in resulting trusts.

        **3.**      **Express Trusts.** As with charitable trusts, express trusts are found and enforced in Oregon based on all the facts and circumstances. *Allen v. Hendrick*, 104 Or. 202, 227 (1922). In determining whether assets should be subject to a trust under Oregon law, "… the guiding principle is that the court should give effect to the intent of the person creating the fund if it is possible to learn from competent evidence what that intent was." *Andrews v. Hochmuth*, 253 Or. 313, 316 (1969). Where the written evidence is ambiguous, resort may be had to extrinsic evidence to determine the intent of the parties. *Holbrook v. Hendricks' Estate*, 175 Or. 159, 169 (1944).

        Archbishop Power's letter of December 23, 1981 to Mark O'Donnell (Forbes Decl. ¶ ) provides strong evidence of the existence of a trust for the benefit of the parishes and parishioners. That letter states:

> While it is true that the land was transferred to the Archdiocese of Portland, it is not true that the Archdiocese as such owns the land for itself. The Archdiocese is an Oregon not for profit corporation incorporated in the state of Oregon, whereas the parish is not so incorporated. The title to all property belonging to the Catholic Church in western Oregon, with some noticeable exceptions such as hospitals, nursing homes, private educational institutions, etc., is vested in the Archdiocese. Such properties, as for example parish plants, <u>though listed under the Archdiocesan corporate title, are really held in trust for the individual parishes.</u>

B.    **The Rights of the Beneficiaries Under Certain Trusts are Superior to the Rights of a Trustee in Bankruptcy.**  The Bankruptcy Code recognizes that assets held by the debtor in trust are not part of the debtor's bankruptcy estate.   11 U.S.C. § 541(b)(1), 11 U.S.C. § 541(d), 11 U.S.C. § 541(c)(2).

1.    **Resulting Trusts.**  In the Ninth Circuit, resulting trusts enforceable under state law are enforceable against the trustee in bankruptcy.  *In re Sale Guaranty Corporation*, 220 B.R. 660 (9th Cir. B.A.P. 1998) (holding that a resulting trust good under California law is good against the trustee in bankruptcy as a hypothetical BFP under § 544(a)(3) where the trustee has inquiry notice of the trust beneficiary's interest).  *In re Torrez,* 827 F.2d 1299 (9th Cir. 1987) (resulting trust imposed for parents on property of debtors as against trustee in bankruptcy where parents provided the down payment to purchase property which was titled in the name of the debtors, the parents made all the payments on the deed of trust against the property, paid the taxes, improved the property, and employed a hired hand to farm the property).  *Accord*:  *In re Golden Triangle Capital, Inc.*, 171 B.R. 79, 82 (9th Cir. B.A.P. 1994).

2.    **Charitable Trusts.**  Bankruptcy courts enforce charitable trusts against claims of trustees in bankruptcy.  In *In re Parkview Hospital,* 211 B.R. 619 (Bankr. N.D. Ohio 1997), the court enforced, against the trustee in bankruptcy,  a charitable trust over a restricted fund established solely for providing financial assistance to medical students, and containing both individual donations made directly to the fund and unrestricted assets placed in the fund by the hospital itself.  The Court relied primarily on *Restatement of Trusts,* 2d Ed.  Similarly, in *In re Bishop College*, 151 B.R. 394 (Bankr. N.D. Texas 1993) the Court held that the trustee in bankruptcy could not reach either the principal or income from two similar trusts established by wills leaving to a bank the deceased's' property to be liquidated and invested in stocks and bonds

1    with the proceeds to be held in trust for the benefit of the college.  Although these cases did not

2    involve a bankrupt debtor holding real property in a charitable trust, there is no reason to believe

3    that a bankruptcy trustee, attempting to assert the rights of a BFP under § 544(a)(3), would not

4    be on inquiry notice (as the trustee is with a resulting trust) regarding parish and high school

5    properties which were donated for, and by are being used for, charitable and religious purposes.

6
7            **3.    <u>Express Trusts.</u>**  In *In re Palmer*, 1992 Bankr LEXIS 593 (Bankr. C.D.

