1  Steven M. Hedberg, OSB No. 84244 (shedberg@perkinscoie.com)
   Douglas R. Pahl, OSB No. 95047 (dpahl@perkinscoie.com)
2  Jeffrey C. Dobbins, OSB No. 02042 (jdobbins@perkinscoie.com)
   PERKINS COIE LLP
3  1120 N.W. Couch Street, Tenth Floor
   Portland, OR  97209-4128
4  Telephone:  (503) 727-2000

5
   Of Attorneys for Defendant Class and Committee of Catholic Parishes, Parishioners and
6  Interested Parties

7

8                  UNITED STATES BANKRUPTCY COURT

9                    FOR THE DISTRICT OF OREGON

10

11  In re                                    NO. 04-37154-elp11

12  ROMAN CATHOLIC ARCHBISHOP OF
    PORTLAND IN OREGON, and successors, a
13  corporation sole, dba the ARCHDIOCESE OF
    PORTLAND IN OREGON

14
              Debtor.
15

16  TORT CLAIMANTS COMMITTEE,               Adversary Proceeding
                                            No. 04-3292-elp
        Plaintiff,
17                                          **PARISH AND PARISHIONERS' CLASS
18  v.                                      AND PARISH COMMITTEE
                                            MEMORANDUM IN OPPOSITION TO
19  ROMAN CATHOLIC ARCHBISHOP OF            PLAINTIFFS' THIRD MOTION FOR
    PORTLAND IN OREGON, and successors, a   PARTIAL SUMMARY JUDGMENT**
20  corporation sole, dba the ARCHDIOCESE OF
    PORTLAND IN OREGON, et al.,
21
              Defendant.
22

23

24

25

26

PAGE  i-    PARISH AND PARISHIONERS' CLASS AND PARISH
            COMMITTEE MEMORANDUM IN OPPOSITION TO
            PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
            JUDGMENT
            [54319-0001/PA052830.120]

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone: (503) 727-2000
Fax: (503) 727-2222

CLERK U.S. BANKRUPTCY COURT
DISTRICT OF OREGON

OCT 1 9 2005

LODGED_____ REC'D ⊘⊘
PAID_____ DOCKETED_____
AFTER 4:30 P.M.

1

**CONTENTS**

2

INTRODUCTION ..................................................................................................1

3

LEGAL STANDARD...........................................................................................4

4

ARGUMENT........................................................................................................5

5

6       I.     A Reasonable and Prudent Purchaser of the Test Properties Would Be On Sufficient Notice of the Parish Defendants' Interests In the Test Properties, and Section 544(a)(3) Would Not Avoid Those Interests. ................................5

7

8           A.    Section 544(a)(3) Applies to Void the Parish Defendants' Interests Only Where a Purchaser of These Properties Would be a Bona Fide Purchaser.......................................................................................5

9

10          B.    Oregon Purchasers Are Subject to Actual, Inquiry, and Constructive Notice of Other Interests in the Property.........................6

11

12          C.    A Reasonable and Prudent Purchaser of these Properties Would Be on Notice that Other Interests Exist, and Would Inquire Into the Nature of Those Other Interests. .............................................................9

13

14                1.    On the Face of the Deeds, A Reasonable and Prudent Purchaser Would Inquire into the Scope of the Archdiocese's Authority.................................................................9

15

16                2.    A Reasonable and Prudent Purchaser Would Be on Notice About Possible Other Interests Based on Their Review of the State Corporation Code and the Archdiocese's Articles of Incorporation. ........................................................................11

17

18

19                3.    The Active Use and Maintenance of the Properties by Parish Defendants Would Prompt a Reasonable Purchaser to Inquire Into the Scope of a Parish's Interest in the Property.............................................................................13

20

21

22                4.    Contemporaneous Public Knowledge Prior to the Filing of the Bankruptcy Put Purchasers on Notice of the Parish Defendants' Interests. .....................................................14

23

24      II.    The Test Properties are Held In Trust For the Benefit of the Parish Defendants. ........................................................................................15

25

26          A.    Oregon Law Permits Express Trusts to Be Created Based on the Relationship of the Parties and Evidence External to the Deed..........15

PAGE  ii-  PARISH AND PARISHIONERS' CLASS AND PARISH
COMMITTEE MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
JUDGMENT
[54319-0001/PA052830.120]

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  (503) 727-2000
Fax:  (503) 727-2222

B. Resulting Trusts Arise When Funds are Used to Purchase Property for the Benefit of Another, Even in the Absence of Express Trust Language in the Deed. ........................................................................19

C. Notice and the Existence of an Express or Resulting Trust Defeats the Strong-Arm Powers of Section 544. ..............................................21

D. The Test Properties Were Purchased and Improved, and are Maintained, For the Benefit of the Parish Defendants, not the Archdiocese...........................................................................................21

 1. Holy Redeemer Parish (Portland, Oregon) ..............................22

 2. Immaculate Conception Parish (Stayton, Oregon) .................28

 3. St. Michael's Church (Oakridge, Oregon) ...............................30

 4. St. Birgitta Parish (Portland (Linnton), Oregon) ....................32

 5. St. Elizabeth Ann Seton Parish (Aloha, Oregon).....................37

 6. St. Mary, Our Lady of the Dunes Parish (Florence, Oregon)..41

 7. Queen of Peace (Salem, Oregon)..............................................44

 8. St. John Fisher (Portland, Oregon) ..........................................48

 9. St. Philip Benizi (Redland, Oregon) .........................................54

III. Principles of Religious Freedom Bar the Relief Sought by the TCC under Section 544(a)(3). ........................................................................58

A. The Religious Freedom Restoration Act Bars Reliance on Section 544 to Void The Parish Defendants' Interests in the Test Properties...59

B. The Religion Clauses of the First Amendment...................................61

IV. Conclusion. ........................................................................................63

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  (503) 727-2000
Fax:  (503) 727-2222

1                            **TABLE OF AUTHORITIES**

2        **Cases**

3        *Akins v. Vermast*, 150 Or. App. 236, 945 P.2d 640 (1997)....................................6, 7, 8

4        *Allen v. Hendrick*, 206 P. 733, 104 Or. 202 (1922) ....................................................16

5
         *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202
6            (1986)..............................................................................................................4

7        *Barnett v. City of Yonkers*, 731 F. Supp. 594 (S.D. N.Y. 1990) ...............................15

8        *Belton v. Buesing*, 402 P.2d 98, 240 Or. 399 (1965) .................................................17

9
         *Berean Fundamental Church Council, Inc. v. Braun*, 281 Or. 661, 576 P.2d 361
10           (1978)............................................................................................................16

11       *Business Men's Assur. Co. of America v. Northern Calif. Veneer, Inc.*, 453 F.2d
12           387 (9th Cir. 1971)........................................................................................17

13       *Cantwell v. Connecticut*, 310 U.S. 296 (1940) ........................................................61

14       *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) .................4

15       *Central Alabama Conference of the African Methodist Episcopal Zion Church in
             America v. Crum*, 746 So.2d 1013 (Ala. Civ. App. 1999)......................................16

16       *Certified Mortg. Co. v. Shepherd*, 115 Or.App. 228, 838 P.2d 1082 (1992)..........................19

17       *Certified Mortg. Co.*, 115 Or. App. at 235, 838 P.2d at 1086.................................20

18       *Certified Mortgage v. Shepherd*, 838 P.2d 1082, 115 Or. App. 228 (1992)..........................19

19
         *Christians v. Crystal Evangelical Free Church (In re Young)*, 141 F.3d 854 (8th
20           Cir.), *cert. denied*, 119 S. Ct. 43 (1998) .....................................................59, 60

21       *City of Medford v. Bessonette*, 463 P.2d 865, 255 Or. 53 (1970) ...........................18

22
         *Good Samaritan Hospital and Medical Center v. U. S. Nat. Bank*, 246 Or. 478,
23           425 P.2d 541 (Or. 1967) ...............................................................................16

24       *Gorzeman v. Thompson*, 162 Or.App. 84, 986 P.2d 29 (1999) ................................6

25       *Guam v. Guerrero*, 290 F. 3d 1210 (9th Cir. 2002).............................................59, 61

26       *Hanscom v. Hanscom*, 208 P.2d 330, 186 Or. 541 (1949) ......................................18

PAGE   iv-   PARISH AND PARISHIONERS' CLASS AND PARISH
             COMMITTEE MEMORANDUM IN OPPOSITION TO
             PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
             JUDGMENT
             [54319-0001/PA052830.120]

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  (503) 727-2000
Fax:  (503) 727-2222

1    *High v. Davis*, 283 Or. 315, 584 P.2d 725 (1978) ...................................................6

2    *Howard v. Foskett*, 189 P. 396, 96 Or. 446 (1920)...............................................17

3    *Hurlbutt v. Hurlbutt*, 36 Or.App. 721, 585 P.2d 724 (1978) ...............................19

4    *In re Clearwater*, 1997 WL 101975 (Bankr. D. Or. 1997) (Perris, J.) .....................8

5    *In re Golden Triangle Capital, Inc.*, 171 B.R. 79 (9th Cir. BAP 1994) ....................21

6    *In re Merrill Lynch & Co., Inc.*, 273 F.Supp.2d 351 (S.D. N.Y. 2003)......................15

7    *In re Mill Concepts Corp.*, 123 B.R. 938 (Bankr. D. Mass. 1991) ..........................61

8    *In re Parkview Hospital*, 211 B.R. 619 (Bankr. N.D. Ohio 1997) ...........................16

9    *In re Probasco*, 839 F.2d 1352, 1354-55 (9th Cir. 1988) .......................................5

10   *In re Sale Guaranty Corp.*, 220 B.R. 660 (9th Cir. B.A.P. 1998), *aff'd*, 199 F.3d
     1375 (9th Cir. 2000)......................................................................................5, 21

11   *In re Thornton*, 544 P.2d 1005 (9th Cir. 1976)...................................................16

12   *In re Weisman*, 5 F.3d 417 (9th Cir. 1993) .........................................................5

13   *In re Wilder*, 42 B.R. 6 (Bkr. D. Or. 1983)........................................................19

14   *In re Wray*, 258 B.R. 777 (Bankr. D. Idaho 2001) ...............................................7

15   *In re Young*, 82 F.3d 1407 (8th Cir. 1996).....................................................59, 60

16   *In re Young*, 82 F.3d 1407 (8th Cir.), *reh'g denied*, 89 F.3d 494 (8th Cir. 1996),
     *vacated and remanded*, 117 S. Ct. 2502 (1997), *on remand sub nom. Christians
     v. Crystal Evangelical Free Church (In re Young)*, 141 F.3d 854 (8th Cir.),
     *cert. denied*, 119 S. Ct. 43 (1998)......................................................................59

17   *Jones v. Wolf*, 443 U.S. 595 (1979) ..................................................................62

18   *Klamath Falls Assembly of God v. State Highway Comm.*, 255 Or. 211, 465 P.2d
     697 (1970)................................................................................................6, 15

19   *Kohler v. Gilbert*, 339 P.2d 1102, 216 Or. 483 (1959)........................................20

20   *Lewis v. Investors Leased Group II*, 118 Or.App. 361, 848 P.2d 113 (1993) ............7

21   *Lozano v. Summit Prairie Cattlemens Ass'n*, 155 Or.App. 32, 963 P.2d 92 (1998)...............19

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  (503) 727-2000
Fax:  (503) 727-2222

*Martin v. Thomas,* 144 P. 684, 74 Or. 206 (1914).................................................................20

*Maryland & Va. Churches v. Sharpsburg Church,* 396 U.S. 367, 90 S.Ct. 499
    (1970)...........................................................................................................................62

*Mills v. Brown (In re Brown),* 182 B.R. 778 (Bankr. E.D. Tenn. 1995).................................61

*Nooteboom v. Bulson,* 153 Or. App. 361, 956 P.2d 1042 (1998)...............................................8

*Paul v. Mazzocco,* 351 P.2d 709, 221 Or. 411 (1960).............................................................17

*Petrain v. Kiernan,* 23 Or. 455, 32 P. 158 (1893)......................................................................7

*Platt v. Jones,* 38 P.2d 703, 149 Or. 246, modified, 39 P.2d 955, 149 Or. 246
    (1934)...........................................................................................................................20

*Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial*
    *Presbyterian Church,* 393 U.S. 440 (1969).................................................................62

*Shipe v. Hillman,* 206 Or. 556, 292 P.2d 123 (1956)...............................................................19

*Shope v. Hillman,* 292 P.2d 123, 206 Or. 556 (1955)...............................................................20

*Smiley v. King,* 564 P.2d 1348, 278 Or. 555 (1977).................................................................18

*Spady v. Graves,* 307 Or. 483, 770 P.2d 53 (1989).................................................................6, 8

*State Farm Mutual Auto. Ins. Co. v. Davis,* 7 F.3d 180 (9th Cir. 1993)....................................4

*Stevens v. Am. Savings Institution, Inc.,* 289 Or. 349, 613 P.2d 1057 (1980).......................6, 7

*Trustees of Presbytery of Willamette v. Hammer,* 235 Or. 564, 385 P.2d 1013
    (1963)...........................................................................................................................16

*Watson v. Jones,* 80 U.S. 679 (1871).......................................................................................61

*Webb v. Stewart,* 255 Or. 523, 469 P.2d 609 (1970)..................................................................7

*Werner v. McCotter,* 49 F.3d 1476 (10th Cir. 1995)................................................................59

*Winters v. Winters,* 109 P.2d 857, 165 Or. 659 (1941)............................................................17

**Statutes**

ORS 105.620.................................................................................................................................8

ORS 128.710(2)...........................................................................................................................20

PAGE  vi-  PARISH AND PARISHIONERS' CLASS AND PARISH
    COMMITTEE MEMORANDUM IN OPPOSITION TO
    PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
    JUDGMENT
    [54319-0001/PA052830 120]

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  (503) 727-2000
Fax:  (503) 727-2222

1    ORS 65 ...................................................................................................11

2    ORS 65.042 ............................................................................................11

3    ORS 65.067 ............................................................................................10

4    ORS 65.077 ............................................................................................11

5    ORS 65.077(1) .......................................................................................11

6    ORS 90.023(1) .......................................................................................19

7    ORS 93.020 ............................................................................................17

8    ORS 93.020(2) .......................................................................................20

9    ORS 93.643(1) .........................................................................................8

10

11    **Other Authorities**

12    11 U.S.C. § 544(a)(3) ................................................................... passim

