1        **6.    St. Mary, Our Lady of the Dunes Parish (Florence, Oregon)**

2        St. Mary, Our Lady of the Dunes ("St. Mary"), of Florence, Oregon, began as a mission

3    of the St. Anne's Parish of Reedsport. See generally M. Brennan Exh. 4 at 3-8. The priest who

4    celebrated Mass in the Florence area began a building fund, and the parishioners raised the

5    money to buy a lot and place a chapel on it. *Id.* at 5. This chapel building was donated by a

6    parishioner, Erwin Mollett, and it was moved to the site. *Id.* In 1957 a new pastor, Father

7    Cornelius Linehan, purchased the current property and started a building campaign for a church

8    designed to seat about 200 people. Brennan Dec. at Exh. 5 at 7. Churchgoers from Florence and

9    Mapleton raised $10,000, *id.* Exh. 3 at 3, another $10,000 was obtained through a grant from the

10   Catholic Church Extension Society of the United States of America, *id.* Exh. 5 at 5-7, and the

11   church borrowed about $5,000 from the Archdiocese's building fund, which would be paid back

12   within four years, *id.*, Exh. 3 at 3. When the loan was paid off, there was a "burning of the

13   mortgage dinner" on December 4, 1960. *Id.* No other money came from the Archdiocese. *Id.*

14       The next major addition to the physical plant of St. Mary was the combination rectory

15   and CCD Center. This structure was built in 1967 and 1968 at a cost of over $30,000. Brennan

16   Dec. at Exh. 6 at 4. Once again, the Catholic Church Extension Society contributed a $10,000

17   grant. *Id.*; *Id.* Exh. 6 at 1. The church had on hand $7,000 in early 1967, and with the $10,000

18   grant from the Extension Society, was able to borrow the rest at 6.5% interest. *Id.* Exh. 6 at 3.

19   St. Mary was established as its own parish, independent of Reedsport, in 1967. Brennan Exh. 3

20   at 11.

21       St. Mary's next major building project was its parish center, built in 1982. Before the

22   center was built, no religious education classes had been held; parish social functions were held

23   in rental halls because there were no facilities in the church. Kirby Exh. 2 at 1-2. The cost to

24   build and furnish the center was $75,000. Parishioners responded to two letters and a few

25   announcements from the pulpit by pledging $60,000. Their donations, added to the parish's

26   $40,000 building fund, were more than enough to complete the new center. No money came

PAGE  41- PARISH AND PARISHIONERS' CLASS AND PARISH
      COMMITTEE MEMORANDUM IN OPPOSITION TO
      PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
      JUDGMENT
      [54319-0001/PA052830 120]

1   from the Archdiocese for this construction. Dec. of Richard Kirby, Exh. 2. In fact, after all was

2   said and done, parishioners paid for the entire parish center and had an extra $70,000 left over in

3   the bank for future building. *Id.* at 2.

4           Besides the money, individual parishioners contributed time and services to the building

5   of the parish center. For instance, one parishioner cleared the land, leveled it, and brought in

6   several thousand yards of dirt. The labor he donated was worth $30,000 to $40,000. Foglio Dec.

7   at 2.[26] This parishioner considers all of his work as having been donated for the benefit of the

8   parish, and the Archdiocese was not even in his mind. *Id.* Many other parishioners contributed

9   their time and labor to the construction of the parish center. Kirby Dec. Exh. 1.

10          The next major building project at St. Mary is the current plan to build a new church

11  building and renovate the existing buildings. The parish began considering building the new

12  church in approximately 1999 because the current one seats only 200, while there are about 450

13  regular parishioners (swelling to about 520 with tourists in the summer months). Gutmann Dec.

14  at 2. Conditions are so crowded now that worshipers spill into adjacent rooms outside of the

15  church itself and even to the outdoors. *Id.* at 2 & Exh. 1 (photographs). A master plan was

16  developed with an architect, with an estimated cost of $2.2 million. Kirby Dec. at 2.

17          A building drive was started in 2001 for this renovation project. Money was raised in

18  several stages, first by solicitation of expected large donors, then mid-level donors, and then the

19  bulk of the parishioners. By June 2002, pledges totaled roughly $500,000 from parishioners and

20  friends of the church. After various pledging programs, such as "Amen Sundays," where special

21  collections were made at Masses, pledges reached over $1.5 million. Janowski Dec. at 2-3; see

22  also Brennan Dec. at 3 and Exh. 2. St. Mary has neither solicited nor received any funds for the

23  building project from the Archdiocese, nor does it expect any such funds in the future. *Id.*

24

25  _____

26          [26] This parishioner also recently cleared land for a new drain field for the new church when it is
built, at a value of $15,000 to $20,000. Foglio Dec. at 2.

PAGE  42-  PARISH AND PARISHIONERS' CLASS AND PARISH
           COMMITTEE MEMORANDUM IN OPPOSITION TO
           PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
           JUDGMENT
           [54319-0001/PA052830.120]

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone: (503) 727-2000
Fax: (503) 727-2222

1    Besides the major projects described above, the parishioners of St. Mary have exhibited

2    an unparalleled spirit of community dedicated to the parish. For example, one parishioner has

3    pledged $50,000 to the building campaign. Janowski Dec. at 4. The pastor himself has pledged

4    $40,000. Gutmann Dec. at 3. Indeed, 341 families of the parish have pledged during the drive,

5    for an average of $4,600 per family. Parishioners serve on the parish council, the administrative

6    council, and the finance council. Many contribute volunteer time for things such as raising

7    money, serving coffee and donuts after Masses, and preparing meals for the homebound.

8    Brennan Dec. at 4-5. These parishioners have donated their time, money, sweat and prayers for

9    the benefit of the parish, not the Archdiocese. The Archdiocese has not even been in their minds.

10   Foglio Dec. at 2; Richard Kirby Dec. at 3; Patrick Kirby Dec. at 3; Janowski Dec. at 4-5; Father

11   Gutmann Dec. at 3; and Brennan Dec. at 5.

12       Reflecting the independent spirit of the parishioners, St. Mary has bank accounts wholly

13   separate from the Archdiocese of Portland. St. Mary has bank accounts with the Oregon Pacific

14   Banking Company in Florence. Brennan Dec. at 2. They include an operating account, two

15   building fund savings accounts, and several parish club accounts, such as the Men's Club and the

16   Women's Guild. *Id.* These accounts belong to the parish and have nothing to do with the

17   Archdiocese. *Id.* St. Mary also has its own tax identification number. *Id.* It employs its own

18   workers. *Id.* Father Don Gutmann, the pastor, has final say-so over the use of these accounts

19   and decisions regarding parish employees. *Id.*

20       In addition to the fact that none of the parishioners' efforts are directed toward the benefit

21   of the Archdiocese and are solely directed to the benefit of the parish, nothing on the church

22   grounds would indicate to the visitor that the Archdiocese of Portland is the owner of the church.

23   For example, all signage refers to St. Mary itself, and there is no reference to the Archdiocese of

24   Portland in words or in symbols. Brennan Dec. at 4. The signage in front of the church, on U.S.

25   101 in Florence, simply says "Our Lady of the Dunes, St. Mary Catholic Church," and then lists

26

PAGE   43-  PARISH AND PARISHIONERS' CLASS AND PARISH
            COMMITTEE MEMORANDUM IN OPPOSITION TO
            PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
            JUDGMENT
            [54319-0001/PA052830.120]

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone: (503) 727-2000
Fax: (503) 727-2222

1   the Mass schedules.  The other sign has a fund drive "thermometer" superimposed on a cross.

2   Brennan Exh. 7.

3        The people of Florence and the parishioners of St. Mary regard their parish as their own

4   and, at this point, regard the Archdiocese as the problem-ridden holder of their money.  They are

5   shocked by the fact that *their* money has been frozen and subjected to court control.  They raised

6   every dime of that money and put it in the ALIP trusting that the money would remain theirs.

7   See, e.g., Janowski Decl. at 4; Brennan Dec. at 2-3.  They are disappointed because of the

8   bankruptcy but they will accomplish the goal of a new church befitting their spirit.

9        **7.    Queen of Peace (Salem, Oregon)**

10       Queen of Peace was created as the "daughter" parish of St. Joseph's Church in Salem.

11  Declaration of George Wolf, ¶ 7.  Throughout the 1950's, St. Joseph's parish population grew

12  considerably.  In August 1960, Rev. Joseph E. Vanderbeck, the pastor of St. Joseph, announced a

13  fundraising campaign to raise $250,000 to construct a school building for a new parish to be

14  formed.  The campaign was called:  "Mother Parish to help build Daughter Parish."  *Id.* and

15  Exhs. 3 and 4.  From the very beginning, it was clear that the future Queen of Peace

16  parishioners—as well as parishioners who would stay at St. Joseph—would be building the new

17  parish themselves.  A letter from Fr. Vanderbeck read:  "The People who will be in the new

18  Parish have contributed to build St. Joseph's, so now those who will remain in St. Joseph's will

19  help the new Parish get started.  It will be a Parish campaign to build the first unit—probably

20  eight classrooms and a hall that can be used as a Church."  *Id.*, Exh. 3 at 1; Exh. 4 at 3.  Members

21  of St. Joseph parish, as well as those belonging to the daughter parish and non-Catholics donated

22  funds to support the new parish.  *Id.*, ¶ 8.

