**Below is an Opinion of the Court.**

_Elizabeth L Perris_
ELIZABETH PERRIS
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In Re:<br><br>ROMAN CATHOLIC ARCHBISHOP OF PORTLAND IN OREGON, AND SUCCESSORS, A CORPORATION SOLE, dba the ARCHDIOCESE OF PORTLAND IN OREGON,<br><br>Debtor. | Bankruptcy Case No. 04-37154-elp11 |
| TORT CLAIMANTS COMMITTEE,<br><br>Plaintiff,<br><br>v.<br><br>ROMAN CATHOLIC ARCHBISHOP OF PORTLAND IN OREGON, AND SUCCESSORS, A CORPORATION SOLE, dba the ARCHDIOCESE OF PORTLAND IN OREGON, et al.,<br><br>Defendants. | Adv. Proc. No. 04-3292<br><br>MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED MOTION FOR PARTIAL SUMMARY JUDGMENT) |

The Roman Catholic Archbishop of Portland in Oregon, and Successors,

a Corporation Sole, dba the Archdiocese of Portland in Oregon ("debtor"

or "the Archdiocese") filed a chapter 11[1] case in 2004. The Archdiocese
has taken the position that, although it holds legal title to
approximately $98 million in deposits and investment accounts[2] and an
extensive amount of real estate, most of that property is held in trust
and, thus, is not available to be used to pay the claims of creditors.
The Tort Claimants Committee ("TCC") seeks a determination in this
adversary proceeding that the property is property of debtor's bankruptcy
estate and is not subject to any interests of anyone else, and to use the
bankruptcy trustee's powers as a hypothetical bona fide purchaser to
avoid any unrecorded interests of third parties in the disputed real
property.

The TCC has filed a series of motions for summary judgment, seeking
a determination of various aspects of the pending proceeding. It seeks
in this Second Restated Motion for Partial Summary Judgment a
determination that debtor's and other defendants' affirmative defenses of
lack of subject matter jurisdiction and religious freedom are without
merit. It also seeks a declaration that debtor's "parishes and schools
have no legal existence separate from or independent of Debtor and do not
have the capacity to sue or be sued." Tort Claimants Committee's
Restated Second Motion for Partial Summary Judgment ¶ 4. Responses to
this motion were filed by associations or groups representing the

---

[1]     Unless otherwise indicated, all chapter and section references
are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330.

[2]     This total comes from the amounts listed in the TCC's First
Amended Complaint ¶ 24. The complaint took the figures from debtor's
bankruptcy Schedule B.

Page 2 –  MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED
          MOTION FOR PARTIAL SUMMARY JUDGMENT)

interests of Marist High School, Central Catholic High School, Regis High School, and the Committee of Catholic Parishes, Parishioners and Interested Parties ("Parish Committee").[3]  Where those non-debtor defendants' arguments align with debtor's, I will not separately address them, but will consider the arguments made by debtor as including the arguments made by the other defendants.

Debtor in turn filed a cross-motion for partial summary judgment, in which it seeks summary judgment on certain issues.  At bottom, its cross-motion seeks a determination that the debtor and the parishes are separate entities.[4]

---

[3]    The Missionaries of the Holy Spirit also filed an opposition. The TCC's Restated Second Motion for Partial Summary Judgment seeks a ruling on all defendants' defenses of lack of jurisdiction and religious freedom, which include such defenses raised by the Missionaries of the Holy Spirit.  The portion of the TCC's motion seeking a determination of whether parishes and schools have separate legal existence does not relate to the property in which the Missionaries of the Holy Spirit assert an interest.

An opposition was also filed by Phoebe Joan O'Neill.  She joins the oppositions of debtor and the Parish Committee to the TCC's Second Restated Motion for Partial Summary Judgment as well as the cross-motion for summary judgment of debtor.  She does not make any separate arguments.

[4]    Debtor's cross-motion seeks summary judgment on the following issues:

1.    The Debtor is, under Oregon corporation law, a corporation sole.  A corporation sole is the incorporation of an office - here, the office of the Archbishop of the Archdiocese of Portland in Oregon.

2.    A Catholic bishop solemnly vows during his ordination to conduct his entire ministry and administration as a bishop in
                                                      (continued...)

Page 3 - MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED
         MOTION FOR PARTIAL SUMMARY JUDGMENT)

I.  PRELIMINARY MATTERS

There are a number of preliminary matters raised by the parties.  I
have ruled on those matters in a separate order, entered this date.

II.  STANDARD FOR SUMMARY JUDGMENT

The court shall grant a party summary judgment on all or part of a

---

[4](...continued)
accordance with Catholic and Canon Law.

   3.   Oregon law requires the Debtor to function and govern its
affairs in accordance with the constitution, canons, rules,
regulations, disciplines, doctrine, and practice of the Roman
Catholic Church.

   4.   The Debtor's Articles of Incorporation require the Debtor
to function and govern its affairs in accordance with the doctrine,
canons, rules, and usages of the Roman Catholic Church.

   5.   The First Amendment guarantees that religious institutions
have the power to decide for themselves, free from state
interference, matters of church government, faith, and doctrine -
including the definition and creation of ecclesial entities like
Catholic parishes and the empowering of church officials to pastor
and administer such parishes and their property.  Catholic
institutions define their governance through Canon Law.

   6.   The Court must consider Canon Law in determining whether
the Parishes are entities separate from the Debtor.

   7.   The Parishes and the Debtor are separate entities.

Debtor's Cross Motion for Partial Summary Judgment at 2-3.  The first six
issues are facts or legal conclusions debtor asserts in support of its
affirmative defenses and opposition to the TCC's claim that the parishes
and debtor are one legal entity.  I will not expressly consider the first
six points or rule on them for summary judgment, because they are not
elements of a claim or defense, but are merely arguments or factual
support for those claims or defenses.  To the extent any of the factual
assertions or legal conclusions are relevant to my decision in this
adversary proceeding, I will address them in the discussion, but will not
expressly grant or deny summary judgment as to them.

Page 4 -  MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED
          MOTION FOR PARTIAL SUMMARY JUDGMENT)

claim or counterclaim "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056.

### III. UNDISPUTED FACTS

Debtor is a corporation sole organized under Oregon's nonprofit corporations laws. It does business as the Archdiocese of Portland in Oregon.

The Archdiocese is an ecclesiastical province of the Roman Catholic Church, which is a hierarchical church headed by the Pope. The Archbishop of the Archdiocese ("the Archbishop") has legislative, executive and judicial power within his Archdiocese. Within the Archdiocese of Portland are 124 parishes. The parishes operate with some autonomy from debtor, although the Archbishop has ultimate say over administrative matters of the parishes. Only one parish in the Archdiocese, St. Elizabeth Parish, is separately incorporated as a nonprofit corporation. The rest of the parishes are not separately incorporated. The Archbishop has the authority to and has suppressed parishes within the Archdiocese.

The Archdiocese also has three high schools, which are not connected to any parish and are not separately incorporated ("the Archdiocesan schools").[5]

---

[5] Those high schools are Regis High School, Central Catholic High
(continued...)

Page 5 - MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED MOTION FOR PARTIAL SUMMARY JUDGMENT)

1    The TCC filed this adversary proceeding to obtain a determination of
2    whether the disputed personal and real property is property of the
3    bankruptcy estate, and to avoid the interests of others in the disputed
4    real property.  In debtor's and the other defendants' answers, they
5    raised affirmative defenses, including claims that this court lacks
6    jurisdiction over the proceeding, and that adjudication of this complaint
7    could entangle the court in religious matters in violation of state and
8    federal law.  This summary judgment motion and cross-motion addresses
9    First Amendment and other religious freedom defenses, as well as whether
10   the parishes and schools are legal entities separate from debtor.  It
11   does not address whether anyone other than debtor holds any interests in
12   the disputed property.