8    Cal. 1992), the court held that the trustee in bankruptcy under § 544(a)(3) loses to one claiming

9    an express trust and whose possession of the property provided constructive notice to any buyer

10   of the person's interest in the property.

11
12           **C.    <u>Section 544(a)(3) Should not be Read to Permit the Avoidance of a</u>**

13   **<u>Beneficiary's Interest in Trust Property Where no Transfer by the Debtor Took Place.</u>**  The

14   Ninth Circuit has held that the trustee's rights as a hypothetical BFP apply under § 544(a)(3)

15   even where no transfer of the property from the debtor took place.  *In re Seaway Express Corp.,*

16   912 F.2d 1125 (9th Cir. 1990).  The Debtor disagrees with this and asserts that § 544(a)(3)

17   should be held to apply only where property has been transferred by the Debtor, following the

18   reasoning of cases such as *In re Mills Concepts Corp.,* 123 B.R. 938 (Bankr. D. Mass. 1991).  If

19   § 544(a)(3) required the existence of a transfer, § 544(a)(3) would be inapplicable here because

20   the Debtor did not transfer any of the properties.

21
22   **IV.    THE RELIGIOUS FREEDOM RESTORATION ACT PRECLUDES THE COURT**
     **FROM APPLYING § 544(a)(3)TO CHANGE THE POLITY OF THE**
23   **ARCHDIOCESE AND THE PARISHES.**

24           **A.    <u>When a Federal Statute Burdens the Free Exercise of Religion, the Religious</u>**

25   **<u>Freedom Restoration Act Exempts the Religious Person or Entity Unless the Statute</u>**

26   **<u>Advances a Compelling Governmental Interest by the Least Restrictive Means.</u>**  The Free

1  Exercise Clause of the First Amendment limits government's power to burden the exercise of

2  religion.  For decades, the Supreme Court applied a strict scrutiny test when statutes burdened

3  the exercise of religion.  In *Sherbert v. Verner*, 374 U.S. 398 (1963), the Supreme Court held that

4  a facially neutral law that burdened the practice of religion must give way to a litigant's free

5  exercise rights unless the government showed that the law furthered a compelling governmental

6  interest by the means least restrictive upon religious liberty.  *See also Wisconsin v. Yoder*, 406

7  U.S. 205 (1972).

8      In 1990, the Supreme Court limited the circumstances in which the compelling

9  governmental interest test would be applied.  *Employment Div. v. Smith*, 494 U.S. 872 (1990).

10  Congress responded by restoring robust protection of religious exercise by enacting the Religious

11  Freedom Restoration Act of 1993 ("RFRA").  RFRA "restore[d] the compelling interest test as

12  set forth in *Sherbert* . . . and . . . *Yoder* . . . and . . . guarantee[d] its application in all cases where

13  free exercise of religion is substantially burdened by government."  42 U.S.C. § 2000bb(b)(1).

14  RFRA is unconstitutional when applied against state law, *City of Boerne v. Flores*, 521 U.S. 507

15  (1997), but not when applied against federal law.[2]

16      **B.**    **RFRA Applies to the Bankruptcy Code**.  One of the first cases to test the

17  constitutionality of RFRA as applied to federal law involved the interaction between the

18  Bankruptcy Code and religious practices.  *Christians v. Evangelical Free Church (In re Young)*,

19  82 F.3d 1407 (8th Cir. 1996), *vacated and rem'd* 521 U.S. 1114 (1997), *reinstated* 141 F.3d 854

20  (8th Cir. 1998).  In that case, the debtors contributed over $13,000 to their church in regular

21  tithes the year before they filed their chapter seven petition.  The bankruptcy trustee filed an

22  adversary proceeding and invoked 11 U.S.C. § 548 to recover these tithes as preference

23  payments.  Even though the Eighth Circuit determined that the tithes were voidable transfers, it

---

24  [2]Guam v. Guerrero, 290 F.3d 1210, 1218-21 (9th Cir. 2002); Christians v. Crystal Evangelical Free Church (In re
    Young), 141 F.3d 854, 858-59 (8th Cir. 1998); Kikumura v. Hurley, 242 F.3d 950, 958 (10th Cir. 2001); Magic
25  Valley Evangelical Free Church, Inc. v. Fitzgerald, 220 B.R. 386, 393-401(D. Ct. Idaho 1998); Mockaitis v.
    Harcleroad, 104 F.3d 1522, 1530 (9th Cir. 1997); Sasnett v. Sullivan, 91 F.3d 1018, 1022 (7th Cir. 1996), vacated
26  and rem. on other grounds, 521 U.S. 1114 (1997); E.E.O.C. v. Catholic Univ. of America, 83 F.3d 455, 468-70
    (D.C. Cir. 1996).