13    4 *Collier on Bankruptcy*, ¶ 544.02, p. 544 (Lawrence P. King ed., 15th ed. 1992)..................5

14    42 U.S.C. § 2000bb ...............................................................................4, 58

15    42 U.S.C. § 2000bb-1(b) ......................................................................59, 60

16    89 CJS, Trusts § 98 .................................................................................19

17    Restatement (3rd) of Trusts § 23, cmt. h .............................................17

18    Restatement (3rd) of Trusts § 28, cmt. c .............................................16

19    Restatement (3rd) of Trusts § 43, cmt. a .............................................16

20    Restatement of Trusts § 1, cmt. a..........................................................17

21

22    **Rules**

23    Fed. R. Bankr. P. 7056 ............................................................................4

24    Fed. R. Civ. P. 56(c) ...............................................................................4

25

26

PAGE  vii-  PARISH AND PARISHIONERS' CLASS AND PARISH
            COMMITTEE MEMORANDUM IN OPPOSITION TO
            PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
            JUDGMENT
            [54319-0001/PA052830.120]

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  (503) 727-2000
Fax:  (503) 727-2222

1    In answer to Plaintiff's Third Motion for Partial Summary Judgment (the "Motion"), the

2    Defendant Class of Parishes, Parishioners and other interested parties certified by the Court in

3    this proceeding, by and through Class Representatives John Rickman, Glenn Pelikan, Johnston

4    Mitchell, St. Andrews Catholic Church (Portland) (through its pastor, Reverend Charles Lienert),

5    St. Anthony Catholic Church (Tigard) (through its pastor, Reverend Leslie M. Sieg) and St. Juan

6    Diego Church (Portland) (through its pastor, Reverend John Kerns), and Intervenor Defendant

7    Committee of Catholic Parishes, Parishioners and Interested Parties in the Archdiocese of

8    Portland in Oregon (the "Committee") (the Committee and the Class, through its Class

9    Representatives, are collectively referred to as the "Parish Defendants") offer the following

10   memorandum in opposition.  This memorandum is supported by the declarations referenced on

11   Exhibit A, hereto.[1]

12                                    **INTRODUCTION**

13        The Tort Claimants' Committee (the "TCC") seeks partial summary judgment with

14   respect to the Test Properties (defined below) on two grounds: (a) avoiding, under 11 U.S.C.

15   § 544(a)(3), any equitable or beneficial interests held by the Parish Defendants in the Test

16   Properties, and (b) declaring that Debtor holds title to the Test Properties free and clear of any

17   beneficial interests.[2]  Like their Second Motion for partial summary judgment, in which the TCC

18   asked the Court to ignore the most salient feature of the relationships between the Archdiocese,

19   the Parishes, and the Parishioners – their status as members of a hierarchical church governed by

20   Canon law and motivated by a deep faith – the TCC asks the Court in this motion to ignore

21

22   _____

23        [1] Citations to individual declarations will be by reference to the defined terms in Exhibit A.

24        [2] It is not clear whether the TCC intends the second part of its motion – deeming the Debtor's
     interest in these properties to be free of any beneficial interest – to stand independently of the first.  We
25   assume for purposes of this brief that it is intended to be, and that the TCC asserts in this motion that the
     Archdiocese has fee simple title to the Test Properties, free of any equitable interest held by the Parish
26   Defendants.  If that is not the case, then part (b) of the motion should simply be denied on the basis of the
     denial of part (a), for the reasons set forth below.

PAGE  1-   PARISH AND PARISHIONERS' CLASS AND PARISH
           COMMITTEE MEMORANDUM IN OPPOSITION TO
           PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
           JUDGMENT
           [54319-0001/PA052830.120]

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  (503) 727-2000
Fax:  (503) 727-2222

1    written and documentary facts that establish the beneficial title held by the Parish Defendants in

2    these properties.  Just like the application of neutral principles of state law led inexorably to an

3    examination of Canon law in resolving the TCC's second motion for partial summary judgment,

4    neutral principles of state notice and trust law in this case lead to the conclusion that any

5    purchaser would not only be put on notice of the Parish Defendant's possible interest in this

6    property, but they would reach the conclusion that such beneficial interests existed.

7          The Motion relies initially on the implausible belief that a reasonable and prudent

8    purchaser of any of the Test Properties could have ignored written and visual evidence

9    evidencing the interests of the Parish Defendants in these properties.  This evidence is found not

10   merely in the actions of parishioners and pastors on the properties themselves, but in the deeds,

11   in Oregon law, in the articles of incorporation of the Archdiocese, and in the common knowledge

12   of the community prior to the filing of the petition in this case.  Any one piece of this evidence

13   would have been sufficient to notify a reasonable and prudent purchaser that they should inquire

14   further into the interests of the Parish Defendants in the Test Properties.  Because a purchaser

15   would have been on notice of such interests, the hypothetical bona fide purchaser status under

16   section 544(a)(3) is defeated, and the first part of the motion for partial summary judgment

17   should be denied.

18         The second part of the Motion, the TCC seeks to clear title to the Test Properties,

19   disregarding the facts that would be learned through the inquiries mandated under law.  If a

20   reasonable and prudent purchaser were to inquire, that purchaser would conclude that the Test

21   Properties are held in trust for the benefit of their respective parish communities.  As

22   overwhelmingly demonstrated by the accumulated evidence set forth in the accompanying

23   declarations, the funds donated by parishioners to purchase, build, and maintain these properties

24   were given by parishioners with the intention that they be devoted to the benefit of the religious

25   and charitable missions of their parish communities.  The role of the Archdiocese has been

26   minimal and the fact that legal title rests with the Archdiocese is incidental.  For each case, the

PAGE  2-    PARISH AND PARISHIONERS' CLASS AND PARISH
           COMMITTEE MEMORANDUM IN OPPOSITION TO
           PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
           JUDGMENT
           [54319-0001/PA052830.120]

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  (503) 727-2000
Fax:  (503) 727-2222

1  final purchase of property, or the transfer of ownership to the Archdiocese, was made with an

2  explicit recognition that the Archdiocese was holding bare legal title to the property as a mere

3  trustee of the Parish Defendants.

4      Far from being contrived for purposes of this proceeding, the trust concepts described by

5  the Parish Defendants are a fundamental fact of life for Catholics in western Oregon.  As

6  Archbishop Cornelius Power wrote in 1981: "While it is true that the land was transferred to the

7  Archdiocese of Portland, *it is not true that the Archdiocese as such owns the land for itself.*"  W.

8  Forbes (St. John Fisher Parish) Exh. 13 at 1.  Addressing "all property belonging to the Catholic

9  Church in western Oregon," the Archbishop stated that "[s]uch properties * * * *are really held in*

10 *trust for the individual parishes.*"  *Id.* (emphasis added).

11     And in 1993, Archbishop William Levada wrote: "[I]t is my understanding that a

12 canonically erected parish is itself a canonical juridic person, and *the assets of the parish – its*

13 *land and buildings – are really held for that church community.*  For example, although the

14 Archdiocese has civil title to all parish properties, the parish itself is the canonical juridic person

15 which would be the beneficiary of the buildings which have been constructed and maintained

16 through the generosity of the parishioners."  Adams (Holy Redeemer) Dec. ¶ 6 and Exh. 2

17 (emphasis added).

18     This documentary history simply confirms what is apparent from the facts surrounding

19 the purchase, holding, and maintenance of these properties:  All the parties involved in this

20 relationship have long understood that these properties are held for the benefit of the parishes

21 and their parishioners.  That intent by the parties is sufficient under Oregon Law to give rise to

22 an express trust.  At the very least, the funds given to purchase these properties were raised and

23 given to church leaders with the explicit understanding that they be used to purchase property

24 and erect buildings for the benefit of the individual parish communities.  Under those

25 circumstances, a resulting trust arises.  Whether these properties are held in an express or

26

PAGE  3-  PARISH AND PARISHIONERS' CLASS AND PARISH
            COMMITTEE MEMORANDUM IN OPPOSITION TO
            PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
            JUDGMENT
            [54319-0001/PA052830.120]

1    resulting charitable trust, the beneficial interest in these properties lies in the hands of the Parish

2    Defendants, and the second part of the Motion should also be denied.[3]

3                                    **LEGAL STANDARD**

4          Summary judgment is appropriate only "if the pleadings, depositions, answers to

5    interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

6    genuine issue as to any material fact and that the moving party is entitled to a judgment as a

7    matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; *State Farm Mutual Auto. Ins. Co.*

8    *v. Davis,* 7 F.3d 180, 182 (9th Cir. 1993).  The moving party bears the burden of establishing the

9    absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-34, 106

10    S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  That burden may only be met by showing that there is an

11    absence of evidence to support the nonmoving party's case. *Id.* at 325.  If the moving party has

12    met its burden, the nonmoving party may identify facts that show a genuine issue for trial.

13    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986).  All

14    reasonable inferences must be drawn in favor of the non-moving party. *Id.* at 249-50.

15

16

17

18

19

20    ─────────────────────

21          [3] If the Court were to interpret section 544 to invalidate the beneficial interests of the Parish
22    Defendants in this case, such a decision would raise substantial Constitutional problems.  Such a ruling
      would amount to a conclusion that the bankruptcy law permitted this Court to invalidate beneficial
23    interests held by religious persons and entities in order to further of their religion.  Such a conclusion runs
      afoul of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, and the First Amendment to the
24    U.S. Constitution.  For reasons explained below and further explicated in the responses to the Parish
      Defendants' response to the TCC's restated second motion for partial summary judgment, those
25    considerations preclude this Court from ruling, contrary to canon law and the structure of the Catholic
      church, that the Parishes do not hold a beneficial interest in these properties.  Fortunately, however, an
26    application of the relevant neutral principles of state law should lead this Court to conclude that the
      properties are held in trust for the Parishes and therefore outside of the scope of the Debtor's estate.

PAGE  4-    PARISH AND PARISHIONERS' CLASS AND PARISH              **Perkins Coie** LLP
            COMMITTEE MEMORANDUM IN OPPOSITION TO          1120 N.W. Couch Street, Tenth Floor
            PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY           Portland, OR  97209-4128
            JUDGMENT                                               Phone:  (503) 727-2000
            [54310-0001/PA052830.120]                               Fax:  (503) 727-2222

1                                    **ARGUMENT**

2   I.     **A Reasonable and Prudent Purchaser of the Test Properties Would Be On**
           **Sufficient Notice of the Parish Defendants' Interests In the Test Properties,**
3          **and Section 544(a)(3) Would Not Avoid Those Interests.**

4          A.     **Section 544(a)(3) Applies to Void the Parish Defendants' Interests**
                  **Only Where a Purchaser of These Properties Would be a Bona Fide**
5                 **Purchaser.**

6              Section 544(a)(3) gives a trustee the power to avoid certain transfers or liens against

7   property of the bankruptcy estate.[4]  The provision allows the trustee to avoid obligations and

8   transfers that would be avoidable by "a bona fide purchaser of real property . . . that obtains the

9   status of a bona fide purchaser at the time of the commencement of the case, whether or not such

10  a purchaser exists."  While this power is granted "without regard to any knowledge of the trustee

11  or of any creditor," section 503(a), the "trustee's constructive knowledge of a prior interest will

12  prevent avoidance of that interest."  *In re Sale Guaranty Corp.*, 220 B.R. 660 (9th Cir. B.A.P.

13  1998), *aff'd*, 199 F.3d 1375 (9th Cir. 2000) (citing *In re Weisman*, 5 F.3d 417, 420 (9th Cir.

14  1993); *In re Probasco*, 839 F.2d 1352, 1354-55 (9th Cir. 1988) (reversing bankruptcy court's

15  holding that purchaser was not on constructive notice).

16             "[S]tate law determines whether the trustee's status as a BFP will defeat the rights of the

17  person against whom the trustee seeks to assert his powers."  *In re Weisman,* 5 F.3d 417, 420 (9th

18  Cir. 1993), *citing* 4 *Collier on Bankruptcy,* ¶ 544.02, p. 544-8 to 11 (Lawrence P. King ed., 15th

19  ed. 1992).  The TCC accepts knowledge of certain narrow facts which it asserts are insufficient

20  to place a bona fide purchaser on notice.  These facts appear to be limited to the preliminary title

21

22  ──────────────

23        [4] Section 544(a)(3) of the Bankruptcy Code provides: "(a) The trustee shall have, as of the
24  commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the
    rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the
25  debtor that is voidable by-- * * * (3) a bona fide purchaser of real property, other than fixtures, from the
    debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a
26  bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether
    or not such a purchaser exists." 11 U.S.C. § 544(a)(3).

PAGE  5-   PARISH AND PARISHIONERS' CLASS AND PARISH            **Perkins Coie** LLP
           COMMITTEE MEMORANDUM IN OPPOSITION TO          1120 N.W. Couch Street, Tenth Floor
           PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY          Portland, OR  97209-4128
           JUDGMENT                                              Phone:  (503) 727-2000
           [54319-0001/PA052830.120]                               Fax:  (503) 727-2222

1   reports set forth in certain public documents: the Declaration of Mr. Newkirk, the articles of

2   incorporation of the Archdiocese and selected citations to Oregon Revised Statutes.

3      **B.    Oregon Purchasers Are Subject to Actual, Inquiry, and Constructive
            Notice of Other Interests in the Property**

4          Oregon courts do not permit bona fide purchasers to wear such restrictive blinders.

5   Under Oregon law, constructive notice may be "record notice" or "inquiry notice." *Akins v.*

6   *Vermast*, 150 Or. App. 236, 945 P.2d 640, 643 (1997) (citing *Spady v. Graves*, 307 Or. 483, 488

7   n.3, 770 P.2d 53 (1989)).  Inquiry notice is generally defined as "notice of facts that would

8   provoke a reasonable and prudent person to investigate [the] prospective purchase . . ." *Id.*

9   (citing *Stevens v. Am. Savings Institution, Inc.*, 289 Or. 349, 356, 613 P.2d 1057 (1980)).