23       Fr. Vanderbeck purchased approximately 8.7 acres of land from Ewald Fruit Farms in

24  1960 with money that was raised by parishioners of St. Joseph Catholic Church.  *Id.*, ¶ 5.

25  Construction on the first building—the school—began in 1963.  The foundation and dedication

26  of the new parish was to coincide with the 100th anniversary of St. Joseph parish.  The name

PAGE  44-  PARISH AND PARISHIONERS' CLASS AND PARISH
       COMMITTEE MEMORANDUM IN OPPOSITION TO
       PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
       JUDGMENT
       [54319-0001/PA052830.120]

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  (503) 727-2000
Fax:  (503) 727-2222

1    Queen of Peace was selected because the name Salem derives from the Hebrew word for peace,

2    "shalom." *Id.*, ¶ 9. The church was blessed and dedicated on September 8, 1963 by Archbishop

3    Edward Howard. At the time of the dedication, the completed structures consisted of

4    gymnasium, which also served as the sanctuary in which Mass services were held, with an

5    adjoining hall that also served as a cafeteria. The school building contained one classroom, a

6    library and an office. *Id.*, ¶ 10 and Exh. 5 at 28.

7        In 1964, three more classrooms were added to the school facility. School opened in the

8    fall of that year under the tutelage of two Franciscan sisters, Sr. Franchon and Sr. Mary Goretti.

9    *Id.* at ¶ 11. One of the classrooms was converted to a residence for the two sisters; the other

10   classrooms were used for teaching students from grades one through four. One grade was added

11   each succeeding year, so that by the fall of 1968, grades one through eight were offered at the

12   school. *Id.* The funds to construct the gymnasium/hall and the school were raised by

13   parishioners; construction was enabled through a line of credit loan from the Archdiocese of

14   Portland in Oregon (the "Archdiocese"). *Id.* and Exh. 6. Also in 1964, the parish purchased two

15   tract homes across the street from the church, which were eventually used to house the sisters

16   and as the rectory for the pastor's residence. *Id.*, ¶ 6.

17       In 1967, another capital campaign was launched to raise funds to construct another two

18   classrooms and a convent to house the now six sisters who were teaching classes. (The convent

19   is now used as the parish offices). *Id.*, ¶ 12. The funds to pay for the additional classrooms and

20   the convent were raised by parishioners. *Id.* The classroom that had been used to house the

21   sisters was converted back to a classroom, so there were now six classrooms for student use. *Id.*

22       In 1988, the parish marked its 25th anniversary. One of the parish's major goals for the

23   year was to retire what remained of its debt owed to the Archdiocese. In June 1989, the parish

24   succeeded. By making a final payment of $38,918—$18,680 of which came from funds raised

25   by the annual parish/school auction—the parish fully satisfied its financial obligation to the

26

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR 97209-4128
Phone: (503) 727-2000
Fax: (503) 727-2222

1   Archdiocese. *Id.*, ¶ 13. The parish held a "mortgage burning" party to celebrate its financial

2   independence. *Id.* and Exhs. 11-12.

3        In 1995, the parish initiated a capital campaign—"Building for Now…And Our

4   Future"—to raise $2.3 million to construct a church building, gathering area, and to remodel the

5   kitchen and restrooms. *Id.*, ¶ 14 and Exh. 13; Declaration of Lawrence Tokarski, ¶ 6. The

6   campaign was extraordinarily successful. The parish obtained a loan from the Archdiocese of

7   $850,000, but due to the generosity of the parishioners, the $2.3 million target was exceeded by

8   approximately $400,000, and the loan was paid in full in 1998. Wolf Decl., ¶ 15. The residence

9   at 376 Friendship Lane, which had been owned by the parish since the 1960's and was being

10  occupied by Sr. Joan Jett, was sold after her tragic death in an auto accident in 1997. *Id.* The

11  proceeds were used to help fund the "Building for Now…And Our Future" campaign. *Id.* Also

12  of significance was a $10,000 grant that the parish received from the Hitchman Foundation, a

13  local Salem foundation that wanted to support the charitable ministries that Queen of Peace

14  provides for the south Salem community. *Id.*

15       The "Building for Now…And Our Future" campaign brought out an enormously

16  generous response from the parish at all levels. One parishioner donated his professional

17  architectural services in the course of serving on the Building Committee. Declaration of

18  Michael McDermott, ¶¶ 5-7. Another made a donation for the specific purpose of purchasing a

19  grand piano for the sanctuary. Declaration of Sandra Smith Gangle, ¶ 5. Another parishioner,

20  who lost her husband in 1995, asked that mourners make contributions to the campaign in his

21  memory in lieu of flowers and other memorials, which resulted in at least $20,000 being raised

22  for the benefit of the parish. Declaration of Kathleen Kelly Burrell Monaghan, ¶ 5. Yet another

23  made a very significant financial contribution, donating four homes for the benefit of the

24  campaign which, after they were sold, raised about $300,000. Tokarski Decl., ¶ 8. During

25  construction, the parish realized that it did not have sufficient funds to complete the chapel,

26  which was planned to be directly behind the altar wall in the main sanctuary. That same

PAGE  46-  PARISH AND PARISHIONERS' CLASS AND PARISH
           COMMITTEE MEMORANDUM IN OPPOSITION TO
           PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
           JUDGMENT
           [54319-0001/PA052830.120]

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone: (503) 727-2000
Fax: (503) 727-2222

1    parishioner donated the entire amount necessary to complete the construction, approximately

2    $40,000, as a memorial to his parents. *Id.*, ¶ 9.

3        The church was dedicated on October 26, 1997 with a special Mass service officiated by

4    many of Queen of Peace's former pastors. Wolf Decl., ¶ 16 and Exh. 16.

5        In 2002, the Marion-Polk Foodshare agency contacted the parish to gauge its interest in

6    providing an 800 square-foot food storage/distribution facility. *Id.*, ¶ 17. The parish did not

7    have an adequate storage facility on its property, but a parishioner offered to pay half the cost of

8    providing an 1800 square-foot modular unit. *Id.* After receiving permission from the

9    Archdiocese to place the facility on the parish's property, the parish acquired the modular unit

10   and has been distributing food to approximately 200 families each month. *Id.*

11       In 2003, a parishioner donated $33,250 to the parish specifically for the purchase of a

12   sculpture entitled "Millenium Cross." *Id.*, ¶ 18 and Exh. 18.

13       Even when there is no ongoing capital campaign, Queen of Peace parishioners are

14   consistently contributing their money, time, or services for the benefit of the parish. For

15   example, in 2000, the parish expanded the size of the church parking lot which required grading

16   the soil, paving, curbing and lighting the lot. Declaration of James D. Monaghan, ¶ 6. A

17   parishioner's family business acted as the general contractor for that project at no charge to the

18   parish. *Id.* Further, the parishioner arranged that most of the subcontractors who worked on the

19   project performed their work at reduced prices. *Id.* The purpose behind these in-kind donations

20   was solely to benefit Queen of Peace. *Id.* Another parishioner has devoted hundreds of hours to

21   work on every school or parish auction since they began as a fundraising method, in roles

22   ranging from a "worker bee" to committee chair to co-chair of the 1999 auction. K. Monaghan

23   Decl., ¶ 4.

24       The parishioners at Queen of Peace believe that their contributions are solely for the

25   benefit of the parish and do not intend for their contributions to benefit the Archdiocese. Wolf

26

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone: (503) 727-2000
Fax: (503) 727-2222

1    Decl., ¶ 25; Gangle Decl., ¶¶ 5-7; Tokarski Decl., ¶¶ 7-10; J. Monaghan Decl, ¶¶ 4-6;

2    McDermott Decl., ¶¶ 8-9; K. Monaghan Decl., ¶ 6.

3    　　　From 1994-2001, Rev. George Wolf, the pastor of Queen of Peace, served as a member

4    of the Archdiocesan Loan Commission, which is comprised of pastors, parishioners, and three

5    non-voting (ex officio) representatives of the Archdiocese. Wolf Decl., ¶ 23.  Its purpose is to

6    review parish and school requests for loans and to administer funds in the Archdiocesan Loan

7    and Investment Program ("ALIP").  *Id.*  The Loan Commission makes recommendations to the

8    Archbishop regarding whether a particular loan should be approved.  *Id.*  In Fr. Wolf's five-year

9    tenure on the Loan Commission, he was not aware of a single instance in which the Archbishop

10   did not follow the Commission's recommendation.  *Id.*  Further, it is clearly understood that

11   ALIP funds are the property of the individual parishes.  *Id.*  The parishes pool these funds

12   together to provide low-interest loans to one another.  *Id.*  An individual parish may withdraw

13   these funds to support its parish ministries.  *Id.*

14   　　　　　　　**8.    St. John Fisher (Portland, Oregon)**

15   　　　In the summer of 1956, Rev. Francis J. Schaefers, the pastor of St. Thomas More

16   Catholic Church ("St. Thomas More"), in Portland's West Hills, concluded that there should be a

17   new parish in that area and that the people there could and would support it.  Campbell Dec. at

18   ¶¶ 5-7; W. Forbes Dec. at ¶ 10.  Fr. Schaefers needed to raise money for the new Parish's

19   property.  He set up a formal dinner at the home of a St. Thomas More parishioner, and invited

20   twelve of St. Thomas More's major donors to be his guests.  Declaration of James O. Stahl at ¶ 5.