IV.  DISCUSSION

1.  <u>Jurisdiction</u>

15   Debtor alleges as an affirmative defense to the TCC's complaint
16   that, "[t]o the extent this Court does not have jurisdiction over one or
17   more of Plaintiff's claims, such claims should be dismissed for lack of
18   jurisdiction."  Defendant Debtor's Answer and Affirmative Defenses at
19   ¶ 50.[6]  Debtor argues that it does not dispute the court's authority to
20   determine what is property of the bankruptcy estate, but raises the
21   defense as a precaution against the court's exceeding the limitations on

23       [5](...continued)
     School, and Marist High School.

25       [6]    To the extent other defendants raise a similar affirmative
     defense, this summary judgment proceeding is intended to apply to the
     similar defenses.

Page 6 –  MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED
          MOTION FOR PARTIAL SUMMARY JUDGMENT)

1   its jurisdiction that are imposed by the First Amendment.

2   The Parish Committee argues that I should not resolve this issue
3   now, because the court could at some time in the future exceed its
4   jurisdiction, so the defense is not ready for determination.  It argues
5   that the court has an obligation not to decide constitutional questions
6   if it need not do so, and that the parties agree that the court can apply
7   neutral principles of law to decide this case, without implicating
8   constitutional questions.

9   Although the parties seem to agree that I can apply neutral
10  principles of law to determine questions about what is property of the
11  estate, they disagree about what that means.  Because this jurisdictional
12  question will continue to be an issue if I do not decide it, I will
13  address it now rather than later in order to move this case toward a
14  resolution.

15      A.   <u>Bankruptcy court's jurisdiction to determine property of the
16           estate</u>

17  The filing of a bankruptcy petition creates an estate, which is made
18  up of "all legal or equitable interests of the debtor in property as of
19  the commencement of the case."  § 541(a)(1).  Property of the estate does
20  not include property "in which the debtor holds, as of the commencement
21  of the case, only legal title and not an equitable interest . . . ."
    § 541(d).
22
23  District courts are granted original and exclusive jurisdiction over
24  bankruptcy cases, and original but not exclusive jurisdiction over civil
25  proceedings arising under the Bankruptcy Code.  28 U.S.C. § 1334(a), (b).
26  As allowed by statute, the United States District Court for the District

Page 7 –  MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED
          MOTION FOR PARTIAL SUMMARY JUDGMENT)

of Oregon has referred its bankruptcy cases and related proceedings to the bankruptcy court. U.S. District Court of Oregon Local Rule 2100.1; 28 U.S.C. § 157(a). Bankruptcy judges may hear and determine matters concerning the administration of the bankruptcy estate. 28 U.S.C. § 157(b). There is no question, and the parties do not seem to dispute, that this court has jurisdiction to determine whether property for which debtor holds legal title but claims not to hold equitable title is property of the estate.

The issue arises with regard to limitations on that jurisdiction. The parties dispute the extent to which the First Amendment's religion clauses limit the bankruptcy court's jurisdiction to determine what is property of the bankruptcy estate when the debtor is, as in this case, a religious organization.[7]

B.   First Amendment limitations on jurisdiction

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . . ." These protections have two aspects: the law may not require a person to accept any particular creed or form of worship, nor may it restrict a person's right to exercise a chosen form of religion. "Thus, the Amendment embraces two concepts, -- freedom to believe and freedom to act." Cantwell v. State of Connecticut, 310 U.S. 296, 303 (1940).

Out of these protections of religious freedom has grown a restriction on the jurisdiction of the courts to decide certain disputes

_____

[7]   The parties do not make any Oregon constitutional arguments.

Page 8 - MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED MOTION FOR PARTIAL SUMMARY JUDGMENT)

touching on religious matters.  The TCC calls the restriction the "ecclesiastical abstention" doctrine; debtor calls it "church autonomy law."  By whatever label, the concept is well-established.  "[T]he First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice."  Jones v. Wolf, 443 U.S. 595, 602 (1979).  Religious organizations have the freedom "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine."  Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am., 344 U.S. 94, 116 (1952).

The restriction on the court's jurisdiction does not mean that it may never adjudicate matters involving church property, however.

> Thus, the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes.  It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment.  Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property.  And there are neutral principles of law, developed for use in all property disputes, which can be applied without "establishing" churches to which property is awarded.  But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice.  If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. . . . [T]he Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine.  Hence, States, religious organizations, and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions.

Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church, 393 U.S. 440, 449 (1969).

Page 9 - MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED MOTION FOR PARTIAL SUMMARY JUDGMENT)

The TCC argues that this limitation on the power of courts to decide matters involving church government and doctrine has been applied only in intra-church disputes, that is, in disputes between competing factions of a religious organization or some other internal church dispute. It relies on Justice Rehnquist's single-justice ruling on an order denying a stay, in <u>Gen. Council on Fin. and Admin. of the United Methodist Church v. Superior Court of Cal.</u>, 439 U.S. 1369 (1978), in which he said:

> In my view, applicant plainly is wrong when it asserts that the First and Fourteenth Amendments prevent a civil court from independently examining, and making the ultimate decision regarding, the structure and actual operation of a hierarchical church and its constituent units in an action such as this. There are constitutional limitations on the extent to which a civil court may inquire into and determine matters of ecclesiastical cognizance and polity in adjudicating intrachurch disputes. But this Court never has suggested that those constraints similarly apply outside the context of such intraorganization disputes. . . . [The] cases are premised on a perceived danger that in resolving intrachurch disputes the State will become entangled in essentially religious controversies or intervene on behalf of groups espousing particular doctrinal beliefs. Such considerations are not applicable to purely secular disputes between third parties and a particular defendant, albeit a religious affiliated organization, in which fraud, breach of contract, and statutory violations are alleged.

439 U.S. at 1372-73.

Debtor argues that I need not follow this opinion, because it is the ruling of a single Supreme Court justice and not the entire Court. I need not decide whether Justice Rehnquist's view is binding, because the question of whether property is part of the bankruptcy estate under the Bankruptcy Code does not require that I resolve matters of faith, doctrine, or governance.[8] If it is appropriate for this court to

---

[8]    Debtor provides the declaration of Margaret Hoffmann explaining
(continued...)

Page 10 - MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED
        MOTION FOR PARTIAL SUMMARY JUDGMENT)

consider internal church law to resolve that dispute, a matter that I will discuss later in this opinion, that consideration will entail simply determining what the internal church law is, not resolving any disputes about faith, doctrine, or church polity.

The parties in this case seek a determination of whether particular property titled in the name of debtor belongs to debtor or belongs instead to parishes, schools, or others. Whether or not such a determination allows or requires this court to consider the Roman Catholic Church's internal law, called the Code of Canon Law, it does not require resolution of a dispute over matters of church government, doctrine, or faith.[9] Who owns the property is, quite simply, not a

---

[8](...continued)
that many of the tort claimants were associated with the church at the time of the alleged sexual abuse. This evidence presumably is offered to show that this is not a third-party dispute, but instead is a dispute between the church and its followers. Whether or not the alleged victims of sexual abuse were affiliated with the church at the time of the alleged misconduct, no one argues that the misconduct was required or permitted by church doctrine. Further, even if the alleged victims could be considered to be within the church and therefore not third parties, the claim of the TCC that any unrecorded property interests may be avoided under § 544(a)(3) of the Bankruptcy Code is a claim on behalf of the bankruptcy estate. There can be no doubt that, if a trustee were appointed in this case, the trustee would be third party with no previous association with the church. Thus, to the extent the TCC is asserting a claim on behalf of the estate, it is a third party, even if individual claimants would not be.

[9]    I agree with the Bankruptcy Court for the Eastern District of Washington that, if the First Amendment deprived the bankruptcy court of jurisdiction to adjudicate the fundamental question of whether, in a voluntary bankruptcy case filed by a religious organization, property held by the debtor is property of the bankruptcy estate, the proper remedy might well be dismissal of the case. See In re Catholic Bishop of
(continued...)

Page 11 - MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED
         MOTION FOR PARTIAL SUMMARY JUDGMENT)

theological or doctrinal matter.