**Page 13 of 20 -** DEBTOR'S BRIEF IN RESPONSE TO THE TORT CLAIMANTS
COMMITTEE'S THIRD MOTION FOR PARTIAL SUMMARY JUDGMENT

1  refused to order the church to disgorge these sums because RFRA trumped. *Id*. at 1416-20.

2      When Congress amended the Bankruptcy Code's strong arm and avoidance provisions, it

3  likewise made clear that it amendments--like the Bankruptcy Code itself--were subject to RFRA:

4      Nothing in the amendments made by this Act [amending § 544 and others] is
5      intended to limit the applicability of the Religious Freedom Restoration Act of
       1993.
6
7  Religious Liberty and Charitable Donation Protection Act of 1988, Pub.L. No. 105-183,

8  § 6, 112 Stat. 517, 518-19 ( June 19, 1998).

9      **C.    The Application of § 544(a)(3) to Consolidate the Parishes and Their**

10 **Property Into the Debtor's Estate Violates RFRA**. RFRA's basic rule is that:

11      Government may substantially burden a person's exercise of religion only if it
12      demonstrates that application of the burden to the person –

13      (1)    is in the furtherance of compelling governmental interest; and
        (2)    is the least restrictive means of furthering that compelling governmental
14              interest.

15 42 U.S.C. § 2000bb-1.

16      **1.    Substantial Burden**. Application of Bankruptcy Code § 544(a)(3) to

17 consolidate parishes and their property into the Debtor's estate would substantially burden the

18 Archdiocese's exercise of religion because such a result would be contrary to those provisions of

19 Catholic Doctrine or Canon Law that: (a) establish parishes as separate juridic persons with their

20 own property; (b) give to parish pastors the authority to administer parish property; (c) require

21 bishops to conduct their administration and governance in accordance with Canon Law;

22 (d) require parishes and other juridic persons, when accepting donations for stated purposes like

23 capital campaigns, to apply those donations exclusively for the intended purposes; (e) require

24 pastors and bishops to conduct the affairs of their respective parishes and dioceses in accordance

25 with Canon Law.[3] The TCC's proposed application of § 544(a)(3) would further burden the free

26
_____
[3]*See generally* Debtor's Combined Brief at 16-17, ¶¶ 4-11; Cafardi Decl. at 24-26, 29-31 and its Ex. A., CIC cc. 113-

1   exercise of religion by diverting real estate set aside to advance the ministry of the Church to be

2   used to pay tort claimants for claims that arose from the alleged wrongful conduct of an earlier

3   generation of Catholic priests and those with authority over them.  This could result in the

4   closure of parishes and schools and the dispersing of parishioners and families.  These burdens

5   on religious exercise are vastly more onerous than the recovery of tithes in *Young*.

6            **2.        Absence of Compelling Governmental Interest.**  As previously

7   explained, RFRA restored *Sherbert's* free exercise analysis.  When balancing the governmental

8   interest, the *Sherbert* Court emphasized:

9            It is basic that no showing merely of a rational relationship to some colorable
10           state interest would suffice; in this highly sensitive constitutional area, '(o)nly the
             gravest abuses, endangering paramount [governmental] interest, give occasion for
11           possible limitation,' [of the affected religious exercise].