10
11         The notice that will deprive the grantee under a subsequently recorded
           deed of priority can be either actual or constructive. *High v. Davis*, 283
12         Or. 315, 333, 584 P.2d 725 (1978).  Constructive notice encompasses both
           notice chargeable under the recording statute, ORS 93.710, and inquiry
13         notice. *Id.*  A properly recorded trust deed constitutes record notice to
           third persons of the rights of the parties under the instrument.  ORS
14         93.710. *Inquiry notice, on the other hand, arises when the existence of a
           claimed interest in real property may be determined through investigation
15         based on facts available to the claimant that would cause a reasonable
           person to make such inquiry.*
16
17  *Gorzeman v. Thompson*, 162 Or.App. 84, 94, 986 P.2d 29, 34 (1999) (emphasis added).

18         Under Oregon law, a broad spectrum of facts that could be learned through investigation

19  are deemed to be available to bona fide purchasers for inquiry notice purposes.  These facts

20  range from information on a preliminary title report to the public minutes of the state highway

21  commission. *Compare High v. Davis*, 283 Or. 315, 584 P.2d 725 (1978) (hunting exception

22  mentioned in preliminary title report) with *Klamath Falls Assembly of God v. State Highway*

23  *Comm.*, 255 Or. 211, 214-215, 465 P.2d 697 (1970) (claimant would have learned of limitation

24  on property rights had it inquired into official minutes of state highway commission). *See also*

25  *Akins*, 150 Or. App. at 244, 945 P.2d at 644-45 (lender charged with knowledge of a borrower's

26  fraud when lender's assumptions about facts unreasonable).

PAGE  6-    PARISH AND PARISHIONERS' CLASS AND PARISH
            COMMITTEE MEMORANDUM IN OPPOSITION TO
            PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
            JUDGMENT
            [54319-0001/PA052839 120]

1     Possession by the Parish Defendants will play a significant role in the resolution of the

2   Motion.  Under Oregon law, possession by a party serves "as a stimulus to investigation

3   concerning the possessor's title," and "furnish[es] an occasion for inquiry."  *Stevens*, 289 Or. at

4   356, 613 P.2d at 1061 (internal citations and quotations omitted); *see also In re Wray*, 258 B.R.

5   777, 786 (Bankr. D. Idaho 2001) (applying Oregon law).  Thus, in *Petrain v. Kiernan*, it was

6   "admitted that the plaintiffs were in the actual possession of the property at the time of the

7   purchase, and several years proceeding, and that it was of that character which places the

8   purchaser upon inquiry.  The effect of possession is to excite inquiry with reference to the title,

9   and operates as effectually to notify a purchaser as any other circumstance the knowledge of

10   which may be brought home to him."  *Petrain v. Kiernan*, 23 Or. 455, 458, 32 P. 158, 159 (1893)

11   (where beneficiary of implied trust is in possession of real estate, legal title to which is in

12   another, purchaser from the latter is charged with notice of trust).  *See also Webb v. Stewart*, 255

13   Or. 523, 539 n.7, 469 P.2d 609, 617 n.7 (1970).  In *Webb*, the court adopted the rule that

14   continued possession by a grantor placed the subsequent purchaser on notice:

15         This seems more in harmony with the general policy of the law that
         possession arouses inquiry.  It seems hardly sufficient investigation to
16         content one's self with learning from the records or from some other source
         that the possessor has purported to part with his title. . . .  Inquiry from him
17         will involve little effort or expense, and should be required ere one can
         attain to the ancient and honorable position of a bona fide purchaser.'
18

19   *Id.* at 538, 469 P.2d at 616.  *See also Lewis v. Investors Leased Group II*, 118 Or. App. 361, 365-

20   66, 848 P. 2d 113, 114-15 (1993) (citing *Webb* with approval).

21         Apparently hoping to avoid the debilitating impact of inquiry notice on its fragile bona

22   fide hypothetical purchaser, the TCC seeks to eliminate the doctrine of common law inquiry

23   notice from the books.  Immediately following its citation to the 1997 decision of *Akins v.*

24   *Vermast* – a case in which the Oregon Court of Appeals withheld bona fide purchaser status from

25   a lender *because he was on inquiry notice of facts that should have caused him to inquire further*

26   – the TCC boldly states that the Oregon legislature had, ten years prior to *Akins*, statutorily

PAGE  7-   PARISH AND PARISHIONERS' CLASS AND PARISH
        COMMITTEE MEMORANDUM IN OPPOSITION TO
        PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
        JUDGMENT
        [54319-0001/PA052830.120]

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone: (503) 727-2000
Fax: (503) 727-2222

1    *abolished* the common law doctrine of inquiry notice through the 1987 enactment of ORS

2    93.643(1). TCC Brief at p. 11.

3            The TCC cites no legislative history to support its interpretation of ORS 93.643(1). This

4    is no surprise, since it is apparent from the face of the statute that it was designed to consolidate

5    the filing of record notices at the county level, not to abrogate more than a century of Oregon

6    common law regarding inquiry notice. Oregon judges would also be surprised by the TCC's

7    argument. Numerous cases subsequent to the statute's enactment apply the common law

8    doctrines of constructive and inquiry notice. Not only is there *Akins* – the TCC ignores that

9    case's reliance on inquiry notice – but many courts, including this Court, have recognized both

10   the statute and, separately, the rich vein of case precedents regarding inquiry notice. *See, e.g.,*

11   *Spady v. Graves*, 307 Or. 483, 487 & n. 3, 770 P.2d 53, 56 & n.3 (1989); *In re Clearwater*, 1997

12   WL 101975 (Bankr. D. Or. 1997) (Perris, J.).[5]

13           Even the TCC's own witness, Mr. Newkirk, makes a compelling case for the vibrancy of

14   common law inquiry notice. The preliminary title reports issued by Chicago Title Insurance

15   Company for each of the Test Properties expressly exclude from title insurance coverage a broad

16   array of potential unrecorded interests in real property. Newkirk Dec., Exh. 1, p.2. Under

17   paragraph 2.b. of the preliminary title reports, those reports excludes from coverage "[a]ny facts,

18   rights, interests or claims which are not shown by the public records but which could be

19   ascertained by an inspection of the land or by making inquiry of persons in possession thereof."

20   *Id.* Were inquiry notice abolished nearly two decades ago, such exclusions would be

21

22   _____

23           [5] The flaw in the TCC's argument is confirmed by the doctrine of adverse possession, which,
24   despite ORS 93.643(1), lives on in statute (ORS 105.620) and case law (*Nooteboom v. Bulson*, 153 Or.
     App. 361, 363, 956 P.2d 1042, 1043 (1998) ("To establish title by adverse possession, the party must
25   show, by clear and positive proof, actual, open, notorious, exclusive, continuous, and hostile possession
     of the property for a 10-year period.")). Under the TCC's expansive reading of ORS 93.643(1), the
26   adverse possessor would be obligated to file a document in the county records in order to provide
     constructive notice. ORS 93.643(1)'s reach is not nearly so sweeping.

PAGE  8-   PARISH AND PARISHIONERS' CLASS AND PARISH
           COMMITTEE MEMORANDUM IN OPPOSITION TO
           PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
           JUDGMENT
           [54319-0001/PA052830.1201]

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  (503) 727-2000
Fax:  (503) 727-2222

1   unnecessary.  The fact that these exclusions exist for these properties simply confirms that

2   interests potentially revealed by inquiry notice *could* be charged to a BFP.

3          Whether in the form of public documents, preliminary title reports, or possessory

4   interests, inquiry notice is alive and well in Oregon, despite the TCC's effort to avoid it.  As

5   discussed in the next section, the application of inquiry notice to this case demonstrates that any

6   reasonable and prudent purchaser of any of the Test Properties would have been on notice of the

7   need to inquire into the Parish Defendants' interests in these properties.

8       **C.    A Reasonable and Prudent Purchaser of these Properties Would Be
                on Notice that Other Interests Exist, and Would Inquire Into the**
9       **        Nature of Those Other Interests.**

10          Any reasonable and prudent investor in the Test Properties would make further inquiries

11  into the nature of the Archdiocese's interest in these properties, and into whether the Parish

12  Defendants had a legal interest in these properties.  See Edlen Dec. at ¶¶ 8-9.  This was true not

13  only as of the time the petition was filed, but long before that.  And, as is discussed further in

14  Part II. below, such an inquiry would reveal that the Test Properties are, in fact, held by the

15  Archdiocese in trust for the Parish Defendants.

16      **1.    On the Face of the Deeds, A Reasonable and Prudent Purchaser
                Would Inquire into the Scope of the Archdiocese's Authority.**
17

18          As an initial matter, at least some of the title report documents submitted by the TCC

19  suggest and even demonstrate on their face the existence of a parish interest in the properties in

20  question.  See, e.g., Newkirk Aff. Exh. 21 at 1 (vesting title insurance in the Archdiocese "and

21  successors; a corporation sole *for the benefit of Immaculate Conception Church*" (emphasis

22  added)); *id.* Exh. 1, at 16 ("Archdiocese of Portland *By* [unclear] *St. Elizabeth Ann Seton*

23  *Catholic Church*" (emph. added)); *id.* Exh. 7 at 27 (noting action by the "Archdiocese of

24  Portland in Oregon *for the St. John Fisher Parish*" (emphasis added)); *id.* Exh. 7 at 54 (listing

25  the owner as "Archdiocese of Portland in Oregon / *St. John Fisher Church*").  In addition, many

26  of the warranty deeds in the Newkirk Aff. require taxes to be sent and the recorded title to be

PAGE  9-   PARISH AND PARISHIONERS' CLASS AND PARISH
           COMMITTEE MEMORANDUM IN OPPOSITION TO
           PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
           JUDGMENT
           [54319-0001/PA052830.120]

1    provided not to the offices of the Archdiocese, but to the Parish Church itself. See, e.g., Newkirk

2    Aff. Exh. 4 at 11, 13. These suggestions of a parish-specific interest are so strong that they

3    arguably amount to actual notice; at the very least, however, they should be sufficient to put any

4    reasonable and prudent person on inquiry notice that a parish interest might exist.

5         Even in the absence of the parish-specific language in the title documents, the very nature

6    of the record owner of the properties – the Roman Catholic Archbishop of the Archdiocese of

7    Portland in Oregon – is such that no prudent purchaser would move forward with a purchase

8    without considering the potentially limited nature of the Archdiocese's authority. Edlen Dec. at

9    ¶ 8. While that authority is most certainly limited by the articles of incorporation and the

10   relevant statutes creating the corporation, see *infra* at Part C.2-3, the record deeds' reference to

11   ownership by the religious "*Archdiocese*" in itself gives a prospective purchaser actual notice of

12   limitations imposed on this unique entity as a matter of Church law and relevant state statutes.

13        According to the deeds and other documents for the Test Properties, title to the properties

14   is held by a religious entity. See, e.g., Newkirk Aff. Exh. 1, at 6 ("Archdiocese of Portland in

15   Oregon,"); *id.* Exh. 1, at 13 ("Roman Catholic Archbishop of Portland in Oregon").[6] While some

16   of these differences in names appear to be stylistic,[7] and while others are due to the differences

17   between the two entities that merged in 1991 to form the current Debtor,[8] all of these references

18   suggest a unique form of entity that would require further inquiry, particularly given all the

19   _____

20        [6] See also Newkirk Aff. Exh. 5 at 1 (vesting title insurance in the "Roman Catholic Archbishop of
     Portland in Oregon and successors, a corporation sole, an Oregon non-profit corporation, which acquired
21   title and was previously known as The Roman Catholic Archbishop of the Archdiocese of Portland in
     Oregon, an Oregon nonprofit corporation.")
22

23        [7] The Archdiocese is variously referred to as "an Oregon corporation," Newkirk Exh. 4 at 1, "an
     Oregon Corporation Sole," *id.* at 6, "a non-profit corporation," *id.* at 9, an "Oregon nonprofit corporation,"
24   *id.* Exh. 5 at 7, "a corporation," *id.* Exh. 6 at 7, and "a Religious corporation," *id.* Exh. 8 at 1.

25        [8] The current Debtor is a corporation sole under ORS 65.067 known as the "Roman Catholic
     Archbishop of the Archdiocese of Portland in Oregon," and the "Archbishop of the Archdiocese of
26   Portland in Oregon" is the individual constituting the corporation and its sole director. Kennedy Dec.
     Exh. 1 at 23.

PAGE  10-  PARISH AND PARISHIONERS' CLASS AND PARISH
           COMMITTEE MEMORANDUM IN OPPOSITION TO
           PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
           JUDGMENT
           [54319-0001/PA052830.120]

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone: (503) 727-2000
Fax: (503) 727-2222

1    surrounding circumstances. See Edlen Aff. at ¶ 8. Furthermore, to the degree that the deeds

2    reference "the Archbishop" – as so many of them do – the authority of that individual is of direct

3    relevance. As discussed in the Debtor's opposition to the TCC's second motion for partial

4    summary judgment, the Archbishop takes office subject to his commitment to comply with the

5    principles of Canon Law, which includes the obligation to hold parish property in trust for the

6    parishes. See, e.g., Vlazny Dec. in support of Archdiocese's Opposition to TCC's Restated

7    Second Motion for Partial Summary Judgment, at ¶¶ 2-4; infra at part I.C.2.

8         **2.    A Reasonable and Prudent Purchaser Would Be on Notice About**
              **Possible Other Interests Based on Their Review of the State**
9             **Corporation Code and the Archdiocese's Articles of Incorporation.**

10        The TCC's brief acknowledges that a reasonable and prudent purchaser would examine

11   Oregon corporation code and the Archdiocese's Articles of Incorporation in order to evaluate the

12   Debtor's authority under local law. See TCC Brief at 9-10. The Oregon Corporation Code,

13   however, is very explicit that the power of a corporation – including its power over property – is

14   conditioned on the articles of incorporation. See ORS 65.077. In addition, and perhaps even

15   more relevantly, Oregon Law makes clear that (1) a corporation sole like Debtor is created "in

16   conformity with the constitution, canons, rules, regulations and disciplines of any church or

17   religious denomination," ORS 65.067(1), and that religious "doctrine or practice governing the

18   affairs of a religious corporation" may, in appropriate circumstances, trump contrary provisions

19   of the state nonprofit corporations law, see ORS 65.042. While the TCC cites the powers of the

20   corporation found in ORS 65, see TCC Brief at 9, it conveniently omits those portions of the

21   code that reference religious practice and doctrine. A complete review would actually point a

22   purchaser to Canon Law – the "doctrine or practice governing the affairs of [this] religious

23   corporation."