21   Fr. Schaefers told the men that they were his "disciples" and that they were going to help him

22   buy the land for the new parish.  Fr. Schaefers told each of them that he needed $100 from each

23   of them—by the end of the evening—so that he could buy a new car that someone would sell to

24   him for $1,200.  *Id.*  Each man wrote a $100 check and gave it to Fr. Schaefers.  *Id.*

25   Fr. Schaefers then took the $1,200 and used it to purchase the car, which became the grand prize

26   for a raffle.  The money raised from the sale of raffle tickets—purchased primarily by

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone: (503) 727-2000
Fax: (503) 727-2222

1   St. Thomas More parishioners—was sufficient to purchase the land for the new parish. *Id.* That

2   parish became St. John Fisher.

3        After the land was purchased, Fr. Schaefers led a capital campaign at St. Thomas More to

4   raise funds to pay for a school building at St. John Fisher. Forbes Dec. at ¶ 12. The original

5   construction cost of the school was $231,000, which was raised primarily from donations from

6   St. Thomas More parishioners, as well as a loan from the Archdiocese. *Id.* The school opened

7   on September 8, 1959, and the first Mass was celebrated in the gymnasium on September 20,

8   1959. *Id.*; S. Corrado Dec. at ¶ 5. The gym served as the church for the next several years until

9   the actual church building was constructed. *Id.*; Forbes Dec. at ¶ 12. In November 1959,

10  St. John Fisher parish began its own capital campaign to pay off the debt owed to the

11  Archdiocese and to finish the classrooms on the lower floor of the school. Forbes Dec. at ¶ 13;

12  Corrado Dec. at ¶ 6 and Exh. 1. The second phase of construction was completed in about 1961,

13  and added 4 classrooms on the lower level of the school, a music/storage room, cafeteria and

14  kitchen. *Id.* at ¶ 6.

15       In 1967, the parish began another capital campaign, this time to raise money to build a

16  church sanctuary and a rectory/office building. *Id.* at ¶ 7; Forbes Dec. at ¶ 15. Once again, the

17  parishioners gave generously and funded the majority of the building costs. The total

18  construction cost for the church was $459,547.97, which consisted of: $261,500 from "D-

19  Notes;" $3,120.04 in interest on those D-Notes; $105,427.93 in Sunday collections and special

20  gifts from parishioners; and loans from the Archdiocese totaling $89,500. Forbes Decl, ¶ 15 and

21  Exhs. 6, 8-9. Construction on the church and the rectory/office began in 1968. *Id.*, ¶16 and

22  Exh. 10. Both structures were completed in 1969, and the church was dedicated on March 2,

23  1969. *Id.*, ¶ 16; Corrado Dec. at ¶ 7. Due to the dedication and sacrifice of St. John Fisher's

24  parishioners, the debt owing to the Archdiocese was paid off in full in short order. Forbes Dec.

25  at ¶ 17 and Exh. 11; Corrado Dec. at ¶ 7. When Rev. Leland DeJardin, St. John Fisher's pastor,

26

PAGE  49-  PARISH AND PARISHIONERS' CLASS AND PARISH
            COMMITTEE MEMORANDUM IN OPPOSITION TO
            PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
            JUDGMENT
            [54319-0001/PA052830 1201]

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone: (503) 727-2000
Fax:  (503) 727-2222

1  announced from the pulpit that the parish had paid off its debt, the congregation burst into cheers

2  and applause.  Corrado Dec. at ¶ 7.

3      The next campaign was to raise money for a pipe organ for the newly-constructed church,

4  which was done through "fun"-raisers like sing-a-longs, white elephant gift sales, dances, and

5  breakfasts, as well as through generous monetary contributions from parishioners.  *Id.*, ¶ 8.  For

6  the next 25 years, the parish held fundraisers on a regular basis:  auctions, bazaars, dances, sing-

7  a-longs, bake sales, and the like, as well as the weekly collections at Sunday services.  The

8  money raised from these endeavors was used to offset tuition costs at St. John Fisher School,

9  provide scholarships, pay bills and salaries at the school and the church, and maintain the

10  buildings and grounds.  At no point in time, from the very beginnings of the parish, did the

11  Archdiocese contribute to or fund either the construction of the buildings or the day-to-day costs

12  of making the parish and school run.  *Id.*, ¶ 9.

13      St. John Fisher School offers education from Kindergarten through eighth grade.

14  Declaration of Sue Harris, ¶ 5.  The only capital improvements that had been made to the school

15  or its facilities since 1961 were a new roof, natural gas conversion and carpeting for the lobby

16  and stairwells under the direction of Fr. Forbes, St. John Fisher's pastor since 1988.  *Id.*  In 1994,

17  under the direction of Fr. Forbes and school principal Sue Harris, a Steering Committee was

18  assembled to assess the goals and needs of both the school and the parish.  *Id.*  The Steering

19  Committee held meetings with small parishioner and school parent groups to learn from them the

20  kinds of improvements they wished to see in both the school and the parish.  *Id.*; Declaration of

21  Mark Zipse, ¶ 5.  At the conclusion of its interviews, the Steering Committee recommended a

22  series of construction goals that were to take place in two phases:  Phase 1 was intended to

23  construct a new Kindergarten classroom to be integrated with and attached to the school,

24  construct a new library, computer center and learning center, and landscape the school to provide

25  shade cover for the classrooms on the west side of the school building.  Phase 2 focused on

26

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  (503) 727-2000
Fax:  (503) 727-2222

1    parking lot redesign, athletic field construction, an addition to the gymnasium, development of a

2    play area, and modifications to the school entry. *Id.*, ¶ 6; Harris Dec. at ¶ 6.

3        In the course of pursing the campaign, the parish had several meetings with Archdiocese

4    representatives. The Archdiocese was enthusiastic about St. John Fisher's immediate goals, but

5    requested that the parish broaden the scope of the planning to examine its long-term needs.

6    Zipse Dec. at ¶ 7. The Archdiocese indicated that St John Fisher was responsible for identifying

7    its own future growth and expansion requirements, which would be unique to each parish. *Id.*

8    As a result of the Building Commission's recommendation, the Steering Committee met and

9    developed a Phase 3, which included modification of the rectory office and entry, eventual

10    construction of a new parish hall, and making upgrades to the ministries offices. *Id.*

11    Archdiocese representatives also made it clear to the parish that any building renovations were to

12    be the sole responsibility of the parish. Harris Dec. at ¶ 8. The parish would be able to borrow

13    from the Archdiocese a small portion of the total costs needed for the construction, but only after

14    the parish had received cash contributions in the amount of 80% of the total construction cost.

15    *Id.*

16        With the building plan now in place, the capital campaign could now begin. Throughout

17    the course of the campaign, called "Blueprints for the Future," it was clear that the money raised

18    would be used for the benefit of the school and parish. Harris Dec. at ¶ 9; Zipse Dec. at ¶ 10.

19    Even the campaign brochure stated that "the majority of funding will come from the parish

20    community." Harris Dec. at Exh. 1 at 8. At the official conclusion of the campaign, $809,325

21    was raised from parishioner donations. Zipse Dec. at ¶ 9. By the time Phase 1 and 2 were

22    completed, however, a total of $1.3 million had been raised. Harris Dec. at ¶ 10. Construction

23    on Phase 1 began in 1994 and was completed in 1995; its total cost was approximately $920,000.