Debtor argues that, if this court does not apply the church's canon law view of property ownership in the civil law bankruptcy arena, the result will be a rearrangement of the church's polity in violation of the First Amendment. I disagree. Debtor, as a religious organization, is free to organize its internal affairs in accordance with its internal church law. It has choices about how to organize itself under civil law in a way that recognizes and implements its internal organization with relation to the secular world. A court's enforcement of the consequences of those choices, whether or not they accurately reflect the church's internal property-ownership view, neither rearranges the church's polity in violation of the First Amendment nor interferes with the church's right to make those choices.

Because this court has jurisdiction over the question presented in this adversary proceeding, which is whether the disputed property belongs to the bankruptcy estate, I will grant summary judgment to the TCC on the defendants' affirmative defenses of lack of subject matter jurisdiction.

2.  Religious freedom defense

Debtor argues under various theories that this court is required to consider and apply internal church law to determine what is property of the bankruptcy estate. It raises this issue as an affirmative defense, claiming that "[t]he adjudication of the Complaint could potentially entangle the Court in religious matters in violation of the First

---

[9](...continued)
Spokane, 329 B.R. 304, 324 n.5 (Bankr. E.D. Wa. 2005).

Page 12 - MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED
        MOTION FOR PARTIAL SUMMARY JUDGMENT)

Amendment of the United States Constitution, Oregon law, and other applicable nonbankruptcy law." Defendant Debtor's Answer and Affirmative Defenses to Plaintiff's First Amended Complaint ¶ 52. This raises the issue of whether, in deciding whether the disputed property is property of the estate, I must consider not only neutral state law but also the Code of Canon Law.[10]

A.   First Amendment

As I have said, in order to respect the religious freedoms provided by the First Amendment, the courts have recognized certain restrictions on resolution of disputes that involve religious institutions. Courts can, for example, resolve intra-church property disputes by deferring to decisions of the highest authority of a hierarchical church. E.g., Watson v. Jones, 80 U.S. (13 Wall.) 679 (1871). None of the parties to this dispute advocate for such an approach in this case.[11]

Courts also may resolve disputes involving church property by applying neutral

secular principles of property, trust and corporate law when the instruments upon which those principles operate are at hand. Thus

---

[10]   It is not clear whether all theories argued in this summary judgment proceeding in support of application of canon law arise under the religious freedom affirmative defense, or are simply arguments in support of debtor's cross-motion for summary judgment on the question of whether the parishes are separate legal entities from debtor. I will discuss all theories under the religious freedom affirmative defense heading, but I recognize that not all theories may technically fit under this defense. All theories are, however, appropriate for consideration in this motion, no matter how they are categorized.

[11]   There is no evidence that the highest authority in the Roman Catholic Church has adjudicated this dispute about the ownership interests in property held by debtor.

Page 13 - MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED
          MOTION FOR PARTIAL SUMMARY JUDGMENT)

no First Amendment issue arises when a court resolves a church property dispute by relying on state statutes concerning the holding of religious property, the language in the relevant deeds, and the terms of corporate charters of religious organizations.

<u>Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar</u>, 179 F.3d 1244, 1249 (9th Cir. 1999). As the Supreme Court explained:

> The primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity. The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice. Furthermore, the neutral-principles analysis shares the peculiar genius of private-law systems in general--flexibility in ordering private rights and obligations to reflect the intentions of the parties. Through appropriate reversionary clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency, or what religious body will determine ownership in the event of a schism or doctrinal controversy.

<u>Jones v. Wolf</u>, 443 U.S. 595, 603 (1979).

Bankruptcy Code § 541 defines property of a bankruptcy estate; property interests are created and defined by state law. <u>Butner v. United States</u>, 440 U.S. 48, 55 (1979). Therefore, consistent with First Amendment jurisprudence and the Bankruptcy Code, I will apply neutral secular principles of state law in order to determine the issues presented in this adversary proceeding.

Debtor argues that, in applying neutral principles of law, I must consider not only state corporate and property law, but also canon law, because that law defines the relationship between the Archbishop and the parishes.

As I explained above, however, neutral principles of law require

Page 14 - MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED MOTION FOR PARTIAL SUMMARY JUDGMENT)

1  application of secular neutral principles, not sacred ones.  The

2  religious organization's internal law is not relevant to the dispute,

3  unless neutral principles of civil law make it so.  There is no

4  constitutional requirement that internal church law be considered in

5  determining a purely secular dispute.[12]

6      B.  State corporate law

7      Debtor argues that, under Oregon statutes relating to corporations

8  sole, internal church law is relevant and, indeed, must be applied in

9  determining the legal status of parishes within the Archdiocese.  The TCC

10  argues that it would violate the First Amendment if the court considered

11  internal church law.  Because I disagree with debtor that Oregon

12  corporate law requires application of canon law to disputes about

13  ownership of church or parish property, I need not discuss whether

14  applying canon law would violate the First Amendment.

15      Debtor relies on four different statutes in its argument that canon

16  law is incorporated into state law for corporations sole.  First is the

17  corporation sole statute, which provides, as relevant:

18      Any individual may, in conformity with the constitution, canons,
        rules, regulations and disciplines of any church or religious
19      denomination, form a corporation hereunder to be a corporation sole.

20

21

22

---

23      [12]  There are situations in which a court needs to consider a
    church's internal law in deciding a secular dispute, for example, in
24  determining whether a church employee was acting within the course and
    scope of employment when the employee committed a tort.  E.g., M.K. v.
25  Archdiocese of Portland in Oregon, 228 F. Supp. 2d 1168 (D. Or. 2002).
    This case does not present such an issue.
26

Page 15 - MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED
              MOTION FOR PARTIAL SUMMARY JUDGMENT)

ORS 65.067(1).[13]  Debtor argues that the reference in the statute to "the constitution, canons, rules, regulations and disciplines of any church or religious denomination" means that those canons and other disciplines must necessarily be applied to all activities of the church.  That is not what the statute says.  I agree with Judge Williams in the Spokane diocese bankruptcy case, who said that similar language in a Washington statute refers to the authority under church law of the individual to form a corporation sole under state law, but it does not require that all dealings of the church with the secular world be governed by that internal law.  In re Catholic Bishop of Spokane, 329 B.R. 304, 326 (Bankr. E.D. Wa. 2005).

That is not to say (and Judge Williams did not say) that the church's canons and other rules and disciplines are irrelevant once the corporation sole is formed.  Debtor argues at length that the corporation sole must be governed according to the canon law of the Roman Catholic Church.  I have no reason to doubt that argument, and nothing in the corporation sole statute precludes the corporation from operating according to internal church doctrine.  However, neither does the statute require the corporation to follow its internal law; that is a matter between the incorporator and the authorities of the church.

Next, debtor cites ORS 65.042, which provides:

If religious doctrine or practice governing the affairs of a

---

[13]  Debtor was actually incorporated under the original version of the corporation sole statute, which was enacted in 1872.  Although the language of the statute has changed over the years, the changes are not significant in ways that affect this case.

religious corporation is inconsistent with the provisions of this chapter on the same subject, the religious doctrine or practice shall control to the extent required by the Constitution of the United States or the Constitution of this state, or both.

Debtor reads this statute as a broad directive that religious doctrine controls debtor's relationship with the secular world. That is not what the statute says. The statute requires application of religious doctrine if two requirements are met: (1) the religious doctrine is inconsistent with the provisions of ORS chapter 65 on the same subject, and (2) application of religious doctrine is required by the state or federal constitution. Debtor does not point to any inconsistency between the provisions of ORS chapter 65 and canon law, nor does it explain why either the state or federal constitution would require application of religious doctrine to all of a religious corporation's relationships with the secular world.

Further, the statute refers only to chapter 65, which is the chapter dealing with non-profit corporations. Even if canon law were inconsistent with state property or trust law, ORS 65.042 would not provide debtor with authority for application of canon law to property or trust law issues.