12  *Sherbert*, 374 U.S. at 406.  The purpose of the § 544 (a)(3) strong arm provision, like that of 11

13  U.S.C. § 548 in *Young*, is to maximize creditors' recovery.   Maximizing creditors' recovery

14  cannot be a compelling interest when the Bankruptcy Code itself includes provisions like

15  11 U.S.C. § 541(b), 11 U.S.C. § 541(c)(2), and 11 U.S.C. § 541(d) which limit creditors'

16  recovery.  *See Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 537 (1993) ("in

17  circumstances in which individualized exemptions from a general requirement are available, the

18  government 'may not refuse to extend that system to cases of "religious hardship"'").

19  Accordingly, *Young* held:

20           We agree with *In re Tessier*, 190 B.R. 396 (Bankr. D. Mont. 1995) that the
             interests advanced by the bankruptcy system are not compelling under RFRA. . .
21           [W]e agree that bankruptcy is not comparable to national security or public
             safety.  We also agree that allowing debtors to get a fresh start or protecting the
22           interests of creditors is not comparable to the collection of revenue through the
             tax system or the fiscal integrity of the social security system, which have been
23           recognized as compelling governmental interests in the face of a religious
             exercise claim.
24

25

26  116, 373, 393, 515.3, 532, 1256-1257.1, 1267.1, 1267.3, 1279.1, 1282, 1284.2.3; Vlazny Decl. ¶ 9; Second Cafardi
    Decl. ¶¶ 15-27.

1 *Young*, 82 F.3d. at 1420 (internal citation added).  *Young* also recognized that accommodating

2 religious exercise as required by RFRA could hardly "undermine the integrity of the bankruptcy

3 system as a whole; its effect will necessarily be limited to the debtor's creditors who, as a result,

4 will have fewer assets available to apply to the outstanding liability . . ."  *Id.* at 1420.

5    **3.** **Least Restrictive Means**.  Even if there were a compelling governmental

6 interest, the TCC's proposed application of § 544(a)(3)--like its earlier request that the Court find

7 that the parishes are mere operating divisions of an Archdiocesan corporation sole--makes no

8 attempt to protect the Archdiocese's free exercise interest by identifying the means least

9 restrictive on the religious liberty interest.

10 **V.** **THE FIRST AMENDMENT DOCTRINE OF CHURCH AUTONOMY**
**PRECLUDES THE COURT FROM APPLYING  § 544(a)(3) TO MODIFY THE**
11 **POLITY AND GOVERNANCE OF THE ARCHDIOCESE AND THE**
**EXEMPLAR PARISHES.**

12   The TCC asks the Court to apply  § 544(a)(3) in a manner that would disregard parishes

13 as ecclesial entities, strip their pastors of their canonical power to administer parish property,

14 collapse those parishes along with their property into the Archdiocesan corporation, and

15 eviscerate the Archbishop's authority as canonical steward.[4]  Cafardi Decl. ¶¶ 27-31, 35-38, 42.

16 The TCC is at the same time requesting the Court to force Regis High School, the Parishes, and

17 the Archdiocese to violate the many canonical provisions requiring them as donees to apply the

18 gifts they have received in accordance with the donors' purposes or intentions.  Cafardi Decl. ¶¶

19 8-30.

20   These are core ecclesiastical subject matters off limits to government because the First

21 Amendment structurally restrains the Court from becoming entangled in such matters.  *Kedroff v.*

22

---

23 [4] The Third Motion ignores the most distinctive facts and issues in this bankruptcy:  that the Debtor facilitates the
24 temporal affairs of a church; that the Debtor is a particular type of corporation, an ecclesiastical corporation sole;
that there are six particular, highly relevant provisions in Oregon corporation law that apply to ecclesiastical
corporations sole or religious non-profit corporations; that the Debtor's articles of incorporation seven times
25 reference and import Catholic doctrine and usages and Canon Law into the Debtor's governance; that granting the
TCC's motion would rewrite the polity and governance of Catholic dioceses and parishes and eviscerate the
26 authority of parish pastors; and that the Religious Freedom Restoration Act and the First Amendment provide
additional protections and rights to churches and their civil corporations.