24        The Archdiocese's Articles of Incorporation also repeatedly reference Canon Law. They

25   make it clear that the "object and purposes" of the corporation are to "provide for and maintain

26   the worship of Almighty God, and the preaching of the gospel of our Lord Jesus Christ,

PAGE   11-  PARISH AND PARISHIONERS' CLASS AND PARISH
             COMMITTEE MEMORANDUM IN OPPOSITION TO
             PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
             JUDGMENT
             [54319-0001/PA052830.120]

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone: (503) 727-2000
Fax: (503) 727-2222

1  according to the doctrine, canons, rules and usages of the Roman Catholic Church, … [and] …

2  for acquiring, holding and disposing of church property for the benefit of the Roman Catholic

3  Church for works of charity and for public worship." Kennedy Dec. Exh. 1 at 3.  The Articles

4  also provide that the Archbishop and his successors "will hold said office or position, in said

5  Diocese, *under the canons, rules and usages of the Roman Catholic Church*." *Id.* at 4.  The

6  Articles make clear that the Archbishop, as the sole member and director of the corporation sole,

7  is bound by his obligations under Canon Law.

8         By this point in his analysis, if a prospective purchaser had not yet decided to confer with

9  the parish and parishioners about the prospective purchase,[9] his examination of Canon Law

10  would leave no remaining doubt that the parish had to be consulted before proceeding with a

11  purchase of property.  As discussed in further detail in the Archdiocese's response to the Second

12  Motion for Summary Judgment, Canon Law dictates that these properties are held by the

13  Archdiocese for the benefit of the parishes.  Under Canon Law, both an archdiocese and a parish

14  are defined by the Code as public juridic persons – artificial persons with the capacity for

15  continued existence.  Canon 515(3).  The Code also describes a parish as a "community of the

16  Christian faithful" established on a stable basis.  Canon 515, Paragraph 1.  Contributions made to

17  a public juridic person – like the financial and real property donations given to the parishes that

18  ultimately became the Test Properties – are presumed to be the property of that juridic person

19  and no other, and must be used for the purpose given, and no other.  See Canon 1267, Paragraphs

20  1, 3; see also Canon 1300 (obligation of recipient to use gift consistent with purpose).  A

21  recurring theme in Canon Law, particularly in the Code's section relating to temporal goods, is

22

23  ─────────────

24       [9] As is clear from the parish-specific discussion in Part II.D., a prospective purchaser approaching a parish regarding a property would be told that the parish and parishioners have a legally-recognized

25  interest in the property.  There is no obligation, for purposes of the BFP rule in section 544, for the purchaser to examine Canon Law, although doing so would also lead to the same conclusion.  What

26  would not be reasonable would be for a purchaser to close her eyes to all the relevant evidence suggesting that a parish interest exists.

PAGE  12-  PARISH AND PARISHIONERS' CLASS AND PARISH
COMMITTEE MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
JUDGMENT
[54319-0001/PA052830.120]

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone: (503) 727-2000
Fax: (503) 727-2222

1  the duty of church administrators to honor the intentions of donors and founders.  See, e.g.,

2  Canon 1267, Paragraph 3.

3      These considerations would prompt a reasonable and prudent buyer into making further

4  inquiries about the possible interest of entities other than Archdiocese in the Test Properties.  See

5  Edlen Dec. at ¶ 9.

6      **3.    The Active Use and Maintenance of the Properties by Parish
           Defendants Would Prompt a Reasonable Purchaser to Inquire Into**
7      **the Scope of a Parish's Interest in the Property.**

8      While the deeds and surrounding circumstances of ownership by the Archdiocese alone

9  impose on a prospective purchaser a duty to inquire into the status of these properties, the daily

10 operations of these properties should give even the least observant buyer pause.  The properties

11 at issue are used by the Parish Defendants on a regular basis.  There are weekly, occasionally

12 daily, services at many of these properties.  They are maintained daily by employees of the

13 parishes.  Parishioners gather for social and religious events, from weddings and baptisms to

14 community fellowship.  Posted prominently at these properties are signs, none of which suggest

15 the involvement of the Archdiocese.  See Bachman Dec. Exhs. 1-8.  If a buyer were to inquire

16 with parishioners about the property and its title, parishioners would refer the inquiries to the

17 parish priest, not the Archdiocese; indeed, many parishioners appear to take offense at the

18 suggestion that the Archdiocese, not their parish community, has the ultimate say regarding their

19 church property.  See, e.g., Janowski (St. Mary, Our Lady of the Dunes Parish) Decl. at 4;

20 Brennan (same parish) Dec. at 2-3..  In light of the substantial activity on the property in which

21 individuals appeared to be holding themselves out as "in control" of the property, any reasonable

22 buyer would be compelled to ask about the interest of the parish and parishioners in the property.

23 Edlen Dec. at ¶ 8.  And if asked, the parish priests and parishioners would insist that the property

24 is there for their benefit, not for the benefit of the Archdiocese.  See generally Section II.D.

25 (describing donative intent and understanding for each property).  No reasonable and prudent

26

PAGE 13- PARISH AND PARISHIONERS' CLASS AND PARISH
         COMMITTEE MEMORANDUM IN OPPOSITION TO
         PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
         JUDGMENT
         [54319-0001/PA052830.120]

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR 97209-4128
Phone: (503) 727-2000
Fax: (503) 727-2222

1   purchaser would be able to purchase the property without both inquiring and learning about the

2   claimed interest of the Parish Defendants.[10]

3   **4.      Contemporaneous Public Knowledge Prior to the Filing of the**
        **Bankruptcy Put Purchasers on Notice of the Parish Defendants'**
4   **Interests.**

5       Although the nature of the deed instrument, the articles of incorporation, the corporation

6   code, and the use of the property are all more than sufficient to prompt a reasonable buyer to

7   inquire into the nature of the parish interest in the property, public discussions and news reports

8   occurring prior to the filing of the bankruptcy petition in this case would have further prompted

9   prospective buyers to inquire into the status of these properties.  By May 2004, for instance,

10  national attention was being given to parishes and schools that the Boston Archdiocese proposed

11  to close in order to help meet its financial commitments.  Parishioners (and the parents of those

12  at the schools) resisted the effort to divert funds to the use of the Archdiocese.  They argued, as

13  the parishes have here, that money being diverted by the Archdiocese had been solicited "based

14  on the premise that the money would be used for the school only."  S. Salatine, "Parents,

15  Students Make Case on Schools," *Boston Globe* (June 2, 2004) (attached as Edlen Dec. Exh. 2).

16      Even more to the point, a front-page article in the *Oregonian* on May 23, 2004, more than

17  a month before the petition was filed, discussed the very question presented in this case.  See S.

18  Woodward, "Archdiocese Says Money For Victims Running Out," *The Oregonian* (Portland,

19  OR) at A01 (May 23, 2004) (attached as Edlen Dec. Exh. 1).  In it, the reporter described, in

20  detail, the same legal arguments regarding the ownership and availability of parish property that

21  are being presented to the Court in these pleadings.  Any developer who was at all observant of

22  current events at the national and local levels in the months leading up to the petition would have

23

24  _____

25      [10] If the Archdiocese were asked about the status of a property by a prospective purchaser, the
        Archdiocese would refuse to take further steps until the parish had been consulted and had approved the
26  sale of the property.  See Dec. of Delia Wilson at 7.  There is no practical way in which a buyer could
        avoid learning about the claims of the Parish Defendants.

PAGE  14-  PARISH AND PARISHIONERS' CLASS AND PARISH
            COMMITTEE MEMORANDUM IN OPPOSITION TO
            PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
            JUDGMENT
            [54319-0001/BA052830.120]

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone: (503) 727-2000
Fax:  (503) 727-2222

1    been well aware of the dispute at issue, and could not have reasonably purchased these properties

2    without making appropriate inquiries.  See generally Edlen Dec. at ¶ 9.

3            Such publicly-available documents have long been deemed sufficient to put a party on

4    notice about particular information.  In *Barnett v. City of Yonkers*, for instance, the Southern

5    District of New York found that general circulation newspaper and magazine articles could be a

6    basis for constructive knowledge of the dangers of asbestos. 731 F. Supp. 594, 600-01 (S.D.

7    N.Y. 1990).  In *In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 378-81 (S.D. N.Y. 2003),

8    the Court reasoned that investors were put on inquiry notice of the fraud by pointed and specific

9    media reports exposing key elements of the plaintiffs' claims.  And in *Klamath Falls Assembly of*

10   *God*, 255 Or. at 214-15; 465 P.2d at 697, the Court deemed a Church to be "on notice" that it had

11   no "access rights" to an adjoining highway because a resolution mentioned in the official minutes

12   of the state highway commission indicated that the highway was to be "non-access," and put the

13   Church on notice that the prior owner had thereby waived those access rights.  *Id.*  If a passing

14   mention describing the nature of adjoining property in official minutes of a meeting is sufficient

15   to amount to notice of the status of the property, the blatantly clear language of the *Oregonian*

16   article should be more than enough to put prospective purchasers on notice about the potential

17   property interests claimed by the Parish Defendants in this case.

18   II.     **The Test Properties are Held In Trust For the Benefit of the Parish**
             **Defendants.**
19

20           A.      **Oregon Law Permits Express Trusts to Be Created Based on the**
                     **Relationship of the Parties and Evidence External to the Deed**

21           If a prospective purchaser of the Test Properties were to inquire into the relationship

22   between the Archdiocese and the parishes, that purchaser could reach no conclusion but that the

23   Archdiocese holds these properties in trust for the benefit of the Parish Defendants.  Under

24   neutral principles of Oregon law, the circumstances surrounding the acquisition and holding of

25   these properties demonstrates that a trust – either an express or a resulting charitable trust –

26

PAGE   15-  PARISH AND PARISHIONERS' CLASS AND PARISH
            COMMITTEE MEMORANDUM IN OPPOSITION TO
            PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
            JUDGMENT
            [54319-0001/BA052830.120]

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  (503) 727-2000
Fax:  (503) 727-2222

1    exists with respect to these properties.  As such, the Court should not grant the second part of the

2    TCC's motion for partial summary judgment.

3          The TCC argues that the Defendants face a particularly high burden in demonstrating the

4    existence of a trust.  Memo in Support of Motion at 7 n.2.  It is important to note, however, that

5    (contrary to the TCC's suggestion) the law does not impose a different burden of proof in a case

6    like this one.  To prove the existence of a trust – particularly an express trust – all that is needed

7    is proof with "reasonable certainty" of the intent of the settler at the time of the conveyance of

8    the res, and clarity with respect to both the res and the beneficiary.  *Allen v. Hendrick*, 206 P.

9    733, 104 Or. 202, 227 (1922) (citing cases); *see also Trustees of Presbytery of Willamette v.

10   Hammer*, 235 Or. 564, 566, 385 P.2d 1013, 1014-15 (1963); *In re Thornton*, 544 F.2d 1005,

11   1007(9th Cir. 1976).  The obligation of clarity poses no particular problem in this case with

12   respect to the nature of either the beneficiary or the res.  The subjects of the trusts at issue are

13   simply those real properties in dispute – the Test Properties.  The beneficiaries of the trusts are

14   the parishes – separate juridic persons under Canon law and under neutral principles of state law

15   – and the collection of individual parishioners that make up that parish.  While the precise

16   membership of a parish may change over time, like any other congregation, those who worship

17   within a particular church, or who go to a particular school, are easily identified.[11]  There is no

18   heightened burden of proof applicable here.  Indeed, where the dispute at issue is not one

19

20   _____

21        [11] *Cf. Berean Fundamental Church Council, Inc. v. Braun*, 281 Or. 661, 576 P.2d 361 (1978) (in
     constructive trust context, finding that beneficiary was the "pastor, local council, and congregation" of
22   worshipers at a particular church).  *See also Good Samaritan Hospital and Medical Center v. U. S. Nat.
     Bank*, 246 Or. 478, 482, 425 P.2d 541, 543 (Or. 1967); Restatement (3rd) of Trusts § 28, cmt. c (noting
23   that beneficiaries of charitable trusts need not be definitely ascertainable).  Cf. Restatement (3rd) of
     Trusts § 43, cmt. a; *Central Alabama Conference of the African Methodist Episcopal Zion Church in
24   America v. Crum*, 746 So.2d 1013, 1017 (Ala. Civ. App. 1999); *Good Samaritan*, 246 Or. at 481 n.1.  *See
     also In re Parkview Hospital*, 211 B.R. 619 (Bankr. N.D. Ohio 1997) (charitable trust found; not property
25   of the estate).

26          The obligation to have a specific beneficiary is not present when the trust is a charitable trust.
     See, e.g., Restatement (3rd) of Trusts § 28, cmt. c.

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  (503) 727-2000
Fax:  (503) 727-2222

1    between the trustee and beneficiary, but between a third party and the parties to the trust, the

2    Oregon Supreme Court has explicitly held that the applicable rule was *not* that a high degree of

3    proof was necessary – merely that the existence of the trust needed to be proven by a

4    preponderance of the evidence.  See *Paul v. Mazzocco*, 351 P.2d 709, 711, 221 Or. 411, 413-14

5    (1960).

6         The Test Properties at issue in this case are either held in an express trust by the

7    Archdiocese, or a resulting trust was created when the properties were purchased using funds

8    raised and provided by parishioners for the benefit of the parishes.  An express trust arises as the

9    result of the deliberate or intentional act of the parties.  *Howard v. Foskett*, 189 P. 396, 96 Or.

10    446, 450 (1920); *see also Business Men's Assur. Co. of America v. Northern Calif. Veneer, Inc.*,

11    453 F.2d 387 (9th Cir. 1971).  An express trust can arise out of the parties' relationship and acts,

12    and so long as the relationship and acts demonstrate a deliberate intent by the parties to enter into

13    a trust relationship, an express trust arises even if there is no written document supporting the

14    finding of that written trust.  See *Winters v. Winters*, 109 P.2d 857, 165 Or. 659, 666 (1941);

15    *Belton v. Buesing*, 402 P.2d 98, 101, 240 Or. 399, 405 (1965).