24    *Id.*, ¶ 11. Construction on Phase 2 began in 1996 and was completed in 1998; the total cost of

25    that phase was approximately $370,000. *Id.* Before construction began on Phase 1, the parish

26    applied for and was granted a line of credit from the Archdiocese in the total amount of

PAGE   51-   PARISH AND PARISHIONERS' CLASS AND PARISH
             COMMITTEE MEMORANDUM IN OPPOSITION TO
             PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
             JUDGMENT
             [54319-0001/BA052830.120]

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone: (503) 727-2000
Fax:  (503) 727-2222

1    $222,000, which the parish did not call upon in full. Forbes Dec. at ¶ 20. In addition to having

2    to demonstrate to the Archdiocese that the parish already had in hand most of the cost of

3    construction, the Archdiocese also required that "[p]arish funds are to be applied to the project

4    before any loan advances are made." *Id.* and Exh. 12. St. John Fisher retired its debt within the

5    terms provided by the loan. *Id.*, ¶ 21.

6        At about the same time the "Blueprints for the Future" capital campaign was underway, it

7    became apparent that the church was sorely in need of new works of art. Corrado Dec. at ¶ 11.

8    The parish formed an Art Committee, which undertook 4 years of extensive research into

9    liturgical art in the Northwest. *Id.* at ¶¶ 11-12. After hundreds of hours, the committee

10   commissioned several works of art, ranging from sculpture to stained glass windows to a

11   complete reworking of the church's baptistry, all of which were valued at approximately

12   $67,000. *Id.*, ¶ 12. A significant portion of the money needed to purchase the art came from one

13   parish family, who intended to benefit only St. John Fisher in donating the necessary funds. *Id.*,

14   ¶ 13.

15       In the summer of 2004, the parishioners' generosity allowed the parish to purchase an air

16   conditioning system in the church. The total cost for the system was $50,000. Funds for this

17   project came from a $1,000 donation from parishioner Nancy Emrick, a $12,500 donation from

18   parishioner Anthony Maksyn, a second collection that was passed around the parish—after the

19   regular collection—on a hot summer weekend, and from the parish's Renewal Fund. Forbes

20   Dec. at ¶ 23.

21       Parishioners volunteer from time to time to perform special maintenance for the parish.

22   *Id.*, ¶ 24. For example, parishioners were responsible for the planting of a hedge of cedar trees

23   along the driveway between the north side of St. John Fisher and St. Luke's Lutheran Church

24   next door. *Id.* Mark Zipse and other parishioners were responsible for the early watering and

25   mowing of the athletic field soon after it was seeded. *Id.*; Zipse Dec. at ¶ 12-14. Many

26   parishioners volunteer to perform regular janitorial services in the church building. A group of

PAGE   52-   PARISH AND PARISHIONERS' CLASS AND PARISH
             COMMITTEE MEMORANDUM IN OPPOSITION TO
             PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
             JUDGMENT
             [54319-0001/PA052830.120]

1   retired men, "The Fishermen," vacuum the church each Thursday morning.  Forbes Decl, ¶ 24.

2   Altar Society members wash the altar linens, while another volunteer washes the clergy's and

3   Eucharistic ministers' white robes.  Further, there is a monthly collection for the renewal and

4   maintenance of the buildings and grounds.  In addition to helping to fund the purchase and

5   installation of the air conditioning system, the Renewal Fund has also been used to replace

6   rotting window frames in the school, install a sprinkler system in the athletic field, and provide

7   routine maintenance, repair and upkeep.  *Id.*

8       It is abundantly clear to parishioners at St. John Fisher that their contributions, both

9   monetary and nonmonetary, are intended to benefit solely the local parish community.  *Id.*, ¶ 30;

10  Corrado Dec. at ¶ 14; Zipse Dec. at ¶ 15; Harris Dec. at ¶ 12; Stahl Dec. at ¶¶ 7-8; Declaration of

11  Connie Flabetich, ¶ 8; Declaration of Ed Flabetich, ¶¶ 3-4.  St. John Fisher parishioners have

12  supported their parish in almost every way imaginable.  Parishioner Ed Flabetich not only ushers

13  at Saturday Mass each week, and provides personal physical labor services such as plumbing and

14  janitorial work in the church and the rectory, he also stepped in to save the church from having to

15  spend thousands of additional dollars to install its new pipe organ by hoisting at least 50 large

16  organ pipes up to an alcove in the church designed to hold the organ.  E. Flabetich Dec. at ¶ 4.

17  Connie Flabetich served as the Choir Director for nine years without pay, and led the efforts to

18  research and obtain a pipe organ for the church.  C. Flabetich Dec. at ¶¶ 4-6.  Parishioners have

19  donated all kinds of professional services for the benefit of the parish, including graphic design,

20  architecture, financial expertise, and landscaping.  Harris Dec. at ¶ 12; Zipse Dec. at ¶ 12.  One

21  parishioner designed a database to enable the school to track the volunteer hours recorded by

22  school parents, a project that took between 300-400 hours.  Stahl Dec. at ¶ 7.  Of course, there

23  also those parishioners who have generously given financial contributions to support the parish;

24  one family alone has donated over $800,000 in the last 48 years.  Corrado Dec. at ¶ 14.

25      Consistent with tradition and the rules of the Canon Law, the Archdiocese may hold legal

26  title to St. John Fisher's real property.  However, such title – like title held in all other Parish

PAGE  53-  PARISH AND PARISHIONERS' CLASS AND PARISH
       COMMITTEE MEMORANDUM IN OPPOSITION TO
       PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
       JUDGMENT
       [54319-0001/PA052830.120]

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone: (503) 727-2000
Fax: (503) 727-2222

1   properties – is intended to be held for the use and benefit of St. John Fisher and its parishioners.

2   Forbes Dec. at ¶ 31. Indeed, the Archbishop explained this policy nearly 25 years ago:

> While it is true that [title to parish property is held by] the Archdiocese of Portland, it is not true that the Archdiocese as such owns the land for itself. The Archdiocese is an Oregon not for profit corporation incorporated in the State of Oregon, whereas the parish is not so incorporated. *The title to all property belonging to the Catholic Church in western Oregon, with some notable exceptions such as hospitals, nursing homes, private educational institutions, etc., is vested in the Archdiocese. Such properties,* as for example parish plants, though listed under the Archdiocesan corporate title, *are really held in trust for the individual parishes.*

9   *Id.* and Exh. 13 at 1 (emphasis added).

## 9.    St. Philip Benizi (Redland, Oregon)

11  St. Philip Benizi Catholic Church ("St. Philip Benizi") is a parish within the diocese of

12  the Debtor located in Redland, Oregon (near Oregon City). The vision for a new Catholic parish

13  in the area started in approximately 1961. Spink Dec. at ¶ 5. At that time, there was no Catholic

14  parish in the area and a number of local Catholics were interested in starting one. *Id.* By 1962,

15  several Redland families had begun meeting on Sunday mornings at the Redland Grange for

16  Mass and catechism classes. *Id.* The services held at the Grange were sponsored by St. John the

17  Apostle, an established parish in Oregon City with hundreds of families in attendance. *Id.* The

18  Grange mission was led by Father James Spink, who was then a young associate of Monsignor

19  Bernards, the long-time pastor of St. John the Apostle. (*Id.* at ¶¶ 4-6).

20  *Acquisition of First Parcel of Land.* Not long after services began at the Redland Grange,

21  a momentum developed among those in attendance to build a new church facility. Spink Dec. at

22  ¶ 7. In 1963, Father Spink and Monsignor Bernards purchased a parcel at the intersection of

23  Redland and Linn's Mill Roads for about $5,000. Spink Dec. at ¶ 7-8 (referencing parcel

24  907629); Saalfeld Dec. I at ¶ 5. At least $1,000 of the purchase price was paid by Monsignor

25  Bernards with his own personal funds. Spink Dec. ¶ 8. Monsignor Bernards was known for

26  generous donations to parishes, and made this donation for the purpose of advancing the new

PAGE  54-  PARISH AND PARISHIONERS' CLASS AND PARISH COMMITTEE MEMORANDUM IN OPPOSITION TO PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY JUDGMENT
[54319-0001/PA052830.120]

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  (503) 727-2000
Fax:  (503) 727-2222

1   "the feeling at the party was one of celebration." *Id.* "Everyone was proud that we satisfied our

2   debt." *Id.*

3       *Construction of other buildings.* After building the new church, the parishioners at St.

4   Philip Benizi went on to build three additional buildings: the rectory, the social hall and the

5   covered play area. Saalfeld Dec. I at ¶¶ 15-21. Each was constructed upon the initial (1963)

6   parcel with funds and labor donated by parishioners.