Finally, debtor relies on two statutes setting out standards of conduct for officers and directors of non-profit corporations. Both statutes say that, in discharging duties as an officer or director of a religious corporation, the officer or director "is entitled to rely on information, opinions, reports or statements, including financial statements and other financial data," presented or prepared by "religious authorities and ministers, priests, rabbis or other persons whose

position or duties in the religious organization the [officer or director] believes justify reliance and confidence and whom the [officer or director] believes to be reliable and competent in the matters presented." ORS 65.357(2)(d)(relating to directors); ORS 65.377(2)(c) (relating to officers).

The fact that an officer or director of a corporation sole may rely on religious authorities or personnel in discharging his duties does not require application of canon law to all of the corporation's relationships or interaction with the secular world, including its need to follow the formalities of state property or trust law with regard to property it holds.

The history of religious corporations in general and corporations sole in particular supports the conclusion that a religious organization's property rights are governed by state law, not internal church law. Before the advent of state-sanctioned religious corporations, religious organizations experienced difficulties with how to continue operation of the organization during a vacancy in the office of the bishop or other church leader, and how to hold church property so that the church would retain ownership in perpetuity. See, e.g., James B. O'Hara, The Modern Corporation Sole, 93 Dick. L. Rev. 23 (1988). Property that was given to or otherwise acquired by the religious organization would sometimes be held in fee simple by the parish priest. But that method of ownership was problematic because, upon the priest's death, the property might be claimed by the priest's heirs. Id. at 29. Property would sometimes be held by trustees in trust for the religious

organization, but that also caused difficulties when the trustees died, resigned, or "became obstreperous." Carl Zollmann, <u>Classes of American Religious Corporations</u>, 13 Mich. L. Rev. 566, 574 (1914).[14]

As a result of these types of difficulties, many states, including Oregon, enacted statutes allowing for the formation of religious corporations in general and corporations sole in particular. <u>See</u> Patrick J. Dignan, <u>A History of the Legal Incorporation of Catholic Church Property in the United States</u> 214-244 (1933). The corporation sole was a corporate form that allowed the Roman Catholic Church to incorporate "in a manner consistent with church polity." O'Hara, <u>The Modern Corporation Sole</u>, 93 Dick. L. Rev. at 31. Under this then-new statutory form of corporation, perpetual corporate succession was assured, and the church existed in a form that could hold property in a way that would be recognized under state law. <u>Id.</u>; Carl Zollmann, <u>Classes of American Religious Corporations</u>, 13 Mich. L. Rev. at 575.

Given this history and the reason for the enactment of the corporation sole statute, it is apparent that religious organizations, including the Roman Catholic Church, recognized the need to conduct church affairs in accordance with state law, at least insofar as

---

[14] For a good outline of the history of forms of church property ownership and statutory corporations sole, relating to both religious organizations in general and the Roman Catholic Church in particular, <u>see</u> Patrick J. Dignan, <u>A History of the Legal Incorporation of Catholic Church Property in the United States</u> (1933); James B. O'Hara, <u>The Modern Corporation Sole</u>, 93 Dick. L. Rev. 23 (1988); Carl Zollmann, <u>Classes of American Religious Corporations</u>, 13 Mich. L. Rev. 566 (1914); Carl Zollmann, <u>Powers of American Religious Organizations</u>, 13 Mich. L. Rev. 646 (1914); Carl Zollmann, <u>Nature of American Religious Corporations</u>, 14 Mich. L. Rev. 37 (1915).

Page 19 - MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED MOTION FOR PARTIAL SUMMARY JUDGMENT)

protecting the property interests of the church was concerned.[15]  This

indicates an understanding that canon law alone did not protect those

property rights, whatever they might be, in the secular world in which

the church operates.

As I have already said, I accept the fact that the Archbishop, in

---

[15]  One commentator on the Code of Canon Law explains that problems arise

> when the civil-law structure of a diocese does not mirror, or is
> otherwise incompatible with, the canonical structure, resulting in
> divergent views of the ownership of church-related property and of
> the appropriate persons to administer and alienate such property.  A
> prime illustration exists in those dioceses in the United States
> where the diocese is civilly structured as a corporation sole.  In
> such a diocese all, or nearly all, church-related assets are civilly
> owned by a single corporation whose sole member is the diocesan
> bishop.  While such a structure is considered desirable by some
> because of the high degree of centralized control it affords, and
> because of its capacity to offer ample collateral as security for
> large construction and other loans, the corporation sole is viewed
> by others as highly undesirable from the viewpoint of liability,
> exposing as it does all parochial and other church-related assets
> within a diocese to satisfy creditors' claims against any individual
> parish or institution, and because centralized ownership and control
> of all church property within a diocese is contrary to the law of
> the Church.

Robert T. Kennedy, New Commentary on the Code of Canon Law 1457 (John P.
Beal, et al., 2000).  The same commentator notes that, in nations such as
the United States,

> it is necessary . . . to seek civil-law recognition, with
> accompanying civil-law capacity for the ownership of temporal goods,
> through incorporation or some other civil-law structuring of
> ecclesiastical entities such as dioceses and parishes and of other
> church-related institutions . . . . Once civil-law status has been
> acquired, the entity then has two sovereigns, canonical and civil,
> and is subject to the provisions of two legal systems.

Id. at 1456.

Page 20 - MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED
        MOTION FOR PARTIAL SUMMARY JUDGMENT)

discharging his duties as a corporation sole and as an Archbishop, is bound to apply and follow canon law in the governance of the Archdiocese. That does not mean that this court is also required to apply and be bound by that internal church doctrine in deciding the purely secular matter of property interests under the Bankruptcy Code and state law.

Oregon corporation sole law allows corporations sole to operate in accordance with church law. Thus, it allows the corporation to structure its organization under the civil law in a way that recognizes and effectuates canon law. It does not, however, require that civil courts rely on canon law to determine rights in property held by the corporation sole. In other words, although a corporation sole is authorized by state law to organize its affairs pursuant to canon law, it is the corporation's organization and structure as implemented under civil law that governs the corporation's relationship with the secular world.

I conclude that Oregon's corporation sole statutes do not require application of canon law in determining interests in church property under state law.

C.  Debtor's articles of incorporation

Debtor argues that its own articles of incorporation "import canon law into the corporation's governance law," Debtor's Brief in Response to Tort Claimants Committee's Restated Second Motion for Partial Summary Judgment at 13, and therefore canon law must be applied to the property dispute in this case.

Debtor relies on references to canon law in the 1874 articles of incorporation, including those that provide that the incorporator,

Page 21 - MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED MOTION FOR PARTIAL SUMMARY JUDGMENT)

Archbishop Blanchet, was "duly appointed . . . in conformity with the Constitution, canons, rules, usages and regulations of [the] Church," that Archbishop Blanchet and his "successors in office [who have been] duly appointed, authorized and empowered as such, according to the canons usages and regulations of the Church . . . shall become a body corporate and a corporation sole," and that "the object and purpose of this corporation is to provide for and maintain the worship of Almighty God, and the preaching of the Gospel of our Lord Jesus Christ, according to the doctrine, canons, rules and usages of the Roman Catholic Church[.]" Articles of Incorporation of the Roman Catholic Archbishop of the Diocese of Oregon (Declaration of Thomas W. Stilley, Exh. 1 at 3-4).[16]

---

[16] Specifically, debtor points to seven references to canon law in the articles of incorporation and the supplementary articles of incorporation. The original articles provide the following five references to canon law:

> [T]hat I, Francis Norbert Blanchet, Archbishop of the Roman Catholic Church for the Diocese of Oregon, . . . and being the duly appointed Archbishop of said Church for said Diocese, in conformity with the Constitution canons, rules, usages and regulations of said Church, and authorized to act for it, . . . do hereby make and subscribe these Articles of Incorporation . . . .