**Page 16 of 20 -** DEBTOR'S BRIEF IN RESPONSE TO THE TORT CLAIMANTS
COMMITTEE'S THIRD MOTION FOR PARTIAL SUMMARY JUDGMENT

1     *St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952) (identifying "matters of church government" as

2     an ecclesiastical subject matter); *Kreshik v. St. Nicholas Cathedral*, 363 U.S. 190 (1960)(same);

3     *Watson v. Jones*, 80 U.S. 679, 727 (1871) (identifying "questions of . . . ecclesiastical rule,

4     custom or law" as ecclesiastical subject matters); *Serbian Eastern Orthodox Diocese v.*

5     *Milivojevich*, 426 U.S. 696, 709 (1976) (identifying "religious law ," "church polity," "control of

6     church property," and "structure and administration" of a diocese as ecclesiastical subject

7     matters). Debtor's Combined Brief at 23-30.

8         The United States Supreme Court has repeatedly recognized that religious institutions

9     determine their own doctrine, polity, and governance.

10
11         [A] spirit of freedom for religious organizations, an independence from secular
12         control or manipulation, in short, power to decide for themselves free from state
13         interference, matters of church government as well as those of faith and doctrine
           [and that those organizations] have federal constitutional protection as part of the
           free exercise of religion against state interference.

14     *Kedroff*, 344 U.S. at 116. The Courts, applying these principles of the Church Autonomy

15     Doctrine, have refused to apply statutes that would rearrange the polity, governance, or Canon

16     Law of a church, *id.,* just as they have refused to apply other statutes touching upon other

17     ecclesiastical subjects. *United States v. Ballard*, 322 U.S. 78 (1944) (refusing to apply federal

18     mail fraud statute); *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir. 1972) (refusing to apply

19     Title VII); *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648 (10th Cir. 2002)

20     (refusing to apply 42 U.S.C. §§ 1985 and 1986).

21

22         In *Kedroff*, the United States Supreme Court voided a New York statute that reallocated

23     authority and changed the polity within the Russian Orthodox Church. Invoking *Watson v.*

24     *Jones*, 80 U.S. (13 Wall.) 679 (1871), it reasoned:

25         By fiat [the New York legislature] **displaces one church administrator with**
26         **another**. It passes the control of matters strictly ecclesiastical from one church
           authority to another. It thus intrudes for the benefit of one segment of a church

**Page 17 of 20 -** DEBTOR'S BRIEF IN RESPONSE TO THE TORT CLAIMANTS
COMMITTEE'S THIRD MOTION FOR PARTIAL SUMMARY JUDGMENT

1  the power of the state into the forbidden area of religious freedom contrary to the
2  principles of the First Amendment.

3  *Id*. at 119 (emphasis added). The TCC's proposed application of § 544(a)(3) would, like

4  *Kedroff's* New York statute, "displace one church administrator" (the parish pastor) "for another"

5  (the archbishop). It would also obliterate the distinctive rights and separateness of parishes. The

6  *Kedroff* Court's conclusion--that "an enactment by a legislature cannot validate action which the

7  Constitution prohibits . . ."--applies with equal force to the TCC's invocation of § 544(a)(3) to

8  extinguish parishes as ecclesial entities. *Id*. at 107.  *Kedroff* squarely holds that the First

9  Amendment precludes a legislature from reallocating authority within a denomination. *Id. See*

10  *also Northside Bible Church v. Goodson*, 387 F.2d 534 (5th Cir. 1967) (invoking *Watson v.*

11  *Jones* to void the Dumas Act by which the Alabama legislature sought to modify Protestant

12  denominational polity so that local churches might more easily split off from their

13  denomination). *Kresik v. St. Nicholas Cathedral*, 363 U.S. 190 (1960) squarely holds that civil

14  courts may not reallocate authority within a denomination.

15
16       Indeed, *Jones v. Wolf*, 443 U.S. 595, 609 (1979) itself, immediately after ruling that

17  neutral principles methodology could be applied in a secessionist church case, abandoned that

18  approach when it determined the Georgia corporation statute might require it to identify the

19  transferee on the warranty deed in accordance with church law. It reasoned that "if the Georgia

20  law provides that the identity of the Vineville church is to be determined according to the 'laws

21  and regulations' of the [Presbyterian Church in the United States], then the First Amendment

22  requires that the Georgia Courts give deference to the presbyterial commission's determination of

23  that church's identity." *Id*.  Six separate provisions of the Oregon corporation statutes similarly

24  require civil authorities to defer to church law so that churches might govern themselves in

25
26

**Page 18 of 20 -** DEBTOR'S BRIEF IN RESPONSE TO THE TORT CLAIMANTS
COMMITTEE'S THIRD MOTION FOR PARTIAL SUMMARY JUDGMENT

1   accordance with their own beliefs.