16         The statute of frauds (ORS 93.020) provides the parties to an alleged trust with a defense

17    to the trust.  The obligations of that statute, however, can be met where the trustee has

18    acknowledged, in writing, the existence of the trust relationship.  *See* Restatement (3rd) of Trusts

19    § 23, cmt. h (writing executed by transferee confirming the holding of property in trust, after

20    receipt of property allegedly given to be held in trust, sufficient to meet statute of frauds); *see*

21    *also Winters*, 165 Or. at 667 (citing Restatement of Trusts § 1, cmt. a).  Several of the Test

22    Properties have such a writing specific to that parish.[12]  In addition, in 1981, then-Archbishop

23    _____

24

25         [12] In the case of St. Elizabeth Ann Seaton Parish, for instance, the Archdiocese and Parish signed
     an instrument explicitly acknowledging that the land would be held in trust.  In other Parishes, including
     St. John Fisher, the Archdiocese has explicitly acknowledged, in writing, the existence of a trust.  See also

26    Newkirk Aff. Exh. 21 at 1 (vesting title insurance in the Archdiocese "and successors; a corporation sole
     *for the benefit of Immaculate Conception Church*").

PAGE  17-  PARISH AND PARISHIONERS' CLASS AND PARISH
          COMMITTEE MEMORANDUM IN OPPOSITION TO
          PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
          JUDGMENT
          [54319-0001/PA052830.120]

1   Power assuaged concerns of a parishioner, noting that "[w]hile it is true that the land was

2   transferred to the Archdiocese of Portland, *it is not true that the Archdiocese as such owns the*

3   *land for itself.*" W. Forbes (St. John Fisher Parish) Exh. 13 at 1. Addressing "all property

4   belonging to the Catholic Church in western Oregon," the Archbishop stated that "[s]uch

5   properties, as for example parish plants, *are really held in trust for the individual parishes*." *Id.*

6   (emphasis added).

7         The statute of frauds has therefore been met for these properties. Even if it had not been

8   met, however, the statute of frauds is a defense that is specific to the parties to the trust and, in

9   particular, to the trustee. See *City of Medford v. Bessonette*, 463 P.2d 865, 868 & n.1, 255 Or.

10  53, 58-59 & n.1 (1970). Thus, even if there were no writing confirming a trust in certain real

11  property, the statute of frauds would *not* nullify the express trust; it would simply provide the

12  parties with the ability to void the trust at the election of the trustee. *Smiley v. King*, 564 P.2d

13  1348, 1350, 278 Or. 555, 561 (1977); *Hanscom v. Irwin*, 208 P.2d 330, 186 Or. 541, 567 (1949).

14  This principle is particularly important where, as here, it is a third party – the TCC – seeking to

15  invalidate the trust. The Oregon Supreme Court emphasized this fact in *City of Medford*, which

16  bears a substantial similarity to this case.

17        In *City of Medford*, the City sought to condemn property. Third parties intervened and

18  ultimately won an award, alleging that they had a beneficial interest in the property as the result

19  of an express oral trust with the title owner. The City appealed, arguing that third parties could

20  not use the Statute of Frauds to undermine the existence of an otherwise valid oral trust. See 463

21  P.2d at 868, 255 Or. at 58-59. The same principle holds here: Both the Parish Defendants and

22  the Archdiocese agree that the Test Properties are held in an express trust. The TCC, as a third

23  party, cannot invoke the statute of frauds in an effort to terminate that trust.

24

25

26

PAGE  18-  PARISH AND PARISHIONERS' CLASS AND PARISH
COMMITTEE MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
JUDGMENT
[54319-0001/PA052830.120]

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone: (503) 727-2000
Fax: (503) 727-2222

1    **B.    Resulting Trusts Arise When Funds are Used to Purchase Property
          for the Benefit of Another, Even in the Absence of Express Trust
2          Language in the Deed.**

3          Even if an express trust did not exist in this case, a resulting trust still would, and

4    resulting trusts are not subject to the statute of frauds. As this Court and the Oregon Courts have

5    recognized, resulting trusts arise out of the operation of law, and they are not subject to the

6    statute of frauds. See *In re Wilder*, 42 B.R. 6 (Bankr. D. Or. 1983); *Certified Mortgage v.*

7    *Shepherd*, 838 P.2d 1082, 1085-86, 115 Or. App. 228, 234-35 (1992); ORS 93.020(1).

8              A resulting trust is not established by virtue of any expressed agreement or
9              contract. Rather it arises under the doctrine of presumed intent that the
               party who furnished the purchase price of a parcel of land contemplated
10             that such property would inure to his own benefit and not that of the
               record title holder and that the title was taken in the name of another for
11             some incidental purpose.

12   *Hurlbutt v. Hurlbutt*, 36 Or. App. 721, 724, 585 P.2d 724, 726 (1978) (citation omitted).

13   "Resulting trusts are based on the equitable doctrine that valuable consideration and not legal

14   title to real or personal property determines the equitable title or interest. 89 CJS, Trusts § 98. A

15   resulting trust arises most often when property is purchased by a third party with money supplied

16   by a financer but title is taken in the buyer's name. In that situation, the financer does not intend

17   the buyer to have the beneficial interest in the property, because the buyer merely holds the

18   property in trust for the financer." *Certified Mortg. Co.*, 115 Or. App. at 234, 838 P.2d at 1085

19   (citing *Shipe v. Hillman*, 206 Or. 556, 564, 292 P.2d 123 (1956)).

20         Under Oregon law, "[a] resulting trust is one in which the circumstances show that, while

21   the grantor may not have expressly intended to create a trust, the grantor also had no intention to

22   give the beneficial interest in the property to the grantee. . . . An essential aspect of an express

23   or a resulting trust is that the putative trustee has received property under conditions that impose

24   a fiduciary duty to the grantor or a third person." *Lozano v. Summit Prairie Cattlemens Ass'n*,

25   155 Or. App. 32, 37-38, 963 P. 2d 92, 95-96 (1998). A resulting trust arises at the time of the

26   purchase of property in order to ensure that equity is done. "Because resulting trusts arise by

PAGE   19-  PARISH AND PARISHIONERS' CLASS AND PARISH
            COMMITTEE MEMORANDUM IN OPPOSITION TO
            PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
            JUDGMENT
            [54319-0001/PA052830.120]

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone: (503) 727-2000
Fax: (503) 727-2222

1  operation of law, no writing is required.  See ORS 93.020(2).  Although the evidence of an

2  intention to create the trust must be clear and convincing, intent may be inferred entirely from

3  circumstantial evidence, including the conduct of the parties." *Certified Mortg. Co.*, 115 Or.

4  App. at 235, 838 P.2d at 1086 (citations omitted).

5      Here, even if there were any question about whether an express trust had arisen, the law

6  would, at the very least, recognize a resulting trust – otherwise, the Archdiocese would have

7  effectively participated in fraud on the Parish Defendants, who entrusted the Archdiocese with

8  legal title to these properties with the intent that the possession and benefit would be remain in

9  the parishes and parishioners, not the Archdiocese.  See, e.g., *Platt v. Jones*, 38 P.2d 703, 149 Or.

10  246, 261, modified, 39 P.2d 955, 149 Or. 246 (1934); *Martin v. Thomas*, 144 P. 684, 74 Or. 206,

11  219-20 (1914) (where purchase price paid by son, but title remained with mother, court found

12  resulting trust).  Resulting trusts are intended to give effect to the presumed intention of the

13  parties, *Kohler v. Gilbert*, 339 P.2d 1102, 216 Or. 483, 505-06 (1959); see also *Shope v. Hillman*,

14  292 P.2d 123, 206 Or. 556, 563-65 (1955), and in this case we know that the intention of the

15  parties was to create a trust relationship consistent with Canon Law.[13]

16      In this case, while Canon Law and the relationship between the Parish Defendants and

17  Archdiocese provide the background for the existence of a trust relationship, the entire history of

18  the parishes communities who use the Test Properties every day of the year, and who built the

19  buildings on those properties, demonstrates an intent that the properties and improvements on

20  them be used for the benefit of the Parish Defendants.  In section D., we address in turn each of

21  the parishes in which Test Properties are located, and demonstrate the degree to which the

22  properties came into the hands of the Archdiocese with the express intention that they be held in

23  trust for the Parish Defendants.

24

25

26  [13] If the Court were to deem these charitable trusts void as a matter of bankruptcy law or seek to alter them, Oregon statutes would arguably require the Attorney General to be notified of that action, and permit the Attorney General to appear.  See ORS 128.710(2).

PAGE  20-  PARISH AND PARISHIONERS' CLASS AND PARISH COMMITTEE MEMORANDUM IN OPPOSITION TO PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY JUDGMENT

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone: (503) 727-2000
Fax: (503) 727-2222

C.     **Notice and the Existence of an Express or Resulting Trust Defeats the Strong-Arm Powers of Section 544.**

Where a debtor holds property in trust for a third party, a bankruptcy trustee cannot avoid the trust under the strong-arm powers of Section 544(a)(3) of the Bankruptcy Code where the trustee has constructive notice of an equitable interest. *In re Sale Guaranty Corp.*, 220 B.R. 660, 665-69 (9th Cir. B.A.P. 1998), *aff'd*, 199 F.3d 1375 (9th Cir. 2000). In *Sale Guaranty*, the Chapter 7 trustee brought suit to quiet title to certain real property and cash proceeds that the debtor received prepetition (and held in resulting trusts) as an accommodator in three 1031 exchanges. Because the clients continued to possess the real property held by the debtor, the trustee was deemed to have constructive knowledge of their equitable interest in the property and, thus, their equitable interests could not be avoided by the trustee under his powers as a bona fide purchaser. *Id.* at 665-69. As the Ninth Circuit concluded,

> [e]nforcement of a resulting trust differs from postpetition imposition of a constructive trust in two important respects. First, a resulting trust gives effect to the intent of the parties at the time of the transfer. As such, the circumstances in which it is effective are governed by the usual standards for establishing intent, and not by the "relatively undefined" equitable considerations that govern constructive trusts. Second, because a resulting trust merely gives effect to the original will of the parties, it is effective from the date of the original transfer, and does not undermine ratable distribution among creditors who possess similar legal rights as of the petition date.

*Id.* at 667 (citing *In re Golden Triangle Capital, Inc.,* 171 B.R. 79, 82-83 (9th Cir. BAP 1994)).

D.     **The Test Properties Were Purchased and Improved, and are Maintained, For the Benefit of the Parish Defendants, not the Archdiocese.**

A review of the history of the parishes associated with the Test Properties demonstrates that each of the Properties was purchased, improved, and maintained with money donated by parishioners for the benefit of the parish. In addition, land, construction materials, and labor were directly donated by parishioners. In each case, the parish history demonstrates minimal involvement by the Archdiocese, with an emphasis on financial independence and a single-

PAGE  21-  PARISH AND PARISHIONERS' CLASS AND PARISH COMMITTEE MEMORANDUM IN OPPOSITION TO PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY JUDGMENT
[54319-0001/PA052830.120]

1    minded determination by parishioners to improve their *own* religious community through the

2    purchase and development of the properties in question.  On repeated occasions, and for many of

3    the different parishes, the Archdiocese acknowledged what is true for every Test Property as a

4    matter of law:  The properties are held by the Archdiocese in trust for the benefit of the Parish

5    Defendants who clean, maintain, improve, socialize, and worship on these properties; they are

6    held in trust for the benefit of those who paid, often at great personal sacrifice, to purchase them.

7    This view has been held by the Archdiocese, parish priests, and parishioners at these churches

8    from the foundation of each parish.  To suggest the contrary trivializes the serious purpose with

9    which thousands of parishioners gave millions of dollars in donations and millions of hours of

10   contributed time over the course of decades.

11          Each parish with Test Property is discussed in turn, below, to demonstrate the parish-

12   specific source of the time and financial contributions that purchases and improved these

13   properties, as well as the intent associated with making those donations.

### 1.    Holy Redeemer Parish (Portland, Oregon)

15          Holy Redeemer Parish, located in north Portland, was founded in 1906 by the

16   Redemptorist Fathers, a religious order.  Rassley Dec. Exh. 1 at 13.  On May 17, 1906, Father

17   William T. Bond purchased a piece of land for $5,000 with the intent of founding Holy

18   Redeemer parish and school.  The Archdiocese did not provide funds for the purchase.  *Id.*  The

19   first public Mass was celebrated on September 16, 1906, and less than two years later, on

20   September 14, 1908, Holy Redeemer school welcomed its first students.  *Id.* at 15-22.  The

21   church and school have been in continuous operation to the present.

22          The Redemptorists maintained title of all property—church, school, rectory, hall—until

23   1994. In March of 1994, the Redemptorist Society of Oregon, a corporation, gifted to the

24   Archdiocese of Portland the entire property known as Holy Redeemer.  Adams Dec. at *passim,*

25   and exhibits.  The only exception to this was the convent, across the street from the rest of Holy

26   Redeemer, which for a time remained in the name of the Redemptorist Fathers.  *Id.* at 5.

PAGE  22-  PARISH AND PARISHIONERS' CLASS AND PARISH
         COMMITTEE MEMORANDUM IN OPPOSITION TO
         PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
         JUDGMENT
         [54319-0001/PA052830.120]

1      The Redemptorists took financial responsibility for all improvements at Holy Redeemer

2    until they left in approximately 1998. For example, in 1907 they decided that the property they

3    had purchased the year earlier was inadequate for the purpose of constructing a church, a rectory,

4    a school, and a convent. Thus, they purchased what was known as the "Marshall Block" with

5    money from the Redemptorists' Provincial in St. Louis ($7,000) and a loan of $11,500 made

6    from Hibernia Bank. Thus, the Society of the Redemptorist Fathers of Oregon (a corporation)

7    acquired seven acres in addition to the original property. Rassley Dec. Exh. 1 at 17-18.

8      The Redemptorists then decided to build a combination church and school building. The

9    original pastor, Father Cantwell, tramped through the parish seeking subscribers for the new

10   school, church, and hall. The cost of the building was to be around $16,000, not including the

11   property. He borrowed more money from Hibernia Bank, which, in addition to the previous

12   loans and grants, made a grand total of $28,500. *Id.* at 20. None of the money came from the

13   Archdiocese of Portland. *Id.* The Redemptorists then sold 30 lots of the property they had

14   bought in order to finance the debt incurred in building the church and school. *Id.* at 26.

15     In the mid-1920s, the Fathers and the parishioners decided that they needed a new

16   church. A funding drive was instituted. *Id.* at 44. The drive was started and $16,000 was to be

17   raised. The parish had $9,000 on hand before the subscription drive, subscriptions were

18   specifically made for an additional amount of $9,004, leaving a balance of $5,996 to be raised

19   before the church building could be begun. *Id.* at 44-45. The Redemptorists' superiors in Rome

20   gave permission to the Redemptorists to borrow $50,000 to complete the church. The final cost

21   was approximately $60,000. *Id.* at 46.