7       The parish rectory (which also serves as office space) was built in 1974 for

8   approximately $50,000. Saalfeld Dec. I at ¶ 17. A loan from the Archdiocese was obtained to

9   supplement parishioner donations, but was paid back, in full, with subsequent parishioner

10  donations. *Id.*

11      In the wake of a growing church body and need for additional space, St. Philip Benizi

12  built a social hall in 1984. Saalfeld Dec. ¶ 18. All of the work for the social hall and the rectory

13  was done by the parish priest and the parishioners. *Id.* The total cost of the social hall was about

14  $180,000. Saalfeld Dec. I, at ¶ 20. That money was raised in a variety of ways, including

15  through a pledge drive. See Silvander Exh. 7 (copies of signed pledge forms).[27]

16      The pledge forms expressly state that the contributions were being made by parishioners

17  "to assist in the building of our parish social hall" because the donors had "a firm belief in the

18  positive benefits for St. Philip Benizi parish." *Id.* Many of the pledges were for significant

19  sums; according to a parish donor log, there were at least 115 parishioners who made pledges (all

20  but one pledging more than $100), with total pledges exceeding $47,000. Silvander Exh. 6 (log

21  of pledges). Parishioners also donated building materials and labor to the construction of the

22  hall, including the donation of drain pipes, a septic system, flooring, painting, trim work and

23  insulation installation, and the installation of a telephone system. See Silvander Exh. 8 at 1-9;

24

_____

25

26      [27] The parish ended up with a surplus in its building fund that it later used to construct a covered
    play structure. The Archdiocese was not in any way involved in the construction of the covered play
    structure, and did not even know about it until after it was built. Saalfeld Dec. at 21.

PAGE  56- PARISH AND PARISHIONERS' CLASS AND PARISH
      COMMITTEE MEMORANDUM IN OPPOSITION TO
      PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
      JUDGMENT
      [SA319-0001/PA052830.120]

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone: (503) 727-2000
Fax:  (503) 727-2222

1    Buxman Dec. at ¶2; Clow Dec. at ¶¶ 3-9.  As one of these parishioners testified, "I did all of this

2    work on a volunteer basis as part of my contribution to our parish."  Buxman Dec. ¶ 2.

3        The Archdiocese did not contribute any funds to the social hall project.  Saalfeld Dec. I,

4    at ¶ 20.  St. Philip Benizi wrote checks directly on its own account to pay the non-volunteer

5    contractors who worked on the project.  *Id.*

6        *Acquisition of Additional Parcels.*  St. Philip Benizi acquired a second parcel of land in

7    1989 for the benefit of the parish.  See Saalfeld Dec. I, ¶¶ 6-7; see also Saalfeld Exh. 2 (aerial

8    map of the property).  The $11,000 purchase was funded completely by donations from the

9    parishioners of St. Philip Benizi.  *Id.* at ¶ 8.  The Archdiocese contributed no funds toward the

10   purchase price and generally deferred to the pastor in his desire to purchase the parcel for the

11   benefit of St. Philip Benizi.  *Id.*; *see generally* Saalfeld Supp. Dec.

12       A third parcel, acquired in 1993, cost $25,000, and was purchased with parishioner-

13   donated funds (not with any money from the Archdiocese) in order to benefit the local parish

14   community.  Saalfeld Dec. at ¶¶ 10-12, 30-37.  In a letter to the Archdiocese dated December 9,

15   1992, Father Saalfeld expressly noted that this property would be acquired "for the benefit of this

16   parish."  Saalfeld Exh. 3 at 1.  With the help of several volunteer parishioners and the local fire

17   department, an old, dilapidated house and garage on the property was burned and cleared.  *Id.* at

18   ¶ 11.

19       *Remodeling and Maintenance.*  Over the years, St. Philip Benizi has spent a lot of money

20   to keep its parish buildings properly updated.  In 1988, St. Philip Benizi upgraded the social hall

21   to add an additional classroom.  Saalfeld Dec. I, ¶ 23.  The cost of this project, approximately

22   $40,000, was paid for completely by the parish building fund.  *Id.*  In 1991, Fr. Saalfeld led a

23   significant remodel of the sanctuary, in which the parishioners again bore the entire cost of

24   approximately $309,000.  *Id.* at ¶¶ 24-27.

25       St. Philip Benizi also relies on volunteer labor to perform basic maintenance for the

26   parish.  Parishioners donate their time to perform janitorial services, to paint the buildings, and to

1    perform yard maintenance.  See generally Saalfeld Dec. at ¶ 28; Silvander Dec. I, ¶ 2; Bucknum

2    Dec. at ¶ 2; Saalfeld Exh. 5 (photos of volunteer work); Silvander Exh. 9 (same).

3        *St. Philip Benizi Presence on Parish Property.*  St. Philip Benizi staff, including its

4    current pastor (Father Michael Patrick), are generally present on the parish premises during

5    regular business hours and week-ends.  Silvander Supp. Dec. at ¶¶ 7-11.  Father Patrick lives on

6    the property, such that he is also generally present during non-business hours.  *Id.* at ¶ 10.  Father

7    Patrick and his staff are generally happy to talk with people who come onto the property, or into

8    the parish office, with questions.  *Id.* at ¶ 11.  In addition, St. Philip Benizi displays a parish sign

9    on the premises that says "St. Philip Benizi Catholic Church" and makes no reference to the

10    Archdiocese.  *Id.* at ¶ 6; Saalfeld Dec. at ¶ 4; Silvander (Supp.) Exh. 5.

11        St. Philip Benizi has its own federal tax identification number and enters into direct

12    contracts with third-parties without involving the Debtor.  Silvander Dec. II, ¶ 2-4; Saalfeld Dec.

13    I, ¶ 20.

14    **III.    Principles of Religious Freedom Bar the Relief Sought by the TCC under**

15    **Section 544(a)(3).**

16        The facts set forth above demonstrate with great breadth how the Test Properties came

17    into existence and, most importantly, why no more than bare legal title in the Archdiocese was

18    ever contemplated by the Parish Defendants.  Constitutional and RFRA issues aside, deep factual

19    questions overwhelm the Third Motion, making summary judgment inappropriate.  However, in

20    the event the Court determines that the interests asserted by the Parish Defendants in the Test

21    Properties do not exist, should be disregarded or are subject to avoidance under section

22    544(a)(3), the Parish Defendants ask that the Court proceed to consider the federal protections

23    that safeguard the religious rights of the Parish Defendants, including pursuant to the Religious

24    Freedom Restoration Act, 42 U.S.C. § 2000bb ("RFRA") and the First Amendment.[28]

25    _____

26        [28] By voiding beneficial interests in property recognized under state law, an application of section
544 to void pre-1978 transfers of property would amount to a violation of the Fifth Amendment of the

PAGE  58-  PARISH AND PARISHIONERS' CLASS AND PARISH
            COMMITTEE MEMORANDUM IN OPPOSITION TO
            PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
            JUDGMENT
            [54319-0001/PA052830 1201]

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  (503) 727-2000
Fax:  (503) 727-2222

1  **A.    The Religious Freedom Restoration Act Bars Reliance on Section 544 to Void
       The Parish Defendants' Interests in the Test Properties.**

2       Under RFRA,

3
4       Government may substantially burden a person's exercise of religion *only*
        if it demonstrates that application of the burden to the person--

5       (1) is in furtherance of a compelling governmental interest;

6
7       (2) is the least restrictive means of furthering that compelling
        governmental interest.

8  42 U.S.C. § 2000bb-1(b) (2003) (emphasis added).  In determining whether a government action

9  "substantially burdens" a person's religious practice, courts look to sincerely held religious

10 beliefs.  *Werner v. McCotter,* 49 F.3d 1476, 1480 n.1 (10th Cir. 1995).  The action must

11 "'significantly inhibit or constrain conduct or expression that manifests some central tenet of a

12 [person's] individual [religious] beliefs; must meaningfully curtail a [person's] ability to express

13 adherence to his or her faith; or must deny a [person] reasonable opportunities to engage in those

14 activities that are fundamental to a [person's] religion.'"  *In re Young,* 82 F.3d 1407, 1418 (8th

15 Cir. 1996) ("*Young I*") (citation and internal punctuation omitted).[29]  The Eighth Circuit restated

16 and reemphasized its conclusions in *Christians v. Crystal Evangelical Free Church (In re*

17 *Young),* 141 F.3d 854 (8th Cir.), *cert. denied,* 119 S. Ct. 43 (1998) ("*Young II*").  *Young II* was

18 subsequently cited with approval by the Ninth Circuit.  *Guam v. Guerrero,* 290 F. 3d 1210,

19 1220-21 (9th Cir. 2002).

20 _____

21 U.S. Constitution without just compensation.  While one court has considered and rejected this argument,
   see *In re Washburn & Roberts, Inc.,* 17 B.R. 305 (Bankruptcy D. Wa. 1982), that court reached the

22 incorrect conclusion that the property right had been "divested" not by the statute but by the failure to
   record the interest.  That conclusion is incorrect because where, as here, the BFP is merely hypothetical,

23 the beneficiary retains the property interest, and could enforce it.  It is only after a BFP actually purchases
   the property that the failure to record effectively divests the party of the property right.  For that reason,

24 voiding pre-1978 transfers of property from the parishes to the Debtor amounts to a violation of the Fifth
   Amendment.