> [T]hat I as Archbishop aforesaid, together with my successors in office or position, duly appointed, authorized and empowered as such, according to the canons usages and regulations of the Church aforesaid, shall become a body corporate and a corporation sole . . . .

> That the object and purpose of this corporation is to provide for and maintain the worship of Almighty God, and the preaching of the Gospel of our Lord Jesus Christ, according to the doctrine, canons, rules and usages of the Roman Catholic Church; . . . .

(continued...)

Page 22 - MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED
         MOTION FOR PARTIAL SUMMARY JUDGMENT)

Those references indicate that the Archbishop holds office, and his successors will hold office, in accordance with canon law. They allow for operation of the corporation sole according to the doctrines and

> [16](...continued)
> 4th. That the title of the undersigned, corporator, making these articles, is "Archbishop of the Diocese of Oregon" and the undersigned as such Archbishop, and his successor or successors, will hold said office or position, in said Diocese, under the canons, rules and usages of the Roman Catholic Church . . . .
>
> [W]henever said office or position shall become vacant . . . , his successor shall and will be chosen and appointed, under and in accordance with the canons, rules and regulations of said church . . . .

Transcript of September 23, 1874 Articles of Incorporation, attached as Exhibit 1 to the Declaration of Thomas Stilley, filed September 19, 2005.

The supplementary articles of incorporation, filed on December 6, 1939, which transfer the seat of the Archdiocese from Oregon City to Portland, are subscribed and sworn by the Chancellor of the Archdiocese of Portland. The Chancellor's sworn statement refers to Archbishop Howard as "duly appointed, authorized and empowered as such successor according to the canons, usages and regulations of the Roman Catholic Church." Supplementary Articles of Incorporation, filed December 6, 1939, attached as Exhibit 1 pp. 7-11 of the Declaration of Timothy Conway filed May 11, 2005.

Finally, the 1940 supplementary articles of incorporation provide that Archbishop Howard

> and his successor or successors, will hold said office or position, in said Archdiocese under the canons, rules and usages of the Roman Catholic Church until death, resignation or deposition, and whenever said office or position shall become vacant by either the death, resignation or deposition of the incumbent, his successor shall and will be chosen or appointed under and in accordance with the canons, rules and regulations of said Church . . . .

Supplementary Articles of Incorporation, filed January 12, 1940, attached as Exhibit 1 pp. 12-18 of the Declaration of Timothy Conway filed May 11, 2005.

Page 23 - MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED MOTION FOR PARTIAL SUMMARY JUDGMENT)

canons of the Roman Catholic Church.  They do not give notice to third
parties that canon law will govern the creation of property interests.
The articles of incorporation provide that one of the purposes of the
corporation is "for acquiring, holding and disposing of church property
for the benefit of the Roman Catholic Church[.]"  Id. at 4.  Nothing in
this statement of purpose requires application of canon law to the
acquisition, holding, and disposition of church property.

I conclude that debtor's articles of incorporation allow the
corporation sole to be operated according to canon and other internal
church law.  They do not, however, provide that canon law governs
property ownership in the secular world.

D.  Religious Freedom Restoration Act

The Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb
- 2000bb-4, prohibits the government from imposing a substantial burden
on a person's exercise of religion, absent a compelling state interest.[17]

---

[17]    Section 2000bb-1 provides:

(a)  **In general**

Government shall not substantially burden a person's exercise
of religion even if the burden results from a rule of general
applicability, except as provided in subsection (b) of this section.

(b)  **Exception**

Government may substantially burden a person's exercise of
religion only if it demonstrates that application of the burden to
the person--

(1) is in furtherance of a compelling governmental interest;
and

(continued...)

Page 24 - MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED
        MOTION FOR PARTIAL SUMMARY JUDGMENT)

Defendants raise two different RFRA arguments in defense to the TCC's claims. First, they argue that RFRA requires the court to rule under § 541 of the Bankruptcy Code that the assets of the parishes are separate from the assets of debtor because, under canon law, parish property is owned by the parish. Second, they argue that use of the bankruptcy trustee's powers as a bona fide purchaser of real property under § 544(a)(3) to avoid any unrecorded interests in parish and school real property would substantially burden the exercise of religion by those who have contributed to the acquisition and maintenance of parish and school property and who worship and are educated there. Although these arguments are made and supported somewhat differently in defendants' responses to both of the TCC's motions for summary judgment that are currently before the court, I will address both arguments in this opinion, because the Second Restated Motion for Partial Summary Judgment seeks dismissal of the RFRA defenses.

RFRA "essentially requires the government to justify any regulation imposing a substantial burden on the free exercise of religion by showing that the regulation satisfies strict scrutiny." <u>Goehring v. Brophy</u>, 94 F.3d 1294, 1298 n.4 (9th Cir. 1996)(quoted with approval in <u>Worldwide

---

[17](...continued)
    (2) is the least restrictive means of furthering that compelling governmental interest.

(c) **Judicial relief**

    A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. . . .

Page 25 - MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED
       MOTION FOR PARTIAL SUMMARY JUDGMENT)

Church of God v. Philadelphia Church of God, Inc., 227 F.3d 1110, 1120 (9th Cir. 2000)).  RFRA puts the burden on the person invoking it to show that the neutral law being applied will substantially burden the free exercise of religion.  See 42 U.S.C. § 2000bb-1(a).

Different courts have articulated the substantial burden test differently.  Under the Ninth Circuit's interpretation of RFRA, which is the standard that I must apply,

> the religious adherent, . . . has the obligation to prove that a governmental regulatory mechanism burdens the adherent's practice of his or her religion by pressuring him or her to commit an act forbidden by the religion or by preventing him or her from engaging in conduct or having a religious experience which the faith mandates.  This interference must be more than an inconvenience; *the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine.*

Goehring, 94 F.3d at 1299 (citation omitted; alteration and emphasis in the original)(quoted with approval in Worldwide Church of God v. Philadelphia Church of God, Inc., 227 F.3d 1110, 1121 (9th Cir. 2000)). Substantial burden "must be more than an inconvenience."  Bryant v. Gomez, 46 F.3d 948, 949 (9th Cir. 1995)(quoted with approval in Worldwide Church of God, 227 F.3d at 1121).

Defendants argue that, in determining what is property of the bankruptcy estate under § 541, the court's failure to recognize the separation of Archdiocesan assets from assets of the parishes, as is required by canon law,[18] would be a substantial burden on religious exercise.  The TCC responds that enforcing bankruptcy and state law in

---

[18]    There does not seem to be any dispute that, under canon law, parish churches and associated properties are "owned" by the parishes.

this case to determine what property is part of the bankruptcy estate would not substantially burden the exercise of religion.[19]

I question whether RFRA applies at all to a determination of what is property of the bankruptcy estate under § 541. Section 541 merely defines what property is included in a bankruptcy estate; issues such as ownership of property are determined by application of state law. See Butner v. United States, 440 U.S. 48, 55 (1979). It is not clear to me how RFRA applies to determination of a status, that is, ownership of property, that is a result of application of state law.[20] The TCC does not, however, argue that RFRA is inapplicable to church property

---

[19] The TCC does not argue that RFRA is unconstitutional as applied to federal law, recognizing that the Ninth Circuit has rejected that argument. See Guam v. Guerrero, 290 F.3d 1210 (9th Cir. 2002)(although the Supreme Court declared RFRA unconstitutional as applied to the states, it is not unconstitutional as applied to the federal government).

[20] There is another problem with application of RFRA in the context of a church property dispute. The purpose of RFRA was to restore the compelling state interest test for laws that produce a substantial burden on a person's exercise of religion, a test the Supreme Court had abandoned as a matter of constitutional law in Employment Div. v. Smith, 494 U.S. 872 (1990). The compelling state interest test had required application of strict scrutiny to application of any religiously neutral law that had the effect of burdening the exercise of religion. See, e.g., Wisconsin v. Yoder, 406 U.S. 205 (1972); Sherbert v. Verner, 374 U.S. 398 (1963).