2       By identifying *Carnes v. Smith*, 222 S.E.2d 322 (Ga. 1976) as an exemplar case  for

3   resolving a church property dispute, *see Jones v. Wolf*, 443 U.S. at 600, the Supreme Court

4   recognized that a church's authority to define its own polity is so great that church law regarding

5   property ownership controls even when it produces an opposite result from merely looking to the

6   named transferee on a deed.  The TCC's bona fide purchaser argument based on § 544(a)(3) is, of

7   course, the TCC's latest effort to cause the Court to ignore all contrary law and evidence and

8   merely look to the identification of the transferees on the deeds for parish property.  *Carnes* and

9   

10  *Jones v. Wolf*  vindicate the First Amendment principle that churches and denominations get to

11  define their own polity, even when the warranty deeds by which they take property may be

12  confusing under other civil legal principles.

13       A fundamental rule of Church Autonomy law is that church law matters because, in

14  America, churches get to define their own governance, their own polity, and their own beliefs.

15  The Georgia corporation statute cannot change this rule and neither can § 544(a)(3) of the

16  Bankruptcy Code.  This is why the Oregon corporation law, again and again, expressly defers to

17  church law for church corporations.  Or. Gen'l Laws at 127 § 9; Or. Gen'l Laws at 135-36 §§ 2

18  and 4; O.R.S. 65.067, O.R.S. 65.042, O.R.S. 65.357(2)(d), and O.R.S. 65.377(2)(c).  It is why the

19  Debtor stated in its articles of incorporation that it would be governed by its own Canon Law.  It

20  

21  is why the Supreme Court placed ownership of Father Steinhauser's copyrights and copyright

22  income after his death in his Benedictine monastery instead of Father Steinhauser's estate even

23  though he held the copyrights in his own name.  *Order of St. Benedict of New Jersey v.*

24  *Steinhauser*, 234 U.S. 640 (1914).  It is why Justice Brandeis ruled that Raul Gonzalez could not

25  be made a chaplain and could not receive the trust income from his great, great, great,

26  

**Page 19 of 20 -** DEBTOR'S BRIEF IN RESPONSE TO THE TORT CLAIMANTS
COMMITTEE'S THIRD MOTION FOR PARTIAL SUMMARY JUDGMENT

1    grandmother's trust even though the trust document appeared to require the same.  *Gonzalez v.*

2    *Roman Catholic Archbishop of Manila*, 280 U.S. 1 (1929).  It is why the Ohio Supreme Court

3    held that Archbishop's Purcell's assignment for the benefit of creditors which automatically

4    transferred all of his property to the trustee in insolvency had no effect on the parish property he

5    held in his own name.  *Mannix v. Purcell*, 19 N.E. 572, 584 (Ohio 1888).  It why the Court here

6    must reject the TCC's argument, based on § 544(a)(3), and hold, just as the Ohio Supreme Court

7    did, that "[t]he legal title to all this property is in the bishop, while the equitable or beneficial

8    interest is in the several congregations . . . ."  *Id*. at 590.

9

10   **VI.    CONCLUSION**

11           For the reasons stated herein and as permitted or required by Oregon corporation and

12   trust law, the Debtor's articles of incorporation, RFRA, and the First Amendment Doctrine of

13   Church Autonomy, the Debtor respectfully requests that the Court deny the TCC's Third Motion

14   for Partial Summary Judgment.