22     As a result of the construction of the new church, the parish incurred a large debt,

23   standing at approximately $61,000 at the beginning of 1935. The parish thus conducted a drive

24   to reduce the debt during 1935 and 1936, during the depths of the depression. *Id.* at 50-55. The

25   results of the drive were excellent; the debt was reduced to just $2,266.55 by the end of 1936.

26   *Id.* at 55.

PAGE  23- PARISH AND PARISHIONERS' CLASS AND PARISH
COMMITTEE MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
JUDGMENT
[54319-0001/PA052830.120]

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR 97209-4128
Phone: (503) 727-2000
Fax: (503) 727-2222

1    By the mid-1940s, it became apparent that a new school building was required. The

2    pastor, Father Martucci, and parishioners agreed to hire a professional fundraising company,

3    setting a goal of $200,000. *Id.* at 75. The drive was a huge success. By August 1951, a total of

4    $206,000 had been pledged. *Id.* The new school opened for business on September 3, 1952. *Id.*

5    But by 1952, the parish's debt had risen substantially, to $275,000. As a means of

6    reducing the debt, parishioners decided to raffle off a model family home at the 1955 pre-Lenten

7    bazaar. *Id.* at 77. The whole parish got behind the project, donating time and materials as well

8    as money. *Id.* People bought raffle tickets as a chance to win the home. As a result of this and

9    other projects, the $275,000 debt in 1952 was reduced to $50,000 in 1955. *Id.*

10    To list the contributions by individual parishioners would be too burdensome. Examples

11    of such contributions abound, however, and range from financial support for the major projects

12    of the parish to a myriad of smaller offers. Parishioners took the initiative, for instance, to fund

13    and build a ramp leading to the small hall on the campus allowing handicapped accessibility.

14    Hicks Dec. at 1. As one participant in that drive notes, that campaign (like others) was

15    undertaken by parishioners for the benefit of the parish, and they did not have the Archdiocese in

16    mind when they did it. Marking Dec. at 2. In the 1970s, parishioners (with donations from local

17    companies) converted the school's playfield from a "rock throw and mud" playground to a field

18    of grass with year-round use. Cooney Dec. at 1. The Archdiocese did not contribute to the

19    project (which would cost over $100,000 in today's dollars), and it was done by parishioners for

20    the benefit of the parish and school. *Id.*

21    In 1983-84, a parishioner who owns a remodeling company donated nearly $30,000 in

22    materials and labor to insulate the school and parts of the church. Herboth Dec. at 2. The

23    parishioner did all of this work and donated all of these materials in furtherance of Holy

24    Redeemer's religious and charitable missions. The Archdiocese was not in his mind when he

25    made these contributions. *Id.*; see also Neisner Dec. at 2 (noting contributions of another active

26

PAGE  24-  PARISH AND PARISHIONERS' CLASS AND PARISH
         COMMITTEE MEMORANDUM IN OPPOSITION TO
         PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
         JUDGMENT
         [54319-0001/PA052830.120]

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  (503) 727-2000
Fax:  (503) 727-2222

1    parishioner and her late husband, and their efforts to raise money for the benefit of the parish

2    through solicitation of other parishioners).

3         Another active parishioner has helped with countless fundraisers that raised funds not

4    only for the parish general fund, but for particular capital improvements, including the new porch

5    and a cry room. Trapnell Dec. at 2. These activities were done for the direct benefit of the

6    parish and parishioners, and none were for the benefit of the Archdiocese. *Id.* at 3. Ms. Alice

7    Cowan, a parishioner since 1935, became a contributing member in 1941 when she gave half of

8    her weekly allowance each Sunday. Cowan Dec. at 2. In 1942, Ms. Cowan helped supply a

9    candy store for candy re-stocking, the proceeds of which helped support the purchase of school

10   books. *Id.* Between 1966 and 1975, Ms. Cowan, along with her husband, took charge of

11   recycling by collecting and sorting tin, smashing glass in 55 gallon drums, and bundling

12   newspaper. *Id.* Ms. Cowan made these contributions for the benefit of the parish, and the

13   Archdiocese was not in her mind. *Id.* She made the contributions because she valued her faith,

14   the school and the parish, and the local community. *Id.*

15        The spirit exhibited by these long-time and older parishioners, and the Redemptorist

16   Fathers, lives on today at Holy Redeemer. In September 2005, Holy Redeemer opened the doors

17   of a new school building that was part of a project costing approximately $3 million. See

18   Corpora Dec. at 3. Of the $3 million, approximately $1.95 million consisted of grants from

19   charitable institutions, such as the Meyer Memorial Trust, the Harry A. Merlo Foundation, the

20   Maybelle Clark Macdonald Fund, and others. These charitable institutions did not make

21   contributions to the new school building because of any desire to benefit the Archdiocese of

22   Portland; rather, their intent was to help the Holy Redeemer school children and the Holy

23   Redeemer community. For example, the Maybelle Clark Macdonald Fund ("MCMF") became

24   aware of Holy Redeemer's capital campaign for a new school building in 2001. It learned of the

25   capital campaign through the Sisters of the Holy Names, who have comprised the core teaching

26   group at Holy Redeemer since the early 1900s. McAninch Dec. at 2.

PAGE  25-  PARISH AND PARISHIONERS' CLASS AND PARISH
           COMMITTEE MEMORANDUM IN OPPOSITION TO
           PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
           JUDGMENT
           [54319-0001/PA052830.120]

1    In evaluating the request for assistance, the MCMF evaluated the needs of the school and

2    its students, and reviewed the role of the school and church as an anchor of its North Portland

3    community. *Id.* See also Corpora Dec. at 2-3 (noting diversity of school). The MCMF thus

4    decided to make a contribution of $400,000, $300,000 of which would go to scholarships for the

5    children and $100,000 of which would go to the building fund. *Id.* at 2-3. The MCMF later

6    authorized Holy Redeemer to use $100,000 of the scholarship money instead for the building

7    fund, as long as Holy Redeemer agreed to raise $100,000 to replace the scholarship money. *Id.*

8    at 3.

9    The MCMF had been making payments under the grant when the Archdiocese of

10    Portland filed for bankruptcy in 2004. When this occurred, the MCMF reconsidered its

11    commitment to Holy Redeemer. They did not want the money to be used for the Archdiocese's

12    bankruptcy estate. They wanted it to stay in the parish where it was intended to go for the

13    benefit of the children of Holy Redeemer school. After some discussions, the MCMF decided to

14    honor its commitment to Holy Redeemer, but made that decision with the original intent: That

15    the grant be used solely for the benefit of Holy Redeemer school and school children. *Id.* The

16    MCMF never had any intention that its grant would benefit the Archdiocese of Portland. *Id.*

17    The grant to Holy Redeemer was in fulfillment of the MCMF's mission, and any use of the funds

18    beyond that would be a violation of the MCMF's grant and contrary to its mission. *Id.*

19    The parish itself also raised $500,000 for the school building. Corpora Dec. at 10-11. An

20    additional $450,000 was pledged by parishioners and friends of Holy Redeemer parish. The

21    parish did finance a portion of the project with a $755,000 loan from the ALIP.[14] Approximately

22

23    ────────────────────

24    [14] The Archdiocesan Loan and Investment Program ("ALIP") is funded by monies exceeding three months of a parish's normal operating expenses, which are then placed in interest-bearing ALIP accounts. Wolf (Queen of Peace Parish) Dec. at ¶ 23. It is clearly understood that ALIP funds are the property of the individual parishes. Wolf Dec. at ¶ 24. The parishes pool these funds together to provide low-interest loans to one another. An individual parish may withdraw these funds to support its parish ministries. *Id.* ALIP is administered by the Archdiocesan Loan Commission, which is comprised of pastors, parishioners, and three non-voting (ex officio) representatives of the Archdiocese. Wolf Dec. at

25

26

PAGE  26-  PARISH AND PARISHIONERS' CLASS AND PARISH
COMMITTEE MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
JUDGMENT
[54319-0001/PA052830.120]

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone: (503) 727-2000
Fax: (503) 727-2222

1   $400,000 of the loan made up the difference between the $3 million total and the $2.5 million of

2   grants and donations.  The other part of the $755,000 loan from the ALIP serves as a "bridge"

3   loan that will be paid off as pledges are paid.  The parish pays interest on the loan to the ALIP.

4   Not a dime of the money raised for the building project has come, or will come, from the

5   Archdiocese.  *Id.*[15]

6         Not surprisingly, a parishioner or casual visitor approaching the church, rectory, or

7   school sees no reference to the Archdiocese of Portland.  For example, the signs on and in front

8   of the church say "Holy Redeemer Catholic Church."  Corpora Dec. at 4; Exs. 2, 3.  No mention

9   is made of the Archdiocese of Portland.  The rectory exhibits only crossed anchors over a

10  crucifix, which is the symbol of the Holy Cross Fathers, of which the pastor and other staff

11  priests are members.  *Id.* at 3 and Exh. 3.  Finally, the school exhibits a sign saying "Holy

12  Redeemer Catholic School."  *Id.* at 3 and Exh. 5.

13        All told, Holy Redeemer has enjoyed a longtime, stable existence and, in turn, has been

14  an anchor for the North Portland neighborhood in which it is situated.  Holy Redeemer is the

15  institution there, not the Archdiocese of Portland.

16

17

18

---

19  ¶ 23.  Its purpose is to review parish and school requests for loans and to administer ALIP funds.  *Id.*  The
    Loan Commission makes recommendations to the Archbishop regarding whether a particular loan should
20  be approved.  Declarant Wolf, who served on the Commission for seven years, never saw the Archbishop
    refuse the Commission's recommendation.  *Id.*
21

22        [15] As may be expected from the foregoing, Holy Redeemer operates as an autonomous operation,
    independent in day-to-day functioning from the Archdiocese of Portland.  For example, Father Corpora,
23  the pastor, has broad authority.  He makes all final employment and financial decisions for the parish.
    Corpora Dec. at 2.  Moreover, Holy Redeemer has several of its own bank accounts, such as the parish
24  account, the school account, the script account, the Mass stipend account, the Boosters' Club account (for
    sports) and the school development capital account.  Corpora Dec. at 3.  These bank accounts are Holy
25  Redeemer's own and have nothing to do with the Archdiocese of Portland.  *Id.*  The authorized signers on
    these accounts include the parish bookkeeper, the school principal, and the pastor.  *Id.*  Similarly, both the
26  parish and the school have their own tax-exempt employer identification numbers with the Internal
    Revenue Service that have nothing to do with the Archdiocese of Portland.  *Id.*

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  (503) 727-2000
Fax:  (503) 727-2222

1    **2.    Immaculate Conception Parish (Stayton, Oregon)**

2    Immaculate Conception Parish in Stayton, Oregon, presently consists of thirteen parcels

3    of property, on which are located the church, the parish house, St. Mary's School and additions,

4    St. Mary's Cemetery and additions, and various parking lots and playgrounds associated with the

5    school.  McNulty Dec. at Exh. 1.  All the properties of the Immaculate Conception Parish were

6    contributed or paid for by members of the parish.  Dunham Dec. at 2; Schwindt Dec. at 2.

7    According to Marcel Van Dreisch, who at the age of 92 has been a parishioner for 62 years and

8    involved in fund raising for most of that time, the properties were built and modified for the

9    parish and not for the Archdiocese.  Van Dreisch Dec. at 2.

10    *The Church.*  The first Immaculate Conception church was built in 1904 with donations

11    from Stayton area parishioners.  McNulty Dec. Exh. 3 at 19.  The first church was built with four

12    acres of land contributed from Theo Gehlen.  The Archbishop at the time was against building a

13    church, but the local people built it anyway.  Minten Dec. at 2-3.  All the money, labor and

14    material was donated by members of the community.  McNulty Dec. at Exh. 4 at 1.

15    The present church was completed on April 12, 1952 after many years of fundraising

16    support by the parishioners.  *Id.* Exh. 3 at 1-2, 28-30.  The money for the church was raised by

17    the parish, with the assistance of a loan from the Archdiocese which has since been repaid.  *Id.*

18    Exh. 4 at 2.  Parishioner donations in 1997 led to the purchase of the pipe organ.  *Id.*; see also

19    Yates Dec. at Exh. 9.[16]

20    *The Rectory.*  The rectory was built in 1932 for $4,000.  The block of land came from

21    parishioner John Goeders and the money was paid by parishioner Anthony Schindler.  McNulty

22    Exh. 4 at 3; Yates Exh. 14.

23

24

25    _____

26    [16] The sign in the front of the church states "Immaculate Conception Church" and does not
mention the Archdiocese.  See Yates Supp. Dec. at 2.

PAGE  28-  PARISH AND PARISHIONERS' CLASS AND PARISH
COMMITTEE MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
JUDGMENT
[54319-0001/PA052830.120]

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  (503) 727-2000
Fax:  (503) 727-2222

1    *The Convent / Parish Center.*  A convent for the nuns was built in 1927, and the $5000

2    cost was paid for by collections and labor from the parishioners.  In 1997, the Parish remodeled

3    the convent into the Parish Center using money from the Parish contingency fund and donations

4    of money and time.  *Id.* Exh. 4 at 3.

5    *St. Mary's School.*  St. Mary's School was originally built in 1929 and there were two

6    subsequent additions in 1936 following the construction of a play shed in 1933.  These buildings

7    were paid for by contributions from the parishioners.  *Id.* Exh. 4 at 4.  Funds, land and lumber for

8    the church school and playground came from the Freres Lumber Co. family and Freres

9    Foundation; these resources were given for the parish and not from the Archdiocese.  There was

10    never an intent to build the school for the Archdiocese.  Freres Dec. at 2.  In 1955, a new school

11    building was built with donations and a loan from the Archdiocese which was repaid.  *Id.* Exh. 4

12    at 4.  A gymnasium was added in 1965 and a new play shed in 1996 with parishioner donations

13    of $95,508.  *Id.* at Exhs. 4 and 7; McNulty Dec. Exhibit 4, page 4.