25
       [29] *In re Young,* 82 F.3d 1407 (8th Cir.), *reh'g denied,* 89 F.3d 494 (8th Cir. 1996), *vacated and*

26 *remanded,* 117 S. Ct. 2502 (1997), *on remand sub nom. Christians v. Crystal Evangelical Free Church
   (In re Young),* 141 F.3d 854 (8th Cir.), *cert. denied,* 119 S. Ct. 43 (1998).

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  (503) 727-2000
Fax:  (503) 727-2222

1      In *Young,* the trustee sought to recover, pursuant to Section 548 of the Bankruptcy Code,

2  prepetition tithes by the debtor to his church. The Eighth Circuit concluded that avoidance of the

3  debtors' religious contributions by the application of section 544(a)(3) would substantially

4  burden the debtors' religious practices:

5           We do not think it is relevant that the debtors can continue to tithe or that
            there are other ways in which the debtors can express their religious
6          beliefs that are not affected by the governmental action. It is sufficient
            that the governmental action in question meaningfully curtails, albeit
7          retroactively, a religious practice of more than minimal significance in a
            way that is not merely incidental.
8

9  *Young I,* 82 F.3d at 1418-19.

10      The court held that the religious contributions were not avoidable under the trustee's

11  fraudulent transfer strong arm powers because Congress effectively amended the Bankruptcy

12  Code when it enacted RFRA.

13           We conclude that RFRA is an appropriate means by Congress to modify
            the United States bankruptcy laws. In attempting to avoid the Youngs'
14          tithes to the church, the Trustee relied on an affirmative act of Congress
            defining which transactions of debtors in bankruptcy may be avoided. *See*
15          11 U.S.C. § 548(A)2)(A). RFRA, however, has effectively amended the
            Bankruptcy Code, and has engrafted the additional clause to §548(a)(2)(A)
16          that a recovery that places a substantial burden on a debtor's exercise of
            religion will not be allowed unless it is the least restrictive means to
17          satisfy a compelling governmental interest.

18  *Young II,* 141 F.3d at 861.

19      We understand the TCC's argument to be that even assuming the existence of a valid

20  charitable resulting trust under Oregon law and assuming that the contributions at issue here

21  were religiously motivated acts of religious expression, section 544(a)(3) would nevertheless

22  result interests of the Parish Defendants in such trusts to be avoided. In such a collision between

23  section 544(a)(3) and RFRA, RFRA prevails. Such an application of section 544(a)(3) would

24  substantially burden the Parish Defendants' exercise of religion – far more than in *Young. See*

25  Parish Defendants' Response to TCC's Concise Statement of Material Facts at 10, ¶ 5 (The Parish

26

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone: (503) 727-2000
Fax: (503) 727-2222

1    Defendants contribute to their parishes as acts of religious faith and expression.)  The relatively

2    brief period of time involved in *Young* is dwarfed by the magnitude of the relief sought by the

3    TCC here.  Here, the religious acts of many generations of parishioners, colorfully illustrated in

4    the numerous declarations filed in support of this memorandum, are implicated by the Court's

5    decision.

6        To satisfy RFRA, the TCC must demonstrate that, as applied here, section 544(a)(3)

7    would be 1) "in furtherance of a compelling governmental interest," and 2) the relevant law is

8    "the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. §

9    2000bb-1(b).

10        In this case, the governmental interest – maximizing property of the estate – is not

11    narrowly tailored.  The application of the Bankruptcy Code would bring far more property into

12    the control of the Debtor than is allowed under Canon Law, more than is permitted by the

13    religious beliefs or donative intentions of parishioners, more than can be reasonably reached

14    under reasonable principles of civil liability, and, interestingly, more than is justified under

15    section 541.[30]  There is no compelling reason to ignore these aspects of religious practice in a

16    generalized effort to broaden the scope of the estate.  That is precisely the conclusion reached by

17    the Eighth Circuit in *Young,* cited with approval by the Ninth Circuit in *Guerrero.*  And it is,

18    respectfully, the result that this Court should reach here.

19    **B.    The Religion Clauses of the First Amendment.**

20        Elimination of the interests of the Parish Defendants as proposed by the TCC would

21    violate the rights of the Parish Defendants under the First Amendment.  The First Amendment

22    provides that "Congress shall make no law respecting an establishment of religion, or prohibiting

23    the free exercise thereof."  Courts are similarly restricted in their consideration of issues

24

25    _____

26        [30] *See Mills v. Brown (In re Brown),* 182 B.R. 778 (Bankr. E.D. Tenn. 1995) (addressing conflict
    between sections 541 and 544); *In re Mill Concepts Corp.,* 123 B.R. 938 (Bankr. D. Mass. 1991) (same).

PAGE  61-  PARISH AND PARISHIONERS' CLASS AND PARISH
    COMMITTEE MEMORANDUM IN OPPOSITION TO
    PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
    JUDGMENT
    [54319-0001/PA052830.120]

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone: (503) 727-2000
Fax:  (503) 727-2222

1    involving religious organizations or doctrine.  Generally, courts may not interpret church laws,

2    policies or practices in a manner that will limit a church's ability to fully practice its religion or

3    be guided by its religious principles.  *Cantwell v. Connecticut,* 310 U.S. 296, 303 (1940).

4           As the Parish Defendants argued in response to the second motion for summary

5    judgment, courts are not prevented from addressing church-related disputes, provided they

6    refrain from considering doctrinal matters and resolve the dispute solely on neutral principles.

7    *Watson v. Jones*, 80 U.S. 679, 727 (1871) (decision of highest church authority binding in

8    "questions of discipline, or of faith, or ecclesiastical rule, custom, or law"); *Presbyterian Church*

9    *in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440

10   (1969) ("there are neutral principles of law, developed for use in all property disputes, which can

11   be applied without 'establishing' churches to which property is awarded"); *Maryland & Va.*

12   *Churches v. Sharpsburg Church,* 396 U.S. 367, 368, 90 S.Ct. 499, 500 (1970) (church property

13   dispute resolved based on deeds, the local church charters, state statutes and constitution of the

14   general church concerning the ownership and control of church property); *Jones v. Wolf,* 443

15   U.S. 595, 604 (1979) ("there may be cases where the deed, the corporate charter, or the

16   constitution of the general church incorporates religious concepts in the provisions relating to the

17   ownership of property").

18          Under neutral principles, a court should review the deeds to the church property and the

19   state statutes governing the holding of church property.  The TCC would have the Court end its

20   inquiry there, affirmatively ignoring Canon Law and its fundamental relationship to the authority

21   of the corporation sole in relation to parish property.  The TCC's constrained view gives short

22   shrift to the full reach of Oregon law in this matter and invites numerous religious freedom

23   objections.  Such an approach ignores the teachings of *Jones*, which makes clear that courts may

24   engage in a limited review of religious documents and practices, including church charters,

25   books of order or discipline of the general church organization. *Id.* at 602-04, 99 S.Ct. at 3026.

26

PAGE  62-  PARISH AND PARISHIONERS' CLASS AND PARISH
         COMMITTEE MEMORANDUM IN OPPOSITION TO
         PLAINTIFFS' THIRD MOTION FOR PARTIAL SUMMARY
         JUDGMENT
         [54319-0001/PA052830 120]

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone: (503) 727-2000
Fax: (503) 727-2222

1   Here, the Court must consider the religious practices and doctrines of the Catholic

2 Church that have informed the religious acts of giving at issue.  To ignore such practices and

3 doctrine undermines and alters the polity of the church and infringes upon the religious

4 expressions of the Parish Defendants protected by the First Amendment.  The Court can only

5 accept the TCC's arguments and void the interests of the Parish Defendants by impermissibly

6 elevating the form of the property records over the substance of every other reasonable indicia of

7 the relationships, rights and obligations of the parties in the Test Properties.  This the First

8 Amendment forbids.

9 **IV. Conclusion.**

10   Substantial questions of material fact preclude the Court from granting the motion.  The

11 TCC's third motion for partial summary judgment should be denied.

12   Dated this 19th day of October, 2005

13       **PERKINS COIE LLP**

16    By _____

17     Steven M. Hedberg, OSB No. 84244
      Douglas R. Pahl, OSB No. 95047

18     Jeffrey C. Dobbins , OSB No. 02042
      Of Attorneys for the Defendant Class and the

19     Committee of Parishioners

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  (503) 727-2000
Fax:  (503) 727-2222

**DECLARATIONS IN SUPPORT OF RESPONSE
TO THIRD MOTION FOR
SUMMARY JUDGMENT**

**General Declarations**
Mark Edlen ("Edlen Dec.")
John Rickman ("Rickman Dec.") [previously filed under Docket No. 275]
Rev. John Kerns ("Kerns Dec.") [previously filed under Docket No. 276]

**Holy Redeemer**
Fr. George Rassley, C.Ss.R. ("Rassley Dec.)
Fr. Bill Adams, C.Ss.R. ("Adams Dec.")
Alice J. Cowan ("Cowan Dec.")
Mary Louise Marking ("Marking Dec.")
William "Doug" Herboth ("Herboth Dec.")
Marjorie Hicks ("Hicks Dec.")
Vince Cooney ("Cooney Dec.")
Sandy Trapnell ("Trapnell Dec.")
Fr. Joseph Corpora, CSC ("Corpora Dec.")
Janeen McAninch ("McAninch Dec.")
Mary Neisner ("Neisner Dec.")