Before the Court decided Employment Div. v. Smith, however, the Supreme Court had not applied the strict scrutiny analysis to disputes involving church property. Instead, it had held that courts had a choice to follow either a policy of deference to the highest authority of a hierarchical religious organization, if that authority had spoken on the question, or to apply neutral principles of secular law in order to resolve the dispute. There is no indication that RFRA was intended to change that approach to the analysis of disputes over ownership of church property.

Page 27 - MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED
          MOTION FOR PARTIAL SUMMARY JUDGMENT)

ownership disputes, so for purposes of this motion I will assume that RFRA has potential application.

Even applying RFRA to the question of who owns the church property, I agree with the TCC that defendants have not shown that applying § 541(a) of the Bankruptcy Code would substantially burden their exercise of religion. Section 541(a) makes all interests in property of a debtor as of the commencement of the case property of the bankruptcy estate. Property interests are determined by state law, to which RFRA does not apply. To the extent the Bankruptcy Code requires debtors, including religious institutions, to follow state law in establishing and protecting property rights, debtor does not explain how that requirement of bankruptcy law substantially burdens the free exercise of religion. A determination under § 541 is simply a determination of status, that is, who owns property. It is hard to understand how the court's determination of what constitutes property of the bankruptcy estate under § 541 could impose a substantial burden on the exercise of religion.

Further, it is not clear that § 541 is inconsistent with canon law. Section 541(d) carves out of the bankruptcy estate "[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest[.]" Thus, if defendants can show that, under state law, the disputed properties are held by the Archdiocese in trust for the parishes and schools, § 541 would recognize that trust relationship, subject to the avoidance provisions of § 544(a)(3).

Debtor argues that "it is astounding that the TCC contends that there would be no 'substantial burden on religious exercise' were this

Court to combine the assets of 124 parishes into the Debtor's estate, contrary to the very Canon Law governing both." Debtor's Brief in Response to Tort Claimants Committee's Restated Second Motion for Partial Summary Judgment at 46-47. It then cites cases in which courts have held that applying § 548 of the Bankruptcy Code to avoid the transfer of tithes given by individual debtors to churches in the year prior to the filing of a bankruptcy petition would be a substantial burden on the debtors' exercise of religion.

The problem with this argument is that debtor does not point to anything in the Code of Canon Law that requires it to hold title to the property as it does, or to anything in state or federal law that prohibits it from effectuating its view of property ownership by complying with neutral secular laws. The secular law provides debtor with the ability to use neutral civil law to create and protect its property interests consistent with the tenets of the church. For example, state law would allow the parishes and schools to be separately incorporated as nonprofit corporations, thereby empowering them to hold title to real property; neither debtor nor the other defendants have pointed out anything in canon law that would preclude such separate incorporation. In the alternative, a religious organization such as debtor could show on the title to real property that it holds the property in trust for some other legal entity or person.

If a religious organization's manner of holding property fails under neutral civil law to protect its internal view of property ownership, but such internal view could have been accommodated by civil law, the burden

on the exercise of religion is caused not by the neutral law but by the religious organization's own choice.[21] That is the situation in this case and is unlike tithing, to which defendants analogize. There was nothing the individual believer who tithed could do to protect his or her religiously motivated giving from avoidance in bankruptcy (before the Bankruptcy Code was changed to protect such voluntary transfers, see § 548(a)(2)).

Defendants argue that applying neutral laws to disregard the separateness of parishes from the archdiocese would substitute one church administrator (the Archbishop) for another (the parish priest), in violation of canon law that gives the parish priest certain authority over parish property. They also argue that disregarding the parishes as ecclesiastical entities would rewrite church polity and governance and eviscerate the authority of the parish priests.

The court's obligation is to apply neutral principles of law to determine property of the estate. As long as neutral civil law does not preclude the church from holding property in a way that recognizes internal church law concepts of property ownership, holding a church organization to the consequences of the choices it has made about how to organize its affairs with relation to the secular world, including its

---

[21]    In fact, one parish in the Portland Archdiocese, the St. Elizabeth Parish of Portland, Oregon, is incorporated as a religious corporation. Declaration of Timothy J. Conway in Support of Tort Claimants Committee's Second Motion for Partial Summary Judgment, Exh. 22. There is also evidence that other parishes in the Portland Archdiocese were separately incorporated but have been dissolved, and that parishes in other dioceses are separately incorporated under state nonprofit corporation laws.

Page 30 - MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED
          MOTION FOR PARTIAL SUMMARY JUDGMENT)

choice of how to hold title to property, does not substantially burden the exercise of religion. What defendants ask this court to do in the name of religious freedom is to disregard the choice debtor has made about how to hold property under civil law, because of their argument that the choice leads to a result not consistent with canon law. It is not for the civil courts to enforce canon law if the actions of the religious organization under applicable civil law do not effectuate what canon law requires.

I conclude that applying neutral secular principles of law to determining rights in property for purposes of this bankruptcy case would not violate RFRA.

The Parish Committee argues that applying § 544(a)(3)[22] to avoid any unrecorded interests in the parish and school real property would violate RFRA, because they made religiously motivated contributions to their parishes, not to the Archdiocese, and taking the fruits of their contributions to pay the claims of the Archdiocese would substantially burden the exercise of their religion. I am not persuaded. Because, as I explain below, the parishes are merely parts of the Archdiocese, the contributions made to the parishes were in effect made to the Archdiocese. Using the fruits of the contributions to pay claims against the Archdiocese does not impose a substantial burden.

---

[22] Section 544(a)(3) gives to a bankruptcy trustee the powers of a hypothetical bona fide purchaser of real property of the debtor as of the commencement of the case, and allows the trustee to avoid any interests in property that could be avoided by that hypothetical bona fide purchaser.

1   Defendants also argue that applying § 544(a)(3) would violate RFRA,

2   because they need parish churches in which to worship and to engage in

3   the sacraments that mark religious occasions in their lives, such as

4   baptisms, marriages, and funerals.  The TCC argues that the loss of some

5   of the parish churches would not substantially burden defendants'

6   exercise of religion, because there is no constitutional right to worship

7   in any particular building, and the parishioners could attend alternate

8   parishes if their particular parish church were sold.  According to the

9   TCC, the need to attend an alternate parish might be an inconvenience,

10  but it does not prevent the parishioners from having the religious

11  experience that the faith mandates.

12      Unlike § 541(a), which simply effectuates the choices debtor has

13  made under state law about how to hold title to property, § 544(a)(3) is

14  a federal law that has the potential to alter the property rights of the

15  debtor and a third party in property titled in debtor's name on the date

16  of bankruptcy.  It gives to the bankruptcy trustee (or someone authorized

17  to exercise the powers of the trustee) the ability to avoid certain

18  interests in real property that would not be avoidable under state law if

19  there were no actual bona fide purchaser of real property.

20      RFRA would prevent avoidance of the asserted beneficial interests of

21  parishioners and those who have donated and sent children to the

22  Archdiocesan high schools only if that avoidance would substantially

23  burden the exercise of religion.  I conclude that there is a question of

24  fact as to whether avoidance of any such interests would substantially

25  burden the exercise of religion.

26

Page 32 - MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED
          MOTION FOR PARTIAL SUMMARY JUDGMENT)

1   The result of a successful § 544(a)(3) claim in this case could mean
2   that the asserted interests of parishioners and other donors would be
3   avoided on all or substantially all of the parish and school real
4   properties, on which the parish churches and Archdiocesan high schools
5   are located.  Once those interests are avoided, the property could be
6   used to meet the claims of creditors, free of any interests of the
7   parishioners and other donors.  In order to use the properties to meet
8   the claims of creditors, the properties could be sold, which would make
9   those churches and schools unavailable to the parishioners and school
10  children to use for worship and education.