15

16                                    SUSSMAN SHANK LLP

17                                    */s/ Thomas W. Stilley*

18                                    By:_____
                                           Howard M. Levine, OSB #80073
19                                         Thomas W. Stilley, OSB #88316
                                           William N. Stiles, OSB #65123
20                                         Of Attorneys for Debtor

21                                    ROTHGERBER JOHNSON & LYONS LLP

22                                    L. Martin Nussbaum, CO Bar No. 15370
                                      Eric V. Hall, CO Bar No. 32028
23                                    Admitted Pro Hac Vice
                                      Of Attorneys for Debtor
24                                    Of Attorneys for Debtor

25   F:\CLIENTS\14961\004\ADVERSARY PROCEEDING (3RD MOTION FOR PARTIAL SUMMARY JUDGMENT)\P-BRIEF (FINAL FORM).DOC

26

1          <u>CERTIFICATE OF SERVICE</u>

2          I certify that on October 19, 2005, I served **by first class mail,** a full and

3   correct copy of the foregoing **DEBTOR'S BRIEF IN RESPONSE TO THE TORT**

4   **CLAIMANTS COMMITTEE'S THIRD MOTION FOR PARTIAL SUMMARY**

5   **JUDGMENT** to the interested parties of record, addressed as follows:

6          PLEASE SEE ATTACHED LIST OF INTERESTED PARTIES

7

8   Dated:        October 19, 2005

9

10                         */s/ Thomas W. Stilley*

11                         _____
                           Thomas W. Stilley, OSB No. 88316
                           Howard M. Levine, OSB No. 80073
12                         Susan S. Ford, OSB No. 84220
                           William N. Stiles, OSB No. 65123

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 1 - CERTIFICATE OF SERVICE

Pamela Griffith
U.S. Trustee's Office
620 SW Main Street, Rm. 213
Portland, OR  97205

Tort Claimants Committee
Albert N. Kennedy
Tonkon Torp LLP
Suite 1600, 888 SW 5th Ave.
Portland, OR 97204

Mr. Donn Christiansen
c/o Michael Morey P.C.
8 N. State Street, Suite 301
Lake Oswego, OR  97034

Catherine Travis
Lane Powell Spears Lubersky LLP
Suite 2100, 601 SW Second Ave
Portland, OR 97204-3158

Steven M. Hedberg
Douglas R. Pahl
Perkins Coie
1120 NW Couch Street, 10th Floor
Portland, OR  97209

Thomas W. Stilley
Sussman Shank LLP
1000 SW Broadway, Suite 1400
Portland, OR  97205

Holy Family Catholic Church
3732 SE Knapp
Portland, OR 97202

Cameo Garrett
4875 Harnden Road
Cashmere, WA  98815

Oregon Education Technology
Consortium
8995 SW Miley Rd., #101
Wilsonville, OR 97070

Thomas Sand
Jerry B. Hodson
Miller Nash LLP
Suite 3500, 111 SW 5th Ave.
Portland, OR 97204

Tom Dulcich
Margaret Hoffman
Schwabe Williamson & Wyatt PC
1211 SW 5th Ave.
Portland, OR 97204

Jeffrey Werstler
IRS1220 SW Third Avenue
MS-0240
Portland, OR  97204

Phoebe Joan O'Neill
1500 SW Fifth Avenue
Unit 703
Portland, OR  97201

ACE Property & Casualty Insurance Company
c/o Joseph A. Field
Field & Associates
610 SW Alder St, Suite 910
Portland, OR 97205

Michael S. Morey
8 N. State Street
Suite 301
Lake Oswego, OR  97034

Peter C. McKittrick
Farleigh Wada & Witt PC
Suite 600
121 SW Morrison St.
Portland, OR 97204

Linda Boyle
Time Warner Telecom, Inc.
10475 Park Meadows Drive, #400
Littleton, CO  80124

Jonathan E. Cohen
PMB 315
6663 SW Beaverton Hillsdale Highway
Portland, OR 97225-1403

Steven C. Berman
Stoll Stoll Berne Lokting & Shlachter
209 SW Oak Street, Suite 500
Portland, OR  97204

Robert J. Vanden Bos
Vanden Bos & Chapman
Suite 520
319 SW Washington St.
Portland, OR 97204

Jame A. Hayes Jr.
Cummins & White LLP
2424 SE Bristol Street, Suite 300
Newport Beach, CA  92660

General Insurance Company
John A. Bennett
Bullivant Houser Bailey, A Professional
Corporation
Suite 300, 888 SW 5th Ave.
Portland, OR 97204