14    *Parking Lots.*  Parking Lot No. 1 was purchased by land sale contract from Madeleine

15    Lachner in 1984.  The original arrangements were $9,000 down and $9000 a year for three years.

16    Parishioners were obligated to make these payments.  Mr. and Mrs. W. J. Roberts, however,

17    donated money to pay off the obligation and clear the title, and named it was named "The

18    Roberts Parkway" at the request of Edward Dunham.  *Id.* Exh. 4 at 3; Yates Dec. Exhs 5 and 6;

19    Dunham Dec. at 2.  Parking Lot No. 2 was purchased from Todd and Scott Humphry for $85,000

20    on January 16, 2004.  Funds from the Capital Campaign drive were used to pay for this property.

21    Yates Dec. Exh. 19.

22    *St. Mary's Cemetery.*  The St. Mary's Cemetery was purchased with donations from

23    parishioners in 1904.  In 1931, Antone and Caroline Keidel donated additional land.  In 1963, the

24    Dombrosky family sold additional land for $10, which was paid from the proceeds of the

25    cemetery to acquire the land for St. Mary's Parish.  *Id.* Exh. 16; McNulty Dec. Exh. 4 at 3.

26

PAGE   29-  PARISH AND PARISHIONERS' CLASS AND PARISH
             COMMITTEE MEMORANDUM IN OPPOSITION TO
             PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
             JUDGMENT
             [54319-0001/PA052830.120]

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone: (503) 727-2000
Fax: (503) 727-2222

1    The Immaculate Conception properties were held by an Oregon nonprofit corporation

2    separate from the Archdiocese and specific to the parish through 1997. At the request of the

3    Archbishop, the corporation was dissolved and the title was transferred to the Archdiocese on

4    August 28, 1998. Yates Dec. Exhs. 13 and 17.

5    In reflecting on the question posed in this case, many parishioners have concluded that

6    the Archdiocese holds the titles to the property for the benefit of the parish.[17] As Parishioner

7    Arthur P. Christiansen notes, "When I think of the Immaculate Conception parish and all its

8    properties, I believe 'we own it.' The parishioners have *always* felt like they controlled the parish

9    and are vocal advocates for the local control of the parish." A. Christiansen Dec. at 3 (emphasis

10   added). As for the Archdiocese, parishioners would often ask, before giving, if any of their

11   donation "was going to Portland to the Archdiocese," and state that "they did not want to

12   contribute to Portland but wanted to be able to take care of their parish and school locally."

13   T. Freres Dec. at 2. It was in that spirit that they gave their time, money, and resources.

14              **3.    St. Michael's Church (Oakridge, Oregon)**

15   St. Michael's Church in Oakridge, Oregon, was dedicated on August 3, 1941. Goddard

16   Dec. at 2; Morrison Dec. at 1. The total cost of the church was $4,119.94. Of this, parishioner

17   contributions made up a significant part, see P. Morrison Exhs. 3, 4, while the Catholic Church

18   Extension Society provided a gift of $2,500. *Id.* at Exh. 3. The Archdiocese loaned the parish

19   $300 for the construction of the church, but the parish soon repaid that loan. N. Husser Dec. at

20   2; P. Morrison Exh. 3. The Hines Lumber Company, which was owned by a parishioner,

21   contributed money and timber for the construction of the church. N. Husser Dec. at 2; DuMont

22   Dec. at 3. Parishioners worked on the construction themselves, see W. DuMont Dec. at 2 (noting

23

24

_____

25   [17] See R. Freres Dec. at 3; T. Freres Dec. at 2-3; F. Freres Dec. at 2-3; Becker Dec. at 2; Van

26   Dreisch Dec. at 2-3; Minten Dec. at 2; Klamp Dec. at 2-3; Brand Dec. at 2-3; C. Coleman Dec. at 2-3; S. Coleman Dec. at 2; Gries Dec. at 2-3; A. Christiansen Dec. at 2-3; L. Christiansen Dec. at 2.

PAGE   30-  PARISH AND PARISHIONERS' CLASS AND PARISH
             COMMITTEE MEMORANDUM IN OPPOSITION TO
             PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
             JUDGMENT
             [54319-0001/PA052830.120]

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR 97209-4128
Phone: (503) 727-2000
Fax: (503) 727-2222

1   father's contribution), and members of the parish also contributed many stained glass windows,

2   B. McCulley Dec. at 2.[18]

3       Parishioners made many subsequent improvements to the parish properties.  In 1960,

4   parishioners raised money and provided labor for the construction of a rectory.  C. Minogue Dec.

5   at 2; M. Freeman Dec. at 3.  Parishioners also built a garage on property later leased from the

6   Union Pacific Railroad.  See G. Palanuk Dec. at 3; C. Minogue Dec. at 2.  In 1954, and again in

7   1977, petitioners raised money and contributed labor for a new roof.  P. Morrison Exhs. 6 and 7.

8   And in 1987, private funds contributed by members of the parish were used to make a major

9   modification to the pitch of the roof.  W. DuMont Dec. at 2.  Inside the church, parishioner

10  William Elefson built the choir loft and cabinets in the sacristy, see *id.*, and parishioners

11  contributed two organs to the church.  *Id.* at 3.  During this time, many women have contributed

12  time, money and work to the parish, and have not done so for the benefit of the Archdiocese.  J.

13  Husser Dec. at 2.

14      The Palanuk family donated a parcel of 80 acres to the parish, which was later sold for

15  $72,000.  That money was deposited in trust with the Archdiocese for the use of the parish.  See

16  G. Palanuk Dec. at 2; P. Morrison Exhs. 10 and 11; J. DuMont Dec. at 3.  In 1997, $10,000 held

17  in Certificates of Deposit was retrieved from the Archdiocese "for the repair and painting of the

18  church and chapel."  See P. Morrison Exhs. 8-9; C. Minogue Dec. at page 2.  Parishioners keep

19  funds at the Archdiocese in order to obtain a higher interest rate, see B. McCulley Dec. at 2, but

20  all those involved understood the funds to be held in trust for the parish.  See, e.g., J. Minogue

21  Dec. at 2 (an accountant and parishioner who has kept the books for the church for the last ten

22

23

24

25  _____

26      [18] The sign in front of the church, "St. Michael's Catholic Church," was made by Parishioners and
    does not mention the Archdiocese.  DuMont Dec. at 2; P. Morrison Supp. Dec. at 2.

PAGE  31-  PARISH AND PARISHIONERS' CLASS AND PARISH
            COMMITTEE MEMORANDUM IN OPPOSITION TO
            PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
            JUDGMENT
            [54319-0001/PA052830.120]

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  (503) 727-2000
Fax:  (503) 727-2222

1    years understands funds to be held in trust); M. Freeman Dec. at 2 (a parishioner who does all the

2    banking and check writing for the parish has same understanding).[19]

3        On several occasions, parishioners have made monetary contributions in order to pay for

4    insurance because the parish was unable to rely on the Archdiocese providing any money in any

5    capacity.  B. McCulley Dec. at 2.  And for some time, in the absence of a priest specifically

6    assigned to the parish, the parishioners have persuaded a retired priest, Father James Dowd, to

7    come to the church on weekends to be present for Mass.  See J. Minogue Dec. at 2; A. Goddard

8    Dec. at 2-3.  The parishioners do not have great means, but are able to provide, through their

9    donations, for upkeep to the church and parish hall.  G. Palanuk Dec. at 3.

10       While the title to the church property is in the Archdiocese, parishioners have long

11   understood that the property – like the funds held by the Archdiocese – is held in trust for the

12   parish and parishioners.  N. Husser Dec. at 3; see also Declarations of G. Palanuk, N. Husser, J.

13   Husser, W. DuMont, J. DuMont, B. McCulley, M. Freeman, J. Minogue, C. Minogue, A.

14   Goddard, and P. Morrison.

15              **4.    St. Birgitta Parish (Portland (Linnton), Oregon)**

16       St. Birgitta Catholic Church ("St. Birgitta") is a parish within the diocese of the Debtor

17   located on Highway 30, in the Portland neighborhood of Linnton.  Minarik Dec. at ¶ 2.  St.

18   Birgitta was originally founded in 1916, but did not acquire its current property and buildings

19   until the mid-1950's and early 1960's.  *See* Minarik Exh. 1 (October 23, 1966 "Golden Jubilee"

20   Souvenir Program) at 7; Minarik Dec. at ¶¶ 8-21.  St. Birgitta moved from its prior location in

21   1955.  Minarik Exh. 1 at 17.  The parish moved because its prior building presented a safety

22   hazard.  Minarik Dec. at ¶ 3.

23

24

25   _____

26       [19] Like other parishes, St. Michaels has a tax ID number separate from that of the Archdiocese.
     P. Morrison Supp. Dec. at 2.

PAGE  32-  PARISH AND PARISHIONERS' CLASS AND PARISH
           COMMITTEE MEMORANDUM IN OPPOSITION TO
           PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
           JUDGMENT
           [54319-0001/PA052830.120]

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone: (503) 727-2000
Fax: (503) 727-2222

1    *Real Property.* The St. Birgitta parish is located on two adjacent parcels of land. The

2    first parcel houses St. Birgitta's main church building, its rectory/chapel building and a portion of

3    its social hall. The second parcel houses a portion of the social hall but is used primarily as a

4    picnic area for the parish. See Minarik Exh. 1 at 4-5 (photos of buildings). Each property was

5    purchased with parish funds, and each building was built using funds and labor donated by St.

6    Birgitta parishioners.

7        The first parcel was acquired for the parish in 1955 by Father Milan Mikulich (generally

8    known as "Father Milan"), who served as pastor of St. Birgitta between 1954 and 1992. *See*

9    Minarik Dec. at ¶ 8 & Exh. 1 (1966 Souvenir Program) at 15. Father Milan arranged for the

10   parish to purchase the land from a woman named Charlotte Kingsley. Minarik Dec. at ¶ 8. The

11   land cost $6,500, which Father Milan paid for using parish resources. Minarik Exh. 1 at 17. The

12   Archdiocese did not contribute to the purchase. Minarik Dec. at ¶ 8.

13       A few years later, Father Milan acquired a second parcel for the parish. Minarik Dec. at

14   ¶ 9. Although the record is somewhat unclear, this land appears to have been either donated to

15   the parish by Archie Kingsley (son of Charlotte Kingsley), or purchased from Mr. Kingsley with

16   funds generated by the parish's sale of a portion of the first parcel to the State of Oregon. *Id.*;

17   Minarik Exh. 2 (October 10, 1976 "Diamond Jubilee" Souvenir Program) at 11, 13. The State of

18   Oregon purchased a portion of the first parcel as part of the State's project to widen Highway 30.

19   *Id.* at 13.

20       *Church.* The new church was the first building to be built on the new parish property.

21   Minarik Dec. at ¶ 11. At the time the new church building was under consideration (early 1955),

22   St. Birgitta parishioners knew that they would have to pay for it themselves. *Id.* The

23   Archdiocese was not going to contribute to the construction process, except by way of a loan that

24   the parish would have pay back, in full. *Id.*

25       A groundbreaking ceremony for the new church was held on August 15, 1955. *Id.*

26   Because the parish was not (and is not) wealthy, the parishioners had to rely heavily on donated

PAGE  33-  PARISH AND PARISHIONERS' CLASS AND PARISH
           COMMITTEE MEMORANDUM IN OPPOSITION TO
           PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
           JUDGMENT
           [54319-0001/PA052830.120]

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone: (503) 727-2000
Fax: (503) 727-2222

1    labor to build the new church. *Id.* at ¶ 11-12. In the weeks and months that followed the

2    groundbreaking, the men of St. Birgitta worked nearly every week-end, with their own hands, to

3    build the church "from the ground up." *Id.* at ¶ 12. Parishioners, as well as other members of the

4    Linnton community, donated their time, labor and materials to make the new church a reality.

5    *Id.*; *see also* Knez Dec. at ¶¶ 2-3. The women of St. Birgitta also helped in the construction

6    process, cooking meals and supporting the men as they worked through the week-ends. Minarik

7    Dec. at ¶ 13.

8          As one long-time parishioner recalls, "Our parish community came together each week-

9    end, working hard until the new church was ready." Minarik Dec. at ¶ 13. "We were all

10   working together toward a common goal: building a new church for our parish community." *Id.*

11   This parishioner (Anna Minarik) also explains that it was "always [her] understanding, based on

12   my interactions with Father Milan and the other parishioners, that the fruits of our labor—our

13   new church—would always be available for use by our parish community, so long as we kept up

14   the building." *Id.*

15         Total cash expenditures for the new church (including land and furnishings) totaled

16   approximately $38,000. Minarik Exh. 1 (1966 Souvenir Program) at 21. These costs were borne

17   by the parish using funds donated by parishioners (approximately $10,000), funds donated by

18   "friends" of the parish (approximately $2,000), funds donated by the Catholic Extension Society

19   (a Chicago-based charitable organization that supports the establishment of new Catholic

20   churches ($6,000)); and a loan to St. Birgitta from the Debtor ($20,600). *Id.* at 21, 30.

21         To help raise their share of the money, the parishioners of St. Birgitta engaged in various

22   fund raising activities. For example, parishioners held numerous spaghetti dinners. *Id.* at ¶ 14.

23   A "pledge drive" campaign was also launched. *Id.* at ¶ 15; *see also* Minarik Exh. 2 (1976

24   Souvenir Program) at 12 (photograph of April 16, 1955 "kick-off campaign"). Ms. Minarik

25   recalls giving "a few hundred dollars" to the pledge drive, which, in her view, "was a lot of

26   money back in the 1950's." Minarik Dec. at ¶ 15. When Ms. Minarik gave this money, she

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  (503) 727-2000
Fax:  (503) 727-2222

1   understood that she was making a contribution to support her parish and its religious and

2   charitable missions. *Id.* at ¶ 16.

3        St. Birgitta parishioners also gave separate monthly pledges to cover the interest charges

4   on the Archdiocesan loan. In January 1958, for example, Ms. Minarik contributed $6.00 to help

5   pay interest charges for that month. *See* Pelikan Dec. (donation log) at 1. Twenty-three other St.

6   Birgitta parishioners made similar donations (all less than $10.00 each) to cover the interest

7   charges. *Id.* Parishioners also made separate contributions to a parish building fund. In 1960,

8   for example, Don Allen contributed $1,327 to the building fund. Pelikan Exh. 3 (contribution

9   certificate) at 1.