**Immaculate Conception (Stayton)**
Frank Yates ("Yates Dec.")
Frank Yates ("Supp. Yates Dec.")
Kathleen I. McNulty ("McNulty Dec.")
Shirley A. Becker ("S. Becker Dec.")
Fr. Panneer Selvam ("Selvam Dec.")
Frances A. Freres ("F. Freres Dec.")
Marcel Van Dreisch ("Dreisch Dec.")
Theodore F. Freres ("T. Freres Dec.")
La Veta Christiansen ("L. Christiansen Dec.")
Arthur P. Christiansen ("A. ChristiansenDec.")
Elmer J. Klamp ("E. Klamp Dec.")
Fred Schwindt ("Schwindt Dec.")
James V. Gries ("Gries Dec.")
Edward Dunham ("Dunham Dec.")
Vincent J. Brand ("Brand Dec.")
Cliff Coleman ("Coleman Dec.")
Sylvia Coleman ("Coleman Dec.")
Robert T. Freres ("R. Freres Dec.")
Katherine L. Kirsch ("Kirsch Dec.")
Ralph Bochsler ("Bochsler Dec.")
Louise Bochsler ("Bochsler Dec.")
Helen D. Klamp ("H. Klamp Dec.")
Thomas R. Becker ("T. Becker Dec.")
Elizabeth Minten ("Minten Dec.")

**St. Michael (Oakridge)**
Patrick Morrison ("Morrison Dec.")
Patrick Morrison ("Supp. Morrison Dec.")
William DuMont ("W. DuMont Dec.")
Mary Susan Freeman ("Freeman Dec.")
Aline C. Goddard ("Goddard Dec.")
Norman H. Husser ("Husser Dec.")

James H. Minogue ("J. Minogue Dec.")
William Hager ("Hager Dec.")
Jean Husser ("Husser Dec.")
Janet DuMont ("J. DuMont Dec.")
Geraldine A. Palanuk ("Palanuk Dec.")
Beverly J. McCulley ("McCulley Dec.")
Christine A. Minogue ("C. Minogue Dec.")

**St. Birgitta**
Anna Minarik ("Minarik Dec.")
Glenn W. Pelikan ("Pelikan Dec.")
Fr. Joseph P. Browne ("Browne Dec.")
John Knez ("Knez Dec.")
John Bender ("Bender Dec.")

**St. Elizabeth Ann Seton (Aloha)**
Donna F. Nemec ("Nemec Dec.")
Shirley R. Hurrell ("Hurrell Dec.")
Fr. Neil Moore ("Moore Dec.")

**St. Mary, Our Lady of the Dunes**
Mary-Helen "Charlie" Brennan ("Brennan Dec.")
Richard Kirby ("Kirby Dec.")
Gary Foglio ("Foglio Dec.")
Phyllis Wells ("Wells Dec.")
Fr. Don Gutmann ("Gutmann Dec.")
Ken Janowski ("Janowski Dec.")
Patrick Kirby ("Kirby Dec.")

**Queen of Peace**
Rev. George Wolf ("Wolf Dec.")
Lawrence E. Tokarski ("Tokarski Dec.")
Kathleen Kelly Burrell Monaghan ("K. Monaghan Dec.")
Michael McDermott ("McDermott Dec.")
Sandra Smith Gangle ("Gangle Dec.")
James D. Monaghan ("J. Monaghan Dec.")

**St. John Fisher**
Frank Campbell ("Campbell Dec.")
James O. Stahl ("Stahl Dec.")
Wayne A. Forbes ("Forbes Dec.")
Sue Harris ("Harris Dec.")
Mark Zipse ("Zipse Dec.")
Susanne M. Corrado ("Corrado Dec.")
Connie Flabetich ("C. Flabetich Dec.")
Ed Flabetich ("E. Flabetich Dec.")

**St. Philip Benizi**
James Spink ("Spink Dec.")
Lawrence Saalfeld ("Saalfeld Dec.")
Mary Lou Silvander ("Silvander Dec.")
Myrtle Poquette ("Poquette Dec.")
Bill Piller ("Piller Dec.")
Gordon F. Clow ("Clow Dec.")
John Buxman ("Buxman Dec.")
Michael L. Bucknum ("Bucknum Dec.")

CLERK, U.S. BANKRUPTCY COURT
DISTRICT OF OREGON

OCT 1 9 2005

LODGED_____ REC'D____
PAID_____ DOCKETED___

1    Steven M. Hedberg, OSB No. 84244 (shedberg@perkinscoie.com)
     Douglas R. Pahl, OSB No. 95047 (dpahl@perkinscoie.com)
2    Jeanette L. Thomas, OSB No. 98042 (jthomas@perkinscoie.com
     PERKINS COIE LLP
3    1120 N.W. Couch Street, Tenth Floor
4    Portland, OR 97209-4128
     Telephone: (503) 727-2000
5
6         Of Attorneys for Committee of Parishes and
          Parishioners and Defendant Class
7

8

9
                 UNITED STATES BANKRUPTCY COURT
10
                  FOR THE DISTRICT OF OREGON
11

12   In re                                │  NO. 04-37154-elp11
13   ROMAN CATHOLIC ARCHBISHOP OF          │  *Adr. 04-3292-elp*
     PORTLAND IN OREGON, and successors, a │
14   corporation sole, dba the ARCHDIOCESE OF │
     PORTLAND IN OREGON                     │  **CERTIFICATE OF SERVICE**
15                                          │
              Debtor.                       │
16

17

18        I hereby certify that I served a copy of the following documents on the parties on the

19   attached List of Interested Parties as indicated, addressed to each party's last known address on

20   the date set forth below:

21        1.    **RESPONSE TO TORT CLAIMANTS COMMITTEE'S CONCISE**

22             **STATEMENT OF MATERIAL FACTS IN SUPPORT OF THIRD MOTION FOR**

23             **PARTIAL SUMMARY JUDGMENT;**

24        2.    **PARISH AND PARISHIONERS' CLASS AND PARISH COMMITTEE**

25             **MEMORANDUM IN OPPOSITION TO PLAINTIFFS' THIRD MOTION FOR**

26             **PARTIAL SUMMARY JUDGMENT;**

PAGE  1-   CERTIFICATE OF SERVICE

[54319-0001/PA052910.031]

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR 97209-4128
Phone: (503) 727-2000
Fax: (503) 727-2222

1  **3.** **DECLARATION OF JOHN BENDER;**

2  **4.** **DECLARATION OF FR. JOSEPH P. BROWNE;**

3  **5.** **DECLARATION OF JOHN KNEZ;**

4  **6.** **DECLARATION OF ANNA MINARIK;**

5  **7.** **DECLARATION OF RECORDS CUSTODIAN GLENN W. PELIKAN;**

6  **8.** **DECLARATION OF SHIRLEY R. HURRELL;**

7  **9.** **DECLARATION OF FR. NEIL MOORE;**

8  **10.** **DECLARATION OF RECORDS OF CUSTODIAN DONNA F. NEMEC;**

9  **11.** **DECLARATION OF FR. BILL ADAMS, C.SS.R;**

10  **12.** **DECLARATION OF VINCE COONEY;**

11  **13.** **DECLARATION OF FATHER JOSEPH CORPORA, CSC;**

12  **14.** **DECLARATION OF ALICE J. COWAN;**

13  **15.** **DECLARATION OF MARJORIE HICKS;**

14  **16.** **DECLARATION OF WILLIAM "DOUG" HERBOTH;**

15  **17.** **DECLARATION OF NANCY HOLDORF;**

16  **18.** **DECLARATION OF MARY LOUISE MARKING;**

17  **19.** **DECLARATION OF JANEEN MCANINCH;**

18  **20.** **DECLARATION OF MARY NEISNER;**

19  **21.** **DECLARATION OF FR. GEORGE RASSLEY, C.Ss.R.**

20  **22.** **DECLARATION OF SANDY TRAPNELL;**

21  **23.** **DECLARATION OF SHIRLEY A. BECKER;**

22  **24.** **DECLARATION OF THOMAS R. BECKER;**

23  **25.** **DECLARATION OF LOUISE BOCHSLER;**

24  **26.** **DECLARATION OF RALPH BOCHSLER;**

25  **27.** **DECLARATION OF VINCENT J. BRAND;**

26  **28.** **DECLARATION OF ARTHUR P. CHRISTIANSEN;**

PAGE  2- CERTIFICATE OF SERVICE

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  (503) 727-2000
Fax:  (503) 727-2222