11      The First Amendment expert for the TCC acknowledged at oral argument
12  on this motion for summary judgment that § 544(a)(3) could impose a
13  substantial burden if the ultimate result were the use of all of the real
14  property titled in debtor's name to satisfy the claims of debtor's
15  creditors, thereby making those properties unavailable for worship and
16  other church purposes.  The TCC's expert argued that, if less than 99
17  percent of the churches were taken to satisfy claims of creditors, the
18  burden would be merely incidental, not substantial.

19      The possibility that the result of the TCC's § 544(a)(3) claim could
20  be the loss of all parish church and Archdiocesan school properties
21  titled in debtor's name raises a question of fact regarding whether
22  application of § 544(a)(3) would impose a substantial burden on the
23  parishioners' exercise of religion.  Without knowing the amount of the
24  claims or the value of the real property, or what alternatives
25  parishioners and school children would have for worship and religious

26

Page 33 - MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED
         MOTION FOR PARTIAL SUMMARY JUDGMENT)

education, I cannot tell whether application of § 544(a)(3) would create a substantial burden on the exercise of religion. The burden might not be substantial, depending on the number of properties that must be sold to pay claims of creditors and whether there are alternative locations for worship and religious education. But if application of the statute leaves the parishioners and school children with no place to worship and study, because no facilities are available, and if they establish that worship and study are central to religious doctrine, the burden could be substantial.

This is summary judgment, and the evidence does not give the answers to those questions.

If defendants can show a substantial burden, then the question is whether the government has a compelling interest in application of § 544(a)(3). The TCC argues that the government has a compelling interest in the uniform and predictable enforcement of the Bankruptcy Code and in maintaining an equitable system for protecting creditors and providing debtors with a fresh start.

Although I do not doubt the importance of the uniform application of the Bankruptcy Code and implementation of the policies of bankruptcy law, I agree with the Eighth Circuit's view articulated in the first <u>Young</u> case that "the interests advanced by the bankruptcy system are not compelling under the RFRA." <u>In re Young</u>, 82 F.3d 1407, 1420 (8th Cir. 1996). The purpose of § 544(a)(3) is to maximize the bankruptcy estate and thereby maximize the recovery for creditors. But the Bankruptcy Code itself contains various provisions that limit the breadth of the estate,

including, for example, § 541(d), which excludes from the bankruptcy estate property in which a debtor holds only legal but not equitable title.   There are also exceptions in the Bankruptcy Code to the policy of providing a debtor with a fresh start, such as the exceptions to discharge set out in § 523(a).   Thus, the Bankruptcy Code itself provides for exceptions that do not further the policies of the Code.   In light of those exceptions, I conclude that there is no compelling governmental interest in applying § 544(a)(3), if doing so would impose a substantial burden on the exercise of religion.

If, after a trial, defendants show that application of § 544(a)(3) would impose a substantial burden on the exercise of religion, the question would become what remedy would be appropriate.   RFRA provides that "[a] person whose religious exercise has been burdened in violation of [RFRA] may . . . obtain <u>appropriate relief</u> against a government."   42 U.S.C. § 2000bb-1(c) (emphasis supplied).   There are many forms that relief might take.   One possibility might be to limit the number of properties subject to the avoidance powers of § 544(a)(3), if it is shown that the loss of some but not all of the churches and schools would be inconvenient but not substantially burdensome.   What relief would be appropriate is a question left for another day.

There is a question of fact as to whether application of § 544(a)(3) would impose a substantial burden on defendants.   Therefore, I will deny summary judgment on defendants' religious freedom defenses, to the extent they assert violations of RFRA by application of § 544(a)(3).

E.   <u>Conclusion</u>

1     I conclude that none of the authorities cited by defendants, the

2     constitution, RFRA, the corporation sole statute, nor debtor's articles

3     of incorporation, require that canon law be considered in applying

4     neutral principles of law to determine the question of ownership of

5     property by this bankruptcy estate.  There is a question of fact as to

6     whether applying § 544(a)(3) to avoid unrecorded interests in real

7     property would be a substantial burden on the exercise of religion.

8     Therefore, the TCC is entitled to summary judgment on the religious

9     freedom affirmative defenses, except the RFRA defense to the § 544(a)(3)

10    claim.

11    3.    <u>Are the parishes separate entities from debtor?</u>

12    The TCC seeks a ruling that the "parishes and schools have no legal

13    existence separate from or independent of Debtor and do not have the

14    capacity to sue or be sued."  TCC's Restated Second Motion for Partial

15    Summary Judgment at 2.  Debtor seeks a ruling that "[t]he Parishes and

16    the Debtor are separate entities."  Debtor's Cross Motion for Partial

17    Summary Judgment at 3.

18    Whether the parishes and Archdiocesan high schools have separate

19    legal existence is relevant.  If they are merely part of the corporate

20    debtor, then, as I discuss below, they are not entities that can hold

21    title to real property or be beneficiaries of trusts.  If they are not

22    separate enough from debtor to sue and be sued, then they cannot assert

23    claims against debtor.  Therefore, I will consider the parties' arguments

24    on this issue.

25    I first note that debtor does not argue that the Archdiocesan high

26

schools are separate entities from debtor; it merely argues that the parishes are separate.  The parties appearing on behalf of the Archdiocesan high schools (Marist, Central Catholic, and Regis High Schools) do not argue that they are separate entities from debtor, but instead argue that whether or not they are separate is irrelevant to the question of whether the school property is held in charitable trust.  Because there does not appear to be a dispute that the three Archdiocesan high schools have no separate legal existence, the TCC is entitled to summary judgment that Marist, Central Catholic, and Regis High Schools are not civil entities separate from debtor.[23]

I turn now to the parishes.[24]  Debtor argues that, under canon law, currently codified in The Code of Canon Law (1983), each parish and diocese is a separate entity known as a "public juridic person," and that each public juridic person owns its respective temporal goods.  See, e.g., Code of Canon Law c. 116 § 1; c. 373; c. 515 § 1; c. 1256.  It also argues, and provides evidence to support its argument, that the parishes operate in many ways independently of the archdiocese.  From those propositions, it asserts that this court must recognize the parishes as separate legal entities from debtor, each of which may own its own

---

[23]  As I explained above, I do not address at this juncture the argument of the representatives of the schools and debtor that the parishes and school properties are held in charitable trust.  That question goes beyond what is at issue in this summary judgment proceeding.

[24]  This discussion does not apply to St. Elizabeth Parish, which is separately incorporated.  The TCC does not dispute that St. Elizabeth Parish is a legal entity separate from debtor.

Page 37 - MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED
         MOTION FOR PARTIAL SUMMARY JUDGMENT)

property.

As I said in the earlier discussion, in this dispute, canon law is not applicable to the question of whether the parishes have separate civil law existence. Even assuming that the parishes operate independently of debtor (and there is a question about how much independence they really have), independent operation does not make them separately recognizable legal entities.

Even debtor's own canon law expert acknowledges that being a separate juridic person under canon law does not give that juridic person a civil law identity. In his book Church Property, Church Finances, and Church-Related Corporations, Nicholas Cafardi explained that

> [t]he public juridic person, as such, has no civil law equivalent and no civil law identity. Its only existence is juridical in the canon law. It is a religious concept and not a civil one.

Adam J. Maida and Nicholas P. Cafardi, Church Property, Church Finances, and Church-Related Corporations 131 (1984). Thus, although canon law gives parishes separate canonical existence, it does not give them separate civil law existence.

Under Oregon law, religious corporations including corporations sole are authorized to sue and be sued, and to hold and dispose of property. ORS 65.074. Debtor does not cite any state law that would authorize unincorporated parishes to sue and be sued or to hold and dispose of real property.[25] In fact, unincorporated religious associations are not legal

---

[25] Debtor points to its list of lawsuits pending at the time of bankruptcy, filed in response to a question on the Statement of Financial Affairs, which it says shows that parishes have in fact been sued.
(continued...)