Robert Millner
Kevin P. Kamraczewski
Sonnenschein, Nath & Rosenthal
8000 Sears Tower
Chicago, IL  60606

Paul E. DuFresne
5135 SW 85th Avenue
Portland, OR  97225

David A Foraker, Future Claimants
Representative
Greene & Markley, PC
Suite 600, 1515 SW 5th Ave.
Portland, OR 97201

L. Martin Nussbaum
Rothgerber Johnson & Lyons LLP
Wells Fargo Tower, Suite 1100
90 South Cascade Avenue
Colorado Springs, CO  80903

Kelly W.G. Clark
Attorney at Law
1706 NW Glisan, Suite 6
Portland, OR  97209

Neil T. Jorgenson
Attorney at Law
520 SW Sixth Avenue, Suite 820
Portland, OR  97204

Karl Mullen
Mullen Law Firm, P.C.
8225 SW Fairway Drive, Suite 100
Portland, OR  97225

Eric J. Neiman
Heather J. Van Meter
Williams Kastner & Gibbs, PLLC
888 SW Fifth Avenue, Suite 600
Portland, OR  97204

Margaret M. Anderson
Patrick M. Jones
Lord, Bissell & Brook LLP
115 South LaSalle Street
Chicago, IL  60603

Thomas W. Brown
Cosgrave Vergeer Kester LLP
805 SW Broadway, 8th Floor
Portland, OR  97205

Scott L. Jensen
Brownstein Rask et al.
1200 SW Main Building
Portland, OR  97205

Marilyn Podemski
2477 SW Arden Road
Portland, OR  97201

Richard C. Josephson
Stephen A. Redshaw
Stoel Rives LLP
Suite 2600, 900 SW 5th Ave.
Portland, OR 97204

David B. Levant
Stoel Rives, LLP
600 University Street, Suite 3600
Seattle, WA  98101

Gary Bisaccio
2125 SW 4th Avenue
Portland, OR  97201

Richard Anderson
Anderson & Monson
Park Plaza West, Suite 460
10700 SW Beaverton-Hillsdale Hwy.
Beaverton, OR  97005

Karen Belair
Law Department
Union Pacific Railroad
1400 Douglas Street, MC 1580
Omaha, NE  68179-1580

Dana Shelton, Recovery Specialist
Recovery Department
NOVA Information Systems, Inc.
7300 Chapman Highway
Knoxville, TN  37920

William Tharp
Fred C. Ruby
Department of Justice
1162 Court Street NE
Salem, OR  97301

Erin K. Olson
2905 NE Broadway St.
Portland, OR  97232-1760

David Slader
David Slader Trial Lawyers P.C.
806 SW Broadway, Suite 400
Portland, OR  97205

Brad T. Summers
Daniel R. Webert
Ball Janik LLP
Suite 1100, 101 SW Main St.
Portland, OR 97204

James B. Davidson
Daniel P. Larsen
Ater Wynne  LLP
Suite 1800, 222 SW Columbia St.
Portland, OR 97201

Timothy J. McNamara
Craig A. Ryan
OneBane Law Firm
PO Box 3507
Lafayette, LA  70502-3507

James M. Altieri, William T. Corbett Jr.
Robert K. Malone, Michael P. Pompeo
Drinker Biddle & Reath LLP
500 Campus Drive
Florham Park, NJ  07932-1047

Michael J. Farrell
Martin Bischoff, et al.
888 SW Fifth Avenue, Suite 900
Portland, OR  97204

Wilson C. Muhlheim
Muhlheim Boyd & Carroll
88 East Broadway
Eugene, OR  97401

Bradley S. Copeland
Loren S. Scott
Arnold Gallagher, et al.
PO Box 1758
Eugene, OR  97440-1758

David Paul
Paul & Sugerman, PC
520 SW Sixth Avenue, Suite 920
Portland, OR  97204

Daniel J. Gatti
1781 Liberty Street SE
Salem, OR  97302

Paulette Furness
Director of Business Affairs
Archdiocese of Portland in Oregon
2838 East Burnside
Portland, OR  97214