10        Father Milan also raised funds from parishioners by asking them to tithe their earnings.

11   In periodic letters to parishioners, Father Milan explained the importance of tithing in the

12   Catholic faith. *See* Pelikan Exh. 4 (letters). Father Milan wrote to parishioners about "the

13   system of tithing," which he said involved "paying 10% of their gross earnings." *Id.* at 3. "May

14   the Lord . . . encourage all the Parishioners to accept *willingly* and practice *happily* the system of

15   tithing," Father Milan wrote in a 1963 letter to the congregation. *Id.* (emphasis in original). In

16   1967, Father Milan wrote another letter, stating that, "[i]f all of our Parishioners would try to

17   accept this system of tithing, . . . our Parish would be free of debt soon, and they would be

18   blessed by God more in spiritual and temporal life." *Id.* at 7. Through these fund-raising efforts,

19   St. Birgitta fully paid off its loan from the Debtor in January 1974. Minarik Dec. at ¶ 18-19. To

20   celebrate this accomplishment and financial independence from the Archdiocese, St. Birgitta

21   held a literal "mortgage burning" party on January 27, 1974. *Id.* at ¶ 19; see also *id.* Exh. 2 at 28

22   (photograph of Father Milan burning the mortgage papers).

23        St. Birgitta displays a parish sign on the premises that says "St. Birgitta Catholic

24   Church." *Id.* at ¶ 3; Browne Exh. 1 (photograph). This sign, which does not mention the

25   Archdiocese, was erect and plainly visible on July 6, 2004. *Id.* There are also a number of

26

PAGE   35- PARISH AND PARISHIONERS' CLASS AND PARISH
          COMMITTEE MEMORANDUM IN OPPOSITION TO
          PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
          JUDGMENT
          [54319-0001/PA052830.120]

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR 97209-4128
Phone: (503) 727-2000
Fax: (503) 727-2222

1   commemorative plaques, located inside and outside of the parish buildings, indicating that the

2   church was built with donations. *Id.* at ¶¶ 6-7.[20]

3      *Social Hall.* St. Birgitta expanded its facilities in 1959 with the construction of a new

4   social hall. Minarik Exh. 1 at 21. The parishioners referred to the hall at the time as another "do

5   it yourself" construction project, as it was built almost entirely with donated labor and materials.

6   *Id.* at 21; Minarik Dec. at ¶ 20; Pelikan Exh. 7 (historical memorandum) at 1; Knez Dec. at

7   ¶¶ 2-3. The hall was valued at $30,000 after its construction, but cost only $6,000 to build

8   because of the donated labor and materials. Minarik Exh. 1 at 21. The $6,000 in costs were paid

9   for by parishioner contributions. Pelikan Exh. 2 (1959 contribution log) at 1. John Knez, who as

10   a young man helped build the hall and whose family was primarily responsible for its

11   construction, has testified that he helped build the hall to support the local parish community and

12   its religious and charitable missions. Knez Dec. at ¶ 3.

13      *Rectory/chapel.* Like the church and the social hall, the rectory/chapel building was also

14   built with volunteer labor provided by parishioners, mostly by the Knez family. Minarik Dec. at

15   ¶ 21; Knez Dec. at ¶¶ 2-3. Although the building was valued at about $60,000 upon completion,

16   construction costs totaled approximately $38,000. Minarik Exh. 2 (1976 Souvenir Program) at

17   18. The Catholic Extension Society donated $10,000 toward the building costs. *Id.* Father

18   Milan provided the balance of the funds "on his own without any burden to the parish or the

19   Archdiocese." *Id.*

20      Because St. Birgitta has a rectory, its pastor lives on the premises. Fr. Joseph Browne

21   was the pastor on July 6, 2004, the date the Debtor filed its bankruptcy petition. Browne Dec. at

22   ¶ 4. In the summer of 2004, Fr. Browne lived in the rectory and was, in general, on the premises

23   "24/7." *Id.* Furthermore, it was Fr. Browne's general practice to talk with anyone who might

24

25  ———————————

26     [20] St. Birgitta has its own federal tax identification number. Minarik Dec. at ¶ 22. St. Birgitta also enters into direct contracts with third-parties without involving the Debtor. *See* Minarik Dec. at ¶ 23.

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone: (503) 727-2000
Fax:  (503) 727-2222

1  come onto the property with questions. *Id.* At all times material, Fr. Browne understood that,

2  under the Canon Law, each parish has an interest in its parish property and church buildings,

3  even though legal title may be held in the name of the diocese. *Id.* at ¶ 5.

4      *Maintenance and Remodeling.* Because of its limited resources, St. Birgitta relies on

5  volunteers and parishioner donations to maintain its buildings and grounds. Bender Dec. at ¶ 2;

6  Browne Dec. at ¶ 9. John Bender is one such volunteer. Mr. Bender has been a parishioner at

7  St. Birgitta for the past 10 years. Bender Dec. at ¶ 1. Over the past few years, Mr. Bender has

8  volunteered a substantial amount of his time to St. Birgitta maintenance projects. *Id.* at ¶¶ 2-3;

9  *id.* Exh. 1 (photograph of volunteer work by Mr. Bender to fix October, 2005 water damage to

10  the parish chapel floor). Mr. Bender has done all of this work on a volunteer basis with the

11  intention and understanding that his work would benefit his local parish community and its

12  religious and charitable missions. *Id.* at ¶ 5.

13      **5.   St. Elizabeth Ann Seton Parish (Aloha, Oregon)**

14      St. Elizabeth Ann Seton Catholic Church ("SEAS") is a relatively new parish within the

15  diocese of the Debtor located in Aloha, Oregon. The vision for SEAS began in the early 1980's

16  when three area parishes — St. Cecelia (Beaverton), St. Matthew (Hillsboro), and Holy Trinity

17  (Beaverton) — moved to start a new parish community in Aloha to accommodate population

18  growth and ease overcrowding. Moore Dec. at ¶ 5. In furtherance of this vision, the Debtor

19  assigned Father Neil Moore to serve as pastor of the new group in July of 1982. *Id.* at ¶ 6. In

20  1984, SEAS started working on the physical components of the parish community—the

21  acquisition of land and the construction of its own church building. *Id.* at ¶ 10. This process

22  took several years, but eventually succeeded as detailed below.

23      *Real Property.* SEAS acquired its land – a single parcel of real property – in the fall of

24  1984. *Id.* at ¶ 11. The land was donated to SEAS by St. Cecelia, one of the "mother parishes" of

25  SEAS. *Id.* A long-time pastor of St. Cecelia, Father Anthony Gerace, had purchased the SEAS

26  parcel many years prior, using funds donated by St. Cecelia parishioners. *Id.* Fr. Gerace

PAGE  37-  PARISH AND PARISHIONERS' CLASS AND PARISH
COMMITTEE MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
JUDGMENT
[54319-0001/PA052830 120]

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR 97209-4128
Phone: (503) 727-2000
Fax: (503) 727-2222

1    purchased the land with the vision of holding it for expansion purposes.  *Id.*  St. Cecilia gladly

2    transferred the land to SEAS in 1984, as St. Cecelia had become overcrowded and it was

3    anticipated that some of its parishioners would begin attending SEAS.  *Id.*

4         To memorialize the terms of the land transfer, St. Cecelia, SEAS and the Archdiocese

5    executed a land transfer agreement on September 26, 1984 (the "SEAS Agreement").[21]  The

6    SEAS Agreement expressly provides that the Archdiocese will hold legal title to the property in

7    trust for SEAS.  As the Agreement provides: "[l]egal title to the property . . . at 192nd and

8    Alexander, Aloha . . . remains in the name of the Archdiocese of Portland in Oregon," but

9    "[c]are, custody and control of the property, together with all of the benefits and obligations

10   attendant thereto, shall pass from St. Cecelia Church to St. Elizabeth Ann Seton Parish effective

11   October 1, 1984."  *See* Moore Exh. 3 at 1.  Prior to the execution of the SEAS Agreement, the

12   Archdiocese circulated a draft decree to Fr. Moore starting that the land would be "held in trust

13   by the Archdiocese for St. Elizabeth Ann Seton parish" and "held canonically as the property of

14   that juridic person."  *See* Moore Exh. 4 at 6.

15        *Main Church Building.*  After acquiring its parcel of land from St. Cecelia, Fr. Moore and

16   the SEAS parish began the process of building the parish sanctuary.  As announced in church

17   bulletins, the new building would be designed and used for charitable and religious purposes.[22]

18   Moore Dec. at ¶¶ 11, 17; Moore Exh. 5 at 4.  Construction costs for the new church building and

19   associated parking lot totaled approximately $800,000.  Moore Dec. at ¶ 18.  The construction

20   was funded completely with donations (mostly from SEAS parishioners) and a loan from the

21   Archdiocese that was paid back in full with parishioner contributions.  *Id.* at ¶¶ 15-24.

22

23   _____

24        [21] A copy of the SEAS Agreement is at Moore Exh. 3.

25        [22] As the May 1988 parish bulletin noted, the new church would be a place "where we can
     worship and celebrate our gatherings as a people . . . .  On Sundays it shall be used for celebrating the
26   Eucharist.  During the week it can be used for a host of other activities – classes, receptions, pot-lucks,
     exhibits, bazaars, socials, and many other such kinds of gatherings."  Nemec Exh. 1 at 1.

PAGE  38-  PARISH AND PARISHIONERS' CLASS AND PARISH
            COMMITTEE MEMORANDUM IN OPPOSITION TO
            PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
            JUDGMENT
            [54319-0001/PA052830.120]

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  (503) 727-2000
Fax:  (503) 727-2222

1     To raise the money for the construction, SEAS engaged in extensive fund raising efforts.

2 *Id.* at ¶ 20. Among other things, a group of SEAS parishioners organized a "pledge drive" to

3 raise funds by going "door to door" to every SEAS parishioner to seek pledges for the new

4 church. *Id.*; *see also* Hurrell Dec. at ¶ 4. The theme for the building drive was "A Place to Call

5 Home." Moore Dec. at ¶ 20. A pledge drive brochure, which was used in soliciting donations,

6 stated that the new church was being built "for all the community," and that it would be available

7 for the benefit of the SEAS community and its religious and charitable missions. Moore Exh. 7

8 at 2. The pledge drive was successful, raising over $230,000 in pledges in just a few weeks.

9 Moore Dec. at ¶ 22.

10     In addition to the pledge drive, SEAS also relied on other donations to cover the

11 construction costs. These included the following: (1) D-Note deposits saved by SEAS during

12 the years before construction began; (2) D-Note deposits by St. Cecilia and St. Matthew that

13 were allocated to SEAS upon its establishment as a new parish[23]; (3) SEAS savings deposited in

14 an independent money market account under the direct custody of SEAS; (4) a donation to SEAS

15 from St. Monica Guild, a Catholic women's organization; (5) a donation to SEAS from St.

16 Joseph's Guild, a Catholic men's organization; (6) support pledges to SEAS from parishioners at

17 Holy Trinity, another one of SEAS's "mother parishes"; and (7) a loan from the Archdiocese

18 (less than $150,000) that was eventually paid back, in full, with SEAS parishioner contributions.

19 Moore Dec. at ¶ 19.

20     By 1992, SEAS needed more space. Moore Dec. at ¶ 25. Fr. Moore, still pastor at the

21 time, knew that the Archdiocese would not contribute to any new building, and that it would

22 have to be paid for by the parishioners of SEAS. *Id.* The Parish therefore used $42,375 of its

23 _____

24

25     [23] St. Cecilia and St. Matthews were required to share some of their D-Note savings with SEAS. Moore Dec. at ¶ 19 n.3. D-notes are basically deposits that each parish makes, in their name, into accounts in the custody of the Debtor. *Id.* The allocation to SEAS was required because, in fairness (and

26 arguably under Canon Law), departing parishioners from the mother parishes needed to be able to "take with them" a fair share of their historical tithes and contributions. *Id.*

PAGE   39-   PARISH AND PARISHIONERS' CLASS AND PARISH
COMMITTEE MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
JUDGMENT
[54319-0001/BA052830.120]

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone: (503) 727-2000
Fax: (503) 727-2222

1    own funds, donated by parishioners, to purchase a modular unit directly from a vendor. The

2    Debtor was not a party to the purchase agreement. See Moore Dec. at ¶ 26 and Exh. 11

3    (agreement). The modular unit was purchased and has been used to provide SEAS with religious

4    education and church office space. Moore Dec. at ¶ 27.

5        *Maintenance and remodeling.* SEAS has maintained the land and its two buildings at its

6    sole expense. Nemec Dec. at ¶¶ 12-13. SEAS relies on volunteer labor by parishioners,[24] and

7    parishioner contributions to its general maintenance fund, to maintain the premises. Nemec Dec.

8    at ¶ 12; Hurrell Dec. at ¶ 6. SEAS segregates funds donated for maintenance, building fund, and

9    other purposes through the use of color-coded contribution envelopes. Nemec Dec. at ¶¶ 9-13.

10    SEAS is currently in the process of constructing a new roof on the church, which will cost

11    approximately $200,000, to be paid for with parish building fund contributions. *Id.* at ¶ 13.

12    Parishioners donate to these funds as part of their religious practice and for the purpose of

13    supporting their local parish community. *Id.* at ¶ 14.[25]

14        *SEAS presence on parish property.* SEAS staff, including its current pastor (Father

15    Urbanksi), are generally present on the parish premises during regular business hours and week-

16    ends. Nemec Dec. at ¶ 4. SEAS staff is "always happy to talk with people who come onto the

17    property, or into our parish office, with questions." *Id.* In addition, SEAS displays a parish sign

18    on the premises that says "St. Elizabeth Ann Seaton Catholic Church" and that does not mention

19    the Archdiocese. Moore Dec. at ¶ 2 and Exh. 1.

20

21

22

23    ─────────────────

24        [24] By way of example, one parishioner, Jack Hurrell, has volunteered on occasion to maintain the
parish grounds. Hurrell Dec. at ¶ 6. Mr. Hurrell also install a sprinkler system for SEAS. (*Id.*) Mr.

25    Hurrell did this work on a volunteer basis with the intention of benefiting his parish community. (*Id.*)

26        [25] SEAS has its own federal tax identification number. Nemec Dec. at ¶ 5. SEAS also enters into
direct contracts with third-parties without involving the Debtor. Nemec Dec. at ¶ 8; Moore Dec. at ¶ 26.

PAGE  40-  PARISH AND PARISHIONERS' CLASS AND PARISH
COMMITTEE MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
JUDGMENT
[54319-0001/PA052830.120]

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  (503) 727-2000
Fax:  (503) 727-2222