[54319-0001/PA052910.031]

| | | |
|---|---|---|
| 1 | **29.** | **DECLARATION OF LA VETA CHRISTIANSEN;** |
| 2 | **30.** | **DECLARATION OF CLIFF COLEMAN;** |
| 3 | **31.** | **DECLARATION OF SYLVIA COLEMAN;** |
| 4 | **32.** | **DECLARATION OF MARCEL VAN DREISCH;** |
| 5 | **33.** | **DECLARATION OF EDWARD DUNHAM;** |
| 6 | **34.** | **DECLARATION OF FRANCES A. FRERES;** |
| 7 | **35.** | **DECLARATION OF ROBERT T. FRERES;** |
| 8 | **36.** | **DECLARATION OF THEORDORE F. FRERES;** |
| 9 | **37.** | **DECLARATION OF JAMES V. GRIES;** |
| 10 | **38.** | **DECLARATION OF KATHERINE L. KIRSCH;** |
| 11 | **39.** | **DECLARATION OF ELMER J. KLAMP;** |
| 12 | **40.** | **DECLARATION OF HELEN D. KLAMP;** |
| 13 | **41.** | **DECLARATION OF KATHLEEN I. MCNULTY;** |
| 14 | **42.** | **DECLARATION OF ELIZABETH MINTEN;** |
| 15 | **43.** | **DECLARATION OF FRED SCHWINDT;** |
| 16 | **44.** | **DECLARATION OF FATHER PANNEER SELVAM;** |
| 17 | **45.** | **DECLARATION OF FRANK YATES;** |
| 18 | **46.** | **SUPPLEMENTAL DECLARATION OF FRANK YATES;** |
| 19 | **47.** | **DECLARATION OF FRANK CAMPBELL;** |
| 20 | **48.** | **DECLARATION OF SUE CORRADO;** |
| 21 | **49.** | **DECLARATION OF CONNIE FLABETICH;** |
| 22 | **50.** | **DECLARATION OF ED FLABETICH;** |
| 23 | **51.** | **DECLARATION OF WAYNE A. FORBES;** |
| 24 | **52.** | **DECLARATION OF SUE HARRIS;** |
| 25 | **53.** | **DECLARATION OF JIM STAHL;** |
| 26 | **54.** | **DECLARATION OF MARK ZIPSE;** |

PAGE  3-   CERTIFICATE OF SERVICE

[54319-0001/PA052910.031]

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  (503) 727-2000
Fax:  (503) 727-2222

1    **55.**   **DECLARATION OF MARY-HELEN "CHARLIE" BRENNAN;**

2    **56.**   **DECLARATION OF GARY FOGLIO;**

3    **57.**   **DECLARATION OF FATHER DON GUTMANN;**

4    **58.**   **DECLARATION OF KEN JANOWSKI;**

5    **59.**   **DECLARATION OF PATRICK KIRBY;**

6    **60.**   **DECLARATION OF RICHARD KIRBY;**

7    **61.**   **DECLARATION OF PHYLLIS WELLS;**

8    **62.**   **DECLARATION OF JANET DUMONT;**

9    **63.**   **DECLARATION OF WILLIAM DUMONT;**

10   **64.**   **DECLARATION OF MARY SUSAN FREEMAN;**

11   **65.**   **DECLARATION OF ALINE C. GODDARD;**

12   **66.**   **DECLARATION OF WILLIAM HAGER;**

13   **67.**   **DECLARATION OF JEAN HUSSER;**

14   **68.**   **DECLARATION OF NORMAN H. HUSSER;**

15   **69.**   **DECLARATION OF CHRISTINE A. MINOGUE;**

16   **70.**   **DECLARATION OF JAMES H. MINOGUE;**

17   **71.**   **DECLARATION OF BEVERLY J. MCCULLEY;**

18   **72.**   **DECLARATION OF PATRICK MORRISON;**

19   **73.**   **SUPPLEMENTAL DECLARATION OF PATRICK MORRISON;**

20   **74.**   **DECLARATION OF GERALDINE A. PALANUK;**

21   **75.**   **DECLARATION OF MICHAEL L. BUCKNUM;**

22   **76.**   **DECLARATION OF JOHN BUXMAN;**

23   **77.**   **DECLARATION OF GORDON F. CLOW;**

24   **78.**   **DECLARATION OF BILL PILLER;**

25   **79.**   **DECLARATION OF MYRTLE POQUETTE;**

26   **80.**   **DECLARATION OF LAWRENCE SAALFELD;**

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  (503) 727-2000
Fax:  (503) 727-2222

[54319-0001/PA052910.031]

1    **81.    DECLARATION OF RECORDS CUSTODIAN MARY LOU SILVANDER;**

2    **82.    SUPPLEMENTAL DECLARATION OF MARY LOU SILVANDER;**

3    **83.    DECLARATION OF JAMES SPINK;**

4    **84.    DECLARATION OF SANDRA SMITH GANGLE;**

5    **85.    DECLARATION OF MICHAEL MCDERMOTT;**

6    **86.    DECLARATION OF JAMES D. MONAGHAN;**

7    **87.    DECLARATION OF KATHLEEN KELLY BURRELL MONAGHAN**

8    **88.    DECLARATION OF LAWRENCE E. TOKARSKI;**

9    **89.    DECLARATION OF REV. GEORGE WOLF; and**

10   **90.    DECLARATION OF MARK EDLEN.**

11   Dated: October 19, 2005

12   **PERKINS COIE LLP**

13

14   By _____

15   Douglas R. Pahl, OSB No. 08633
     Of Attorneys for Committee of Parishes and

16   Parishioners and Defendant Class

17

18

19

20

21

22

23

24

25

26

PAGE  5-    CERTIFICATE OF SERVICE

[54319-0001/PA052910.031]

## Tort Claimants Committee v.
## Roman Catholic  Archbishop of Portland
## in Oregon, and Successors, a corporation sole dba
## the Archdiocese of Portland in Oregon
## Adversary Proceeding No. 04-03292-elp

### List of Interested Parties

**VIA HAND DELIVERY**

Albert N. Kennedy
Tonkon Torp LLP
1600 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2099
Fax:  (503) 274-8779

Pamela J. Griffith
Office of the U.S. Trustee
620 SW Main Street, Room 213
Portland, OR  97205
Fax:  (503) 326-7658

Howard M. Levine
Thomas W. Stilley
Sussman Shank LLP
1000 SW Broadway, Suite 1400
Portland, OR  97205-3089
Fax:  (503) 248-0130

Brad T. Summers
Ball Janik LLP
101 SW Main Street, Suite 1100
Portland, OR  97204
Fax:  (503) 226-3910

**VIA US MAIL**

James M. Finn
Schwabe, Williamson & Wyatt P.C.
Suite 1600-1900
1211 SW Fifth Avenue
Portland, OR  97204-3795
Fax:  (503) 796-2900

Michael J. Farrell
Martin, Bischoff, Templeton
    Langslet & Hoffman, LLP
888 SW 5th Avenue, #900
Portland, OR  97204
Fax:  (503) 224-9471

Joseph A. Field
Field & Associates
610 SW Alder Street, Suite 910
Portland, OR  97205
Fax:  (503) 225-0276

Erin K. Olson
Law Office of Erin Olson, P.C.
2905 NE Broadway
Portland, OR  97232-1760
Fax:  (503) 548-4435

David A. Foraker
Greene & Markley, P.C.
Suite 600
1515 SW Fifth Avenue
Portland, OR  97201-5492
Fax:  (503) 224-8434

James Ray Streinz
McEwen Gisvold LLP
1600 Standard Plaza
1100 SW Sixth Avenue
Portland, OR  97204
Fax:  (503) 243-2687

Paul E. DuFresne
5135 SW 85th Avenue
Portland, OR  97225
Fax:  (503) 297-9933

Joseph E. Deems
Deems Law Offices
15260 Ventura Blvd., Ste. 1810
Sherman Oaks, CA  91403
Fax:  (818) 995-6496

Bradley S. Copeland
Arnold Gallagher Saydack
    Percell Roberts & Potter PC
P.O. Box 1758
Eugene, OR  97440-1758
Fax:  (541) 484-0536

L. Martin Nussbaum
Rothgerber Johnson & Lyons LLP
Wells Fargo Tower, Suite 1100
90 South Cascade Avenue
Colorado Springs, CO  80903
Fax:  (719) 386-3070