Page 38 - MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED MOTION FOR PARTIAL SUMMARY JUDGMENT)

persons that may take title to real property in their names.  See, e.g.,
State v. Sunbeam Rebekah Lodge No. 180 of Hermiston, 169 Or. 253, 266
(1942); Liggett v. Ladd, 17 Or. 89 (1888).  Because the parishes are not
separately incorporated, as they could be under Oregon religious
corporations law, they cannot hold title to real property.  They are not
separate from, but are merely a part of debtor.  Accord F.E.L.
Publications, Ltd. v. Catholic Bishop of Chicago, 754 F.2d 216, 221 (7th
Cir. 1985)(Catholic parishes not separate and independent entities from
Catholic Bishop, so Bishop could not be liable for interfering with
business relationship of parishes and third party); E.E.O.C. v. St.
Francis Xavier Parochial School, 77 F. Supp. 2d 71 (D.D.C. 1999), aff'd,
254 F.3d 315 (D.C. Cir. 2000)(table)(parish was unincorporated division
of archdiocese, which was a corporation sole, and therefore could not be

---

[25](...continued)
Declaration of Thomas W. Stilley, Exh. 5.  According to debtor's list, in
many of those cases, the parish was sued as an assumed business name of
debtor.  In none was the parish or school sued independently of debtor.
Further, nothing in the exhibit shows the outcome of the lawsuit against
the parish or school; it is entirely possible that the parish or school
could successfully defend by claiming that it was not an entity that had
the capacity to be sued.  I am not persuaded that the fact that a
plaintiff names an entity in a lawsuit provides evidence that the entity
has the capacity to be sued.

    Debtor also notes that four parish schools (Blanchet Catholic
School, St. Joseph School, Queen of Peace School, and St. Vincent de Paul
School) are registered with the Oregon Secretary of State as authorized
representatives of the Oregon Wine and Food Festival.  The assumed
business name on record with the state is the Oregon Wine and Food
Festival, not the schools themselves, which are merely authorized
representatives of the festival.  That evidence does not create a
question of fact as to whether the schools themselves are separate legal
entities authorized to hold title to real property under Oregon law.

Page 39 - MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED
         MOTION FOR PARTIAL SUMMARY JUDGMENT)

sued).

This result is consistent with the position that debtor has taken in other legal proceedings. For example, in its answer to a complaint filed in state court, debtor admitted that "the Church of St. Michael The Archangel is a parish of the Archdiocese under the Canon Law of the Roman Catholic Church, . . . but that the parish is not a separate secular legal entity." Declaration of Michael Fletcher filed October 26, 2005, Exhibit 12 at p. 1. The Archdiocese has also taken the position that schools run by the parishes are part of and not separate from the Archdiocese. See Declaration of Timothy Conway filed May 11, 2005, Exhibits 6 and 7. Although I do not rely on those positions to reach my conclusion, they do show that debtor has considered the issue in the past and has reached the same conclusion as I do today.

Debtor argues that, even if the parishes are not legal entities that can hold title to real property, they have sufficient legal existence to allow them to be beneficiaries of a trust. They point to the recognition of churches as separate entities in various statutory schemes. Specifically, they point to the Internal Revenue Code, which provides an exemption from taxation for "any community chest, fund, or foundation, organized and operated exclusively for religious, [or] charitable . . . purposes," 26 U.S.C. § 501(c)(3); the Bankruptcy Code, which excludes charitable contributions "to a qualified religious or charitable entity" from fraudulent transfer avoidance, 11 U.S.C. § 548(a)(2); and Oregon's Charitable Trust and Corporation Act, which defines "religious organization" as "any organized church or group organized for the purpose

of divine worship, religious teaching, or other directly ancillary purposes." ORS 128.620(4).[26]

Those statutes do not provide support for concluding that parishes are sufficiently separate from debtor to be the beneficiaries of trusts. If anything, they show that, if an unincorporated religious organization is to have legal status for some purpose, a statute must expressly provide for such status.

"A person who has the capacity to take and hold legal title to property has the capacity to be the beneficiary of a trust of such property." 76 Am. Jur. 2d Trusts § 240 (2005). Thus, natural persons have the capacity to be beneficiaries of trusts, as do corporations. 2 Mark L. Ascher, et al., Scott on Trusts § 116 (4th ed. 2001). Unincorporated associations also may be beneficiaries of a trust. Restatement (Second) of Trusts § 119 (1959); Good Samaritan Hosp. and Med. Ctr. v. U.S. Nat'l Bank, 246 Or. 478 (1967).

There is no authority to which the parties direct me or of which I am aware, however, that would allow a division of a corporation or a unit or part of a legal entity to be a beneficiary of a trust. It is one

---

[26]    The definition of "religious organization" in the Charitable Trust and Corporation Act does not assist debtor. The Act exempts religious organizations from many of its provisions. ORS 128.640(2). Those provisions that do apply to such organizations relate primarily to the authority of the attorney general to investigate and enforce the provisions of the Act. ORS 128.680 - 128.710; 128.720 - 128.750. Nothing in the Charitable Trust and Corporation Act even hints at providing authority for an unincorporated religious organization to hold property in its own right or to sue or be sued, other than by the attorney general in his or her regulatory capacity. See ORS 128.680 - 128.710.

Page 41 - MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED
           MOTION FOR PARTIAL SUMMARY JUDGMENT)

thing to hold that an independent unincorporated association has the capacity to be the beneficiary of a trust. It is quite another to hold that a corporation can hold property in trust for a unit or part of itself.

Debtor has chosen to organize its operations under a corporation sole. It chose to separately incorporate (or allow the separate incorporation of) St. Elizabeth Parish; it could also have chosen to incorporate the other parishes as religious corporations, by which they would gain a civil legal status and could exercise the powers granted to such corporations, including the power to hold and dispose of property and to sue and be sued. Debtor did not, however, choose to do that, and gives no reason why it could not, under state law, have separately incorporated the parishes or in some other way organized itself to protect the canonical ownership rights, if any, of the schools and parishes. The existence of St. Elizabeth Parish is evidence that such incorporation is possible and acceptable.[27]

The TCC is entitled to summary judgment that the parishes and schools are not separate legal entities with the capacity to sue or be sued. Debtor's cross-motion for summary judgment will be denied.

## V. CONCLUSION

There is no First Amendment impediment to this court's jurisdiction to determine whether property in which title is held by debtor belongs to

---

[27] Debtor proposes in its plan of reorganization that it have the right to alter the organization and structure of debtor, including possibly incorporating each of the parishes and schools. Debtor's Chapter 11 Plan of Reorganization, filed November 15, 2005, at ¶ 8.8.

Page 42 – MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED
        MOTION FOR PARTIAL SUMMARY JUDGMENT)

1  the bankruptcy estate or to others.  The requirements of protection of

2  religious freedom, including RFRA, do not prohibit this court from

3  deciding this issue.  No federal constitutional or statutory law, nor

4  state statute, nor debtor's articles of incorporation require application

5  of the Code of Canon Law to the determination of whether the disputed

6  property is property of the bankruptcy estate.  Under civil law, the

7  parishes and high schools are not separate civil legal entities that have

8  the capacity to sue and be sued or to be beneficiaries of trusts.

9       There is a question of fact whether RFRA would preclude avoidance of

10  all unrecorded interests in real property titled in debtor's name.

11  Therefore, the TCC are not entitled to summary judgment on the RFRA

12  defense to the § 544(a)(3) claim.

13       The TCC's restated second motion for partial summary judgment will

14  be granted, except that it will be denied with regard to the RFRA defense

15  to the § 544(a)(3) claim.  Debtor's cross-motion for partial summary

16  judgment will be denied.  Mr. Kennedy should submit the order.

17                                   ###

18

19  cc:  Howard M. Levine
        Albert N. Kennedy
20       Brad T. Summers
        Steven M. Hedberg
21       Brad S. Copeland
        Phoebe Joan O'Neill
22       James Ray Streinz
        David Foraker

23

24

25

26

Page 43 - MEMORANDUM OPINION (TORT CLAIMANTS COMMITTEE'S SECOND RESTATED
          MOTION FOR PARTIAL SUMMARY JUDGMENT)